BRETT A. SHUMATE
Assistant Attorney General
ANDREW I. WARDEN
Assistant Director, Federal Programs Branch
SAMUEL S. HOLT
KATHLEEN C. JACOBS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Telephone: (202) 674-9761
Samuel.Holt2@usdoj.gov
Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| REACH COMMUNITY DEVELOPMENT, *et al.*, <br><br>         *Plaintiffs*, <br><br>     v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br>         *Defendants*. | Case No. 3:25-cv-2257 |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

I.    Congress Has Conferred Authority on DHS to Enforce Federal Immigration Laws and Protect Federal Property .......................................................................... 2

II.    Crowd Control Devices .............................................................................. 3

III.    Threats and Violence Against Federal Personnel and Property at the Portland ICE Facility. ...................................................................................................... 5

IV.    Procedural History ..................................................................................... 9

LEGAL STANDARD ....................................................................................... 10

ARGUMENT .................................................................................................... 10

I.    Plaintiffs lack standing to seek prospective relief based on alleged harm sporadically occurring months ago. ........................................................... 10

II.    Plaintiffs will not suffer irreparable harm absent preliminary relief, as shown by their months-long delay in filing suit and their subsequent weeks-long delay in seeking preliminary relief after filing suit. ............................................... 13

III.    Plaintiffs are not likely to succeed on the merits of their novel substantive due process and Fourth Amendment theories. ................................................... 15

        A.    Plaintiffs are not likely to succeed in their substantive due process theory because Plaintiffs fail to establish a deprivation of a liberty or property right that shocks the conscience. ............................................ 15

               1.    Plaintiffs do not have a constitutionally protected liberty or property interest at stake. ...................................................... 15

               2.    There is no due process deprivation from incidental harm resulting from DHS's lawful government action. ................................... 24

               3.    Dispersing crowds that are violent, obstructive, or trespassing is not conscience-shocking behavior. ............................................ 26

        B.    Plaintiffs are unlikely to prevail on their Fourth Amendment claim because Plaintiffs have not been seized and law enforcement have acted reasonably. ............................................................................... 30

IV.    The balance of the equities and public interest weigh against an injunction. ................... 32

V.      Scope of Relief...................................................................................................... 34

VI.     An evidentiary hearing is not needed to decide this preliminary injunction motion. ....... 34

VII.    The Court should require a bond and stay any injunction ................................... 35

CONCLUSION............................................................................................................ 35

# TABLE OF AUTHORITIES

**CASES**

*145 Fisk, LLC v. Nicklas*,
  986 F.3d 759 (7th Cir. 2021) ................................................................ 23

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................................... 2

*BAM Hist. Dist. Ass'n v. Koch*,
  723 F.2d 233 (2d Cir. 1983) ................................................................ 21

*Bell v. Keating*,
  697 F.3d 445 (7th Cir. 2012) .............................................................. 33

*Breithaupt v. Abram,*
  352 U.S. 432 (1957) ............................................................................. 27

*Byard v. City & Cnty. of S.F.*,
  2017 WL 2298044 (N.D. Cal. May 25, 2017) ................................ 29, 30

*Cameron v. Johnson*,
  390 U.S. 611 (1968) ............................................................................. 26

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ............................................................................. 24

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) .............................................................. 13

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .......................................................................... 10, 11

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................ 10, 12

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) .............................................................. 15, 19, 26, 27

*Collins v. City of Harker Heights*,
  503 U.S. 115 (1992) ............................................................................. 16

*Concerned Citizens of Neb. v. NRC*,
  970 F.2d 421 (8th Cir. 1992) .............................................................. 16

*Coshow v. City of Escondido*,
  132 Cal. App. 4th 687 (2005) ............................................................. 16

*Cruzan v. Dir., Missouri Dep't of Health*,
    497 U.S. 261 (1990) ................................................................................ 15

*Ely v. Velde*,
    451 F.2d 1130 (4th Cir. 1971) ................................................................ 17

*Est. of Soakai v. Abdelaziz*,
    137 F.4th 969 (9th Cir. 2025), *pet. for cert. filed*, No. 25-427 (U.S. Oct. 8, 2025)...... 28, 29, 30

*Felarca v. Birgeneau*,
    891 F.3d 809 (9th Cir. 2018) .................................................................. 26

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975) ................................................................ 13

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) .................................................................. 10

*Gasper v. LA Stadium & Exposition Dist.*,
    418 F. Supp. 716 (E.D. La. 1976), *aff'd*, 577 F.2d 897 (5th Cir. 1978) ............................ 17, 18

*Graham v. Connor*,
    490 U.S. 386 (1989) .................................................................. 30, 31, 32, 34

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................ 24, 33

*Greer v. Spock*,
    424 U.S. 828 (1976) ............................................................................ 33

*Guertin v. Michigan*,
    912 F.3d 907 (6th Cir. 2019) ................................................................ 17, 18

*Hagedorn v. Union Carbide Corp.*,
    363 F. Supp. 1061 (N.D. W. Va. 1973) .................................................. 16, 18

*Hutchins v. District of Columbia*,
    188 F.3d 531 (D.C. Cir. 1999) ................................................................ 20

*In re Agent Orange Prod. Liab. Litig.*,
    475 F. Supp. 928 (E.D.N.Y. 1979) ........................................................ 17

*In re Neagle*,
    135 U.S. 1 (1890) ................................................................................ 3

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*,
    799 F.2d 547 (9th Cir. 1986) ................................................................ 35

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,*
    505 U.S. 672 (1992) ........................................................................................... 33

*Juster Assocs. v. City of Rutland,*
    901 F.2d 266 (2d Cir. 1990) .............................................................................. 23

*Kenneally v. Lungren,*
    967 F.2d 329 (9th Cir. 1992) ........................................................................ 34, 35

*Leyra v. Denno,*
    347 U.S. 556 (1954) ........................................................................................... 19

*Lydo Enters. v. Las Vegas,*
    745 F.2d 1211 (9th Cir. 1984) .......................................................................... 13

*Maryland v. King,*
    567 U.S. 1301 (2012) ......................................................................................... 33

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ........................................................................................... 32

*Mich. Dep't of State Police v. Sitz,*
    496 U.S. 444 (1990) ........................................................................................... 34

*Missouri v. McNeely,*
    569 U.S. 141 (2013) ........................................................................................... 27

*Moreland v. Las Vegas Metro. Police Dep't,*
    159 F.3d 365 (9th Cir. 1998) ............................................................................ 15

*Mortensen v. Cnty. of Sacramento,*
    368 F.3d 1082 (9th Cir. 2004) .......................................................................... 10

*Mylan Pharms., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) ...................................................................... 14

*Ne. Jet Ctr., Ltd. v. Lehigh-Northampton Airport Auth.,*
    No. CIV. A. 90-CV-1262, 1997 WL 230821 (E.D. Pa. May 5, 1997) ................... 23

*Nelsen v. King Cnty.,*
    895 F.2d 1248 (9th Cir. 1990) ...................................................................... 10, 11

*Newsom v. Trump,*
    141 F.4th 1032 (9th Cir. 2025) ......................................................................... 32

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................... 35

*Noem v. Vasquez Perdomo*,
   146 S. Ct. 1 (2025) ............................................................................ 10

*Nunez v. City of San Diego*,
   114 F.3d 935 (9th Cir. 1997) ........................................................... 20

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985) ......................................................... 13

*O'Bannon v. Town Ct. Nursing Ctr.*,
   447 U.S. 773 (1980) ................................................................... 24, 26

*Ochoa v. City of Mesa*,
   26 F.4th  (9th Cir. 2022) .................................................................. 28

*Paul v. Davis*,
   424 U.S. 693 (1976) ........................................................................ 22

*Perdomo v. Noem*,
   148 F.4th 656 (9th Cir. 2025) ......................................................... 11

*Petta v. Rivera*,
   143 F.3d 895 (5th Cir. 1998) ........................................................... 19

*Phantom of E. PA v. N.J. State Police*,
   2008 WL 2039461 (E.D. Pa. May 12, 2008) ................................. 21

*Pinkney v. Ohio EPA*,
   375 F. Supp. 305 (N.D. Ohio 1974) ................................................ 17

*Porter v. Osborn,*
   546 F.3d 1131 (9th Cir. 2008) ......................................................... 28

*Puente v. City of Phx.*,
   123 F.4th 1035 (9th Cir. 2024) ...................................... 25, 27, 28, 31

*Reno v. Flores*,
   507 U.S. 292 (1993) ........................................................................ 16

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ........................................................................ 25

*Rochin v. California*,
   342 U.S. 165 (1952) ........................................................................ 27

*Rosenblum v. Does 1-10*,
   474 F. Supp. 3d 1128 (D. Or. 2020) ......................................... 11, 12

*Saenz v. Roe,*
  526 U.S. 489 (1999)..........................................................................................20

*Sampson v. All Am. Home Assistance Servs., Inc.,*
  No. 13-CV-495-WSD, 2013 WL 12322089 (N.D. Ga. Mar. 7, 2013) ....................................19

*SF Chapter of A. Philip Randolph Inst. v. EPA,*
  2008 WL 859985 (N.D. Cal. Mar. 28, 2008)....................................................16, 18

*Sivers Const. Co. v. U.S. Steel Corp.,*
  272 Or. 608 (1975)..........................................................................................22

*Stanley v. Univ. of S. Cal.,*
  13 F.3d 1313 (9th Cir. 1994) ..............................................................................34

