# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD TRUMP, *et.al.*,<br><br>*Defendants*. | Case No. 3:25-cv-1756-IM |

### **DECLARATION OF CHIEF PATROL AGENT TIMOTHY P. SULLIVAN**

I, Timothy P. Sullivan, declare and affirm as follows:

1. I am employed by the U.S. Border Patrol, an operational division of the U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS).

2. I am submitting this declaration to explain CBP's possible deployment of any less lethal munitions that could be construed to be "tear gas, smoke grenades, and other chemical munitions" at or near the Portland ICE Facility located at 4310 S Macadam Ave, Portland, OR 97239 on June 14, 2025, October 4, 2025, October 7, 2025, October 12, 2025, and October 16, 2025.

3. The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties.

**Background on CBP and My Position**

4. CBP is charged with enforcing the Nation's immigration laws to protect national security and uphold the integrity of the immigration system, among other missions. CBP includes various subcomponents, which includes two law enforcement agencies: the U.S. Border Patrol and the Office of Field Operations. As part of this mission, Border Patrol Agents (BPAs) from the U.S. Border Patrol, and Customs and Border Protection Officers (CBPOs) from Office of Field Operations are responsible for preventing the unlawful entry of individuals into the United States and apprehending those who attempt to enter illegally or who have violated the nation's immigration laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

5. The U.S. Border Patrol includes a Special Operations Group (SOG) which is tasked to respond nationally to any national security threat or law enforcement emergency. SOG oversees the Border Patrol Tactical Unit (BORTAC) and the Border Patrol Search, Trauma, and Rescue Unit (BORSTAR). SOG is headquartered in El Paso, Texas, and there are 12 Special Operations Detachment (SODs) located throughout the United States. BORTAC is a highly specialized law enforcement unit comprised of BPAs with extensive experience in responding to emergent and high-risk incidents involving DHS and CBP, like civil disturbances. These teams can be called upon to deploy immediately in response to civil disturbances when needed. These team members may identify themselves as SOG, SOD, BORTAC, BORSTAR and/or MRT.

6. The Office of Field Operations includes a Special Response Team (SRT). Although SRT is part of a different sub-component than myself, having worked alongside SRT, I can say they function similarly to SOG in that they are a highly specialized law enforcement unit comprised of CBPOs with extensive experience in responding to emergent and high-risk operations and incidents involving DHS and CBP, like civil disturbances.

7. I have worked at CBP, specifically the U.S. Border Patrol for 28 years. Presently, I am the Chief Patrol Agent of SOG which is based in El Paso, Texas. I have been the Chief Patrol Agent of SOG since January 2016. In this role, I am responsible for managing SOG's national operations and administrative functions.

**CBP's Use of Force Policy**

8. CBP's Use of Force Policy is a public document, available here.[1] All CBP authorized officers and agents, including but not limited to BPAs and CBPOs, must comply with CBP's Use of Force Policy.

9. CBP's Use of Force Policy addresses the types of less lethal devices and munitions BPAs and CBPOs may deploy and outlines the circumstances in which they may be utilized. Specifically, Chapter 3 outlines CBP authorized less lethal devices and/or munitions. The following are the chemical munitions that may be deployed: (1) Oleoresin Capsicum (OC) spray; (2) Compressed Air Launchers, like the Pepperball Launching System (PLS) and FN3030; (3) Munition Launchers (e.g. 40 mm) and Less Lethal Specialty Impact and Chemical Munitions (LLSI-CM); and (4) Other chemical irritants authorized by CBP which may include but are not limited to handheld Stinger Rubber Ball Grenades, and smoke, CS, and OC canisters.

///

---

[1] https://www.cbp.gov/sites/default/files/assets/documents/2021-Jul/cbp-use-of-force-policy_4500-002A.pdf (January 12, 2026).

10. Based on my understanding and representations made to me by those who oversee CBP's Use of Force Policy, here is a general explanation of what each type of less lethal device can do as crowd control measure: (1) OC spray is essentially pepper spray and the type used can deploy up to 20 feet; (2) PLS and FN303 can launch chemical irritant projectile or non-toxic projectiles, specifically they can be filled with micro pulverized OC powder that causes irritation to mucus membranes and when used for area saturation can impact 10-300 feet; (3) 40mm and LLSI-CM can deliver chemical irritants and when used for area saturation, depending on the type of projectile being launched, can impact up to 450 feet; and (4) CS or OC canisters/grenades, rubber ball grenades, and smoke canisters are typically thrown by hand and exposure to these chemical munitions is typically in small amounts and dissipates rather quickly.

