# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
(Portland Division)

| | |
|---|---|
| REACH COMMUNITY DEVELOPMENT, *et al.*,<br><br>　　　*Plaintiffs*<br><br>　　　v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et. al.*,<br><br>　　　*Defendants* | Case No. 3:25-cv-2257<br><br>Declaration of Assistant Field Office Director Jeffrey Chan |

**DECLARATION OF JEFFREY K. CHAN**

I, Jeffrey Chan, hereby declare as follows:

1. I am employed as an Assistant Field Office Director ("AFOD") with the U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") division, assigned to the Portland Office, which falls under the Seattle Field Office Area of Responsibility ("AOR"). I have been employed by ICE since 2006, but employed in Oregon since 2008, and have held various ERO roles involving detention, processing, and removal operations. I have been an AFOD in Portland since June 2024. My duties include overseeing the intake, processing, and transfer of noncitizens detained in Oregon, ensuring compliance with ICE policies, federal laws, and local agreements. I am familiar with the operations of the Portland Field Office located at 4310 South Macadam Avenue, Portland, OR, as well as ICE's processing, detention and transfer policies, guidance and protocols.

2. This statement is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction. The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties.

**Background**

3. ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

4. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and have been delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security, who are a risk to public safety, and who enter the United States illegally—including those who cross the border illegally, which is a federal criminal misdemeanor, 8 U.S.C. § 1325, and

those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326. It is also the mission of ERO "to protect the homeland through the arrest and removal of those who undermine the safety of our communities and the integrity of our immigration laws." *See* Enforcement and Removal Operations, www.ice.gov/about-ice/ero.

5. The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

6. Violent opportunists and disruptive protesters have targeted the Portland Field Office and the employees who work there since early June 2025. Protesters at the ERO Portland Office have assaulted federal law enforcement officers with rocks, bricks, pepper spray, and incendiary devices like commercial grade fireworks. A substantial amount of damage has been done to federal property at the Portland ICE Facility. At times, less than lethal munitions are used for crowd dispersal.

**DHS Use of Force Policy**

7. In responding to public safety threats, ICE officers and special agents are bound by the DHS use of force policy titled, *Update to the Department Policy on the Use of Force*

(Feb. 6, 2023) (Use of Force Policy), available at

https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf. The general principle undergirding the Use of Force Policy is the respect for human life and the communities served. To that end, the Use of Force Policy requires that law enforcement officers only use force when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the law enforcement officer at the time force is applied.

**Specific Examples**

8. According to reports, on June 14, 2025, a crowd of over hundreds formed near the Portland Field Office and protestors were throwing rocks, bricks, unknown objects, barricading doors, breaking windows, starting fires, and had breached the facility's front double glass doors into the lobby area. ICE special response team (SRT) personnel utilized less than lethal devices such as 40mm munitions launchers and the Pepperball Launching System (PLS) to launch chemical irritant projectiles, such as pepperballs, to attempt to clear the protestors from federal property. Multiple protestors were taken into custody for assaulting federal officers, trespassing, and destruction of federal property.

9. According to reports, on June 24, 2025, SRT members deployed smoke and CS cannisters into a crowd of 100-plus protesters and agitators who were trespassing on federal property in violation of federal law and blocking the driveway entrance into the ICE facility. The crowd had been instructed multiple times by FPS officers to stay off federal property and not block the driveway. A crowd rapidly advanced on officers during an arrest and several CS canisters and low roll flash bangs were deployed so that federal

officers could return inside the building. A PLS was also used at this time. While arresting a protester wielding a machete and knife, multiple protesters surrounded the arresting operators and officers, so various less lethal munitions from OC, CS, and PLS were used.

10. According to reports, on July 4, 2025, officers arrested one individual with a pistol in his waist. One officer was assaulted by another individual. On several occasions, officers saturated the area with a PLS near the north gate on federal property to move individuals back after verbal commands were ignored. Officers used CS gas and Oleoresin Capsicum (OC) spray on non-compliant individuals. Both handheld chemical munitions and 40mm skat rounds were used.

