Darin M. Sands, OSB No. 106624
**Bradley Bernstein Sands LLP**
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480
dsands@bradleybernstein.com

Daniel F. Jacobson (D.C. Bar No. 1016621)+
**Jacobson Lawyers Group PLLC**
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Telephone: +1 301-823-1148
Dan@jacobsonlawyersgroup.com

+ admitted pro hac vice

*Attorneys for Plaintiffs*

(Additional counsel listed on signature page)

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| REACH COMMUNITY DEVELOPMENT, WHITFIELD TAYLOR, individually and as Parent and Next Friend of Minor Children A.T. and B.T., ERICA DEL NIGRO, individually and as Parent and Next Friend of Minor Child J.D., MINDY KING, SUSAN DOOLEY, JANICE LINEBERGER, ROY BROOKS, DIANE MORENO, JANE DOE, REBECCA ROE, REACH B49 PARTNERS LP, and REACH OFFICE LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, in her official capacity as Secretary of Homeland Security, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, TODD LYONS in his official | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Case No. 3:25-cv-2257 |

capacity as Acting Director of ICE, U.S.
CUSTOMS AND BORDER PROTECTION,
RODNEY SCOTT in his official capacity as the
Commissioner of CBP, FEDERAL PROTECTIVE
SERVICES, FARON PARAMORE in his official
capacity as the Director of FPS, U.S. SECRET
SERVICE, and SEAN CURRAN in his official
capacity as Director of the Secret Service,

                    *Defendants*.

# **INTRODUCTION**

1.      It should go without saying that, under our Constitution, the federal government

may not knowingly release poison gas into the homes of citizens who are simply trying to go

about their lives. But that is exactly what has been happening for the last six months at the

Gray's Landing affordable housing complex in Portland.

2.      Gray's Landing is located across the street from the Immigration and Customs

Enforcement (ICE) facility in South Waterfront, less than 100 feet away at its closest point.

Since June, seemingly every time protesters assemble on S. Moody Avenue outside the ICE

facility, federal officers indiscriminately deploy tear gas, smoke grenades, pepper balls, and other

chemical agents in mass volume. Officers use these weapons without regard to crowd size, to the

presence or absence of violence, or to basic safety. When federal officers deploy these chemical

munitions, gases and particulates infiltrate the homes of Gray's Landing residents, including the

twelve individual Plaintiffs in this action.

3.      The tear gas and other chemical agents that Defendants have used countless times

near Gray's Landing are designed to be used sparingly, in outdoor environments only, and for

the purposes of dispersing persons. They are not designed for sustained human exposure over a

months-long period, and they are certainly not meant for use in an indoor residential location

where residents live, sleep, and breathe. Inside Gray's Landing, the gases do not dissipate. They seep through windows and vents, accumulate in hallways and bedrooms, and bind to walls, carpets, clothing, furniture, and children's toys. Such long-term, residential exposure to these toxins appears to be unprecedented. Tragically, but not unexpectedly, Plaintiffs are suffering immense physical and psychological harm as a result.

4.      With each exposure, Plaintiffs experience physical reactions including difficulty breathing, unstoppable coughing, severe burning in their throats and eyes, dizziness, headaches, and more. Those symptoms do not usually end when the smoke clears. Some residents' symptoms persist for days or weeks, and others now appear to be permanent. The psychological torment is equally devastating. Many residents of Gray's Landing are veterans or survivors of domestic violence who live with post-traumatic stress disorder (PTSD). Each gassing (which is typically accompanied by flashbang explosions outside) serves as a new triggering event. Plaintiff Jane Doe, for instance, survived a gunshot to her head from her former abuser, and each time federal officers deploy flashbangs and tear gas outside her window, the blasts and fumes trigger a horrific panic and physical manifestations of that panic. Roy Brooks, who has muscular dystrophy, lost so much sleep from the unpredictable explosions that he suffered irreversible muscle loss. Diane Moreno, who suffers from a hormonal disorder that causes the overproduction of cortisol, now needs to have her adrenal gland removed to avoid further harm.

5.      Residents are forced to sacrifice their liberty to try to preserve their physical safety. Plaintiffs seal their windows and doors with tape, place towels under their doors, and wear gas masks *in their own homes*, all in an often-futile effort to keep the gas and smoke out of their apartments and bodies. A.T. and B.T., two girls under ten years old, sometimes sleep in their father's closet to feel some sense of safety. The ordinary incidents of home life—opening a

window, stepping onto a balcony, letting a child sleep in her own bed—have become sources of danger and anxiety.

6.     There can be no justification for the federal government's sustained poisoning of Gray's Landing residents, but Defendants' conduct is truly shocking given the cavalier manner in which they continue to deploy these munitions when officers face no violence or other imminent threat. In fact, Defendants appear to have used these chemical munitions at times, not to address any real danger, but to put on a show for conservative "influencers" whom Defendants invited to the ICE facility to film the protests for propaganda purposes.

7.     Defendants cannot claim ignorance of the harm they are inflicting on Gray's Landing residents. Federal officers shoot their munitions directly toward Gray's Landing, which is a massive residential building that sits right behind the protesters. Defendants know that Gray's Landing is in the line of fire and that its residents will be exposed, but do not care. Indeed, when an employee for the landlord at Gray's Landing confronted ICE officers about how their use of chemical munitions was harming her and others in the building, the officers laughed and told her that they only use gases that are "environmentally friendly." Even after Plaintiffs filed this lawsuit documenting their extreme injuries from the tear gas, Defendants again deployed the chemical munitions in a reckless manner that infiltrated residents' homes and caused severe harm.

8.     Though the bar for government conduct that shocks the conscience in violation of the substantive component of the Due Process Clause is a high one, Defendants' repeated use of dangerous gases meets that standard. The Department of Homeland Security and its components have infringed upon Plaintiffs' rights to life, liberty, and property, and Defendants have done so

with deliberate indifference to the harms they are causing to Plaintiffs and other innocent bystanders.

9.      Plaintiffs bring this action to bring an end to Defendants' shocking and unconstitutional poisoning of their bodies and homes.

## PARTIES

10.      Plaintiff Whitfield Taylor is a resident of Gray's Landing, who lives on the fifth floor of the southwest corner of the complex, roughly 100 feet from the ICE facility. Taylor lives in his apartment with his 7-year-old daughter, A.T., and his 9-year-old daughter, B.T. They have lived at Gray's Landing for six years. Plaintiff Whitfield Taylor appears individually and as Parent and Next Friend of Minor Children A.T. and B.T.

11.      Plaintiff Mindy King is a resident of Gray's Landing, who lives on the second floor on the south side of the complex. Her apartment is at the corner facing the complex's internal courtyard, giving her a direct view of the ICE facility. From that view, King has regularly videotaped Defendants' response to protesters, including Defendants' use of tear gas and other chemical agents. King has lived in her apartment for 10 years and currently lives there with her 13-year-old son.

12.      Plaintiff Jane Doe is a resident of Gray's Landing who lives on the fifth floor of the southwest side of the complex facing Bancroft Street. Doe is a survivor of domestic violence, having once been shot in the head at point blank range by her abuser. She has lived in the building for six years and currently lives in her apartment with her 17-year-old daughter, who is pregnant. Doe is proceeding under pseudonym out of fear for her personal safety.

13.     Plaintiff Susan Dooley is a resident of Gray's Landing who lives on the northwest side of the complex, facing west over S. Moody Avenue. She is 72 years old and a veteran of the Air Force, having served during the Vietnam War. She has lived in Gray's Landing for 10 years.

14.     Plaintiff Janice Lineberger is a resident of Gray's Landing who lives on the east side of the building but facing west, with her apartment overlooking the courtyard. She has lived in the building for several years and now sits on the board for REACH Community Development.

15.     Plaintiff Rebecca Roe is a resident of Gray's Landing who lives on the west side of the complex, with her apartment facing the internal courtyard. Roe is a survivor of decades of domestic violence and moved to Gray's Landing to escape the perpetrator of that violence. Roe is proceeding under pseudonym out of fear for her personal safety.

16.     Plaintiff Roy Brooks is a resident of Gray's Landing who lives on the second floor of the west side of the building, with windows facing S. Moody Ave. He has lived in Gray's Landing since 2015.