*Sterling v. City of Jackson,*
  159 F.4th 361 (5th Cir. 2025) ........................................................................17, 19

*Tanner v. Armco Steel Corp.,*
  340 F. Supp. 532 (S.D. Tex. 1972) ........................................................................17

*Torres v. Madrid,*
  592 U.S. 306 (2021)..........................................................................................31

*Tri-Cnty. Concerned Citizens Ass'n v. Carr,*
  2001 WL 1132227 (E.D. Pa. Sep. 18, 2001), *aff'd*, 47 F. App'x 149 (3d Cir. 2002)..............21

*Tyson v. Sabine,*
  42 F.4th 508 (5th Cir. 2022) ..............................................................................19

*United States v. Griefen,*
  200 F.3d 1256 (9th Cir. 2000) ........................................................................32, 33

*United States v. Salvucci,*
  448 U.S. 83 (1980)..........................................................................................30

*Updike v. Multnomah Cnty,*
  870 F.3d 939 (9th Cir. 2017) ..............................................................................11

*Valeo Intell. Prop., Inc. v. Data Depth Corp.,*
  368 F. Supp. 2d 1121 (W.D. Wash. 2005)....................................................................13, 14

*Villegas v. Schulteis,*
  2010 WL 3341888 (E.D. Cal. Aug. 25, 2010)................................................................14

*Virginia v. Hicks,*
  539 U.S. 113 (2003)..........................................................................................26

*Wash. Mobilization Comm. v. Cullinane*,
  566 F.2d 107 (D.C. Cir. 1977) ................................................................. 25

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ................................................................................ 16

*Wedges/Ledges of Cal., Inc. v. City of Phx.*,
  24 F.3d 56 (9th Cir. 1994) ...................................................................... 22

*Westwood v. City of Hermiston*,
  787 F. Supp. 2d 1174 (D. Or. 2011), *aff'd*, 496 F. App'x 728 (9th Cir. 2012) ....... 23

*Williams v. Fears*,
  179 U.S. 270 (1900).................................................................................. 20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................ 10, 13, 32

*WMX Techs., Inc. v. Miller*,
  197 F.3d 367 (9th Cir. 1999) ................................................... 19, 22, 23, 24

## STATUTES

6 U.S.C. § 202 ............................................................................................. 2

6 U.S.C. § 211 ............................................................................................. 2

6 U.S.C. § 252 ............................................................................................. 2

8 U.S.C. § 1103 ........................................................................................... 2

18 U.S.C. § 111 ......................................................................................... 32

18 U.S.C. § 1361 ....................................................................................... 32

40 U.S.C. § 1315 ......................................................................................... 2

## UNITED STATES CONSTITUTION

U.S. Const. amend. V................................................................................. 15

## OTHER AUTHORITIES

DHS Press Release, *As American Enjoyed Their Weekend, ICE Law Enforcement Risked
  Their Lives to Arrest the Worst of Worst Illegal Alien Murders, Rapists, Pedophiles, and
  Gang Members* (Jan. 12, 2026),
  https://perma.cc/LSC3-3J8X........................................................................ 5

Update to the Department Policy on the Use of Force (Feb. 6, 2023),
    https://perma.cc/K996-RNFR ...................................................................................................... 3

## INTRODUCTION

Plaintiffs advance novel substantive due process and Fourth Amendment theories based on months-old allegations; as such, legal obstacles pervade Plaintiffs' request for emergency relief. Plaintiffs are residents and owners of a housing complex called Gray's Landing near the Immigration and Customs (ICE) facility in downtown Portland. Widespread protests have targeted Department of Homeland Security (DHS) personnel and property at the Portland ICE Facility. Some of those protests have turned violent, obstructive, or otherwise unlawful. At some of the unlawful protests, officers responded by issuing lawful dispersal orders and deploying less lethal crowd-control devices, including chemical-based crowd control agents ("CCAs").

Plaintiffs allege that their constitutional rights have been violated because CCAs drifted through the air away from the protests and temporarily affected Gray's Landing. Those allegations rest on a handful of discrete incidents occurring months ago—during parts of the summer of 2025 and October 2025. Plaintiffs' emergency, extraordinary relief should be denied.

First, Plaintiffs lack standing to seek prospective relief. Plaintiffs cannot establish an immediate and certainly impending threat of future injury based on isolated, past incidents occurring months ago. For similar reasons, Plaintiffs cannot demonstrate the irreparable harm needed for a preliminary injunction. Their months-long delay in filing suit followed by further weeks-long delay in even seeking a preliminary injunction confirms the absence of any exigency.

On the merits, Plaintiffs seek to enjoin DHS's use of CCAs based on substantive due process and Fourth amendment theories that have no legal support. Courts around the country have consistently rejected attempts to expand the notion of bodily integrity or liberty to include the right to be free from incidental exposure to airborne substances that are diffuse or dissipating. And courts have similarly rejected—or have not recognized—Plaintiffs claimed property and right-of-

1

movement theories. And dispersing crowds that are violent, obstructive, or trespassing is not conscience-shocking behavior as needed to show a due process violation. Nor does it reflect an intent to restrain as needed to show a Fourth Amendment violation.

The merits, public interest, and equities all strongly favor Defendants and counsel against granting any emergency relief. Plaintiffs' preliminary injunction motion should be denied.

## **BACKGROUND**

### I.    **Congress Has Conferred Authority on DHS to Enforce Federal Immigration Laws and Protect Federal Property**

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). U.S. Customs and Border Protection (CBP) is an agency within DHS charged with, among other things, "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(8); Ex. 1, Decl. of Timothy P. Sullivan (Sullivan Decl.) ¶ 4. ICE, another agency within DHS, is likewise charged with, among other things, enforcing and administering federal immigration laws. *See*, *e.g.*, 6 U.S.C. §§ 202, 252(a)(3). ICE has a facility located at 4310 South Macadam Avenue, Portland, Oregon ("ICE Facility"). Ex. 2, Decl. of Jeffrey K. Chan ("Chan Decl.") ¶¶ 12-13. The protection of the ICE Facility falls primarily within the responsibilities of the Federal Protective Service (FPS), the law enforcement agency within DHS charged with protecting federal government facilities and persons therein. *See* 40 U.S.C. § 1315; Ex. 3, Decl. of Roberto Cantu ("Cantu Decl.") ¶ 3.

The federal government has broad authority to protect federal property, personnel, and government functions. Congress has authorized DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government." 40 U.S.C. § 1315(a).

And the President and Executive Branch have a duty to protect federal officials, federal property, and the performance of federal functions. *See In re Neagle*, 135 U.S. 1, 64–68 (1890).

DHS has issued policy guidance on the use of force by its personnel. *See* Chan Decl. ¶ 7; Update to the Department Policy on the Use of Force (Feb. 6, 2023), available at https://perma.cc/K996-RNFR ("DHS Policy"). "The general principle undergirding the [DHS] Use of Force Policy is the respect for human life and the communities served." Chan Decl. ¶ 7. To that end, federal law enforcement should "only use force when no reasonably effective, safe, and feasible alternative appears to exist." Chan Decl. ¶ 7.

However, DHS authorizes officers and agents to use "the level of force that is objectively reasonable in light of the facts and circumstances confronting the [law enforcement officer] at the time force is applied," recognizing that officers and agents are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving." DHS Policy §§ II.B & II.C.2. The policy states that law enforcement should "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage." *Id.* § III.C. But this does not mean that law enforcement must "meet force with equal or lesser force," "retreat to avoid the reasonable use of force," or "wait for an attack before using reasonable force to stop a threat." *Id.* § III.D; Cantu Decl. ¶¶ 28-30; Chan Decl. ¶¶ 7,18.; Sullivan Decl. ¶ 8 n. 1.

## II.    Crowd Control Devices

As the frequency of volatile protests increased, so has threats against officers and federal property. Cantu Decl. ¶ 5. As a result, federal law enforcement have been forced to employ "crowd

control tactics to prevent the destruction of federal facilities or serious injury to federal employees and the public." *Id.* ¶ 4. That is the situation for the ICE Facility in Portland. *Id.* ¶ 5.

In response to violent, obstructive, or trespassing crowds, federal law enforcement have at times issued dispersal orders when feasible and then have at times used crowd control devices to disperse crowds that have refused to comply with dispersal orders. Cantu Decl. ¶¶ 10-12; Sullivan Decl. ¶¶ 15-16, 19; Chan Decl. ¶¶ 12, 14, 16. Some of these devices are chemical-based crowd control agents ("CCAs") that have varying dispersal impact zones. Cantu Decl. ¶¶ 6-8; Sullivan Decl. ¶¶ 9-11. Each of the CCAs utilized at the ICE Facility are intermediate or less lethal force weapons that assist officers in deescalating situations, like civil disturbances. Cantu Decl. ¶¶ 8, 28; Sullivan Decl. ¶ 5.

For crowd control, FPS at times uses these three types of CCAs that's impact can last between 15–45 minutes depending on conditions:

1.  Oleoresin Capsicum (OC), an oil-based irritant derived from chili peppers commonly known as pepper spray, which is deployed by MK9 Foggers in an aerosol format. *Id.* ¶ 6. The MK9 Fogger deploys up to approximately 20 feet. *Id.* ¶ 7.

2.  Plastic balls that contain either Pelargonic Acid Vanillylamide (PAVA) or non-chemical paint balls used for marking. *Id.* ¶ 6. PAVA affects a radius of approximately 15 feet. *Id.* ¶ 7.