11. If the BPA or CBPO is certified to use the less lethal device per CBP's Use of Force policy, these less-lethal munitions sometimes are utilized during civil disturbances as crowd control measures for the safety of the public and the BPAs and CBPOs. Whenever feasible a verbal warning is provided prior to using any less lethal device, but due to the dynamic situations encountered during these events, in many cases in direct response to immediate threats, giving warnings and/or commands and time for a subject or subjects to comply may not always be feasible. Exposure to CS or OC canisters/grenades, rubber ball grenades, and smoke canisters tend to be minimal and rapidly dissipates. Of course, environmental conditions such as humidity, wind, precipitation and air temperature can affect how long the chemicals remain in the area.

**My Role in Portland**

12. Since October 2025, I have been assigned as CBP's Incident Commander for the protection of the Portland ICE Facility. In this role, I have operational oversight and am responsible for any CBP personnel assisting with the protection of the Portland ICE Facility and responding to civil disturbances at or around the Portland ICE Facility, including but not limited to, those CBP personnel in SOG, SOD, BORTAC, BORSTAR, MRT and SRT.

**June 14, 2025**

13. FPS requested short term CBP assistance to protect the Portland ICE Facility and SOG was ordered to assist from June 14, 2025 to June 22, 2025. As such, a team from SOG/SOD was sent to help protect the Portland ICE Facility from June 14, 2025 to June 22, 2025. I was not part of that team.

14. According to CBP reporting, from June 14, 2025, from approximately 5:00 p.m. until June 15, 2025, at 3:00 a.m., a large crowd congregated in front of the Portland ICE Facility. When BPAs arrived on scene, a large crowd surrounded the front of the Portland ICE Facility, which had been vandalized—the glass doors to the building entrance were

shattered and the vehicle access gate was damaged. When CBP personnel drove up to the Portland ICE Facility, unknown objects were thrown at them and struck their vehicle.

15. At approximately 6:00 p.m., the Portland Police Bureau along with the Federal Protective Service made announcements to the crowd to disperse and that a failure to adhere to this order may result in the deployment of chemical and or impact munitions, and that they may be subject to arrest.

16. At approximately 6:30 p.m., BPAs deployed in front of the Portland ICE Facility. The crowd numbered approximately two hundred people. The crowd was blocking traffic, surrounding law enforcement units and shouted, "Fuck ICE, All Cops Are Bastards, I hope you die, and kill yourself!" Many in the crowd were wearing face masks and air filtration devices. The crowd began throwing rocks, sticks, bottles of water and other unknown projectiles at BPAs. Their actions posed an immediate threat to the BPAs' and hindered their ability to stop unauthorized access to the Porland ICE Facility, which is a controlled federal facility with can have both federal personnel and detainees inside. BPAs utilized the following less lethal devices and munitions: Oleoresin Capsicum (OC) spray, Compressed Air Launchers, Munition Launchers, and hand thrown munitions. Such tactics allowed BPAs to effectively and temporarily stop the hostile crowd, allowing other federal law enforcement officers to board up the glass entry doors with plywood. Once the glass doors were covered, BPAs disengaged from the crowd and withdrew back into the building.

**June 24, July 4, July 15, August 18, August 19, and September 1, 2025**

17. As it relates to the protection of the Portland ICE Facility, CBP was not present in Portland and therefore did not assist with the protection of the Portland ICE Facility on these dates.

**October 4, 2025**

18. According to CBP reporting, there appears to have been two instances where BPAs and a CBPO utilized less lethal devices and munitions outlined in paragraph 10.