11. According to reports, on July 15, 2025, protestor activity increased in non-compliance in the early morning and late hours. Early morning, officers repeatedly told protestors to stay off federal property. When protestors failed to keep their distance from the officers affecting an arrest, CS, smoke, and PLS rounds were deployed. Around 11 PM, protestor count was around 35-40 people. The crowd was told to step back from federal property. PLS rounds were deployed to remove protestors that continued to trespass on federal property.

12. According to reports, on August 18, 2025, FPS initiated a call to Portland Police Bomb Squad for a possible Vehicle-Borne Improvised Explosive Device. Multiple protesters trespassed on federal property despite multiple verbal warnings for protestors to leave federal property. Around 12:30 AM on August 19, 2025, SRT officers deployed both hand-thrown chemical munitions and PLS as crowd control measures. Those protestors

that remained were detained and/or cited for trespassing and failing to comply with lawful orders.

13. According to reports, on September 1, 2025, in the evening approximately 200 protesters assembled near the ICE building, with some carrying sticks, baseball bats, shields, improvised weapons, and what appeared to be ballistic vests. Property was damaged along the fence line. Several SRT Operators deployed hand-thrown chemical munitions, and PLS as part of the crowd control measures.

14. According to reports, on October 4, 2025, crowds ranged from 100-200 protestors throughout the day. FPS officers issued multiple dispersal warnings using the Long Range Acoustic Device, advising subjects to vacate federal property. Violent protestors, many equipped with gas masks, body armor, helmets and improvised weapons (sticks, baseball bats, shields), made threatening gestures toward officers, trespassed onto federal property, and blocked access to the ICE facility. SRT utilized hand-thrown smoke, CS cannisters, and PLS to clear the area.

15. According to reports, on October 7, 2025, the Portland Police Department blocked pedestrian and vehicle traffic around the ICE facility for much of the day.

16. According to reports, on October 12, 2025, protest activity was increased during daytime hours and decreased into the evening. At approximately 3 to 5 PM, the crowd size was around 400 protestors. Around that time 100 individuals assembled at the front gate and blocked the driveway into the ICE Facility. Officers cleared the driveway and arrested two protestors who failed to comply with lawful orders to clear the driveway and two other protestors for assault on an officer. The crowd decreased to 100-200 protestors in the evening.

17. According to reports, on October 16, 2025, a blue sedan with dark tinted windows blocked traffic near the Portland Field Office, so ICE SRT deployed smoke to prompt the vehicle to move from in front of the facility. The vehicle later returned, and hand thrown smoke was deployed to encourage the vehicle to leave.

**The Current Situation**

18. Department Policy on the Use of Force notes that law enforcement officers may use force only when no reasonably effective, safe, and feasible alternative exists, and there may be a range of responses that are reasonable or appropriate for a particular incident. ICE officers and agents are trained to use the minimum amount of force necessary to resolve dangerous encounters while prioritizing both officer safety and safety to the public. As of the date and time of this declaration, there have been no uses of chemical munitions by ICE in Portland since October 2025.

**Impact of Plaintiffs' Requested Relief**

19. If the Court grants Plaintiffs' request to limit the use of chemical munitions only to where "necessary to protect against an imminent threat to life," there will be a negative impact. There are certain circumstances where ICE uses chemical munitions to protect ICE employees, contractors, detainees, the federal facilities, and the general public in the vicinity of the federal buildings. There is an increased risk of serious harm if ICE is unable to use deescalating crowd control tactics, such as chemical munitions, to prevent protesters, rioters, and crowds from harmful, destructive, or obstructive behavior. These deescalating tactics allow officers to control unlawful crowds without having to use hands-on techniques.

//

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on January 21, 2026

Jeffrey Chan
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
Portland, Oregon