17.     Plaintiff Diane Moreno is a resident of Gray's Landing who lives on the fourth floor facing the courtyard, toward the south end of the building. She has lived in Gray's Landing for four years. She has observed Defendants use chemical weapons against peaceful protesters.

18.     Plaintiff Erica del Nigro is a resident of Gray's Landing who has lived on the third floor with her twelve year-old son, J.D., since February 2025. Her apartment overlooks the courtyard of the building. She appears individually and as Parent and Next Friend of Minor Child J.D.

19.     Plaintiff REACH Community Development ("REACH CDC") is a nonprofit organization registered in Oregon and Washington with a principal place of business in Portland,

Oregon. REACH CDC manages properties in Oregon and Washington, and Gray's Landing is one of the largest properties that REACH CDC manages. REACH CDC's mission is to create opportunities for *all people* to thrive by developing and promoting access to quality, affordable homes, supportive services, and community. REACH CDC envisions a world where there is a universal right to housing with *all people* living in safe, vibrant, and healthy communities. REACH CDC has won numerous state and national awards for its creative approach to building healthy communities and its innovative housing projects.

20.     Plaintiff REACH B49 Partners LP, a subsidiary of REACH CDC, owns the land underlying Gray's Landing and the residential units of Gray's Landing.

21.     Plaintiff REACH Office LLC, also a subsidiary of REACH CDC, owns the commercial offices on the first floor of Gray's Landing, including the commercial offices used by REACH CDC.

22.     Defendant U.S. Department of Homeland Security (DHS) is a cabinet-level department of the Executive branch of the federal government.

23.     Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity.

24.     Defendant U.S. Immigration and Customs Enforcement (ICE) is a component agency of Defendant DHS.

25.     Defendant Todd Lyons is the Acting Director of ICE. He is sued in his official capacity.

26.     Defendant U.S. Customs and Border Protection (CBP) is a component agency of DHS.

27.    Defendant Rodney Scott is the Commissioner of CBP. He is sued in his official capacity.

28.    Defendant Federal Protective Service (FPS) is a component agency of DHS.

29.    Defendant Faron Paramore is the Director of FPS. He is sued in his official capacity.

30.    Defendant U.S. Secret Service is a component agency of DHS.

31.    Defendant Sean Curran is the Director of the Secret Service. He is sued in his official capacity.

## JURISDICTION AND VENUE

32.    This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

33.    This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

34.    Venue is appropriate under 28 U.S.C. § 1391(e) in the District of Oregon because one or more Plaintiffs resides in this district and a substantial amount of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL AND LEGAL BACKGROUND

**Gray's Landing**

35.    Since Gray's Landing was built nearly fourteen years ago, REACH CDC has served as the property manager of the complex. REACH CDC functions as the landlord for Gray's Landing and also provides services to residents. Among REACH CDC's services for

residents are a weekly food pantry, access to food boxes that are donated for the facility, community events, lease education, energy assistance, and a transit program that includes deeply discounted streetcar passes.

36. Two wholly owned subsidiaries of REACH CDC, REACHB49 Partners LP and REACH Office LLC (collectively with REACH CDC, the "REACH Plaintiffs"), own the residential and commercial spaces within Gray's Landing respectively, and REACH B49 Partners LP also owns the lot upon which Gray's Landing sits.

37. Gray's Landing contains 209 affordable apartments, which currently house 237 tenants. Tenants must meet certain eligibility criteria to live in the building. All tenants must have income that is less than 60% of the Area Median Income. Other residents must meet additional criteria, such as those who receive Project Based Voucher rental subsidies from the U.S. Department of Housing and Urban Development, with a preference for veterans for these units. Some residents participate in other subsidy programs, including those who participate in the U.S. Department of Veterans Affairs Supportive Housing (VASH) program.

38. Indeed, forty-two apartments in Gray's Landing are reserved for low-income veterans. And 33% of residents live in units that receive some form of rental subsidy support.

39. Sixteen percent of Gray's Landing residents identify as disabled. Five percent of Gray's Landing residents are between 0 and 5 years old and 13 percent are younger than 18 years old. Thirty percent of residents are aged 63 and older.

40. Consistent with its mission, REACH Plaintiffs prioritized the health of its future residents when designing Gray's Landing. The building achieved LEED Platinum certification from the U.S. Green Building Council, reflecting its commitment to high environmental and health standards. REACH CDC enhanced indoor air quality by making Gray's Landing a smoke-

free facility; installing formaldehyde-free cabinets and countertops; providing continuous exhaust bathroom ventilation and kitchen exhaust fans, all connected to exterior ventilation chases; and using solvent-free paints and primers, low toxic adhesives and sealants, and low emitting carpets.

41.    Indoor air quality generally affects individuals' health, especially for children and pregnant people. Exposure to airborne chemicals can affect child and fetal development, causing out-of-balance immune response, altered gene expression, preterm birth, diminished lung function, and disrupted brain development.

42.    Gray's Landing sits diagonally across Bancroft Street and S. Moody Avenue from the Portland ICE facility. Some Gray's Landing residents, including multiple Plaintiffs, have balconies approximately 100 feet from the Portland ICE facility.

43.    The below image shows Gray's Landing when it was under construction, and the general location of the apartments of the Plaintiffs who are residents of Gray's Landing (the "Resident Plaintiffs").



**Protests Near the ICE Facility**

44.    ICE has operated a field office near the intersection of Bancroft Street and S. Moody Avenue since 2011.

45.    This year, the Portland ICE facility has been the scene of protests since at least early June 2025. The crowd size at these protests peaked at approximately 450 protesters on June 12, 2025. The protests were nearly nightly through the end of June, all of July, as well as part of August. They have varied in size and frequency over time, generally becoming more sporadic in recent months, but significant crowds have come in connection with specific events, such as the day after the President announced he would be deploying the national guard to Portland (September 28, 2025), the October 18, 2025 "No Kings" protests,[1] and following the killing of Alex Pretti in Minnesota on January 24, 2026. Protests of various sizes, and Defendants' use of tear gas and other chemical agents, continue to this day.

46.    The protesters have generally congregated near the north driveway to the ICE facility, on Bancroft Street, and filled out down Bancroft Street running east, directly in front of the south side of Gray's Landing. At times, protestors have also gone up S. Moody Avenue, on the western side of Gray's Landing.

47.    The federal officers responding to the protests around the Portland ICE facility have not only been from ICE. DHS has deployed and cross-designated officers from across DHS, including from FPS, CBP, and the Secret Service.

48.    During protests, armed federal officers consistently stand on two levels of the ICE facility looking down on the street, with many of these officers standing at a diagonal angle

---

[1] *See* Findings of Fact and Conclusions of Law, ECF No 146 (3:25-cv-1756-IM) at 21-23 (D.Or. November 7, 2025).

facing directly toward Gray's Landing. The officers shoot tear gas, smoke bombs, pepper balls, and other projectile chemical munitions from these positions. The following image shows the positioning of the officers on top of the ICE facility, with the photo being taken from in front of the southwest corner of Gray's Landing.[2]



49.     The protests have been largely peaceful. The only substantial damage to the Portland ICE facility occurred in mid-June when protesters broke windows and blocked entrances at the facility.

---

[2] Baumhardt, Alex, Mia Maldonado & Julia Shumway, *Tens of thousands protest across Oregon as part of No Kings day*, Oregon Capital Chronicle (Oct. 18, 2025), https://oregoncapitalchronicle.com/2025/10/18/tens-of-thousands-protest-across-oregon-as-part-of-no-kings-day/ (photo by Alex Baumhardt).

PAGE 13 — FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

**Defendants' Use of Tear Gas and Other Chemical Munitions**

50.     Since the protests began in earnest in June 2025, Defendants have consistently—

and indiscriminately—fired chemical munitions at protesters on Bancroft Street and S. Moody

Avenue. In various instances, Defendants have fired chemical munitions that have hit Gray's

Landing apartments or the building's courtyard. Gray's Landing occupants have found tear gas

canisters, pepper balls. and other munitions on the sidewalks to their building, on their balconies,

in the building parking garage, and in the building courtyard.