3.  Breakable "pepper balls" release OC in a dust format, which are deployed by a PepperBall Launching System (PLS). *Id.* ¶ 6. The impact zone for a pepper ball is approximately three to six feet when deployed at the dry, hard ground and even less if wet. *Id.* ¶ 7.

CBP and ICE-SRT utilize these CCAs, as well as:

1.  Munition Launchers (40mm) and Less Lethal Specialty Impact and Chemical Munitions that can deliver a chemical irritant projectile. Sullivan Decl. ¶ 9; *see also* Chan Decl. ¶ 8.

4

2. Other chemical irritant projectiles thrown by hand or with a launcher that include CS or OC canisters/grenades (commonly known as tear gas), rubber ball grenades, and smoke canisters. Sullivan Decl. ¶ 9; *see also* Chan Decl. ¶ 9. Exposure to these types of munitions is typically in small amounts, and these CCAs dissipate rather quickly. Sullivan Decl. ¶ 9.

Using CCAs generally results in fewer injuries to officers, suspects, and violent protestors alike, because it allows law enforcement to avoid physical confrontation. Cantu Decl. ¶¶ 7-8; Sullivan Decl. ¶ 24.

### III. Threats and Violence Against Federal Personnel and Property at the Portland ICE Facility.

Recently, opposition to enforcement of federal immigration law has taken the form of violence against federal law enforcement personnel. Violence against ICE officers and agents has increased approximately 1,300% across the United States, including 3,200% in vehicle attacks and an 8,000% increase in death threats. *See* DHS Press Release at https://perma.cc/LSC3-3J8X

Beginning in the summer of 2025, various unlawful protests and riots erupted outside of the ICE Facility in Portland, requiring law enforcement to deploy various CCAs depending on the threats posed to federal employees and property. Cantu Decl. ¶¶ 9-25; Chan Decl. ¶¶ 8-17; Sullivan Decl. ¶¶ 13-22. Protests outside the ICE facility over the summer "were often violent in nature, where groups of protestors would threaten the building and federal law enforcement officers working in an around the [ICE] facility." Cantu Decl. ¶ 5.

*June 14, 2025*: Hundreds of individuals gathered outside of the ICE facility throwing rocks, bricks, unknown objects, barricading doors, breaking windows, starting fires resulting in a breach of the facility, resulting in numerous arrests for assaulting federal officers, trespassing, and destruction of federal property. Chan Decl. ¶ 8; Sullivan Decl. ¶¶ 13-16. This unprecedented breach of the facility required law enforcement to use CCAs, including 40mm launchers, hand

thrown stingers, and pepper balls, to clear the dangerous crowd from the facility. *Id*.

*June 24, 2025*: A large crowd gathered outside the ICE Facility and began trespassing and blocking the entrance. Chan Decl. ¶ 9. Despite multiple warnings to disperse and stay off the property, the crowd refused to comply. *Id.* As a result, smoke and CS cannisters were deployed to disperse the unlawful crowd. *Id.* One member of the crowd attempted to light a munition to deploy against officers. Cantu Decl. ¶ 9. Federal law enforcement pursued the subject who was found to be wielding a machete and knife when officers approached to arrest her. *Id.*; *see also* Chan Decl. ¶ 9. After this individual was commanded to stop, FPS officers deployed five rounds of FN303 striking the suspect in the torso before she fled east on Bancroft Street. Cantu Decl. ¶ 9. After apprehending the suspect and while effectuating the arrest, officers were surrounded by the crowd and CCAs were needed to safely execute the arrest. Chan Decl. ¶ 9.

*July 4, 2025*: Arrests were effectuated in a violent crowd outside of the ICE facility necessitating deployment of pepper balls, CS gas, MK9 Fogger with OC spray deployed with one second bursts. Cantu Decl. ¶ 10; *see also*, Chan Decl. ¶ 10. On several occasions, pepper balls were used near the north gate at the ICE facility to move crowds back after verbal commands were ignored. Chan Decl. ¶ 10.

*July 15, 2025*: In the early morning hours, protestor activity increased in non-compliance necessitating the use of CS Smoke and PLS rounds. Chan Decl. ¶ 11. Later that night, a group of approximately 30–40 protestors were warned to stop trespassing on federal property, and PLS rounds were deployed to disburse those who continued to trespass on federal property. *Id.*

*August 18, 2025*: An individual abandoned her vehicle in front of the driveway at the ICE facility, impeding government operations and causing alarm about what might be in the vehicle, such as a potential Vehicle-Borne Improvised Explosive Device. Chan Decl. ¶ 12; Cantu Decl.

¶ 11. That night, despite multiple warnings to disburse, a crowd continued to move into the facility driveway and throw trash and rocks at law enforcement. Cantu Decl. ¶ 11. FPS officers were forced to deploy OC Spray with MK-9 foggers and FN303 PAVA munitions to disperse the crowd. *Id*. ICE also utilized CCAs to assist in dispersal and control of the crowd. Chan Decl. ¶ 12.

*September 1, 2025*: On Labor Day, approximately 200 individuals arrived at the ICE facility carrying improvised weapons and shields, and blocked entrances and exits of the facility. Cantu Decl. ¶ 12; Chan Decl. ¶ 13. The fence surrounding the property was damaged and the crowd failed to comply with lawful orders to disburse despite repeated verbal and Long-Range Acoustical Device (LRAD) warnings. Cantu Decl. ¶ 12. As a result, officers were forced to deploy pepper balls against those damaging the fence as well as those blocking the main entrance of the facility with a prop guillotine. *Id*. Eventually, after additional warnings, FPS and ICE officers deployed hand-thrown chemical munitions and PLS to disperse the unlawful crowd. *Id.*; Chan Decl. ¶ 13.

*October 4, 2025*: Crowds ranged from 100–200 throughout the day. Chan Decl. ¶ 14; Cantu Decl. 14. In the afternoon, approximately 100 individuals trespassed on federal property and refused to disperse despite numerous LRAD warnings to vacate the area. *Id.*; Sullivan Decl. ¶ 19. Officers were forced to attempt to physically push the crowd back. Cantu Decl. ¶ 14; Sullivan Decl. ¶ 19. Rather than voluntarily disburse, individuals wearing gas masks, body armor, helmet, and improvised weapons made threatening gestures towards officers. Cantu Decl. ¶ 14; Sullivan Decl. ¶ 19. While pushing the crowd back, one subject attacked an officer and threw a large heavy object striking the officer's upper body. Cantu Decl. ¶ 14. In response, the officer deployed OC spray with his MK9 Fogger and the subject was detained by federal law enforcement. *Id.* ICE also utilized hand-thrown smoke, CS cannisters, and PLS to clear the area and disperse the crowd. Chan

Dec. ¶ 14. Similar unlawful conduct occurred that night, necessitating the use of CCAs. Sullivan Decl. ¶ 20.

*October 12, 2025*: A crowd of hundreds converged on the ICE Facility with many blocking the front gate and the driveway. Chan Decl. ¶ 16. Attempting to clear the driveway, an officer attempted to effectuate an arrest of an individual who spit on an officer. Cantu Decl. ¶ 17. While attempting to arrest the individual, a crowd swarmed the officer and actively attempted to pull the subject away and even grabbed the officer by his vest in an attempt to pull the officer off of the subject, allowing the subject to flee. Cantu Decl. ¶ 17. As a result, the officer deployed his MK9 Fogger to stop the individuals from impeding law enforcement. *Id.* Later that day, MK9 Fogger was also used to disburse a crowd that had barricaded a security guard in his guard shack and that had attempted to destroy security cameras. Cantu Decl. ¶ 18. Two individuals were arrested for failing to comply with lawful orders and two for assault on an officer. Chan Dec. ¶ 16.

*Other October Incidents*: Other incidents in October involved crowds that were impeding arrest, shining bright strobe lights in officers' eyes, pressing back against officers, and blocking the entrance into the ICE Facility. Cantu Decl. ¶¶ 13, 15-11; Chan Decl. ¶ 17; Sullivan Decl. ¶ 22. As a result, officers at time used CCAs to disperse the unlawful crowds. Cantu Decl. ¶¶ 13,16, Chan Decl. ¶ 17; Sullivan Decl. ¶ 22.

These unlawful protests largely receded over the fall and winter months with a few incidents requiring crowd control devices since October.  Cantu Decl. ¶ 5; Sullivan Decl. ¶ 23.

*November and December 2025*: With the decrease in activity, there have been only a handful of instances when FPS has had to use any CCAs. Cantu Decl. ¶¶ 19-23. In fact, the only CCAs used by FPS in November and December were pepper balls.  *Id.*

8

_January 2026_: Unlawful and violent protests outside of the ICE Facility occurred on January 9 and 10, 2026. Cantu Decl. ¶¶ 24–25. The crowds threw rocks at law enforcement and blocked the ICE Facility's entrance. Cantu Decl. ¶¶ 24–25. This unlawful conduct required FPS to use CCAs to disperse the unlawful crowds, maintain a clear driveway, and prevent destruction of federal property. _Id._ As in November and December, the only CCAs used by FPS in January were pepper balls. _Id._

### IV. Procedural History

This case relates to the unlawful protests at the Portland ICE Facility and alleged downstream impacts of those protests on a nearby housing community called Gray's Landing. Compl., ECF 1. Gray's Landing sits catty corner to the Portland ICE Facility. Compl. ¶ 41. Plaintiffs associated with Gray's Landing sued in December based on alleged conduct that occurred months ago. They assert that when federal law enforcement personnel used CCAs like tear gas during protests occurring from June to October 2025, those CCAs at times drifted through the air and affected Gray's Landing. _See generally_ Compl. They allege that the CCAs sometimes affected Grays Landing's internal courtyard and sometimes seeped into apartments as well. _E.g._, _id._ ¶ 81. After filing suit in December, Plaintiffs waited 24 more days before moving for a preliminary injunction. _See_ Pls.' Mot for Prelim. Inj., ECF 20 ("Mot.").