19. First, at approximately 1:00 PM, BPAs attempted to clear the Portland ICE Facility driveway to establish a safe pathway for vehicles entering and exiting the facility. Portland ICE Facility is clearly marked by a large blue line with white lettering stating: "U.S. Government Property – Do Not Block." The blue line is well-illuminated by facility lighting, ensuring it is visible to individuals in the area at all times. Around this time, Federal Protective Service issued a warning over the Long-Range Acoustic Device (LRAD), instructing individuals to clear the driveway, refrain from trespassing onto federal property, and advising that a failure to comply could result in arrest. The LRAD warning is utilized to project at a volume sufficient for individuals in the vicinity of the building to hear and understand. A crowd had gathered and refused repeated commands

to move from the entrance. At least one BPA was physically assaulted, and at least one BPA utilized the less lethal munition launcher and hand thrown munitions. Such tactics ensured the crowd backed away without further incident.

20. Second, at approximately 10:00 PM BPAs and a CBPO (i.e., a Special Response Team Operator) again exited the Portland ICE Facility driveway to establish a safe pathway for vehicles entering and exiting the facility. A crowd had gathered and refused repeated commands to move from the entrance. Despite verbal warnings and attempts to physically create space, the crowd actively resisted. At least one BPA was physically assaulted, and BPAs and CBPO BPAs utilized the following less lethal devices and munitions: Compressed Air Launchers, Munition Launchers, and hand thrown munitions. Such tactics ensured the crowd backed away without further incident.

**October 7, October 12, and October 16, 2025**

21. It is my understanding that no less lethal device or munition, including chemical munition, was deployed on these dates by CBP at or near the Portland ICE Facility.

**From October 16, 2025 to January 9, 2026**

22. According to CBP reporting, on October 18, 2025, at approximately 8:30 PM, the crowd outside the Portland ICE Facility had grown to hundreds of individuals. BPAs and CBPOs attempted to clear the Portland ICE Facility driveway to establish a safe pathway for vehicles entering and exiting the facility. The crowd was aggressive and hostile, shining strobe lights directly at the BPAs and CBPOs to impair their vision and coordination. They yelled obscenities and threats, creating an environment of heightened tension and danger. Members of the crowd pressed forward toward the BPAs and CBPOs, attempting to thwart law enforcement efforts by interfering with operations and obstructing movement. The crowd's actions, including verbal threats and physical intimidation, posed an immediate risk to the safety of law enforcement personnel and the integrity of the mission to protect the Portland ICE Facility. BPAs and CBPOs utilized the following less lethal devices and munitions: Compressed Air Launchers and hand thrown munitions. Such tactics ensured the crowd backed away without further incident.

23. Since mid to late October to present, based on representations made to me by those CBP personnel who worked at the Portland ICE Facility, as well as from my time at the Portland ICE Facility, there have been fewer crowds at or near the Portland ICE Facility thereby reducing the need for the use of less lethal devices and munitions. Based on reporting and as of the date and time of this declaration, the most recent time that CBP has used chemical-based less lethal munitions was on October 18, 2025.

///

**Impact of Plaintiffs' Requested Relief**

24. Further limiting the use of less lethal devices and munitions, specifically an injunction limiting CBP's use of chemical munitions where "necessary to protect against an imminent threat to life" would adversely affect CBP law enforcement operations.  Less lethal munitions, including chemical munitions, are an important de-escalation tool for law enforcement.  It is important to have the ability to use these measures should circumstances warrant such measures.  They permit CBP law enforcement to successfully disperse certain violent, hostile, or obstructive crowds.  On occasions when CBP law enforcement officers are faced with escalating force from crowds, less lethal devices and munitions can enable BPAs and CBPOs to safely mitigate these volatile situations without resorting to the use of further physical force or deadly force in compliance with CBP's Use of Force Policy.  An order that would prohibit BPAs and CBPOs from using less lethal devices and munitions, like chemical munitions, could lead to more violent, physical engagements, not less.  Consequently, I believe that the issuance of a preliminary injunction in this case would adversely impact CBP operations, potentially endanger CBP personnel, and would have a negative impact on public safety.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

January 22, 2026

TIMOTHY P SULLIVAN
Digitally signed by TIMOTHY P SULLIVAN
Date: 2026.01.22 09:54:16 -07'00'

Timothy P. Sullivan
Chief Patrol Agent, SOG
U.S. Border Patrol
U.S. Customs and Border Protection
U.S. Department of Homeland Security