51.     Defendants have indeed deployed a range of chemical munitions next to Gray's

Landing and Plaintiffs' apartment in particular, including tear gas, smoke grants that emit four

different colors of smoke, pepper balls, and more.

52.     During summer 2025 and in October 2025, there were extended periods when

Defendants used these chemical munitions on a near nightly basis.

53.     For example, the two images below were captured by Plaintiff Mindy King from

her apartment.





54.     Defendants have deployed these chemical munitions when protests have been

entirely non-violent and federal officers were under no physical threat. Sometimes federal

---

[3] Image captured by Plaintiff Mindy King looking across Bancroft Street in the direction of the ICE facility.
[4] Image captured by Plaintiff Mindy King looking across Bancroft Street in the direction of the ICE facility, showing red and green gases used by federal law enforcement officers.

PAGE 15 — FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

officers have deployed chemical agents with no instigating event at all, seemingly at random. Chemical munitions have been used when protesters have simply been chanting loudly or using profanity. At other times, officers have used these weapons solely because a protester walked close to, or stuck a toe over, a blue line that Defendants placed at the end of the driveaway to the ICE facility at some point after the protests had begun. Defendants have used chemical munitions against protests large and small, including recently when only a dozen or so protesters were outside the ICE facility.

55.    Defendants have not used tear gas and the other chemical munitions solely to disperse crowds of protesters. Defendants have also used these munitions to disable, disorient, and otherwise harm protesters. Residents of Gray's Landing have personally observed Defendants' officers using the chemical munitions for these purposes, and instances have been captured on video as well.

56.    For instance, on October 2, 2025, after officers had cleared the entrance to the Portland ICE facility of protesters, two individuals stood outside of the police line yelling at officers. An officer then sprayed a chemical spray in the protesters' faces from less than five feet away. These protesters did not present a threat to the three or four armed officers.[5]

57.    On October 4, 2025, Defendants appear to have targeted Plaintiff Mindy King's apartment with tear gas while she was filming events from the apartment. During the afternoon that day, federal officers began deploying tear gas and smoke grenades with a relatively small crowd peacefully assembled in front of the ICE facility. Then, with little to no crowd in close proximity to King's apartment, one or more officers fired a tear gas canister from a long distance

---

[5] Iboshi, Kyle, *Did federal officers cross the line at Portland's ICE facility?*, KGW (Nov 17, 2025), https://perma.cc/BT6F-NNF2.

PAGE 16 — FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

that landed on or next to King's deck, while she was in her residence. King frequently videos and livestreams the protests from her apartment, which has a direct view of the ICE facility. And officers know that King videos and livestreams from her apartment. In one instance, they shined their flashpoints at her when they were standing nearby on the street, to prevent King's recording. On information and belief, the officers targeted King's unit on October 4, 2025, because of her recording activities.

58.    Defendants again used tear gas when faced with no real threat on the evening of October 4, 2025. After Defendants moved back a crowd from the area in front of the ICE facility, Defendants deployed chemical munitions against them, including tear gas, smoke grenades, and pepper balls. The protesters did not threaten law enforcement or otherwise take actions commensurate with this show of force.[6]

59.    On October 11, 2025, Defendants again encountered peaceful protesters and deployed tear gas and pepper balls with the intent to temporarily disable them. The protesters did not threaten law enforcement or otherwise take actions commensurate with this show of force. Before law enforcement exited the Portland ICE building, protesters had been dancing in the street.[7]

60.    On October 18, 2025, one resident of Gray's Landing observed Defendants firing pepper balls into the crowd from the roof of the Portland ICE facility. A short time later, federal agents deployed yellow tear gas and other chemical irritants into the crowd. Federal officers fired pepper bullets into the backs of retreating protesters.

---

[6] Brynelson, Troy & Alex Zielinski, *Federal tactics on Portland protesters escalate, hours after judge rules against Trump*, Oregon Public Broadcasting (Oct. 5, 2025), https://perma.cc/5ZSE-8G7B.
[7] Portland Oregon ICE BUILDING PROTEST (Oct. 11, 2025), https://perma.cc/8V8L-XQ3R (video beginning around 1 hour and 26 minute mark).

PAGE 17 — FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

61.     Shockingly, Defendants have also deployed chemical munitions for show. On September 27, 2025, the President announced that he was "directing Secretary of War, Pete Hegseth, to deploy all necessary Troops to protect War ravaged Portland."[8] Several days later, the President gave a speech describing Portland as a "war ravaged" and otherwise painting it in apocalyptic terms.[9]

62.     In the weeks that immediately followed, Defendants hosted a number of conservative influencers at the Portland ICE facility. Defendants invited the influencers to take videos and pictures from the roof of the facility, in a patent effort to create propaganda to support the President's assertions and his decision to deploy the National Guard to Portland.[10] As NPR reported on October 11, "The Trump administration is working with right-wing influencers to shape the public's understanding of protests against ICE in Portland."[11] The below image is from that same NPR story reporting on the access provided to these influencers.

---

[8] RapidResponse47 (@RapidResponse47), Tweet (Sept 27, 2025), https://perma.cc/2K8C-AYET
[9] Lee, Chantelle, *Trump Says Portland Is 'War Ravaged.' Here's What to Know About Crime in the City*, TIME (Sept. 30, 2025), https://perma.cc/YQK4-HCT9.
[10] Borrud, Hillary, *'Do not fail Portland,' city urges Trump DOJ in response to police probe*, OregonLive, Oct. 6, 2025, https://perma.cc/Q8E4-FPDK (Photo by Zaeem Shaikh).
[11] Neumann, Erik, *Conservative Influencers in Portland*, NPR, Oct. 11, 2025, https://perma.cc/HQM8-8G4A.



63.    Defendants denied mainstream news outlets access to the facility at the same time it was granting special access to these influencers.[12]

64.    During the two weeks that immediately followed the President's statement and decision to call up the National Guard, Defendants repeatedly used tear gas, smoke grenades, pepper balls, and other chemical agents, with the conservative influencers filming from the ICE facility all the while.[13]

---

[12] Mongeau Hughes, Lillian, *Feds grant ICE building access to conservative media, influencers, ignore local Portland press*, OregonLive, Oct. 7, 2025, https://perma.cc/8G44-246S.
[13] The first image below is from Erik Neumann, *Right-wing influencers shape nation and Trump's understanding of Portland protests*, Oregon Public Broadcasting, Oct. 13, 2025, https://perma.cc/772T-HS2L. The second and third images below are from *Protesters, counter protesters, and law enforcement clash at Portland ICE headquarters*, Reuters, Oct. 6, 2025, https://www.reuters.com/pictures/protesters-counter-protesters-law-enforcement-clash-portland-ice-headquarters-2025-10-06/.



Alejandro Figueroa  /  OPB

Protesters recover after gas is deployed at the U.S. Immigration and Customs Enforcement facility, Portland, Ore., Oct. 4, 2025.



[1/29]  Law enforcement officers stand amid smoke from a smoke grenade released to disperse demonstrators in front of the U.S. Immigration and Customs Enforcement (ICE) headquarters in Portland, Oregon, October 5. REUTERS/Carlos Barria Purchase Licensing Rights

Share this photo



[2/29]  A protestor reacts as law enforcement officers deployed smoke grenades outside the (ICE headquarters in south Portland, October 5. REUTERS/Carlos Barria Purchase Licensing Rights ⬚    Share this photo ⬚

65.     What's more, federal officers used chemical munitions in atypical ways during this time period, suggesting that the incidents may have been staged for propaganda purposes.

66.     For instance, on or about October 4, 2025, federal law enforcement officers exited the ICE facility and cleared the driveway, as they do many nights. But in an unprecedented move, officers proceeded to push protesters to the east down Bancroft Street, stopping outside the southeast corner of Gray's Landing. Officers then deployed tear gas and other chemical munitions squarely in front of Gray's Landing, near Plaintiff King's apartment. Tear gas billowed into the building's emergency exit and spread into the building, causing severe physical injuries to residents in that area as described further below.