Plaintiffs are seven residents at Gray's Landing ("Resident Plaintiffs") and three organizations that own and manage Gray's Landing ("REACH Plaintiffs"). Compl. ¶¶ 10–19. Plaintiffs claim that Defendants are violating their substantive due process and Fourth Amendment rights. They ask this Court to preliminarily enjoin Defendants from deploying CCAs that are likely to infiltrate Gray's Landing, unless the use of such substances "is necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons." Mot. at 44.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain such a remedy, Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Id.* at 20. Plaintiffs' request for preliminary injunction must be denied if they fail to establish either likelihood of success on the merits, *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015), or irreparable harm absent preliminary injunctive relief, *Oregon Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1268 (D. Or. 2022). Plaintiffs fail at each preliminary injunction factor, giving this Court numerous, independent routes for denying the motion.

## ARGUMENT

### I.    Plaintiffs lack standing to seek prospective relief based on alleged harm sporadically occurring months ago.

To demonstrate standing to obtain prospective relief, a plaintiff must show "a very significant possibility of *future* harm." *Mortensen v. Cnty. of Sacramento*, 368 F.3d 1082, 1086 (9th Cir. 2004) (emphasis added and quotation omitted). And the required "threatened injury must be *certainly impending*"—not merely "*possible.*" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring in grant of application for stay) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 (1983)). Allegations of past injury might support a remedy at law, but they are "insufficient" to support a request for prospective relief. *Mortensen*, 368 F.3d at 1086; *Nelsen v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990).(holding that to demonstrate standing to seek injunctive relief "past exposure

to harm is largely irrelevant"). Rather, "[t]o have standing to seek an injunction against future unlawful conduct, a plaintiff must show a 'sufficient likelihood' that they will suffer a similar injury in the future." *Perdomo v. Noem*, 148 F.4th 656, 673 (9th Cir. 2025); *see also Updike v. Multnomah Cnty*, 870 F.3d 939, 948 (9th Cir. 2017) (holding plaintiff lacked standing to seek an injunction compelling a county to provide him with certain interpretive services at its detention facilities, even though he alleged he had been booked at county detention facilities on five prior occasions).

Applying these principles, courts frequently reject requests for injunctive relief when predicated on isolated instances of alleged misconduct by law enforcement. *See, e.g.*, *Lyons*, 461 U.S. at 101–02; *Nelsen*, 895 F.2d at 1251; *Rosenblum v. Does 1-10*, 474 F. Supp. 3d 1128, 1137 (D. Or. 2020); *Chicago Headline Club v. Noem*, No. 25-3023, Dkt. No. 28 (7th Cir. Nov. 19, 2025) ("Order, *Chicago Headline Club*"). For example, in *Rosenblum*, the court held that plaintiffs lacked standing based on allegations of illegal seizures by law enforcement; the court found that unless the plaintiffs could show that "all of Defendants' seizures are illegal" or that they are under direct orders to make random arrests without probable cause, there could be no real or immediate threat of future harm. 474 F. Supp. 3d at 1136–37 (citing *Lyons*, 461 U.S. at 105–06).

Here, Plaintiffs do not have standing to seek prospective, injunctive relief. For starters, Plaintiffs misstate their standing burden: they claim they have standing because "Defendants have given no indication that they will refrain" from deploying CCAs "when large protests again occur outside the ICE facility." Mot. at 41–42. But Plaintiffs' burden is not to show a real and certainly impending threat that federal law enforcement will merely use CCAs at the Portland ICE facility. Under *Lyons*, the question is whether any given plaintiff has alleged "a sufficient likelihood" that each specific plaintiff will "again be wronged in a similar way." 461 U.S. at 111.  So, Plaintiffs

11

here must show a real and certainly impending threat that protests will occur at or near the Portland ICE facility; that those protests will be violent, dangerous, or obstructive; that, in response, federal law enforcement will use CCAs in an unlawful way; that the CCAs will float through the air in the direction of Gray's Landing; and that the CCAs will affect these particular Plaintiffs in such a way that substantive due process rights are deprived. And all those possibilities will have to converge at the same time. That alone is a highly "speculative chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410. Plaintiffs' standing is even more speculative since Plaintiffs here do not even attempt to establish that federal law enforcement have used CCAs unlawfully every time or are under specific orders to do so. *See Rosenblum*, 474 F. Supp. 3d at 1137.

Additionally, Plaintiffs' allegations of exposure to CCAs—even taken on their face—are vague or stale or both. Plaintiffs' declarants primarily rely on generalized references to months— "sometime in October"—when Gray's Landing was affected, rarely specifying when or how often exposure allegedly occurred. *See* Decl. of Mindy King, ECF 20-1 9 ("King Decl.") (mentioning only October 4); Decl. of Rebecca Roe, ECF 20-2 ("Roe Decl.") (no specific dates); Decl. of Margaret Salazar, ECF 20-4 ("Salazar Decl.") (mentioning only October 4 and December 1); Decl. of Jane Doe, ECF 20-6 ("Doe Decl.") (mentioning only July 4 and some other "incident over the summer"); Decl. of Susan Dooley, ECF 20-7 ("Dooley Decl.") (no specific dates); Decl. of Janice Lineberger, ECF 20-8 ("Lineberger Decl.") (no specific dates); Decl. of Whitfield Taylor, ECF 20-9 ("Taylor Decl.") (no specific dates); Decl. of Christine Piggott, ECF 20-10 ("Piggot Decl.") (no specific dates). And apart from a passing reference to "notic[ing] fumes" on December 1, Salazar Decl. ¶ 13, the few specific dates Plaintiffs identify are months old—the most recent in October. Indeed, Plaintiffs concede that protests "have not been as high in recent weeks as they

12

were over the summer and in October." Mot. at 41. The record supports Plaintiffs' concession: no CS gas (i.e., tear gas) has been used near the Portland ICE facility since October. ICE has not used any CCAs since October 2025, Chan Decl. ¶ 18; CBP has not used any CCAs since October 18, Sullivan Decl. ¶ 23; and FPS does not use CS gas, Cantu Decl. ¶¶ 6, 19–26 This changed state of affairs cuts against Plaintiffs' claim of a "certainly impending" injury and instead suggests the opposite. In sum, Plaintiffs rely on vague and stale allegations to string together a speculative chain of possibilities. That is not sufficient to establish standing.

## II. Plaintiffs will not suffer irreparable harm absent preliminary relief, as shown by their months-long delay in filing suit and their subsequent weeks-long delay in seeking preliminary relief after filing suit.

To receive a preliminary injunction, Plaintiffs must show that they are "likely to suffer irreparable harm *in the absence of preliminary relief*." *Winter*, 555 U.S. at 20 (emphasis added). To show irreparable harm justifying a preliminary injunction, a plaintiff generally must "demonstrate *immediate* threatened injury[.]" *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis modified). That emphasis on immediacy makes sense. "A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights." *Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).

By a similar token, a "delay in seeking a preliminary injunction" weighs against "the propriety of relief." *Id.* A "delay before seeking a preliminary injunction implies a lack of urgency," and hence a lack of "irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). "By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action" and the extraordinary remedy of a preliminary injunction. *Lydo Enters.*, 745 F.2d at 1213. Numerous courts have held similarly. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (a 44-day delay in seeking a preliminary injunction was "inexcusable" and

"bolstered" the "conclusion that an injunction should not issue"); *Valeo Intell. Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (holding that a three-month delay in seeking preliminary injunctive relief is inconsistent with insistence of irreparable harm); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (finding that two-month delay "militates against a finding of irreparable harm").

Here, Plaintiffs claim irreparable injury based on alleged constitutional violations from October. Yet Plaintiffs waited nearly two months to even file suit and waited another twenty-four days to seek preliminary injunctive relief. Plaintiffs have known about their alleged harms for months, yet they offer no explanation for this months-long delay. Worse, Plaintiffs themselves admit that conditions on the ground have improved—not worsened—since October. Mot. at 41. Indeed, the only CCAs used at the Portland ICE facility since October are pepper balls, which are roughly the size of a gumball, have a limited chemical dispersal radius, and could not plausibly have harmed Plaintiffs. The months-long delay coupled with changed circumstances on the ground undermine any claim than an immediate injunction is needed to address imminent irreparable harm. Since Plaintiffs themselves did not think that their alleged injuries from October merited immediate relief, this Court should not either.