67.     The below images are from livestreams broadcast by King from her apartment on or around October 4, 2025. The image on the left shows Bancroft Street having been cleared by officers, and the image on the right shows officers deploying tear gas on the cleared street, right in front of Gray's Landing and close to King's apartment.



68.    In another unusual incident during this time frame, federal officers chased

protesters up both S. Moody Avenue and Bancroft Street simultaneously, with conservative

influencers embedded with the officers and taking pictures. The officers used tear gas and other

chemical munitions during this chase.

69.    Defendants continue to use chemical munitions outside Gray's Landing to this

day. On January 24, 2026, in response to protests following the killing of Alex Pretti, Defendants

released chemical munitions numerous times over the course of the evening outside of the

Portland ICE facility. That evening, federal officers deployed chemical munitions at least five

times by 9 p.m.[15] On the first few occasions, DHS's use of tear gas was primarily, but not

---

[14] Screenshots approximately six minutes apart from a livestream filmed by Plaintiff Mindy King
on or about October 4, 2025, first showing Bancroft Street clear of protesters before federal law
enforcement officers deployed tear gas or other chemical munitions on Bancroft Street in front of
Gray's Landing.
[15] Crombie, Noelle, *Protesters converge on Portland ICE facility after latest Minneapolis
shooting, met with tear gas*, Jan. 24, 2026, Oregon Live,
https://www.oregonlive.com/portland/2026/01/protesters-converge-on-portland-ice-facility-after-
latest-minneapolis-shooting-met-with-tear-gas.html.

PAGE 22 — FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

entirely, focused on protests in or near the driveway to the ICE facility. At first, DHS released

small quantities of gas to clear the driveway of protesters attempting to enter the ICE facility and

threaten ICE officers. By the final uses, however, Defendants deployed longer-distance

munitions that flooded the street next to Gray's Landing with gas and smoke, and released large

amounts of tear gas and other chemical munitions, which infiltrated Gray's Landing and

Plaintiffs' apartments.

70.    The two images below are screenshots from a video taken by Plaintiff Roe,

approximately two minutes apart, from the courtyard at Gray's Landing looking toward the

driveway of the ICE facility:





71.     Defendants attacked protesters and non-protesters indiscriminately. Diane

Moreno, for example, was about to walk into Gray's Landing at around 4:30 p.m. on January 24

when she was hit with at least five rubber bullets in quick succession, even though she had done

nothing more than walk past the protest trying to get home. She was exposed to tear gas both

outside and inside her apartment, causing bloody nasal discharge and a sinus infection.

72.     Again, on the evening of January 30, 2025 (while Plaintiffs' counsel were in the

process of filing this amended complaint), Defendants deployed tear gas and chemical munitions

outside of Gray's Landing against peaceful protesters. Beforehand, the protesters had simply

been standing on the street and sidewalk outside of the ICE facility and had done nothing to

provoke Defendants' attack. Without warning, a large contingent of armed DHS agents exited

the ICE facility in riot gear and gas masks and immediately began deploying chemical agents

against the peaceful protesters. The chemicals predictably infiltrated Gray's Landing and

Plaintiffs' apartments, again causing them physical and psychological harm.

73.     Defendants have given no indication that they will refrain from deploying the

chemical munitions in huge volumes if faced with large protests outside the ICE facility in the

future. Indeed, Defendants have similarly deployed tear gas, smoke grenades, pepper spray, and

other chemical munitions in other dense residential areas in 2026, including in the Minneapolis

area.[16]

**Tear Gas and Other Chemical Munitions Infiltrate Gray's Landing and Injure Plaintiffs**

74.     Throughout the period since June 2025, when Defendants have deployed tear gas,

smoke grenades, and other chemical munitions near the ICE facility, the chemical agents

frequently infiltrate Gray's Landing. The chemicals consistently get into the units on the

southern and western sides of the complex, the parking garage on the west side, and the

courtyard in the middle of the complex. The chemicals infiltrate apartments in other parts of the

building as well, depending on which direction the wind is blowing when the munitions are

deployed.

75.     Many Gray's Landing residents, including Plaintiffs, have resorted to wearing gas

masks in their homes, placing wet towels under their doors, taping duct tape around their door,

sleeping in the bathtub, and taking other measures to try to minimize the amount of gas and other

chemicals that enter their units and their lungs.

76.     Defendants know that their sustained use of tear gas, smoke, and other chemical

agents impacts Gray's Landing and its residents. Gray's Landing is less than 100 feet away from

the ICE facility, located directly behind the protesters at whom the officers are aiming their

munitions.

77.     In at least one instance, an employee of the REACH Plaintiffs specifically

informed Defendants that the chemicals were injuring people inside of Gray's Landing. In July

---

[16]Estelle Timar-Wilcox, *Tear gas causes health concerns for Twin Cities residents*, MPR News,
January 28, 2026, https://www.mprnews.org/story/2026/01/28/tear-gas-health-concerns-twin-
cities-residents.

2025, employee Christine Piggott approached two federal law enforcement officers standing outside the ICE facility. She told the officers that she worked at Gray's Landing and asked them to stop using the tear gas and other chemical munitions because they were severely affecting her. The officers laughed at Piggott. They told Piggott that she was just experiencing allergies. They also told her that the chemical munitions they used were "environmentally friendly," and instructed her to return to her office.

78.    And Defendants have deployed tear gas and other chemical munitions immediately next to Gray's Landing even after Plaintiffs filed this lawsuit, when Defendants were indisputably on full notice of the severe injuries that their use of chemical munitions was causing Plaintiffs.

79.    Defendants have exhibited, at a minimum, deliberate indifference to the harm their use of chemical munitions causes residents and staff at Gray's Landing, including Plaintiffs.

80.    As a result of Defendants' actions, residents of Gray's Landing have suffered severe physical and emotional injuries, and significant infringements on their freedom of movement.

81.    Common physical symptoms that residents report from exposure to the chemicals include difficulty breathing, coughing fits, burning in their throat and eyes, dizziness, and headaches. These physical symptoms are not limited to the time when Defendants are actively deploying the chemicals, but often persist in the days after. Numerous residents report permanent changes to their voice. Some have coughed for months.

82.    Numerous residents have also suffered severe psychological trauma from Defendants' actions. A number of residents suffer from post-traumatic stress disorder (PTSD) from their time in the military or from being victims of domestic and other violence. The sudden,

loud explosions next to their apartments, and plumes of gas and other chemical agents, provoke horrifying PTSD reactions. Other residents have experienced extreme anxiety and panic attacks from the gases invading their homes.

83.    Children living at Gray's Landing have become accustomed to weapons of war exploding outside of their homes. Kids sleep in closets to reduce exposure to gas penetrating gaps in their windows and teenagers have had to learn how to properly seal gas masks.

84.    Resident Plaintiffs are among those who have experienced these physical and psychological injuries.

85.    Plaintiff Whitfield Taylor and his two daughters, A.T. and B.T., live on the southwest corner of Gray's Landing that is closest to the ICE facility. Taylor and his daughters are constantly unable to sleep due to the booming flashbangs that federal officers deployed outside their unit. When officers deploy tear gas and other chemical munitions, Whitfield rushes to his window to stuff wet towels around his window air conditioning unit, but it is often ineffective at stopping the gas from entering his home. Whitfield and his children have suffered burning eyes and throats from the chemical munitions, and A.T. and B.T. have suffered respiratory symptoms that necessitated Taylor to take them to urgent care. Whitfield's daughters have suffered psychological trauma as well. On nights when Defendants have deployed flashbangs and chemical munitions, A.T. and B.T. have slept inside of the closet of Taylor's room, building a makeshift fort to feel protected.

86.    Plaintiff Doe is a victim of domestic violence who survived a gunshot to her head from pointblank range from an abusive partner. She is deaf in one ear and suffers from PTSD and episodes of hyperventilation. Defendants' use of chemical munitions outside of Doe's home has prompted episodes of PTSD. On multiple occasions, a munition has exploded so close and so

loudly that Doe, overcome by distress, has fled to a closet and urinated on herself. Doe, whose

apartment is on the southwest side of Gray's Landing, also frequently has tear gas and smoke

enter her unit. In one particularly extreme incident over the summer, Doe recalls that

Defendants' tear gas munitions got inside Gray's Landing and filled up her apartment. Doe

began to scream and cry and had significant difficulty breathing. In another incident,

Defendants' use of green smoke was so heavy near her apartment that she could see the green

smoke residue on her window screen. Doe had to go to urgent care in at least one instance, and

physical symptoms are not limited to the nights that the munitions are used. She feels the effect

in the days that follow, with her head feeling like it is about to explode. Moreover, Doe lives in

her unit with her 17-year-old daughter who is pregnant. Doe fears that her future grandchild is

suffering from exposure to tear gas and other chemical munitions.