Resident Plaintiffs claim that they are suffering physical and psychological harms. Mot at 39. And the REACH Plaintiffs claim that they are suffering harm to their business mission. *Id.* Even assuming that is true, both of those harms have seemingly already occurred months ago, and Plaintiffs do not explain how they now face immediate threatened injury. *See Villegas v. Schulteis*, 2010 WL 3341888, at *3 (E.D. Cal. Aug. 25, 2010) (declining to issue a preliminary injunction because "[t]he purpose of [such relief] is to prevent future irreparable harm, not to remedy past harm"). Finally, Plaintiffs claim they have suffered economic harm based on alleged costs they

incurred to remediate Gray's Landing. Mot. at 39. But Plaintiffs have not shown how a prospective injunction would redress retrospective financial costs. And it is entirely speculative that Plaintiffs will incur any new costs in the future that they can attribute to the use of CCAs. This Court should not grant Plaintiffs an extraordinary remedy based on alleged months-old harms; the preliminary injunction standard requires much more.

### III. Plaintiffs are not likely to succeed on the merits of their novel substantive due process and Fourth Amendment theories.

#### A. Plaintiffs are not likely to succeed in their substantive due process theory because Plaintiffs fail to establish a deprivation of a liberty or property right that shocks the conscience.

The Due Process Clause provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To establish a substantive due process violation, Plaintiffs must show both that (1) Defendants deprived Plaintiffs of a liberty or property interest of constitutional magnitude, *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 370 (9th Cir. 1998), and (2) Defendants' deprivation "shocks the conscience," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Plaintiffs fail at both steps.

1. <u>Plaintiffs do not have a constitutionally protected liberty or property interest at stake.</u>

Plaintiffs theorize that Defendants are depriving them of three liberty or property rights: the right to bodily integrity; the right to personal security and movement; and the right to possess, use, and enjoy one's property. Mot. at 27–32. Each of Plaintiffs' theories stretches the Due Process Clause well beyond its established and reasonable limits.

**Bodily Integrity.** Although the Supreme Court has recognized that the concept of substantive due process protects the right to bodily integrity in certain limited contexts, generally a right to be free from forcible bodily intrusions, *see, e.g.*, *Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 269 (1990). Plaintiffs do not identify any authority supporting such a right in the

circumstances presented here—nor can they. "[T]he right to bodily integrity is not coextensive with the right to be free from the introduction [or exposure] of an allegedly contaminated substance[.]" *Coshow v. City of Escondido*, 132 Cal. App. 4th 687, 709 (2005). The Supreme Court "has always been reluctant to expand the concept of substantive due process," given that "the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Nevertheless, Plaintiffs propose a dramatic expansion of the concept of bodily integrity beyond any recognized limit.

An analysis of whether a fundamental right has been violated begins with a "careful description" of the asserted fundamental liberty interest because "the doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever . . . asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Before conferring fundamental status upon a previously unrecognized right—like the right to be free from CCAs—the Supreme Court requires Plaintiffs to demonstrate that the "interest is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it were] sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). Plaintiffs do not provide any historical authority to support their claim that Plaintiffs have a fundamental right to be free from incidental exposure to wafting CCAs.

In fact, courts around the country have consistently rejected attempts to expand the notion of bodily integrity or liberty to include the right to be free from incidental exposure to airborne substances that are diffuse or dissipating. *See, e.g.*, *SF Chapter of A. Philip Randolph Inst. v. EPA*, 2008 WL 859985, at *7 (N.D. Cal. Mar. 28, 2008) (rejecting asserted right to be free from climate change pollution); *Concerned Citizens of Neb. v. NRC*, 970 F.2d 421, 426–27 (8th Cir. 1992) (finding no liberty interest in the right to an environment free of any non-natural radiation);

16

*Hagedorn v. Union Carbide Corp.*, 363 F. Supp. 1061 (N.D. W. Va. 1973) (holding that plaintiff's allegations that emissions from Union Carbide Corporation's plant were fouling the air and causing him pulmonary damage with consequent medical expense and loss of income did not present a controversy arising under the Fifth, Ninth, or Fourteenth Amendments to the Constitution); *In re Agent Orange Prod. Liab. Litig.*, 475 F. Supp. 928, 933–34 (E.D.N.Y. 1979) (finding that there is no "constitutional right under the fifth, ninth, or fourteenth amendments to be free of the allegedly toxic chemicals involved in this litigation"); *Gasper v. LA Stadium & Exposition Dist.*, 418 F. Supp. 716, 721 (E.D. La. 1976) (finding no fundamental right to free from exposure to tobacco smoke), *aff'd*, 577 F.2d 897 (5th Cir. 1978); *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir. 1971) (holding that there is no constitutional right to a healthful environment); *Pinkney v. Ohio EPA*, 375 F. Supp. 305, 310 (N.D. Ohio 1974) ("[T]he Court is unable to rule that the right to a healthful environment is a fundamental right under the Constitution."); *Tanner v. Armco Steel Corp.*, 340 F. Supp. 532, 537 (S.D. Tex. 1972) ("[N]o legally enforceable right to a healthful environment . . . is guaranteed by the Fourteenth Amendment or any other provision of the Federal Constitution."). In sum, the overwhelming authority has already rejected Plaintiffs' theory of liberty and bodily integrity.

The two cases that Plaintiffs rely on concerning intentional contamination of entire cities' water supply do not support Plaintiffs' theory here. In *Sterling v. City of Jackson*, 159 F.4th 361, 368–84 (5th Cir. 2025), the Fifth Circuit found a violation of the fundamental right to bodily integrity where Plaintiffs claimed that the "[c]ity knowingly contaminated drinking water with lead and then encouraged residents to drink the toxic water." Similarly, in *Guertin v. Michigan*, 912 F.3d 907, 915, 921 (6th Cir. 2019), the Sixth Circuit recognized a deprivation of bodily integrity in Flint, Michigan, where government actors "knowingly and intentionally introduce[ed]

life-threatening substances [into the city water supply]" and then "falsely assured the public that the water was safe." *See also id.* at 921–22 (recognizing that "the Constitution does not guarantee a right to live in a contaminant-free, healthy environment.").

Neither case supports Plaintiffs' novel (and nearly limitless) fundamental right. *First*, the harm in *Guertin* and *Sterling* was of a fundamentally different character. The harmful substances there had no legitimate governmental objective, did not quickly dissipate, and directly infected the entire city's drinking water. Here, by contrast, CCAs have a valid law enforcement and public safety purpose, are airborne substances that are diffusing and dissipating, and affected Plaintiffs incidentally. Cantu Decl. ¶¶ 7, 25; Sullivan Decl. ¶¶ 10-11. That difference makes this case more like exposure to non-natural radiation, emissions, air pollution, and secondhand tobacco smoke— scenarios courts have found not to implicate the Due Process Clause. *See Gasper*, 418 F. Supp. at 721; *Hagedorn*, 363 F. Supp. at 1061; *SF Chapter of A. Philip Randolph Inst.*, 2008 WL 859985, at *7.

*Second*, the nature of government conduct in *Guertin* and *Sterling* was fundamentally different. The cities in both cases knowingly contaminating the water supply with dangerous substances and then told the residents it was safe to drink the water. Plaintiffs here do not allege that Defendants were even thinking about Gray's Landing at all when they used CCAs to disperse protestors in front of the Portland ICE Facility, much less that each time Defendants used CCAs, they did so knowing that it would contaminate the air at Gray's Landing.

This Court should follow the weight of authority in favor of Defendants and reject Plaintiffs' request to expand the bodily integrity doctrine to include any exposure to diffuse and dissipating CCAs. The consequences of accepting Plaintiffs' theory would be to constitutionalize nearly every situation where law enforcement use CCAs. But the consequences would not end

18

there: any plaintiff exposed to government-caused substances or toxins—even those that are airborne, diffuse, or dissipating—could assert a deprivation of bodily integrity, thereby, constitutionalizing tort law as well. This Court should not adopt such a sweeping expansion of the Due Process Clause. *See Lewis*, 523 U.S. at 842 (finding that the Supreme Court has "always been reluctant to expand the concept of substantive due process"); *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999) (Due Process Clause "is not 'a font of tort law[.]'"). At a minimum, this Court should not grant an extraordinary remedy based on Plaintiffs' novel, unprecedented legal theories of substantive due process. *See, e.g., Sampson v. All Am. Home Assistance Servs., Inc.*, No. 13-CV-495-WSD, 2013 WL 12322089, at *10 (N.D. Ga. Mar. 7, 2013) (citing cases where preliminary relief denied when plaintiff relies on "unprecedented and novel interpretation" of law).

Plaintiffs then pivot and claim that "psychological harms" resulting from exposure to CCAs alone is sufficient to establish that they have a liberty interest at stake. Mot. at 29. For this they rely on dicta from *Sterling*, where the Fifth Circuit stated that "a governmental actor can violate [due process] through mental coercion alone." *Sterling*, 159 F.4th at 376 (citing cases). But the cases the Fifth Circuit cites to support its dicta only highlight how far Plaintiffs' theory departs from established precedent. The cited cases involve the voluntariness of a confession, *Leyra v. Denno*, 347 U.S. 556 (1954), a child's excessive-force claim that was "inspired by malice," *Petta v. Rivera*, 143 F.3d 895, 902 (5th Cir. 1998), and coercion used to facilitate sexual abuse, *Tyson v. Sabine*, 42 F.4th 508, 519 (5th Cir. 2022). Those situations are far afield from a case involving CCAs wafting through the air and temporarily affecting a housing community. Plaintiffs cite no analogous authority to support their novel theory that claiming psychological harm from exposure to an airborne substance is by itself enough to establish a deprivation of bodily integrity.