       87.     Plaintiff Susan Dooley is a 72-year-old Air Force veteran who has diabetes,

fibromyalgia, and high blood pressure. The chemical munitions that Defendants deploy

consistently enter her apartment on the west side of Gray's Landing overlooking S. Moody

Avenue. With this exposure, Dooley has had trouble getting words out when speaks and feels

that her speech is slurred. In October 2025, she started feeling extremely disoriented and dizzy,

and she has since fallen four times, requiring medical assistance after each fall. The tear gas and

other chemical munitions have made it hard for Dooley to breathe and have worsened her

asthma. In November 2025, Dooley went to see a doctor at a U.S. Department of Veterans

Affairs medical facility, and the doctor immediately sent her to the emergency room, where she

was diagnosed with shortness of breath and mild heart failure. She also had low blood oxygen

saturation.

88.     Plaintiff Mindy King suffered an acute physical reaction during and following the aforementioned October 4 incident when Defendants pushed a crowd back down Bancroft Street and then deployed tear gas in front of King's apartment. King immediately yelled to her 13-year-old son to put on a gas mask that she had purchased for him and taught him to wear over his long hair. King, her neighbors, and even her dog had constant coughing fits in the week after the October 4 incident.

89.     Plaintiff Janice Lineberger's apartment faces Gray's Landing's internal courtyard, which often fills up with the gas and smoke that Defendants deploy. The gas and smoke sit in the courtyard and slowly seep into Lineberger's apartment. Lineberger also frequently finds pepper balls on the ground inside the courtyard. On a typical night when Defendants deploy chemical munitions, Lineberger has difficulty breathing and her eyes hurt immensely. Those injuries persist today; Lineberger has visited the doctor four times due to eye discomfort and doctors have not been able to adequately treat her condition. Lineberger's voice has also permanently changed, becoming gravely and low since the exposure to the munitions began. In one particularly jarring incident, Lineberger was pulling into the Gray's Landing garage when Defendants deployed chemical munitions. Her face, eyes, and scalp began itching, and she had difficulty breathing. When she got out of the car, the gas followed her into the elevator and got into her hallway and apartment. Lineberger used to walk around the neighborhood at night, but now she does not leave her apartment.

90.     Plaintiff Rebecca Roe has suffered severe physical and psychological effects from tear gas and other chemical irritants, including passing out in her apartment. When Roe inhales tear gas, as she has dozens of times from June through November, her heart feels like it is being squeezed and she has heart palpitations. She also experiences burning eyes, nose, and throat and

suffers from a long-lasting cough when exposed to the gas. Roe has been exposed to tear gas in her apartment on numerous occasions, leading to her passing out multiple times and forcing her to go to the emergency room on one occasion. Roe has a gas mask and has worn it inside of her apartment to avoid the physical effects of the tear gas and other chemical irritants; she has even been forced to sleep with her gas mask on. Today, even when gas is not actively being deployed, Roe experiences dizziness and coughing. Roe, a survivor of domestic violence who suffers from PTSD, has experienced major psychological trauma from Defendants' actions.

91.    Plaintiff Roy Brooks suffers from a condition called limb-girdle muscular dystrophy ("LGMD"), which is a genetic disorder causing muscular atrophy and irreversible muscle loss. He uses a wheelchair. The frequent, unpredictable, and deafening explosions of tear gas, flashbangs, and other loud ammunition up South Moody Street has caused him loss of sleep and anxiety, which in turn has led to a significant and permanent loss of muscle tone. Before the summer, Brooks could transfer to a standard toilet and back to his wheelchair without assistance, but now he no longer can. If Defendants continue to use these explosive weapons on a regular basis, Brooks will likely suffer more irreversible muscle loss. Additionally, Brooks suffered days-long coughing fits, running nose, and watering eyes from the gas getting into his apartment. His apartment lacks air conditioning, and during the summer, when the tear gas was significant and awful, he couldn't open his windows to let in any cooler air. He was forced to choose between keeping the windows closed at all times and letting his apartment get stiflingly hot or having tear gas pour into his apartment.

92.    Plaintiff Diane Moreno has a condition called Cushing's disease, which causes the body to produce too much of the stress hormone cortisol. Defendants' use of tear gas, flashbangs, rubber bullets, and other munitions have caused a massive elevation in her cortisol, leading to

her needing surgery to remove an adrenal gland and placing her at risk of further, potentially life-threatening harm. When tear gas enters her apartment, she suffers from respiratory issues, tightness in her chest, and serious sinus problems. Defendants have also shot her multiple times with barrages of rubber bullets when she was trying to enter Gray's Landing or flee the tear gas in her apartment.

93. Plaintiff Erica del Nigro has an autoimmune syndrome called mast cell activation syndrome. Tear gas is a major trigger for her condition, and has caused her long-lasting allergic reactions such as a six-week-long full-body rash. In January, the return of the tear gas triggered a severe allergic reaction, causing migraines, hives, and eye inflammation. Each exposure puts her at risk of going into life-threatening anaphylaxis. She has developed persistent respiratory issues as a result of Defendants' tear gas use and regularly required an asthma inhaler throughout the fall. The pepperballs and tear gas have harmed del Nigro's twelve year-old son, J.D., as well. He has suffered from chronic respiratory issues since the summer and missed school repeatedly in the fall due to illness, and has been prescribed multiple medications to address his wheezing and asthma-like symptoms. Defendants' actions have also caused him serious anxiety; he is now afraid to leave home for fear that he will not be able to get back home safely.

94. The REACH Plaintiffs have suffered financial injuries and substantial harm to their organizational mission. The REACH Plaintiffs have undertaken a number of measures to safeguard the health and well-being of residents and staff in response to the ongoing disturbances near the ICE facility. These include: installing air scrubbing machines throughout the commercial and residential spaces and regularly replacing HVAC charcoal filters to maintain safe air quality and remove chemical residue following munitions activity; providing in-unit air purifiers for residents to improve indoor air quality; installing sticky mats at all building

entrances to prevent people from bringing in chemical residue on their shoes; offering ear plugs to residents seeking noise mitigation; hiring daily courtesy patrols to ensure resident and staff safety, deter confrontations, and coordinating rapid on-site responses and accommodating resident requests to relocate to quieter units on the north side of the building, when available. To date, REACH B49 has spent more than $100,00 on mitigation efforts, with future cleanup still needed.

95.     As a whole, Defendants' use of tear gas, smoke grenades, and other chemical agents has damaged the property of the REACH Plaintiffs and of the residents of Gray's Landing. The chemicals stick to carpets, clothes, and furniture, leaving an odor and producing yet-unknown lasting health effects.

96.     Gray's Landing is not the only nearby entity that has been affected by Defendants' use of chemical munitions. An elementary school known as the Cottonwood School of Civics and Science previously was located across the street from Gray's Landing, to the east of the Portland ICE facility for years. The school was forced to permanently relocate over the summer because the tear gas and other chemical munitions created an unsafe environment for students. The Cottonwood School communicated its concerns publicly in June 2025,[17] and the Cottonwood School had previously directly

97.     Relocating is not an option for many residents of Gray's Landing, nor for the REACH Plaintiffs as property owners and managers.

---

[17] "The Cottonwood School Condemns Use of Chemical Agents Near Campus," The Cottonwood School of Civics and Science (June 20, 2025), https://perma.cc/D6TV-TPV6.

**Health Effects of Chemical Agents Used Near Gray's Landing**

98.     The chemical munitions that Defendants have used in and around Gray's Landing,

including but not limited to tear gas, different-colored smoke grenades, and pepper balls, are

known to produce serious health effects even from short-term exposures.