**Right of Movement.** Plaintiffs next claim that Defendants have "meaningfully impair[ed] residents' personal security and liberty of movement[.]" Mot. at 30–31. They claim that these rights are infringed because they have had to place towels under their doors and have, at times, avoided using common areas and going outside at night. *Id.*

Wrong again. To begin, it is not clear what Plaintiffs mean by the right to "personal security"—none of the cases cited by Plaintiffs refer to such a right. As to Plaintiffs' supposed "liberty of movement," while the Supreme Court has recognized that there is a fundamental right to travel, that right has largely been cabined to interstate travel, *Saenz v. Roe,* 526 U.S. 489 (1999), and absolute restrictions on movement like curfews, *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997). As a D.C. Circuit en banc plurality described it, the right to travel is a narrow one, originating from "a concern over state discrimination against outsiders rather than concerns over the general ability to move about." *Hutchins v. D.C.*, 188 F.3d 531, 536 (D.C. Cir. 1999) (plurality) (citing Supreme Court cases). Indeed, one of the Supreme Court cases Plaintiffs rely on proves the point. In *Williams v. Fears*, 179 U.S. 270, 274 (1900), a state was taxing employment agents who were involved in hiring laborers for out-of-state employment. The Court there found such a law did not infringe on the right to movement or travel. *Id.* Plaintiffs here cite no case finding that the fundamental right to travel is infringed when law enforcement actions to protect public safety indirectly result in residents avoiding common areas or going outside at night. Plaintiffs' theory of the right to travel has no basis in caselaw and thus fails.

**Property Interest.** Although Plaintiffs indisputably have a property interest in the ownership of their homes, Plaintiffs have not established a constitutional deprivation of that right. Plaintiffs claim that their property rights have been deprived because CCAs have traveled through

the air and temporarily affected their apartments—sometimes even for several days. Mot. at 31–32. But even accepted on its face, this theory fails.

Caselaw indicates that there is no cognizable deprivation of a property interest when a plaintiff asserts temporary interferences with the use and enjoyment of property. For example, in *Tri-Cnty. Concerned Citizens Ass'n v. Carr*, the court was "hard pressed to find either controlling or persuasive authority which establishes a fundamental right in . . . the unfettered use and enjoyment of one's land." 2001 WL 1132227, at *3 (E.D. Pa. Sep. 18, 2001), *aff'd*, 47 F. App'x 149 (3d Cir. 2002). As such, the court held that the plaintiffs' claimed "right not to be subjected to common nuisances such as odors, noise, pollution, dirt and other noxious and dangerous situations . . . fail[ed] to raise a constitutionally protected interest." *Id.* at *4; *see also Phantom of E. PA v. N.J. State Police*, 2008 WL 2039461, at *2 (E.D. Pa. May 12, 2008) ("Even when real property ownership is at issue . . . substantive due process does not protect mere 'interfere[nce] with the use and enjoyment of a plaintiff's land[.]'" (citation omitted)). Similarly, the Second Circuit has found that government-caused declines in property value also does not amount to a constitutional deprivation of property, finding that the Due Process Clause does not exist to ensure "the maintenance of transient levels of the quality of neighborhood life." *BAM Hist. Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983).

Here, Plaintiffs' asserted harms do not amount to a constitutional deprivation of property. Plaintiffs construct their flawed theory around three declarants: Dooley, Doe, and Salazar. *See* Mot. at 31–33. Dooley claims that CCAs have traveled through the air and lingered in her home sometimes for "several days." Dooley Decl. ¶ 7. But Dooley does not aver when specifically this occurred or how often this occurred—just that it occurred sometime in October. *Id.* Similarly, Doe claims that federal law enforcement officers released tear gas that "flooded [her] apartment." Doe

Decl. ¶¶ 8–10. Based on the declaration, this appears to have happened twice: "around July 4," *id.* ¶ 8, and "[i]n another incident over the summer," *id.* ¶ 9. And Salazar alleges that CCAs have "regularly entered Gray's Landing since June" and caused damage to Gray's Landing. Salazar Decl. ¶ 9. But besides identifying two dates—one of which involved merely "notic[ing] fumes"— Salazar does not say when or how often this has occurred. In sum, Plaintiffs ask this Court to find that the government deprives a person of a constitutionally protected property right when an CCA wafts through the air and temporarily affects a person's property. Even accepting Plaintiffs' assertions as true, such temporary, isolated interferences do not rise to a constitutional magnitude. If it did, it is hard to see any reasonable limiting principle to Plaintiffs' expansive view of substantive due process.

Plaintiffs then assert that the REACH Plaintiffs have suffered constitutional deprivations to their "reputation, business relationships, and goodwill." Mot. at 32. Plaintiffs clump these alleged interests together and vaguely assert a deprivation of all three—but they are, in fact, different interests requiring independent analyses.

First, the Ninth Circuit has held "that reputation, without more, is not a protected constitutional interest." *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 374 (9th Cir. 1999) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

Second, business goodwill is only a constitutionally protected property interest when business goodwill is properly characterized as a property interest under state law. *Wedges/Ledges of Cal.*, *Inc. v. City of Phx.*, 24 F.3d 56, 65 (9th Cir. 1994). Defendants are not aware of any Oregon Supreme Court decision holding that individuals have a constitutionally protected property interest

in "business goodwill."[1] But even if "business goodwill" is a constitutionally protected property interest in Oregon, Plaintiffs must establish through specific evidence that it has a monetary "goodwill value," as Oregon courts "decline[] to assign a value for goodwill" based on "general assertion[s]" that goodwill exists. *Westwood*, 787 F. Supp. 2d at 1197. The REACH Plaintiffs here provide neither evidence nor a specific value of their business goodwill, making it impossible to determine whether any goodwill exists or has been lost. They assert only a vague and general loss of goodwill—exactly the type found insufficient in *Westwood*.

Third, Defendants are not aware of any due process right to "business relationships." In fact, numerous courts have indicated that no such property right exists under the Due Process Clause. *See 145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 770 (7th Cir. 2021) ("Illinois tort law does not transform a business relationship into a constitutionally protected property right."); *Juster Assocs. v. City of Rutland,* 901 F.2d 266, 272 (2d Cir. 1990) (finding no "constitutionally protected property interest" in an asserted loss of business relationships); *Ne. Jet Ctr., Ltd. v. Lehigh-Northampton Airport Auth.*, No. CIV. A. 90-CV-1262, 1997 WL 230821, at *9 (E.D. Pa. May 5, 1997) ("Despite the interest that tort and contract law has in preserving business relationships, this is not a property interest worthy of constitutional protection.").

Even if this Court determined that the REACH Plaintiffs had some constitutionally protected property interest in its reputation and business goodwill, Plaintiffs' injury must "involve[] much more than an injury to the reputation of a business" to implicate due process.

---

[1] Defendants note that at least one case discusses goodwill, but the court there never announced a broad and general property interest in "business goodwill." *See Sivers Const. Co. v. U.S. Steel Corp.*, 272 Or. 608, 612 (1975). Another federal district court has noted that Oregon does recognize damages for loss of business goodwill, but the court there never identified an Oregon case finding that business goodwill is a constitutionally recognized property interest. *See Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174, 1197 (D. Or. 2011), *aff'd*, 496 F. App'x 728 (9th Cir. 2012).

*WMX Techs., Inc.*, 197 F.3d at 375–76. Plaintiffs must show "actual, direct interference" with their business to rise to the level of a constitutionally protected property interest. *Id.* For example, the Ninth Circuit has held that even "defamatory remarks made to the county and the public generally" that affected the plaintiff's "business reputation" was "not sufficient to satisfy the requirement that a constitutionally protected property interest be at stake." *Id.* 376.

The REACH Plaintiffs here fall far short of establishing that Defendants "actual[ly]" and "direct[ly]" interfered with their business. *Id.* Plaintiffs allege only that "Defendants' conduct . . . damaged the REACH Plaintiffs' business relationships and goodwill." Mot. at 32. But "damage to the reputation of a business, without more, does not rise to the level of a constitutionally protected property interest." *WMX Techs., Inc.*, 197 F.3d at 376. In fact, Plaintiffs' claims here—that CCAs wafted through the air and caused damage to their reputation and business—is much weaker than the claims of broad public defamation found insufficient in *WMX Techs., Inc.* Plaintiffs' theory is thus meritless.

> 2. <u>There is no due process deprivation from incidental harm resulting from DHS's lawful government action.</u>

To show a deprivation, Plaintiffs must show that the government acted unlawfully, because due process "does not apply to the indirect adverse effects of governmental action" or to the "consequential injuries resulting from the exercise of lawful power." *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 789 (1980). But Plaintiffs cannot make that showing because federal law enforcement have used CCAs lawfully to disperse unlawful demonstrations.

"[W]here demonstrations turn violent, they lose their [constitutionally] protected quality[.]" *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." *Cantwell*

*v. Connecticut*, 310 U.S. 296, 308 (1940). "[I]n assessing whether a sufficient clear and present danger justifies dispersal of a crowd, '[i]t is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it *as a unit*.'" *Puente v. City of Phx.*, 123 F.4th 1035, 1062–63 (9th Cir. 2024) (quoting *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977)) (emphasis added).