99.     Tear gas—a blanket term that may refer to one or a combination of several

chemical compounds—is used by converting chemical agents into a spray, packaging it into a

canister, and then releasing the spray into the air through a small explosion inside the canister.

100.    Smoke grenades may refer to several different screening devices made through a

delayed explosion emitting smoke to block vision for several minutes. White smoke grenades

historically use hexachloroethane as a primary ingredient, while modern colored smoke grenades

use a combination of sugar, magnesium carbonate and red, yellow, green, or violet dyes. A small

explosion releases the dyes in the form of smoke.

101.    Pepper balls are generally made from a compound derived from peppers and

contain a powdered form of pepper spray; they are shot from a gun and break apart upon contact,

emitting a powder compound.

102.    In their original formulations, smoke bombs were highly toxic.[18] Although they

were later reformulated, even after the reformulations, the National Research Council of the

National Academy of Science recommended that members of the military using colored smoke

grenades wear protective gear, that the smoke be used for signaling purposes and not for

---

[18] *See, e.g.*, Union of Concerned Scientists, The Equation, *Top US Chemical Weapons Company Selling Lethal Smoke as Non-Hazardous*, https://perma.cc/GP2K-AYRQ.

obscuring military locations, and that "the Army avoid exposing the general public to the …

products."[19]

103.    Tear gas and pepper balls, among other chemical agents, are banned weapons of

war under the 1997 Chemical Weapons Convention.

104.    The United States is a signatory of the Chemical Weapons Convention and may

not lawfully use tear gas and pepper balls in armed conflicts. But the Chemical Weapons

Convention does not prohibit the use of these same chemical agents for domestic law

enforcement purposes.

105.    Because of how these chemicals are used—through explosions or projectiles that

release the chemicals into the air as a vapor or powder—it is difficult if not impossible to control

them. They are indiscriminate and expose bystanders to chemicals, just as they expose the

individuals at whom they are aimed.[20]

106.    The pain that these chemical agents inflict on exposed persons is not incidental.

The chemical agents are *designed* to target the body's pain receptors. They "temporarily make

people unable to function…by causing irritation to the eyes, mouth, throat, lungs, and skin."[21]

107.    The Oregon Health Authority explains that this "irritation" is serious and includes

burning of the eyes, nose, mouth, and skin, as well as difficulty swallowing, chest tightness,

---

[19] National Research Council (US) Subcommittee on Military Smokes and Obscurants, https://perma.cc/8R6X-A5D2.

[20] *See, e.g.*, International Network of Civil Liberties Organizations and Physicians for Human Rights, *Lethal in Disguise 2: How Crowd Control Weapons Impact Health and Human Rights*, at 59 (2022), https://perma.cc/6RA4-WZWG.

[21] *Riot Control Agents Chemical Fact Sheet*, *CDC Chemical Emergencies*, (Sept. 4, 2024), https://perma.cc/F3TW-AJQB.

choking sensations, nausea, vomiting, wheezing, and shortness of breath, among other symptoms.[22]

108.    The CDC, meanwhile, describes exposure to chemical munitions used for riot control as "poisoning." The CDC states that "[t]he level of poisoning depends on the amount someone was exposed to, how the person was exposed, and for how long."[23] "It also depends on the location of exposure (indoors versus outdoors)."[24]

109.    The elderly, children, pregnant people, and people who already have respiratory problems are most likely to experience health effects from chemical agents. *Chicago Headline Club v. Noem*, No. 25-cv-12173, 2025 WL 3240782, at *69 (N.D. Ill. Nov. 20, 2025).

110.    The CDC explains that "[p]eople exposed to riot control agents may experience some or all of the following symptoms immediately after exposure: Eyes: excessive tearing, burning, blurred vision, redness; Nose: runny nose, burning, swelling; Mouth: burning, irritation, difficulty swallowing, drooling; Lungs: chest tightness, coughing, choking sensation, noisy breathing (wheezing), shortness of breath; Skin: burns, rash; and Other: nausea and vomiting."[25]

111.    Other harms that can result from any exposure include allergic reactions, gastrointestinal issues, and psychological damage including anxiety and post-traumatic stress disorder.[26]

---

[22] *Tear Gas Frequently Asked Questions*, OREGON HEALTH AUTHORITY, (last revised Oct. 30, 2025), https://perma.cc/6CFZ-CHD7.
[23] *Riot Control Agents Chemical Fact Sheet*, *CDC Chemical Emergencies*, (Sept. 4, 2024), https://perma.cc/F3TW-AJQB.
[24] *Id.*
[25] *Id.*
[26] *See, e.g.*, Britta N. Torgrimson-Ojerio et al., *Health Issues and Healthcare Utilization Among Adults Who Reported Exposure to Tear Gas During 2020 Portland (OR) Protests: A Cross-Sectional Survey*, BMC Public Health 21, art. 803 (Apr. 26, 2021), https://perma.cc/X637-EQ47.

112.     According to the CDC, "[l]ong lasting exposure or exposure to a large dose may cause severe effects such as: Blindness; Glaucoma - a serious eye condition that can lead to blindness; Immediate death due to severe chemical burns to the throat and lungs; Respiratory failure possibly resulting in death;" and "Breathing problems, such as asthma." The CDC adds that "[t]hese effects are more likely if someone was exposed in a closed setting, such as indoors."[27]

113.     Recent studies have shown that exposure to these chemical munitions can also have "significant and long-lasting health harms." *Chicago Headline Club*, 2025 WL 3240782, at *69.

114.     Recent studies have also connected exposure to chemical agents to reproductive changes in women, including severe cramping and mis-timed or changed menstrual cycles. *Id.* While research remains in early stages, studies raise serious concerns about the effects of tear gas on fertility, with one small study identifying an increase in miscarriage rates among exposed individuals.[28]

115.     In a section on its site titled "What to do if you are exposed," the CDC writes: "Since breathing in riot control agents is the primary way of exposure, leave the area and get fresh air . . . If the riot control agents were released indoors, get out of the building."[29]

116.     The CDC does not advise on what individuals should do if they are exposed to chemical munitions indoors, but going outside would not escape the exposure.

---

[27] *Id.*
[28] Asha Hassan et al, *More Than Tears: Associations Between Exposure to Chemical Agents Used by Law Enforcement and Adverse Reproductive Health Outcomes*, 3 Front. Epidemiol. 1177874 (Aug. 22, 2023), https://doi.org/10.3389/fepid.2023.1177874 (in addition to the study at hand, the article cites to instances in which use of tear gas was linked to miscarriages abroad).
[29] *Id.*

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Due Process Clause of the Fifth Amendment
### (All Plaintiffs Against All Defendants)

117.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

118.    The Due Process Clause of the Fifth Amendment protects individuals against arbitrary government action that deprives them of life, liberty, or property.

119.    Defendants' sustained use of chemical munitions in and around Gray's Landing substantially burdens and infringes upon Plaintiffs' rights to (a) bodily integrity; (b) freedom from arbitrary bodily restraint; and (c) use and enjoyment of their property *See, e.g.*, *Ingraham v. Wright*, 430 U.S. 651 (1977); *Rochin v. California*, 342 U.S. 165 (1952); *Washington v. Harper*, 494 U.S. 210 (1990); *Crown Point Development v. City of Sun Valley*, 506 F.3d 851, 856 (9th Cir. 2007); *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1026 (9th Cir. 2007).

120.    First, courts have recognized that the right to bodily integrity is protected under substantive due process, and that it is violated when government officials intentionally or with deliberate indifference cause toxic or dangerous substances to enter people's bodies through their homes. *See, e.g.*, *Guertin v. State of Mich.*, 912 F.3d 907 (6th Cir. 2019) (recognizing a bodily-integrity substantive due process claim based on lead-contaminated drinking water); *Sterling v. City of Jackson*, No. 24-60370, 2025 WL 3205505 (5th Cir. Nov. 17, 2025) (same); *cf. Helling v. McKinney*, 509 U.S. 25 (1993) (recognizing that deliberate exposure to airborne toxins may violate contemporary standards of decency under Eighth Amendment).