Here, federal law enforcement personnel at the Portland ICE Facility have been confronted by violent, trespassing, and/or obstructive crowds. *See* Chan Decl. ¶¶ 8-17; Sullivan Decl. ¶¶ 13-22; Cantu Decl. ¶¶ 9-18. On June 14, hundreds of protestors gathered in front of the facility and threw rocks, bricks, and other unknown objects. Chan Decl. ¶ 8. Protestors broke windows, started fires, damaged the facility's access gate, and even breached the facility by shattering the glass entrance. *Id.*; Sullivan Decl. ¶¶ 13-16. Law enforcement reacted by using CCAs to "clear the protestors from federal property." Chan Decl. ¶ 8; Sullivan Decl. ¶ 16. Similar conduct by demonstrators continued beyond June 14.

From June through October,

- Protestors have repeatedly assaulted law enforcement and impeded arrests. *See* Chan Decl. ¶ 10 (assault on July 4); Sullivan Decl. ¶ 19 (assault on October 4); Cantu Decl. ¶ 10, 17 (assault on October 12, impeding arrest on July 4 and October 12). Law enforcement can lawfully use CCAs to disperse an assaultive and obstructive crowd. *See Puente,* 123 F.4th at (rejecting constitutional challenge to use of chemical agents and munitions to disperse crowd); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) ("[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection.").

- Protestors have repeatedly trespassed on and vandalized federal property. *See* Chan Decl. ¶¶ 8-9, 11-12 (trespass and/or vandalism on June 14, June 24, July 15, August 18, October 4); Cantu Decl. ¶¶ 14, 15, 18 (trespass and/or vandalism on October 4, 11, and 12). Law enforcement can lawfully use CCAs to disperse a trespassing crowd. *See Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (assuming that the asserted court street was a public forum and holding that the government could, consistent with the constitution, punish trespassing protestor and prevent the trespasser from future entry onto that street).

- Protestors have repeatedly blocked traffic into the Portland ICE facility. *See* Chan Decl. ¶¶ 9, 14-17 (blocking traffic on June 24, October 4, October 7, October 12, and October 16); Cantu Decl. ¶¶ 11, 12, 13, 16 (blocking traffic on August 18, September 1, October 1, and October 11). On August 18, an individual abandoned a vehicle in front of the ICE facility, which blocked traffic and required the bomb squad to clear the vehicle. Chan Decl. ¶ 12; Cantu Decl. ¶ 11. Law enforcement can lawfully use CCAs to disperse a crowd that is blocking traffic. *See Cameron v. Johnson*, 390 U.S. 611, 617 (1968) ("'[P]icketing and parading (are) subject to regulation even though intertwined with expression and association" where such conduct "obstructs or unreasonably interferes with ingress or egress to or from the courthouse."); *Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) (no constitutional violation where officers struck or jabbed the plaintiffs with batons and knocked one of them to the ground when plaintiffs linked arms to prevent officers from reaching unlawful encampment).

In sum, the record here shows that officers acted lawfully. That, by itself, defeats Plaintiffs' due process theory. *See O'Bannon*, 447 U.S. at 789.

3.  <u>Dispersing crowds that are violent, obstructive, or trespassing is not conscience-shocking behavior.</u>

Even if Plaintiffs were able to clear all the other legal impediments in their path and could somehow establish that a constitutionally recognized liberty or property interest has been deprived, Plaintiffs still must establish that "the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. "[O]nly the most egregious official conduct can be said" to shock the conscience. *Id.* at 846. Thus, negligent tortious conduct is categorically beneath constitutional due process. *Id.* at 848–49. The Supreme Court has found government conduct sufficiently conscience shocking in only extreme circumstances, like when the government forced an emetic solution through a tube into a suspect's stomach and forcibly pumped the suspect's stomach. *Rochin v. California*, 342 U.S. 165, 171–74 (1952). But the Supreme Court found that government officials did not act sufficiently conscience shocking even when they drew blood without consent from an unconscious suspect. *See Breithaupt v. Abram,* 352 U.S. 432, 435 (1957).

A plaintiff can satisfy the shock-the-conscience requirement under one of two tests: deliberate-indifference or the purpose-to-harm. *Puente v. City of Phoenix*, 123 F.4th 1035, 1055 (9th Cir. 2024). The purpose-to-harm standard applies under "circumstances [that] 'force the officers to act quickly" or under "fast paced circumstances presenting competing public safety obligations." *Id.* In applying that standard, the Ninth Circuit in *Puente* held that the purpose to harm standard applied to officers using chemical-based crowd control munitions to disperse a protest. *Id.* So too here (assuming the Court even reaches this part of the analysis despite the long list of legal impediments in Plaintiffs' path).

Plaintiffs argue that federal law enforcement had time to deliberate because CCAs were used on various occasions over a period of months. Mot. at 34. But in each separate instance,

officers responded to unique circumstances and were required to make snap judgments. *See Missouri v. McNeely*, 569 U.S. 141, 158 (2013) ("[P]olice actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules[.]"); Cantu Decl. ¶¶ 9–12 (showing weeks between one use of CCAs and the next). The record shows that federal law enforcement used CCAs in real time, in response to evolving and varied conduct, such as assault, vandalism, trespassing, or blocking traffic into the ICE Facility. Cantu Decl. ¶¶ 9-25; Sullivan Decl. ¶¶ 13-22; Chan Decl. ¶¶ 8-17. Such situation-specific, time-sensitive responses are evaluated under the purpose-to-harm standard.

And under that standard, officer's use of force shocks the conscience only if the officer acted with a "purpose to harm the plaintiffs for reasons *unrelated* to legitimate law enforcement objections." *Puente*, 123 F.4th at 1055 (emphasis added). The purpose-to-harm test is satisfied in only "rare situations where the nature of an officer's deliberate physical contact such that a reasonable factfinder would conclude the officer intended to harm, terrorize, or kill." *See Porter v. Osborn,* 546 F.3d 1131, 1137-39 (9th Cir. 2008). Where an officer pursues other objectives, such as an "arrest, self-protection, [or] protection of the public," there is no purpose to harm. *Ochoa v. City of Mesa*, 26 F.4th 1056, 1056 (9th Cir. 2022).

Here, Plaintiffs fall far short of showing federal law enforcement acted with a "purpose to harm." As explained above in Part III.A.2, the protests outside of the ICE facility have involved, among many other things, people vandalizing government property, people bringing machetes and guns, and people blocking the ICE Facility's entrance. Cantu Decl. ¶¶ 9-25; Sullivan Decl. ¶¶ 13-22; Chan Decl. ¶¶ 8-17. Thus, federal law enforcement used CCAs for a legitimate law enforcement purpose to disperse those unlawful and obstructive crowds. *See Puente*, 123 F.4th at 1056 (finding no purpose to harm where law enforcement used CCAs to disperse a crowd).

Even if the deliberate indifference test applied, law enforcement's conduct in dispersing violent, dangerous, or obstructive demonstrations show no deliberate indifference, which is a "stringent standard of fault," requiring a "culpable mental state"; "[n]ot even gross negligence will do." *Est. of Soakai v. Abdelaziz*, 137 F.4th 969, 985 (9th Cir. 2025), *pet. for cert. filed*, No. 25-427 (U.S. Oct. 8, 2025). In sum, regardless of the test that the Court applies, federal law enforcement actions here are far from the conscience-shocking line.

Moreover, there is another legal impediment in Plaintiffs' way. Although the Ninth Circuit recently determined that injury to a bystander can constitute conscience-shocking behavior, the Ninth Circuit in that same decision indicated that bystander liability under due process is most appropriate when "harm to a third party is a clear, known risk and is entirely foreseeable." *Abdelaziz*, 137 F.4th at 980. For example, in *Abdelaziz*, the Ninth Circuit determined that an officer's conduct was conscience shocking when he initiated a high-speed car chase with a suspect and the suspect smashed into a taco truck, killing the plaintiff that had stopped in front of the truck. *Id.* at 975. Further, the Ninth Circuit indicated that if an officer intended to "shoot at an unarmed civilian purely for the purpose of causing pain" and "instead [struck] a bystander standing *a few feet away*," that conduct would be conscience shocking. *Id.* at 980 n.5 (emphasis added).

Here, though, Plaintiffs are not foreseeable bystanders. Plaintiffs are not the protestors on the ground but occupy apartments in a nearby housing complex. As such, any exposure to CCAs reach Plaintiffs only through a sequence of contingent events: CCAs are released; the weather conditions—like wind—are such that the CCAs waft in the direction of Gray's Landing; and the volume released is enough to reach Resident Plaintiffs' apartments. That is far cry from the limited situations in which the Ninth Circuit has recognized bystander liability under due process: an individual standing in front of a crashed truck or someone positioned only a "few feet away."

29

*Abdelaziz*, 137 F.4th at 975–80. Plaintiffs are too removed from the actual encounters with law enforcement to be considered "entirely foreseeable" or to be considered sufficiently conscience shocking. *Abdelaziz*, 137 F.4th at 980; *see also Byard v. City & Cnty. of S.F.*, 2017 WL 2298044, at *8 (N.D. Cal. May 25, 2017) (indicating that "remote consequence" does not rise to the level of conscience shocking behavior).

Plaintiffs assert they are foreseeable bystanders based on one encounter where declarant Piggott told two officers that their use of CCAs was causing her "adverse effects" at Gray's Landing. Piggott Decl. ¶ 5. But according to Piggott, those officers reacted by telling her that they did not think that was possible, *id.*, which establishes that law enforcement did not, in fact, view Gray's Landing and its residence as "entirely foreseeable." *Abdelaziz*, 137 F.4th at 980. And in any event, one encounter with two officers is hardly probative evidence that all law enforcement over a period of months knew about the alleged effects on Gray's Landing.