121.    Defendants have substantially infringed upon Resident Plaintiffs' right to bodily integrity by repeatedly causing toxic chemicals—including from tear gas, smoke grenades, and

pepper balls—to infiltrate Plaintiffs' apartments and the common areas of Gray's Landing. Defendants have recklessly or intentionally caused these poisons to enter Plaintiffs' bodies, at a minimum showing deliberate indifference to the fact that Gray's Landing residents would be impacted by Defendants' use of chemical munitions. Plaintiffs have not consented to this invasion of their bodily integrity. And Defendants' actions have caused Plaintiffs to suffer acute and chronic respiratory distress; exacerbation of existing cardiac, pulmonary, and other medical conditions; headaches; disorientation; sustained burning of the eyes and throat; and other serious medical symptoms; as well as acute and persistent psychological harms, including the triggering of the PTSD of certain residents.

122.    Second, Defendants' conduct has arbitrarily interfered with Resident Plaintiffs' liberty by effectively confining them in their apartments, and in some instances in interior rooms such as bathrooms and closets. Defendants have restrained Plaintiffs' liberty of movement by causing gas, smoke, and other chemical munitions to fill up Plaintiffs' apartments, the common areas of Gray's Landing in hallways, stairwells, and community spaces, and the areas immediately outside the building, rendering it unsafe for Plaintiffs to leave their units or the building.

123.    Third, Defendants have deprived the Resident Plaintiffs of their protected property interests. The chemical munitions deployed by Defendants' conduct have contaminated Resident Plaintiffs' apartments and their personal belongings—including clothing, bedding, upholstered furniture, carpets, children's toys, and other household items.

124.    Defendants have also substantially burdened and infringed upon the REACH Plaintiffs' protected property interests in the Gray's Landing building, grounds, and offices in Gray's Landing, and in the REACH Plaintiffs' reputation, business relationships, and goodwill.

*See Action Apartment Ass'n*, 509 F.3d at 1026; *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 61–62, 65 (9th Cir. 1994) (citing *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989)); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7–8, 11–13 (1949); Or. Admin. R. 150-307-0020(1).

125.    Defendants have substantially burdened and infringed upon the REACH Plaintiffs' protected property interests by repeatedly causing toxic chemicals, including from tear gas, smoke grenades, and pepper balls, to infiltrate and contaminate the Gray's Landing building and grounds, including REACH CDC's offices.

126.    The REACH Plaintiffs have incurred and will continue to incur substantial costs to address and remediate the contamination caused by Defendants' repeated use of chemical munitions, including costs for specialized cleaning and decontamination, enhanced filtration and HVAC maintenance, personal air purifiers available for resident households, and other repairs necessary due to Defendants' deployment of chemical munitions.

127.    The persistent association of Gray's Landing with tear gas and chemical exposure, and the recurring reality of visible gas clouds and chemical odors in and around the building, have harmed the REACH Plaintiffs' business goodwill and its reputation.

128.    Defendants have also substantially burdened REACH CDC's liberty interests. REACH CDC is a nonprofit community development organization whose mission is to create opportunities for all people to thrive by developing and promoting equitable access to quality, affordable homes, supportive services, and community. To carry out that mission, REACH CDC located its corporate headquarters within the commercial space of Gray's Landing, including operating on-site property management and resident service offices within Gray's Landing, so staff could be physically present with, and accessible to, the residents they serve. Defendants'

repeated use of tear gas, pepper spray, smoke grenades, and other chemical munitions in and around Gray's Landing has substantially burdened REACH CDC's ability to operate as a housing provider to support vulnerable populations in need of affordable housing.

129.    On multiple occasions, chemical agents released by Defendants have infiltrated REACH CDC's on-site offices, lobbies, and hallways. Staff members have experienced burning eyes, coughing, headaches, and exacerbations of asthma and other respiratory conditions while working at Gray's Landing and in REACH CDC's offices, and some have been unable to complete their shifts as a result.

130. Defendants' pattern of saturating the area around Gray's Landing with chemical munitions has also forced REACH CDC to divert significant time and resources away from its mission to crisis response and remediation. REACH CDC has had to deploy staff to ventilate and clean contaminated offices and common spaces; to place commercial-grade air purifiers on every floor of the residential building and throughout its main office suites; to upgrade filters per professional HVAC vendor recommendations; to provide in-unit air purifiers for resident households; to install sticky mats at every entry point to building entrances to collect chemical residue from shoes; to purchase personal protective equipment; to field and respond to residents' and staff complaints and health concerns; and to coordinate with contractors to remediate damage. Time and money that REACH CDC would otherwise devote to providing resident services and maintaining and improving its housing has been redirected towards efforts to cope with the ongoing contamination that Defendants knowingly create.

131. Where government conduct substantially burdens or infringes upon a person's right to life, liberty, or property, the conduct violates substantive due process if it "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

132. Government conduct "shocks the conscience" when officials have time to deliberate and act with deliberate indifference to a serious risk to life, health, or bodily integrity. *See id.* at 850–52 (1998); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

133. Defendants' repeated use of tear gas, smoke grenades, pepper balls, and other chemical agents outside Gray's Landing—many dozens of times over a period of six months and counting—is not a split-second reaction to an unforeseen emergency. It is the product of high-level policies, training, and operational decisions about how to respond to anticipated and regularly occurring protests at the ICE facility.

134. Defendants have had months to evaluate and revise their decision to direct and authorize the widespread use of tear gas, smoke grenades, pepper balls, and other chemical agents in the immediate vicinity of Gray's Landing. They have continued to use these munitions even after receiving direct complaints about the munitions' effects from REACH staff, and after the deleterious health impacts on Gray's Landing residents received extensive media coverage in news segments and online articles, including in stories for which Defendants provided an official comment. Those warnings and news stories aside, it is impossible for Defendants to have not known that their chemical munitions would not impact Gray's Landing, a dense, multi-story residential building located less than 100 feet from the ICE facility, and directly next to the protesters at whom Defendants fire the munitions.

135. Defendants knew, or were deliberately indifferent to the fact, that the chemical munitions would cause and did cause injuries to Gray's Landing residents and staff, as well as the REACH Plaintiffs, including all of the physical and psychological injuries commonly associated with these munitions.

136. Despite that knowledge, Defendants continued to authorize and carry out large-scale deployments of tear gas, smoke bombs, and other chemical munitions immediately adjacent to Gray's Landing, often at night, without meaningfully tailoring the amount, type, timing, or direction of fire to avoid the residential building, and without adopting available alternatives and mitigation measures that would have reduced or eliminated the risk to Plaintiffs.

137. Defendants' deliberate indifference to the harms caused Plaintiffs was not necessary to serve any compelling law enforcement purpose. Defendants have repeatedly deployed chemical munitions where protesters were non-violent and posed no threat to officers. And, in truly shocking manner, Defendants used chemical munitions for show, to give "content" to conservative influencers and media to support the President's characterization of the situation in Portland.

138. Defendants have not only exhibited deliberate indifference to the harms to Gray's Landing residents, but in at least one instance appear to have targeted a Gray's Landing resident, Plaintiff Mindy King. As previously described, Defendants knew that King videotaped and livestreamed their actions from her apartment, and on or around October 4, 2025, Defendants fired a projectile tear gas canister from long distance at King's apartment, landing on or next to the deck of her unit. Defendants fired this tear gas at a time when there was no significant protest activity in the immediate vicinity of her apartment.

139. Defendants' decisions and omissions, taken as a whole, amount to deliberate indifference to Plaintiffs' rights to life, bodily integrity, liberty, and property, and therefore shock the conscience and violate substantive due process.

140. In the alternative, if the Court concludes that Defendants did not have time to deliberate before deploying the chemical munitions, Defendants' conduct still shocks the

conscience because Defendants acted with "purpose to harm." Where actual deliberation is not practical, executive conduct violates substantive due process if officials act with a purpose to harm a civilian for reasons unrelated to legitimate law-enforcement objectives such as arrest, self-defense, or defense of others. *See Lewis*, 523 U.S. at 854–55; *Porter*, 546 F.3d at 1137; *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013).