### B. Plaintiffs are unlikely to prevail on their Fourth Amendment claim because Plaintiffs have not been seized and law enforcement have acted reasonably.

In a half-hearted two paragraphs, Plaintiffs alternatively assert that Defendants are violating the Fourth Amendment.[2] They theorize that Defendants "use of force has restrained resident Plaintiffs' 'liberty of movement," and thus they have been seized. Plaintiffs are wrong again on the law. The Fourth Amendment protects against "unreasonable searches and seizures." Thus, when the use of force entails a "seizure" of a "person," courts evaluate whether the force was excessive under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). But before even deciding whether law enforcement acted reasonably, Plaintiffs must establish that they were seized.

---

[2] To the extent Plaintiffs are attempting to assert the Fourth Amendment rights of third-party protesters, they do not have standing to do so. *See United States v. Salvucci*, 448 U.S. 83, 95 (1980).

Here, there is no seizure. Plaintiffs provide no evidence that Defendants "objectively manifest[ed] an intent to restrain" any Plaintiff by using CCAs to disperse third-party protestors in front of the ICE facility. *See Torres v. Madrid*, 592 U.S. 306, 311 (2021) (cleaned up). Nor have they shown that any Plaintiff was seized. That alone defeats their Fourth Amendment claims.

Nor have Plaintiffs shown that Defendants seized the protestors. The record establishes that Defendants sought to disperse dangerous, disruptive, and obstructive crowds, not restrain them. The "seizure" of a "person" follows from either some physical force or show of authority that "in some way restrains the liberty of the person." *Torres*, 592 U.S. at 311 (cleaned up). By contrast, the entire purpose of dispersing an unlawful crowd is to encourage them to leave the area, not to restrain or confine them under government control.

*Puente* is instructive. There, the Ninth Circuit held that the Phoenix police's dispersal of an uncompliant crowd by airborne chemical irritants (e.g., tear gas and pepper spray) and auditory or visual irritants was not a "seizure" within the meaning of the Fourth Amendment. *Puente,* 123 F.4th at 1051-54. The court explained that "an application of force with an objective intent merely to *disperse* or *exclude* persons from an area—and *without* any measures objectively aimed at detaining or confining them in the process—does not involve the necessary 'intent to *restrain*' that might give rise to a 'seizure.'" *Id*. at 1052 (emphasis in original). The same analysis applies here. Plaintiffs provide no evidence that federal law enforcement used CCAs with any objective intent other than to disperse or excuse persons from an area. Plaintiffs thus fail to demonstrate any Fourth Amendment seizure occurred. That is also fatal to Plaintiffs' Fourth Amendment claims.

Even if the Fourth Amendment objective reasonableness standard applied, Plaintiffs fail to meet that standard as well. That standard requires that officer's use of force be "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their

underlying intent or motivation." *Graham*, 490 U.S. at 397. "[R]easonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396–97.

As explained in Part III.A.2, the record shows that federal law enforcement responded to unlawful demonstrations and acted to disperse such demonstrations. A crowd where significant numbers are freely engaging in assaultive behavior, are trespassing on federal property, or are blocking traffic creates an objectively reasonable ground to issue dispersal orders and, if needed, enforce them with the use of CCAs. Because doing so is objectively reasonable under the circumstances, Plaintiffs are unlikely to prevail on their Fourth Amendment theory.

## IV. The balance of the equities and public interest weigh against an injunction.

The balance of the equities and public interest favor Defendants, who are enforcing existing law and defending life and property in response to repeated unlawful attacks. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). "The federal government's interest in preventing" attacks on federal personnel and damage to federal buildings "is significant." *See Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025) (collecting cases).

Moreover, the public has an interest in quelling disorderly crowds that threaten the integrity of public property. *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000); *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (recognizing "the legitimacy of the government's interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights." (cleaned up)). Additionally, Congress has recognized such interests by making the destruction of federal property and assault of federal officers felonies. 18 U.S.C. §§ 111, 1361. The federal government thus has an interest in "preserv[ing] the property

under its control for the use to which it is lawfully dedicated[;]" for government buildings, those uses are public uses that are in the public interest. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-80 (1992) (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). The public interest is advanced when law enforcement personnel disperse crowds acting unlawfully near federal buildings and personnel. *See, e.g.*, *Grayned*, 408 U.S. at 116; *Griefen*, 200 F.3d at 1260; *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012).

Put simply, Plaintiffs cannot dispute that the federal government and the public have a compelling interest in protecting federal property and personnel. Plaintiffs' theory that Defendants' used CCAs "with no violence or other imminent threats to life," Mot. at 38, is unavailing when the facts are replete with vandalism to the ICE Facility and attacks on federal personnel and property. Cantu Decl. ¶¶ 9-25; Sullivan Decl. ¶¶ 13-22; Chan Decl. ¶¶ 8-17. In any event, aside from blanket assertions, Plaintiffs cite no source for this heightened standard of "violence or other imminent threats to life" as a requirement to use CCAs. In fact, law enforcement can lawfully use CCAs to protect federal property, disperse crowds obstructing traffic into federal buildings, and stop civil disturbances. *See* Cantu Decl. ¶ 8; Chan ¶ 19; Sullivan Decl. ¶ 8.

By contrast, Plaintiffs' proposed injunction would irreparably harm the government and the public interest. *See* Order, *Chicago Headline Club*, at 2. As detailed above, the injunction would improperly constrain officers' ability to respond to disruptive and violent protests at the ICE Facility, thereby endangering the safety of officers, detainees inside the ICE Facility, and the public alike. It also interferes with lawful enforcement of the Nation's immigration laws, and "[a]ny time [the Government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers from a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012); *see also* Order, *Chicago Headline Club* at 2. Moreover, the injunction turns the

separation of powers on its head by installing this Court as the overseer of every CCA decision that federal law-enforcement make in often "tense, uncertain, and rapidly evolving . . . situations[.]" *Graham*, 490 U.S. at 397. Courts should not place themselves in the untenable position of micromanaging day-to-day federal law-enforcement operations in this manner. *See Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 453-54 (1990). Accordingly, the balance of equities strongly counsels against a preliminary injunction.

V.    **Scope of Relief.**

Even if this Court was inclined to grant Plaintiffs any relief, Plaintiffs' proposed injunction is improper for at least two reasons. *First*, Plaintiffs seek an injunction affecting all CCAs. But Plaintiffs' alleged harm seems primarily—or entirely—based on the use of CS gas (commonly known as tear gas). Thus, to remedy Plaintiffs' claims, any injunction should only concern the use of CS gas. *Second*, Plaintiffs ask this Court to enjoin Defendants from using CCAs only when "necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons." Mot. at 44. But as explained above, federal law enforcement agencies are permitted to use CCAs in a broader set of circumstances, including to protect federal property and to disperse crowds blocking the entrance into federal facilities. *See, e.g.*, Cantu Decl. ¶ 27. Thus, any injunction should not override what law enforcement are lawfully permitted to do.

VI.    **An evidentiary hearing is not needed to decide this preliminary injunction motion.**

Plaintiffs' request for an evidentiary hearing should be denied. *See* ECF 29. First, the Ninth Circuit has consistently ruled that there is no presumption in favor of evidentiary hearings when deciding a preliminary injunction. *See, e.g.*, *Kenneally v. Lungren*, 967 F.2d 329, 334 (9th Cir. 1992); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1326 (9th Cir. 1994). Indeed, the Ninth Circuit expressly disfavors evidentiary hearings where, as here, the facts are complicated, or where, as

here, such a hearing would be burdensome. *See, e.g.*, *Kenneally*, 967 F.2d at 334-35; *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986).

Here, there is no reason to depart from the general rule of deciding the preliminary injunction motion on a written record. Plaintiffs' contemplated hearing would be highly "impractical" given "the magnitude of the inquiry" they propose. *Int'l Molders*, 799 F.2d at 555. Plaintiffs have indicated that they want to call five or more witnesses, which would require a significant amount of party and judicial resources.

At most, the Court should hold an oral argument—not an evidentiary hearing—to discuss Plaintiffs' novel substantive due process and Fourth Amendment theories. Even assuming for argument's sake that the Court accepted entirely Plaintiffs' version of the facts, Plaintiffs' claims would fail for all the many legal reasons discussed above. With all these dispositive legal issues lurking, Plaintiffs tellingly want the Court and the parties to spend substantial time and resources on an evidentiary hearing rehashing facts already discussed in declarations. That is as inefficient as it is misguided for a case like this. The Court should deny the evidentiary hearing request.

## VII.    The Court should require a bond and stay any injunction

Finally, if the Court grants an injunction, it should require a bond pursuant to Rule 65(c). And to the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal, or at a minimum, administratively stayed for seven days. Defendants have, at a minimum, satisfied the requirements for a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

## <u>CONCLUSION</u>

For these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: January 22, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW WARDEN
Assistant Director
Federal Programs Branch

*/s/ Samuel S. Holt*
SAMUEL S. HOLT
KATHLEEN JACOBS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 674-9761
Fax: (202) 616-8470
Samuel.Holt2@usdoj.gov

*Counsel for Defendants*

**<u>Certificate of Compliance</u>**

This brief complies with the page-limitation rule under LR 7-2(b), because it contains 35 pages, including headings, footnotes, and quotations, but excluding caption, table of contents, table of authorities, signature block, exhibits, and any certificates of counsel.