141.    Defendants repeatedly deployed tear gas, smoke grenades, pepper balls, and other chemical munitions in a manner and at times when there was no immediate threat to officer safety or public safety that could explain or justify saturating the street outside Gray's Landing with poison gases and chemicals. Defendants have shot and placed heavy volumes of chemical munitions into the street at times when protesters had largely dispersed, when there were only a dozen or fewer protesters, or where protesters were not engaging in violent conduct.

142.    Video footage captures Defendants' use of chemical agents to immobilize, injure, or otherwise intentionally harm protesters, rather than disperse them. In one documented incident that is illustrative of Defendants' intent in using their chemical weapons, Defendants sprayed the outside of a protester's inflatable frog suit, from just a foot or two away.[30] In other footage, officers sprayed the faces of two protesters who were non-violently yelling at the officers. And in an incident during one afternoon in June, officers at the ICE facility shot a protester in the eye with a tear gas canister, gashing his face, sealing his eye shut, and concussing him.[31]

143.    Residents of Gray's Landing have also viewed Defendants using chemical munitions to intentionally harm protesters.

---

[30] ICE agent pepper-sprays frog-suited protester, (Oct. 5, 2025), https://perma.cc/4CTR-YRRE.
[31] Thompson, A.C. & McSwane, J. David, *Trump's Immigration Forces Deploy "Less Lethal" Weapons in Dangerous Ways, Skirting Rules and Maiming Protesters*, ProPublica, Nov. 25, 2025, https://perma.cc/4JQ8-L47N.

144.     It does not matter for purposes of a substantive due process claim, however, whether Defendants intended to harm Plaintiffs rather than protesters. A bystander may state a purpose-to-harm claim where officers act with an unconstitutional purpose to harm someone else and the bystander is foreseeably injured as a result. *See Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 978–80 (9th Cir. 2025). Plaintiffs are precisely the kind of foreseeable bystanders placed at risk by Defendants' purposeful decision to deploy chemical agents to harm protesters.

145.     Plaintiffs lack an adequate remedy at law for Defendants' ongoing and threatened violations of their substantive due process rights. Monetary damages cannot fully compensate for the ongoing and future risk to life, health, bodily integrity, and property posed by continued use of chemical agents adjacent to Plaintiffs' homes.

146.     Absent declaratory and injunctive relief, Defendants are likely to continue using tear gas, smoke grenades, pepper balls, and other harmful chemical agents next to Gray's Landing in the same or similar manner. To this day, Defendants have continued to use the chemical munitions in the face of protests, and the protests outside of the Portland ICE Facility are likely to swell at future dates as current events unfold. Defendants, thereby, are likely to continue to subject Plaintiffs to unconstitutional deprivations of their rights to life, liberty, bodily integrity, and property.

### COUNT II
### Violation of the Fourth Amendment
### (All Plaintiffs Against All Defendants)

147.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

148.     In the alternative to violating the Fifth Amendment, Defendants' actions constitute unreasonable seizures in violation of the Fourth Amendment.

149.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amend. IV.

150.    A "seizure" for Fourth Amendment purposes occurs when there is a government "use of force with intent to restrain." *Torres v. Madrid*, 592 U.S. 306, 317 (2021).

151.     "[A] seizure does *not* require intent to restrain a *specific* person;" rather, "there is a seizure as long as the officer (a) uses force, (b) with intent to restrain *a* person's body (even if that person is not the plaintiff)." *LaRocca v. City of Los Angeles*, No. 2:22-CV-06948-SVW-PD, 2024 WL 1635908 (C.D. Cal. Mar. 14, 2024); *accord Cullinan v. City of Los Angeles*, 752 F. Supp. 3d 1180, 1184 (C.D. Cal. 2024). Thus, a plaintiff challenging a seizure need not have been the target of the government's use of force, and the government official need not have even known the plaintiff was present at the time of the challenged actions. *See Villanueva v. California*, 986 F.3d 1158, 1168-69 (9th Cir. 2021).

152.    Defendants have restrained the Resident Plaintiffs' "liberty of movement" through their use of tear gas, smoke grenades, and other chemical munitions. *Id.* at 1166. As a result of the chemical munitions, Plaintiffs have been unable to leave their apartments, and in some instances have had to seal themselves in their closets, bathrooms, or bedrooms. Plaintiffs have been further confined to wearing gas masks from acute exposures to the chemical agents.

153.    As documented above, Defendants have deployed chemical munitions not merely to disperse crowds for legitimate law enforcement purposes, but to intentionally restrain protesters, journalists, and others at or around the scene of the protests. Thus, "the chemical deployments at issue here were undertaken with an objective intent to restrain, such as, for

example, by targeting an immobilizing level of force at selected individuals." *Puente v. City of Phoenix*, 123 F.4th 1035, 1053 (9th Cir. 2024).

154.    Defendants' use of chemical munitions for such purposes is objectively unreasonable. Defendants have repeatedly deployed the chemical munitions near the ICE facility when protests were peaceful or otherwise posed no threat of harm to federal officials. Defendants have deployed these weapons even where alternative means were available to accomplish any legitimate government objective in responding to the protests. And Defendants knew that scores of people—inside the protests and in the surrounding area—would be seriously harmed by Defendants' use of chemical munitions to restrain the targeted individuals. *Boyd v. Benton Cnty.*, 374 F.3d 773 (9th Cir. 2004).

155.    Defendants' unreasonable use of force with intent to restrain, which did restrain Plaintiffs' liberty of movement, violates the Fourth Amendment.

156.    Plaintiffs lack an adequate remedy at law for Defendants' ongoing and threatened violations of their Fourth Amendment rights. Absent declaratory and injunctive relief, Defendants are likely to continue using tear gas, smoke grenades, pepper balls, and other harmful chemical agents next to Gray's Landing in the same or similar manner, thereby continuing to subject Plaintiffs to unconstitutional deprivations of their Fourth Amendment rights.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that Defendants' use of tear gas, smoke grenades, and other chemical munitions violates Plaintiffs' Substantive Due Process rights under the Fifth Amendment, or right to be free from unreasonable seizures under the Fourth Amendment;

B.    Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from deploying tear gas, smoke grenades, and other chemical munitions that are likely to infiltrate Gray's Landing and its apartments, unless the use of such munitions is necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons;

C.    Award Plaintiffs reasonable costs and attorneys' fees; and

D.    Grant any other relief that the Court deems fit and proper.


January 30, 2026                    Respectfully submitted,


                                    */s/Daniel F. Jacobson*
                                    Daniel F. Jacobson (D.C. Bar No. 1016621)+
                                    Lynn D. Eisenberg (D.C. Bar No. 1017511)+
                                    Stephen K. Wirth (D.C. Bar No. 1034038)+
                                    Brian C. Rosen-Shaud (D.C. Bar No. 90042065)+
                                    **Jacobson Lawyers Group PLLC**
                                    5100 Wisconsin Ave. NW, Suite 301
                                    Washington, DC 20016
                                    Telephone: +1 301-823-1148
                                    Dan@jacobsonlawyersgroup.com

                                    Darin M. Sands, OSB No. 106624
                                    Colin Hunter, OSB No. 131161
                                    **Bradley Bernstein Sands LLP**
                                    1211 NW Glisan St., Ste 204
                                    Portland, OR 97209
                                    Telephone: +1 503-734-2480
                                    dsands@bradleybernstein.com
                                    chunter@bradleybernstein.com

                                    Taylor Jaszewski (CA Bar No. 345094)+
                                    **Bradley Bernstein Sands LLP**
                                    1212 Broadway, Suite 1100
                                    Oakland, CA 94612
                                    Telephone: +1 510-380-5801
                                    tjaszewski@bradleybernstein.com

PAGE 47 — FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

Brian D. Netter (D.C. Bar No. 979362)+
Jeffrey B. Dubner (D.C. Bar No. 1013399)+
Anna L. Deffebach (D.C. Bar No. 241346)+
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
bnetter@democracyforward.org
adeffebach@democracyforward.org

Katie Schwartzmann (La Bar No. 30295)+
**Protect Democracy**
201 St. Charles Ave., Suite 114
New Orleans, La 70170
(202) 573-4382

+ Admitted pro hac vice

*Counsel for Plaintiffs*