Darin M. Sands, OSB No. 106624
**Bradley Bernstein Sands LLP**
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480
dsands@bradleybernstein.com

Daniel F. Jacobson (D.C. Bar No. 1016621)+
**Jacobson Lawyers Group PLLC**
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Telephone: +1 301-823-1148
Dan@jacobsonlawyersgroup.com

+ admitted pro hac vice

*Attorneys for Plaintiffs*

(Additional counsel listed on signature page)

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| REACH COMMUNITY DEVELOPMENT, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>    *Defendants*. | Case No. 3:25-cv-2257<br><br>**PLAINTIFFS' SUPERSEDING MOTION FOR PRELIMINARY INJUNCTION**<br><br>**ORAL ARGUMENT AND EVIDENTIARY HEARING REQUESTED** |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

L.R. 7-1(A) CERTIFICATION .................................................................................... 1

MOTION........................................................................................................................ 1

MEMORANDUM OF LAW ......................................................................................... 1

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.    Gray's Landing Is an Environmental and Health-Conscious Affordable Housing Community Across from the Portland ICE Facility................................. 3

    B.    Defendants Discharge Chemical Munitions Towards Grays Landing in the Face of Generally Non-Violent Protests .................................................... 6

    C.    Federal Officers Have Targeted Individuals with Chemical Munitions .............. 17

    D.    Chemical Munitions Enter Gray's Landing, Injuring Plaintiffs ........................... 19

    E.    Chemical Munitions Produce Dangerous Health Consequences.......................... 25

LEGAL STANDARD..................................................................................................... 27

ARGUMENT.................................................................................................................. 27

I.    Plaintiffs Are Likely to Succeed on the Merits.................................................... 27

    A.    Defendants Have Harmed Plaintiffs' Liberty and Property Interests ................. 28

    B.    Defendants' Conduct Shocks the Conscience.................................................... 34

    C.    Defendants Are Alternatively Violating Plaintiffs' Fourth Amendment Rights .............................................................................................................. 39

II.    Plaintiffs Are Suffering Irreparable Harm ......................................................... 40

    A.    Plaintiffs Are Suffering Physical, Psychological, and Constitutional Harms....... 40

    B.    Defendants' Use of Chemical Munitions Is Continuing and Likely to Recur ................................................................................................................ 43

III.    The Public Interest and Balance of the Equities Weigh in Favor of Injunctive Relief.................................................................................................. 45

IV.    Scope of Relief..................................................................................................... 46

CONCLUSION .............................................................................................................. 47

CERTIFICATE OF COMPLIANCE ............................................................................. 49

# TABLE OF AUTHORITIES

**CASES**

*A.D. v. Cal. Highway Patrol*, 712 F.3d 446 (9th Cir. 2013) ......................................... 35

*Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*,
    509 F.3d 1020 (9th Cir. 2007) ................................................................... 33

*Alsaada v. City of Columbus*, 536 F. Supp. 3d 216 (S.D. Ohio 2021) ......................... 47

*Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066 (N.D. Cal. 2020) ............. 40

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ................................ 40

*Berg v. Cnty. of Los Angeles*, No. CV 20-7870 DMG (PDX),
    2021 WL 4691154 (C.D. Cal. May 28, 2021) ........................................... 47

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't.*,
    466 F. Supp. 3d 1206 (W.D. Wash. 2020) ................................................ 47

*Chicago Headline Club v. Noem, No. 25 C 12173*,
    2025 WL 3240782 (N.D. Ill. Nov. 20, 2025) ........................................... 26

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .......................................................... 32

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ............................... 27, 34, 35, 38

*Crown Point Development v. City of Sun Valley*, 506 F.3d 851 (9th Cir. 2007) ........................ 32

*Davis v. Multnomah County*, No. 3:20-cv-02041-SB, Dkt. No. 154 (D. Or. Sept. 5, 2025) ........ 31

*Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150 (D. Or. 2020) ................... 43, 46

*E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020) ......................... 42

*Egbert v. Boule*, 596 U.S. 482 (2022) ......................................................................... 42

*Estate of Soakai v. Abdelaziz*, 137 F.4th 969 (9th Cir. 2025) ............................... 38, 39

*Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256 (9th Cir. 1989) ........................... 44

*Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019) ................................................ 29, 35

*Hayes v. Cnty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013) ..................................... 35

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) .............................................. 45

*Hess v. Garcia*, 72 F.4th 753 (7th Cir. 2023) ........................................................... 40

*Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120 (D. Or. 2020) ...................... 44

*LaRocca v. City of Los Angeles*, No. 2:22-CV-06948-SVW-PD,
2024 WL 1635908 (C.D. Cal. Mar. 14, 2024) ........................................................ 40

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) .................................................... 32

*Los Angeles Press Club v. Noem*, No. 2:25-CV-05563-HDV-E,
2025 WL 2658327 (C.D. Cal. Sept. 10, 2025) ......................................................... 46

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ............................................... 40, 45

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................... 27

*Nunez by Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997) .......................... 32

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) ..................................................... 35

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) .............................................. 45

*Schmerber v. California*, 384 U.S. 757 (1966) ......................................................... 28

*Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) ................................................... 31

*Sterling v. City of Jackson*, 159 F.4th 361 (5th Cir. 2025) ....................... 28, 29, 30, 35

*Union Pac. Ry. v. Botsford,* 141 U.S. 250 (1891) ...................................................... 28

*United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993) ................... 32

*Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021) ........................................... 40

*Washington v. Dep't of Health & Hum. Servs.,* No. 6:25-cv-0178-AA,
2025 WL 3002366 (D. Or. Oct. 27, 2025) ............................................................. 43

*Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56 (9th Cir. 1994) ...... 33

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) ........................................ 34, 35, 38

*Williams v. Fears*, 179 U.S. 270 (1900) .................................................................... 32

*Young v. Cnty. of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) ............................ 31, 40

*Westwood v. City of Hermiston*, 787 F. Supp. 1174 (D. Or. 2011) ............................ 33

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ................................................................ 34

**REGULATIONS**

Or. Admin. R. 150-307-0020(1) ................................................................................. 33

## L.R. 7-1(A) CERTIFICATION

The parties discussed proceedings in this case with the Court at the January 27, 2026, status conference. Defendants are opposed to Plaintiffs' request for preliminary injunctive relief.

## MOTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs move for a preliminary injunction to preclude Defendants from deploying tear gas, smoke grenades, and other chemical munitions that are likely to infiltrate Gray's Landing and its apartments, unless the use of such munitions is necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons.

## MEMORANDUM OF LAW

### INTRODUCTION

As this brief is being filed, tear gas is once again inside the homes of Plaintiffs and other residents of Gray's Landing. Once again, despite facing no violence or imminent threats at all, Defendants have indiscriminately released tear gas onto the streets immediately next to the Gray's Landing apartment complex, infiltrating Plaintiffs' homes where they are just trying to live and breathe in peace. This needs to end.

The government's actions in this case are truly shocking. Acting with pre-meditation—day after day, week after week, month after month, and now year after year—federal officers have deployed massive amounts of tear gas, smoke grenades, and pepper balls directly toward and around Gray's Landing, an affordable housing complex next to the Immigration and Customs Enforcement (ICE) facility in Portland. Officers have done so repeatedly when faced with no violence from protesters or imminent risk of harm. Far from it; officers have deployed these munitions at times seemingly for target practice, and at other times for show. And the

officers have taken these actions with deliberate indifference to the harmful effects on Gray's Landing residents. Plaintiffs and other people in Gray's Landing have suffered acute respiratory distress, horrible burning in their eyes and throats, dizziness, slurred speech, irreversible muscle loss, severe allergic reactions, and episodes of PTSD due to the government's actions. Department of Homeland Security (DHS) officials knew that the gas and smoke were causing such injuries, and they have kept using the munitions with abandon anyway.

Plaintiffs seek a preliminary injunction so that they need not suffer any more harm from the federal government releasing poison gas into their homes. Defendants' conduct violates Plaintiffs' substantive due process rights to liberty and property. The government causing poisonous gas and chemicals to enter Plaintiffs' bodies violates their right to bodily integrity, which the Supreme Court has long recognized as a component of the right to liberty. The invasion of Plaintiffs' bodily integrity is severe and lasting, and Defendants have independently restrained Plaintiffs' liberty by curtailing their freedom of movement. And the repeated, sustained infiltration of gas and smoke into Gray's Landing has made it all-but-impossible for Plaintiffs to use and enjoy their property. Each of these infringements on Plaintiffs' substantive due process rights is the result of Defendants' deliberate indifference to Plaintiffs' plight, and therefore each violates the Fifth Amendment.

Each time Defendants release chemicals into the air around Gray's Landing, as they did once again only six days ago, Plaintiffs suffer irreparable harm. Those harms are deadly serious for some Plaintiffs. One Plaintiff has Cushing's Disease and now needs to have an adrenal gland removed because of Defendants' use of chemical munitions. Another Plaintiff has muscular dystrophy and has suffered permanent muscle loss. Other Plaintiffs are domestic violence survivors with severe PTSD, and yet others live with their children who are being traumatized by

the gas and smoke entering their homes. Absent an injunction, the harms to these persons will continue or get even worse, as Defendants' actions make clear that they will continue to deploy tear gas and other chemical munitions from the ICE facility in response to protest. Plaintiffs should not be forced to suffer a single additional instance of breathing in chemicals in a manner the CDC describes as "poisoning." And the public certainly has an interest in stopping this unconscionable violation of constitutional rights.

## BACKGROUND

### A. Gray's Landing Is an Environmental and Health-Conscious Affordable Housing Community Across from the Portland ICE Facility

Gray's Landing is a large affordable housing complex in Portland. In developing Gray's Landing nearly fourteen years ago to serve the significant unmet need for affordable housing in Portland, Plaintiff REACH Community Development[1] prioritized the health of residents—the building achieved LEED Platinum certification from the U.S. Green Building Council and is a smoke-free facility.

Of Gray's Landing's 209 affordable apartments, 42 are reserved for low-income veterans. Gray's Landing is home to people of all ages and backgrounds—16% of the 237 individuals living there identify as disabled; 5% are between the ages of 0 and 5; and 30% are age 63 or older. All residents must have an income that is less than 60% of the Area Median Income. Some residents must meet stricter income criteria because their units receive Section 8 housing assistance. Roughly 33% of residents receive some form of rental subsidy to live in the building.

---

[1] REACH Community Development is the property manager at Gray's Landing, and two wholly owned subsidiaries, REACHB49 Partners LP and REACH Office LLC (collectively with REACH Community Development, the "REACH Plaintiffs"), own the residential and commercial spaces within Gray's Landing respectively. REACH B49 Partners LP also owns the lot upon which Gray's Landing sits.

Gray's Landing sits kitty-corner from the Portland ICE facility, at the intersection of S. Moody Avenue and Bancroft Street. The southwest corner of Gray's Landing, where Plaintiffs Jane Doe and Whitfield Taylor and his daughters live, is closest to the ICE facility, less than 100 feet away. Gray's Landing has an outdoor, U-shaped courtyard that many apartments overlook, including those of Plaintiffs Janie Lineberger, Mindy King, and Rebecca Roe.[2]

---

[2] Plaintiffs refer to the individual plaintiffs who live at Gray's Landing as "Resident Plaintiffs."



- Pls. Dooley and Brooks
- Pls. Roe and Moreno
- Pls. Lineberger and del Nigro
- Driveway to ICE Facility
- ICE Facility
- S. Moody Ave.
- Pls. Taylor + kids); Jane Doe
- Pl. King
- Bond St.
- Bancroft St.

Salazar Decl., Ex. 21.

**B. Defendants Discharge Chemical Munitions Towards Grays Landing in the Face of Generally Non-Violent Protests**

The Portland ICE facility next to Gray's Landing has been the scene of protests since at least early June 2025. The crowd size at these protests peaked at approximately 450 protesters on June 12, 2025. The protests occurred nearly every day at one point during the summer, and although protest sizes have ebbed and flowed since, significant crowds have continued to gather in response to political developments or other newsworthy events. For example, protests swelled in the first weeks of October after the President announced he would be deploying the National Guard to Portland, and during the October 18, 2025 "No Kings" protests.[3] Protests of various sizes continue to this day in response to national events, including the shooting of Alex Pretti in Minnesota in January 2026. Protesters generally congregate near the north driveway to the ICE facility, on Bancroft Street, and continue down Bancroft Street running east, directly in front of the south side of Gray's Landing.

In the vast majority of instances where Defendants have used tear gas and other chemical munitions, the protesters have been non-violent.[4] Another judge of this Court, in ruling that the deployment of the National Guard to Portland was unlawful, concluded: "the trial record showed that although protests outside the Portland ICE building occurred nightly between June and October 2025, ever since a few particularly disruptive days in mid-June, protests have remained peaceful with only isolated and sporadic instances of violence. The occasional interference to

---

[3] *See* Findings of Fact and Conclusions of Law, ECF No. 146 (3:25-cv-1756-IM) at 21-23 (D.Or. Nov. 7, 2025).
[4] *See id.* at 29.

federal officers has been minimal, and there is no evidence that these small-scale protests have significantly impeded the execution of any immigration laws."[5]

Despite the non-violent nature of these protests, federal officers (including at various times agents from ICE, FPS, CBP, and Secret Service)[6] have consistently and indiscriminately shot tear gas, smoke grenades, pepper balls, and other projectile chemical munitions from the street and from multiple levels of the ICE building, often shooting directly toward Gray's Landing. King Decl., Ex. 1; Roe Decl., Exs. 9-12, 14-16, 18. Plaintiffs to this action who are residents of Gray's Landing (the "Resident Plaintiffs") have witnessed—and in some cases videotaped—the moments when federal officers begin using tear gas and other chemical munitions on a given night. These Plaintiffs uniformly attest that federal officers have regularly used tear gas, smoke grenades, and pepper balls in response to little to no provocation, and certainly not any violence threatening the officers or others. *See* Doe Decl. ¶¶ 6; Dooley Decl. ¶ 4; King Decl. ¶ 4; Lineberger Decl. ¶¶ 3, 4; Taylor Decl. ¶ 4; Moreno Decl. ¶ 17. Officers have used the chemical munitions on occasions when as few as a dozen protesters were present, Taylor Decl. ¶ 4, solely because a protester walked close to, or stuck a toe over, a blue line at the end of the driveway to the ICE facility, Doe Decl. ¶ 6, or when protesters were simply chanting loudly or using profanity, Taylor Decl. ¶ 4.

Defendants have used chemical munitions recently and are using them again *tonight*. On January 24, 2026, Defendants released chemical munitions outside of the Portland ICE facility on at least five different occasions over the course of the evening. On the first few occasions, the use of tear gas was primarily, but not entirely, focused on protesters in or near the ICE driveway

---

[5] *Id.* at 78.
[6] Kyle Iboshi, *Did Federal Officers Cross the Line at Portland's ICE Facility?*, KGW (Nov. 18, 2025), https://perma.cc/BT6F-NNF2.

. By the final uses, however, Defendants deployed munitions that flooded the street next to Gray's Landing with gas and smoke,      infiltrating      Gray's Landing and Plaintiffs' apartments. Roe Exs. 37-39; Roe Decl. ¶¶ 5-6; Doe Decl. ¶¶ 11-12; Lineberger Decl. ¶¶ 9-10; *see* Moreno Decl. ¶¶ 11-12; Jacobson Exs. 40-42. The two images below are screenshots from Roe Exhibit 37      taken from the courtyard at Gray's Landing looking toward the driveway of the ICE facility:





T    he below screenshot is from an online live stream of the events of January 24, showing     tear gas billowing directly next to Gray's Landing, which is the building on the right side of the image.



Jacobson Exhibit 42.

Defendants attacked protesters and non-protesters indiscriminately on January 24. Diane Moreno, for example     was hit with at least five rubber bullets in quick succession while doing nothing more than walk past the protest trying to get home. Moreno Decl. ¶ 10. She was exposed to tear gas both outside and inside her apartment, causing bloody nasal discharge and a sinus infection. *Id.* ¶ 11.

On January 30, Defendants deployed large amounts of tear gas yet again. At the time Defendants did so, protesters were merely standing and sitting around outside the ICE facility;

---

[7] Jacobson Exhibit 42.

they did not appear to be in the driveway or engaging in any violence or threatening behavior. Jacobson Exs. 45 and 46.

Shockingly, Defendants have also deployed chemical munitions next to Plaintiffs' homes for propaganda purposes. On September 27, President Trump announced that he was "directing Secretary of War, Pete Hegseth, to deploy all necessary Troops to protect War ravaged Portland."[8] Several days later, the President described Portland as "war ravaged" and painted it in apocalyptic terms.[9] In the weeks that immediately followed, DHS hosted and gave roof-top access to a number of conservative "influencers" to photograph and film the purported chaos outside the ICE facility, in a patent effort to create propaganda to support the President's assertions.[10]

The below images show just a few of the many examples of influencers filming from the top of the ICE facility during this time period.

---

[8] RapidResponse47 (@RapidResponse47), X(Sept. 27, 2025), https://perma.cc/2K8C-AYET (attached as Jacobson Exhibit 22).

[9] Chantelle Lee, *Trump Says Portland Is 'War Ravaged.' Here's What to Know About Crime in the City*, TIME (Sept. 30, 2025), https://perma.cc/YQK4-HCT9.

[10] Hillary Borrud, *'Do Not Fail Portland,' City Urges Trump DOJ in Response to Police Probe*, OregonLive (Oct. 6, 2025), https://perma.cc/Q8E4-FPDK (Photo by Zaeem Shaikh); *see also* Erik Neumann, *Conservative Influencers in Portland*, NPR (Oct. 11, 2025), https://perma.cc/HQM8-8G4A.



[11]

---

[11] Conservative influencer Nick Sortor, on left. Troy Brynelson, *Right-wing Influencer to Sue Portland for $10 Million After Arrest at ICE Protests*, Or. Pub. Broad. (Dec. 9, 2025), https://www.opb.org/article/2025/12/09/portland-oregon-police-nick-sortor-lawsuit/ (attached as Jacobson Exhibit 23)    .

**Katie Daviscourt** 
@KatieDaviscourt

···

On top of the roof at Portland ICE with @hunnybadgermom! 🤍



12

---

[12] Katie Daviscourt (@KatieDaviscourt), X (Oct. 3, 2025),
https://x.com/KatieDaviscourt/status/1974227338167472474 ("On top of the roof at Portland
ICE with @hunnybadgermom !") (attached as Jacobson Exhibit 24).



The influencers were also invited to stand behind federal officers at street level. For instance, on October 4, 2025, Plaintiff Rebecca Roe witnessed influencers standing outside the ICE facility behind the police line, including Ben Bergquam, who was standing next to someone wearing a sweatshirt that read "the beatings will continue until morale improves."[14]



---

[13] Screenshot of a video showing influencer Julio Rosas; *see* James Klug (@realJamesKlug), X (Oct. 5, 2025), x.com/realJamesKlug/status/1975018065407668447.
[14] Roe Exhibit 7.
[15] *Id*. Bergquam is in the center wearing a black hat.



The same day, Bergquam posted a video from in front of the ICE facility: "Happening now at the Portland ICE facility! Multiple arrests, tear gas and the fight to save our country! God Bless ICE! God Bless America!"[17] The next day, Bergquam posted a video showing tear gas in the street outside of Gray's Landing and the ICE facility, writing "I could watch this one over and over!"[18]

Apparently to make the influencers' footage more dramatic and better support the President's depiction of the situation, federal officers substantially increased their use of tear gas, smoke grenades, and other chemical munitions during this time, and they used these munitions in

---

[16] *Id.*

[17] Ben Bergquam - Real America's Voice (RAV-TV) News (@BenBergquam), X (Oct. 4, 2025), https://x.com/BenBergquam/status/1974616980960530643 (attached as Jacobson Exhibit 25).

[18] Ben Bergquam - Real America's Voice (RAV-TV) News (@BenBergquam), X (Oct. 5, 2025, https://x.com/BenBergquam/status/1974970052345790595 (attached as Jacobson Exhibit 26).

unusual ways.[19] During the afternoon of October 4, influencers were watching as a relatively small crowd of protesters assembled outside the ICE facility. King Decl., Ex. 1. Defendants nonetheless flew *blackhawk helicopters* overhead, and they then suddenly deployed tear gas and smoke grenades at the crowd (and at Plaintiff Mindy King, as described below). *Id.* In turn, influencer Nick Sortor posted on X: "DHS has deployed BLACKHAWKS over the ICE facility in Portland, as rioters get tear-gassed and pepperballed by agents … NO MERCY!"[20]

Defendants escalated their use of gas and smoke later that day, in an incident that was patently for show. On the evening of October 4, federal law enforcement slowly pushed protesters east down Bancroft Street, creating a line in front of Gray's Landing. King Decl., Ex. 2. Plaintiff Mindy King lives on Bancroft Street next to where the officers pushed the crowd, and despite watching federal officers from her window frequently, she had never seen them move protesters in this way previously. Oregon Public Broadcasting reporters onsite likewise described the officers' actions as atypical. Jacobson Decl. Ex. 19. And according to the same reporters, the "[f]ederal officers were flanked by videographers, toting professional equipment and wearing high-visibility vests." Troy Brynelson & Alex Zielinski, *Federal tactics on Portland protesters escalate, hours after judge rules against Trump*, Or. Public Broadcasting, Oct. 5, 2025, https://perma.cc/LSR3-3WWB (attached as Jacobson Decl. Ex. 20). The videographers "filmed

---

[19] See Erik Neumann, *Right-wing Influencers Shape Nation and Trump's Understanding of Portland Protests, Or. Pub. Broad.* (Oct. 13, 2025), https://perma.cc/772T-HS2L; *Protesters, Counter Protesters, and Law Enforcement Clash at Portland ICE Headquarters*, Reuters, Oct. 6, 2025, https://www.reuters.com/pictures/protesters-counter-protesters-law-enforcement-clash-portland-ice-headquarters-2025-10-06.
[20] Nick Sortor (@nicksortor), X (Oct. 4, 2025), https://x.com/nicksortor/status/1974591900146659654 (attached as Jacobson Exhibit 27); *see* Exhibit 1 0:00:20 (video from     King showing     helicopter flying over the ICE facility).

from behind the lines of officers, capturing the show of force," while "[a]t least two drones swept over the scenes." *Id.*

Once the officers had pushed the protesters to the corner of Bancroft and Bond Streets, outside the southeast corner of Gray's Landing, the officers took "a pause," and then "dropped tear gas and other chemical munitions at protesters' feet and legs." *Id.* According to the Oregon Public Broadcasting report, its reporters "didn't observe anything before officers started using the gas." Jacobson Decl. Ex. 19. "Officers then marched back to the ICE building in a similar, stuttered fashion, punctuating each stop with gas and volleys of pepper balls." Jacobson Decl. Ex. 20. Meanwhile, "[o]fficers similarly pushed a group of protesters and other people northbound through South Moody Avenue." *Id.* As described in more detail below, the gas released by officers this night flooded Gray's Landing, filling its hallways and common areas, and pouring into apartments, causing substantial breathing difficulties for Mindy King and many other residents. Plaintiff Diane Moreno was trying to flee the tear gas in her apartment when Defendants chased protesters toward her, hitting her with rubber bullets and tear gassing her to the point she was left vomiting on the side of the road. Moreno Decl. ¶ 9.

Plaintiff Janice Lineberger also fell victim to extreme use of tear gas by federal officers during this period. Although Bancroft Street typically is the locus of federal officers' use of tear gas, on October 7, Lineberger was driving down Moody Avenue when individuals came running up the street screaming about tear gas being used. Lineberger Decl. ¶ 6. Federal agents told her to go into the Gray's Landing garage, and heavy amounts of tear gas followed Lineberger into the garage, eventually traveling with her in the elevator and up to her apartment. *Id.* Lineberger suffered intense physical reactions during this incident. *Id.* ¶¶ 6-7.

The White House swiftly used the influencers' footage of these incidents to produce propaganda. On October 4, the official White House X account released a one-minute video montage of clips showing purported chaos outside the ICE facility, including scenes of tear gas and green smoke enveloping the streets, with most of the footage apparently taken by Katie Daviscourt, one of the influencers that had been invited to film from the ICE facility.[21] The White House even hosted a presidential roundtable on October 8, 2025, where the President spoke with influencers who had been dispatched to Portland.[22]

The influencers continued to use Defendants' use of tear gas for propaganda purposes thereafter, with one posting the next week: "DHS agents just FLOODED THE STREETS at ICE Portland with tear gas and chemical munitions … President Trump has authorized ANY AND ALL force necessary."[23]

### C. Federal Officers Have Targeted Individuals with Chemical Munitions

Defendants have also used chemical munitions to disable, disorient, and otherwise harm protesters, rather than to merely disperse them. Plaintiffs have personally observed Defendants' officers using the chemical munitions for such purposes. Doe Decl. ¶ 6; Lineberger Decl. ¶ 4; *see*

---

[21] The Post Millenial (@TPostMillennial), X (Oct. 4, 2025), https://x.com/TPostMillennial/status/1974529848535376165 (attached as Jacobson Exhibit 28). This was not the first time that ICE had given Daviscourt special access to produce ICE-friendly content. *See* Katie Daviscourt (@KatieDaviscourt), X (Sep. 11, 2025), https://x.com/KatieDaviscourt/status/1966241097413488959 (video featuring sit-down interviews with ICE officers) ((attached as Jacobson Exhibit 29)
[22] Brett Samuels, *White House Hosts Conservative* Influencers *for Antifa Roundtable Amid Portland Protests*, The Hill (Oct. 8, 2025), https://thehill.com/homenews/administration/5545888-trump-roundtable-antifa-crackdown/. https://x.com/nicksortor/status/1974591900146659654; Katie Daviscourt (@KatieDaviscourt), X, Portland, Ore. — *Federal agents disperse rioters laying siege to the ICE facility, deploying tear gas and crowd control munitions throughout the streets* (Oct. 5, 2025), https://x.com/KatieDaviscourt/status/1974748903951208802/ (attached as Jacobson Exhibit 30).
[23] Nick Sortor (@nicksortor), X (Oct. 18, 2025), https://x.com/nicksortor/status/1979747922259726613 (attached as Jacobson Exhibit 31).

Dooley Decl. ¶ 4; King Decl. ¶¶ 4, 7; Taylor Decl. ¶ 4. Brooks Decl. ¶ 5. Plaintiff Rebecca Roe

has taken videos and photos of officers using chemical munitions at close range, for reasons

other than to merely disperse the protesters. *See* Roe Decl., Exs. 8, 10, 11, 12, 16, 18.

Several examples of officers specifically targeting individuals with tear gas and other

chemical sprays, to harm rather than disperse them, have been widely reported, including:

- In June, officers shot tear gas canisters through the *closed* gate of the ICE Facility and hit
  a nurse in the face, crushing his eye and concussing him.[24]

- On October 2, an officer then sprayed a chemical spray in two protesters' faces from less
  than five feet away, even though the protesters were only yelling at the officers.[25]

- October 11, Defendants encountered peaceful protesters and deployed tear gas and
  pepper balls with the intent to temporarily disable them. Before law enforcement exited
  the Portland ICE building, protesters had been dancing.[26]

- Around this time, an officer sprayed the air vent of a protester's inflatable frog suit from
  just a foot away    .[27]

On October 4, 2025, federal officers seemingly targeted Plaintiff Mindy King herself,

while she was filming officers' use of tear gas from her apartment in Gray's Landing. King

frequently videotapes and livestreams events at the ICE facility, and officers had previously

shined flashlights at her while she was filming, demonstrating that the officers knew of her

filming activities. King Decl. ¶ 3. In the afternoon of October 4, moments after officers began

---

[24] A.C. Thompson & J. David McSwane, *Trump's Immigration Forces Deploy "Less Lethal" Weapons in Dangerous Ways, Skirting Rules and Maiming Protesters*, ProPublica (Nov. 25, 2025), https://perma.cc/4JQ8-L47N.
[25] Iboshi, *supra* n.6.
[26] *Portland Oregon ICE BUILDING PROTEST ANTIFA VS VELLYRAY* (YouTube, Oct. 11, 2025), https://perma.cc/8V8L-XQ3R (video beginning around 1 hour and 26 minute mark).
[27] ICE agent pepper-sprays frog-suited protester, (Oct. 5, 2025), https://perma.cc/4CTR-YRRE.

shooting tear gas from the ICE facility, an officer standing far away on the street up Bancroft shot a projectile tear gas canister that landed directly below King's apartment. *Id.* ¶ 7. King recalls that only a few Portland police officers, and no protesters, were next to her apartment at the time. *Id.* The evidence thus suggests that the officers were targeting King's unit directly with the long-range tear gas canister they shot. King Decl. ¶¶ 4, 7.

### D. Chemical Munitions Enter Gray's Landing, Injuring Plaintiffs

Given Gray's Landing's proximity to the ICE facility, tear gas, colored smoke, pepper balls, and other chemical agents have predictably infiltrated Gray's Landing seemingly every time they are used. Indeed, Defendants have fired chemical munitions that have directly hit Gray's Landing apartments or the building's central courtyard, and Gray's Landing occupants have found tear gas canisters, pepper balls, and other munitions on the sidewalks next to their building, on their balconies, in the building parking garage, and in the building courtyard. As just one example, Mindy King captured the image below from her apartment:

[28]

---

[28] Screenshot from King Decl. Exhibit 5 (looking across Bancroft Street in the direction of the ICE facility).

Gray's Landing residents, including Plaintiffs, have incurred significant physical and psychological injuries from the sustained exposure to tear gas and other chemical munitions. Federal agents' use of flashbangs and tear gas has triggered episodes of PTSD for Jane Doe, a survivor of domestic violence who was once shot in the head by her abuser. Doe Decl. ¶¶ 3, 7. On one occasion, Doe fled to her closet in fear and urinated on herself as a reaction to the triggering of her PTSD. *Id.* ¶ 7. Doe, who lives on the southwest corner of Gray's Landing closest to the ICE facility, has had tear gas fill her apartment on a sustained basis, including several particularly severe episodes. *Id.* ¶¶ 8-12. Doe lives with her daughter who recently lost a pregnancy. *Id.* ¶ 2. On one occasion in July 2025 when tear gas filled Doe's apartment, the gas masks she had purchased did not protect her or her family and the gas was so invasive that chemicals got into Doe's food and left a green residue on Doe's window screens. *Id.* ¶ 8. After this and similar incidents, Doe has been left crying, struggling to breathe, and with her home and belongings full of gas. *Id.* ¶¶ 8-9.

Very recently, tear gas entered Doe's apartment on January 24, 2026. *Id.* ¶¶ 11-12. The chemicals were so intense that they forced Doe from her living room and kitchen. *Id.* ¶ 11. Doe slept in her closet that night, and Doe's "daughter slept in [the] bathtub to attempt to avoid the gas." Doe Decl. ¶¶ 11-12. Just as she had experienced in the summer and fall of 2025, Doe developed an itchy throat, watery eyes, and cough that lasted for days. *Id.* ¶¶ 12, 14. Doe's "symptoms have gotten worse after each exposure." *Id.* ¶ 14. And just as in July 2025, the food and drink that was out in Doe's kitchen was contaminated by the tear gas. *Id.* ¶ 12.

Tear gas and other chemical odors have also infiltrated Susan Dooley's apartment on a consistent basis. Dooley has suffered from dizziness, shortness of breath, sleep deprivation, and aggravations to her existing asthma due to exposure to the chemicals federal agents have

released. Dooley Decl. ¶ 5. When Dooley went to her doctors at the VA in November, the doctor immediately sent her to the emergency room, where doctors found that her blood oxygen saturation was low due to difficulty breathing after gas exposure and diagnosed her with mild heart failure. *Id.* Dooley fell four times in October, and even today feels disoriented and slurs her words when speaking. *Id.* ¶¶ 5, 8. These new symptoms only developed after Defendants began releasing gas and chemicals outside of Dooley's home. *See id.* ¶ 8.

Whitfield Taylor and his children, who also live at the southwest corner of the complex closest to the ICE facility, are often unable to sleep due to the chemicals, flashbangs, and bright lights outside of their apartment. Taylor Decl. ¶ 6. Despite Whitfield's best efforts to seal his windows and doors, chemicals have frequently entered the apartment and burned his family's eyes and caused severe throat irritation. *Id.* Whitfield has taken his daughters to urgent care given these symptoms, and his daughters began sleeping at times in the closet of his bedroom to feel some sense of safety from federal officers' activities outside their window. *Id.* ¶ 7.

Rebecca Roe suffers from PTSD, which has been repeatedly triggered by the weapons used by federal officers outside of her apartment. Roe Decl. ¶ 9. The tear gas and smoke that federal officers use often seeps into her home, making Roe dizzy, burning her eyes, and causing chest pain. *Id.* ¶ 10. She reports that "[her] entire respiratory system hurts." *Id.* These symptoms worsened on January 24, 2026, when tear gas again entered Roe's apartment and lingered for multiple days. *Id.* ¶ 11. She has had to sleep in her bed wearing a gas mask. *Id.* ¶ 12. And she has gone to the emergency room to treat these injuries. *Id.* ¶ 10.

Plaintiff Mindy King has had to acquire gas masks for herself and her teenage son, who she has taught how to properly seal the mask around his long hair. King Decl. ¶ 5. When federal officers pushed back protesters down Bancroft Street on October 4 and released tear gas on the

street just in front of her apartment, the gas flooded her section of the building, causing King and her dog to cough profusely, and King's cough persisted for weeks. *Id.* ¶ 6.

Janice Lineberger has had difficulty breathing and had itchy eyes, scalp, and face. Lineberger Decl. ¶ 6. Even after showering following an exposure in the Gray's Landing parking garage, Lineberger continued to feel ill. *Id.* Lineberger's voice has indefinitely changed since before federal agents began using chemical munitions—her "voice is now very gravely, as if [she] was a chain smoker." *Id.* ¶ 7. Lineberger observed Defendants fire tear gas at least six times on January 24, 2026, and she declares that after the gas entered her home "my voice got worse, my breathing was impaired, and I developed a significant headache." *Id.* at ¶ 10. The repeated use of gas and other chemical munitions has caused Lineberger to experience severe anxiety and fear of violence outside of her home. *Id.*

Diane Moreno suffers from Cushing's disease, which causes overproduction of cortisol. The frequent exposure to tear gas in her apartment, lack of sleep, and anxiety have driven her cortisol levels to an unprecedented and dangerous high, leading her to get surgery to have one of her adrenal glands removed. Moreno Decl. ¶¶ 4, 13, 14 . Even outside of her apartment, she is not safe: as noted above, Defendants shot her several times with rubber bullets in both October and January, when she was simply walking home to her apartment or trying to leave the area. *Id.* ¶¶ 10-11. She also suffers from respiratory problems, tightness in her chest, and serious sinus problems as a result of Defendants' tear gas, which has forced her to visit urgent care multiple times and begin using an inhaler. *Id.* ¶¶ 8-9.

Erica del Nigro has an autoimmune syndrome called mast cell activation syndrome, which causes severe allergic reactions and other immune responses. Del Nigro Decl. ¶ 4. Tear gas, del Nigro now knows, is a major trigger for her autoimmune condition: she has suffered

persistent respiratory issues and severe allergic reactions like a six-week long full-body rash, and developed migraines, hives, and eye inflammation after Defendants began gassing Gray's Landing again in January. *Id.* ¶¶ 6-7, 10. The chemicals from the pepperballs also set off her allergies. *Id.* ¶ 9. Her 12-year-old son J.D. has also developed chronic respiratory issues that have required treatment with multiple medications; both he and del Nigro began using inhalers, even though neither of them needed one before tear gas began infiltrating their apartment. *Id.* ¶ 10. J.D. has also developed serious anxiety and is "often afraid to leave the apartment, not knowing if he'll be able to get back home safely," leading his doctor to place him on anxiety medication. *Id.* ¶ 11.

Roy Brooks, who has muscular dystrophy, has suffered irreversible muscle loss. Brooks Decl. ¶ 6. The sleep loss from the frequent and unpredictable explosions of tear gas canisters and flashbangs have led to irreversible muscle atrophy, now leaving him unable to transfer from his wheelchair to a standard toilet and back. *Id*. ¶¶ 6-8. The lack of a steady sleep schedule also puts additional stress on his pulmonary and cardiovascular systems, with a potential risk for permanent and life-threatening damage. *Id*. ¶ 9. Tear gas has entered his apartment repeatedly, causing coughing, a running nose, and watering eyes. *Id.* ¶ 11. Because his apartment lacks air conditioning, over the summer he had to choose between a stiflingly hot apartment or having tear gas pour into his apartment. *Id.* ¶ 10.

The REACH Plaintiffs have incurred significant financial expenses and harms to their core missions as a result of Defendants' use of chemical munitions. Salazar Decl. ¶¶ 16-23. To safeguard the health and well-being of residents and staff, the REACH Plaintiffs have, among other things, installed air scrubbing machines throughout the commercial and residential spaces; regularly replaced HVAC charcoal filters to maintain safe air quality and remove chemical

residue following munitions activity; provided in-unit air purifiers for residents to improve indoor air quality; installed sticky mats at all building entrances to prevent people from bringing in chemical residue on their shoes; offered ear plugs to residents seeking noise mitigation; and hired daily safety patrols. *Id.* ¶ 16. The REACH Plaintiffs have spent more than $100,000 on mitigation efforts already, with future cleanup expected. *Id.* ¶¶ 17-18. The REACH Plaintiffs face the prospect that any remediation work they undertake will need to be repeated ad infinitum, since federal officers have given no indication that they will stop using tear gas and other chemical agents near Gray's Landing. *Id.* ¶ 18.

Defendants have known full-well that their use of tear gas and other chemical agents has harmed the inhabitants of Gray's Landing, and the officers have continued to use these munitions anyway. REACH employee Christine Piggott approached DHS officers in early July to inform them that the tear gas and chemicals were harming her and others who lived and worked at Gray's Landing. Piggott Decl. ¶ 5. The officers laughed at Piggott. *Id.* They told her derisively that she must have allergies because the gases they used were "environmentally friendly." *Id.* The harms to Gray's Landing residents from Defendants' use of chemical munitions has also been widely reported and known, including through news reports, a lawsuit brought by a Gray's Landing resident in August that described the "near-nightly toxic environment" created federal officers' use of tear gas and smoke,[29] and even from a letter from members of Congress.[30] And,

---

[29] Zaeem Shaikh, *Portland police not required to enforce noise rules at ICE protests, judge rules*, The Chronicle, Aug. 20, 2025, https://www.chronline.com/stories/portland-police-not-required-to-enforce-noise-rules-at-ice-protests-judge-rules,385677 (attached as Jacobson Exhibit 32).

[30] *See* Ltr. to Sec. Noem from Oregon members of Congress, Oct. 16, 2025, https://bynum.house.gov/sites/evo-subsites/bynum.house.gov/files/evo-media-document/letter-to-sec-noem.pdf (attached as Jacobson Exhibit 33).

of course, Defendants knew about the harms to Plaintiffs from this lawsuit when they deployed heavy amounts of tear gas outside Plaintiffs' apartment on January 24, 2026.

### E.  Chemical Munitions Produce Dangerous Health Consequences

Defendants are using weapons of war—tear gas, smoke grenades, and pepper balls—outside of Gray's Landing. Chemical agents, including tear gas and pepper balls, are banned weapons under the 1997 Chemical Weapons Convention. The United States armed forces could not lawfully deploy these weapons against an enemy army, but Defendants have been knowingly releasing these chemical agents into homes at Gray's Landing for months.

Though sometimes referred to as "non-fatal," "the term is misleading and erroneous" as "[d]eath critical illness and injury, and severe and permanent disability have resulted from tear gas exposures." Rao Decl. ¶ 39. The chemical agents in each of these weapons are designed to cause pain, as the Centers for Disease Control and Prevention ("CDC") has explained: they are designed to "temporarily make people unable to function … by causing irritation to the eyes, mouth, throat, lungs, and skin."[31] The Oregon Health Authority explains that this "irritation" is serious and includes burning of the eyes, nose, mouth, and skin, as well as difficulty swallowing, chest tightness, choking sensations, nausea, vomiting, wheezing, and shortness of breath, among other symptoms.[32] The CDC further describes exposure to chemical munitions used for riot control as "poisoning,"[33] as does the scientific literature "as they have no therapeutic indication, and they consistently and intentionally cause bodily injury." Rao Decl. ¶ 41.

---

[31] *Riot Control Agents Chemical Fact Sheet*, *CDC Chemical Emergencies*, (Sept. 4, 2024), https://perma.cc/F3TW-AJQB.

[32] Ore. Health Auth., *Tear Gas Frequently Asked Questions* (last revised Oct. 30, 2025), https://perma.cc/6CFZ-CHD7; *see* Rao Decl. ¶ 44.

[33] *CDC*, *supra* note 31.

There have not been direct studies on the kinds of long-term tear gas exposures facing Gray's Landing residents and staff, and for good reason—it would be unethical to purposefully expose children, the elderly, pregnant people, or even healthy adults with repeated exposures. *Id.* ¶¶ 38, 71, 112. Yet it is known that exposure to these chemical munitions can have "significant and long-lasting health harms." *Chicago Headline Club v. Noem, No. 25 C 12173*, 2025 WL 3240782, at *69 (N.D. Ill. Nov. 20, 2025), *stayed*, No. 25-3023, Dkt. No. 28 (7th Cir. Nov. 19, 2025). As the CDC explains, "[l]ong lasting exposure … may cause severe effects" such as blindness, respiratory failure, and death.[34] Recent surveys have also connected repeated exposure to reproductive changes in women, with women who experienced more than five days chemical exposure more likely to report changes. Rao Decl. ¶ 114.

The CDC states that "[t]he level of poisoning depends on the amount someone was exposed to, how the person was exposed, and for how long."[35] "It also depends on the location of exposure (indoors versus outdoors)."[36] The CDC advises that "[i]f the riot control agents were released indoors, get out of the building," but CDC does not provide advice about what to do if unable to escape an indoor exposure.[37] How an individual is affected by the poison depends on a variety of factors, including age and underlying health conditions. Rao Decl. ¶ 68. Children, for example, are particularly vulnerable and have an increased risk of airway obstruction; older individuals or people with asthma, immune system vulnerabilities, or other similar conditions are similarly more likely to have trouble clearing their airways *Id.* ¶¶ 69-88.

---

[34] *Id.*
[35] *CDC*, *supra* note 31.
[36] *Id.*
[37] *Id.*

These chemical weapons are indiscriminate and, once released, cannot be controlled; upon exploding or being released into the air, chemicals expose bystanders and targets alike. *Id.* ¶¶ 59-60. The environment in which they are released can greatly affect their movement as well, such as the location of buildings and entering indoor space, which can cause the poisons to stay at higher concentrations for longer. *Id.* ¶¶ 66-68. And, once released, "chemicals remain in the environment long after the visible 'cloud' or 'fog' disappears. *Id.* ¶ 50. Particles contaminate other objects, rendering them both dangerous and indistinguishable from non-contaminated objects. *Id.*.These objects—including furniture, window treatments, and other items that are difficult to replace or remove for cleaning—then pose ongoing health risks to anyone coming into contact with them. *Id.* ¶¶ 50-53.

## LEGAL STANDARD

The Court should grant a preliminary injunction where Plaintiffs show (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Where, as here, injunctive relief is sought against the federal government, the final two factors converge. *Id.* at 435.

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits

The Due Process Clause of the Fifth Amendment protects against arbitrary government action that deprives persons of life, liberty, or property. Where government conduct substantially burdens or infringes upon one of these rights, the conduct violates substantive due process if it "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

Defendants' repeated use of tear gas, smoke grenades, pepper balls, and other chemical agents in and around Gray's Landing substantially burdens and infringes upon Plaintiffs' rights to: (1) bodily integrity; (2) freedom from arbitrary bodily restraint; and (3) use and enjoyment of their property. And Defendants' recurring and egregious use of these chemical weapons—without regard for Plaintiffs' fundamental rights and well-being—shocks the conscience. Defendants have known that these toxins are infiltrating Gray's Landing, and have nonetheless continued to use the munitions for months with deliberate indifference to the severe harms that Plaintiffs and other residents are suffering. And although not necessary to find that Defendants have violated substantive due process, Defendants have even deployed these weapons with the purpose to harm targeted persons, without any legitimate law enforcement purpose.

## A. Defendants Have Harmed Plaintiffs' Liberty and Property Interests

**1.** At the core of the liberty interests protected by the Due Process Clause is a person's right to "bodily integrity," which "is rooted in a long and rich history." *Sterling v. City of Jackson*, 159 F.4th 361, 373 (5th Cir. 2025). As far back as 1891, the Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded[,] … than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. v. Botsford,* 141 U.S. 250, 251 (1891); *see Schmerber v. California*, 384 U.S. 757, 772 (1966). Since then, "the right has been recognized to cover many fact patterns," including in cases analogous to the government's conduct here. *Sterling*, 159 F.4th at 374 (recounting history and cases).

In particular, courts have recognized that government-caused exposure to toxic substances can violate a person's right to bodily integrity—even when the mechanism of exposure is diffuse environmental exposure, rather than forcible, intentional administration. In

the Flint water-contamination litigation, the Sixth Circuit held that "a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent." *See Guertin v. Michigan*, 912 F.3d 907, 921 (6th Cir. 2019). The Fifth Circuit came to the same conclusion in similar litigation related to the Jackson water-contamination crisis. Surveying Supreme Court precedent, the court concluded that "[t]he consistent throughline of these cases is consent: when a person does not consent to an intrusion, that intrusion is subject to judicial scrutiny, regardless of if the intrusion is beneficial or even necessary." *Sterling*, 159 F.4th at 374.

Plaintiffs have demonstrated that Defendants' conduct is violating their right to bodily integrity by subjecting them to repeated, nonconsensual exposure to toxic airborne substances. Plaintiffs' declarations describe recurrent exposure—inside their own homes—to chemical agents that cause both acute and persistent respiratory and other bodily harms. Every Resident Plaintiff attests that gas and smoke have entered and affected their bodies while they have been inside their apartments or the common areas of Gray's Landing, causing intense physical reactions such difficulty breathing, coughing, burning eyes and throat, dizziness, nausea, or chest pain. *See* Dooley Decl. ¶¶ 5, 8; Roe Decl. ¶¶ 10, 12; Doe Decl. ¶¶ 8, 9, 12; Lineberger Decl. ¶¶ 6-7; King Decl. ¶ 6; Taylor Decl. ¶¶ 6-7.

The invasion of Plaintiffs' bodily integrity, and the physical harms it causes, is also lasting. Susan Dooley, who is 72 years old, has had her blood oxygen saturation levels drop precipitously, and she continues to slur her words and feel disoriented. Dooley Decl. ¶¶ 5, 8. Janice Lineberger's voice seems to have permanently changed; she now has a gravely voice that sounds like she was a heavy smoker for decades. Lineberger Decl. ¶¶ 7, 10. Rebecca Roe, who has suffered severe coughing and burning sensations in her throat, nose, and eyes, chest pain and

heart palpitations, and an emergency-room visit after exposure, still has lingering breathing symptoms. Roe Decl. ¶ 10. Diane Moreno now requires an irreversible surgery to remove one of her adrenal glands as a result of the stress caused by Defendants' tactics. Moreno Decl. ¶ 13-14. Roy Brooks has suffered irreversible muscle loss that has left him permanently unable to transfer from his wheelchair to the toilet (and vice versa) without assistance. Brooks Decl. ¶ 8. Erica del Nigro and her son J.D. both needed inhalers, and her son is on anxiety medications. Del Nigro Decl. ¶¶ 7, 10-11. And all of the Resident Plaintiffs explain that the physical symptoms they feel from a gassing incident continue for days after. *See* Dooley Decl. ¶¶ 7, 8; Roe Decl. ¶ 10; Doe Decl. ¶¶ 8-10, 14; Lineberger Decl. ¶¶ 6-8; King Decl. ¶ 6; Taylor Decl. ¶ 7; Brooks Decl. ¶ 11; Moreno Decl. ¶ 7; del Nigro Decl. ¶¶ 6, 9. For many of the Resident Plaintiffs, further exposure risks even more severe, and potentially fatal, harm. *See* del Nigro Decl. ¶ 5 (risk of anaphylaxis); Moreno Decl. ¶ 14 (risk of adrenal crisis after upcoming surgery); Brooks Decl. ¶ 9 (risk of pulmonary or cardiac damage); Doe Decl. ¶ 14 ("my symptoms have gotten worse after each exposure"); Lineberger Decl. ¶ 7 ("Each time the tear gas gets into my apartment, the symptoms get worse.").

Beyond the physical harms caused by these "forcible intrusions into the body," *Sterling*, 159 F.4th at 376, the record also establishes serious psychological harms caused by Defendants' conduct. These harms implicate Plaintiffs' right to bodily integrity as well: "[A] governmental actor can violate [the right to bodily integrity] through mental coercion alone." *Id.* (citing cases). Here, moreover, plaintiffs suffered psychological harms that were caused by physical intrusions of gas, light, and sound. Residents with prior trauma describe that flashbangs, loud detonations, and chemical agents outside their windows trigger PTSD episodes, panic, and disorientation—harms that are exacerbated by the fact that these events occur at home, where residents should be

able to feel safe. Doe Decl. ¶¶ 3-4, 7-9, 11-12; Roe Decl. ¶¶ 9-13. Plaintiffs also describe the ongoing mental strain of repeated chemical incursions into their living spaces, including fear, sleep disruption, and persistent distress associated with lingering chemical odors and residue. Doe Decl. ¶¶ 7, 12; Dooley Decl. ¶¶ 4-5; Roe Decl. ¶¶ 12-13; Lineberger Decl. ¶¶ 10-11; Moreno Decl. ¶ 16; del Nigro Decl. ¶¶ 12-13; Brooks Decl. ¶¶ 8-9.

As explained by Dr. Rama Rao, one of the country's leading toxicologists, these physical and psychological symptoms are consistent with the known effects of the kinds of chemical agents Defendants appear to be using. Rao Decl. ¶¶ 102-104. And the continued exposure to these toxins threatens even more severe harm: the medical literature reports numerous cases of hospitalization and life-threatening conditions due to similar exposures. Rao Decl. ¶¶ 47, 58, 71, 82, 83. The Ninth Circuit has accepted similar expert testimony in prior cases, with then-Judge Kennedy observing that "[t]ear gas and other chemical agents are dangerous, inflict pain, and can cause permanent injury and even death," and that such chemicals are especially harmful "in closed places." *Spain v. Procunier*, 600 F.2d 189, 194 (9th Cir. 1979) (quotations omitted). Magistrate Judge Beckerman made similar findings in a suit regarding "ongoing tear gas exposure" to inmates housed in the Multnomah County Detention Center during the 2020 Portland riots. *Davis v. Multnomah County*, No. 3:20-cv-02041-SB, Dkt. No. 154, slip op. at 132 (D. Or. Sept. 5, 2025) (Findings & Recommendation).[38] And the federal government's own

---

[38] Magistrate Judge Beckerman recounted substantial evidence that repeated exposure to tear gas had caused "rashes, impaired breathing and sleep, blurry vision, nightmares, anxiety, excessive coughing and worry, chest pains, dizziness, lightheadedness, headaches, migraines, exacerbated asthma and mental health symptoms, irritation and burning of the eyes, face, nose, skin, and throat, 'coughing and spitting stuff up,' [and] waking up vomiting." *Davis*, slip op. at 132. *See also, e.g.*, *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161-62 (9th Cir. 2011)   .

expert agency warns that "[l]ong lasting exposure" may cause blindness, respiratory failure, and other severe effects, including death.[39]

**2.** Plaintiffs have also demonstrated that Defendants' use of chemical munitions meaningfully impairs residents' liberty of movement in and out of their homes. *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944-45 (9th Cir. 1997) (describing "fundamental right of free movement"); *Williams v. Fears*, 179 U.S. 270, 274 (1900) (recognizing "right to remove from one place to another according to inclination" as "an attribute of personal liberty"); *City of Chicago v. Morales*, 527 U.S. 41, 53-55 (1999) (plurality op.) (similar). Resident Plaintiffs describe taking extraordinary measures to avoid exposure—placing towels under doors, sealing windows and keeping them closed even in hot weather, sleeping in bathtubs, wearing gas masks inside and to sleep, abandoning ordinary use of patios and common areas, and avoiding going outside at night altogether. Lineberger Decl. ¶¶ 5, 8; Roe Decl. ¶ 12; Dooley Decl. ¶ 8; Moreno Decl. ¶ 9; Brooks Decl. ¶ 10. A.T. and B.T. have hidden in their father's closet. Taylor Decl. ¶ 7.

**3.** The Due Process Clause also protects against arbitrary government action that deprives people of "property," including the right to possess, use, and safely enjoy one's home and personal effects. *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) (describing due process as "protect[ing] [property owner's] use and possession of property from arbitrary encroachment—to minimize substantively unfair … deprivations of property" (quotations omitted); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005) ("[A property] regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause."); *Crown Point Development v. City of Sun Valley*, 506 F.3d 851, 856 (9th Cir. 2007) ("explicitly" permitting a substantive due process

---

[39] *CDC*, *supra* n.31.

claim "that [a] land use action lacks any substantial relation to the public health, safety, or general welfare"); *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1026 (9th Cir. 2007) (similar).

Defendants' use of tear gas and other chemical munitions has enormously burdened Resident Plaintiffs' property interests, including in their homes and their personal belongings. Jane Doe describes an instance when "tear gas and green smoke grenades entirely flooded" her apartment; the gas "got into our food," and "residue from the green smoke was visible on [the] window screen." Doe Decl. ¶ 8. The contamination does not dissipate when the clouds clear: "the gas and smoke get into the apartment and linger in our carpets and on our surfaces," and "[d]espite attempts to clean the chemicals out of our apartment, it still smells like tear gas for longer after any incident when the gas is used." *Id.* ¶ 10. Susan Dooley likewise attests that whenever federal officers use tear gas near Gray's Landing, "it lingers in my apartment afterwards for several days, in the carpets and my other belongings." Dooley Decl. ¶ 7; *see also* Roe Decl. ¶ 10.

The REACH Plaintiffs have likewise suffered deprivations of their property interests in the Gray's Landing building, grounds, and offices, and in their reputation, business relationships, and goodwill.[40] REACH's CEO explains that gas and other chemicals have caused significant chemical contamination and other property damage to Gray's Landing. Salazar Decl. ¶¶ 9-15. In response, the REACH Plaintiffs have undertaken expensive mitigation and cleanup measures. *See id.* ¶¶ 16-19. Defendants' conduct has also damaged the REACH Plaintiffs' business

---

[40] A business's goodwill is a constitutionally protected property interest, so long as it is "characterized as a property interest" under state law. *See Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 61-62, 65 (9th Cir. 1994). Oregon characterizes business goodwill as a property interest. *See Westwood v. City of Hermiston*, 787 F. Supp. 1174, 1197 (D. Or. 2011) (citing cases); Or. Admin. R. 150-307-0020(1) (defining "Goodwill" as "Personal Property").

relationships and goodwill. *Id.* ¶¶ 20-23. In particular, the REACH Plaintiffs have cultivated valuable goodwill with residents, staff, and the community related to their provision of safe and affordable housing to everyone, including many veterans who suffer from PTSD. *Id.* Defendants' harmful conduct is destroying that valuable goodwill, harming the REACH Plaintiffs' relationships with existing tenants and making it harder to find new tenants. *Id.* And the REACH Plaintiffs have had to deploy significant attention, staff time, and resources responding to Defendants' harmful conduct, which has diverted resources from their provision of resident services. *Id.* ¶¶ 16-19.

### B. Defendants' Conduct Shocks the Conscience.

"[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *Lewis*, 523 U.S. at 846 (cleaned up). The Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government'" and against the "exercise of power without any reasonable justification." *Id.* at 845-46 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). Arbitrary government conduct violates substantive due process if it is so "egregious" conduct that it "shocks the conscience." *Id.* at 846.

Whether conduct shocks the conscience is "context dependent" and often turns on whether the circumstances permitted deliberation by government officials before acting. *See id.* at 850-51; *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Where officials have time to engage in "repeated reflection," government officials' "deliberate indifference" to the harms caused by their actions can shock the conscience. *Lewis*, 523 U.S. at 851-53; *see Wilkinson*, 610 F.3d at 554. Where, instead, officers must make a "snap judgment" in a rapidly escalating situation and cannot practically deliberate, due process liability generally requires a heightened showing of "a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*,

610 F.3d at 554. The "purpose to harm" inquiry is subjective, focused on whether the official acted with an illegitimate, harmful purpose rather than to advance a legitimate governmental objective. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013).

**1.** The evidence demonstrates that Defendants had ample time to deliberate over whether to use tear gas, smoke grenades, and pepper balls next to Gray's Landing. Defendants have used these chemical munitions many dozens of times over a period of seven months, including in certain recurring fact patterns such as when a protester steps a foot or toe over a blue line that ICE has drawn at the end of its driveway, Doe Decl. ¶ 6, or before individuals drive in or out of the ICE parking lot, King Decl., Ex. 1 at 2:20; Roe Decl., Ex. 18 at 3:55; *see* Jacobson Decl. Ex. 19. It is clear that Defendants have made operational decisions, at an organizational level, to use tear gas, smoke grenades, and pepper spray next to Gray's Landing in the face of anticipated, recurring protests. King Decl., Exs. 1, 2; Roe Decl., Exs. 8, 9, 10, 16. These are not split-second decisions made in the heat of a rapidly unfolding emergency. Defendants' conduct is the product of premeditated operational choice—with ample time to reevaluate and revise tactics over the course of repeated incidents—rather than a single rapidly escalating confrontation demanding instantaneous reaction.[41]

Defendants have had time to deliberate not only over months of recurring protests, but also during a given night before choosing to deploy chemical munitions. For instance, in the incident on the evening of October 4, officers slowly pushed protesters down the street, paused, and then without provocation dropped massive volumes of tear gas at the feet of the protesters.

---

[41] *Compare Guertin*, 912 F.3d at 925 ("the alleged decisions … took place over a series of days, weeks, months, and years"); *Sterling*, 159 F.4th at 378 ("seven months"); *with Lewis*, 523 U.S. at 836-37 ("75 second[]" highspeed chase); *Porter v. Osborn*, 546 U.S. 1131, 1139 (9th Cir. 2008) ("entire … encounter" took "probably no more than five minutes"); *and Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) ("only four seconds elapsed").

Jacobson Decl., Exs. 19-20. In fact, the officers' use of tear gas that evening was completely pre-planned; the officers had videographers in tow behind them as they slowly marched down the street and then released gas and smoke. Jacobson Decl. Ex. 19 (Troy Brynelson & Alex Zielinski, *Federal tactics on Portland protesters escalate, hours after judge rules against Trump*, Or. Public Broadcasting, Oct. 5, 2025, https://perma.cc/LSR3-3WWB).

In other instances, as mentioned, officers have shot tear gas before individuals drive in or out of the ICE parking lot, meaning the officers decided in advance to release the gas, since in each instance they knew a vehicle would be departing or arriving. King Decl., Ex. 1 at 2:20; Roe Decl., Ex. 18 at 3:55; *see* Jacobson Decl. Ex. 19. Similarly, a June 24 video shows federal officers slowly exiting the driveway of the ICE Facility and deliberating before deploying green smoke over 90 seconds later, despite facing no new or imminent threat. Roe Decl., Ex. 10.

The record further establishes that, with their time to deliberate, Defendants have been deliberately indifferent to the harms caused to Gray's Landing inhabitants by their conduct. There is direct evidence that Defendants, both at the leadership level and their agents on the ground, had actual knowledge of the harms to Plaintiffs caused by their conduct. As described, in July 2025, a REACH employee complained directly to DHS officers standing outside the ICE facility about the serious harm their use of gas was causing people inside Gray's Landing, and the officers openly mocked her. Piggott Decl. ¶ 5. Also in July, a Gray's Landing resident filed a lawsuit in state court in which she described federal officer's use of tear gas and pepper spray as creating a "near-nightly toxic environment." Shaikh, *supra* n.29. The press has also published numerous stories and news segments about the harms to Gray's Landing residents since the summer, and in some cases reached out through formal channels for the government's position. Members of Congress even notified Secretary Noem about the plight of residents. Jacobson

Decl. Ex. 33. And even after Plaintiffs filed this lawsuit and their original motion for a preliminary injunction, Defendants again deployed massive amounts of tear gas and chemical agents immediately adjacent to Gray's Landing. Roe Decl. ¶¶ 5-8.

Defendants cannot credibly claim that they did not know that repeated chemical-agent deployments immediately next to Gray's Landing would inevitably expose residents and their apartments to contamination, given the immediate proximity of the large complex and the repeated nature of the operations, often at night, when residents were most likely to be present. Through it all, Defendants were well aware of the health risks that this exposure would inevitably cause. The entire purpose of deploying these chemical weapons is to harm the people exposed; "that is how they achieve their intended effect of dispersing, subduing, or incapacitating targets." Rao Decl. ¶ 109. Indeed, the federal government's own expert agency describes it as "poisoning" and warns people to "leave the area" if exposed.[42] And Defendants regularly decontaminate their own property after using these chemical weapons, but they hose the chemical residue away from the ICE building towards Gray's Landing. Del Nigro Decl. ¶ 15.

The fact that Defendants did nothing to mitigate the known harms caused by their use of chemical munitions underscores their deliberate indifference to Plaintiffs' harms. Defendants continue large-scale deployments of chemical agents next to residences, in a dense urban environment where fumes do not readily dissipate, without meaningful tailoring of quantity, type, timing, or direction to mitigate predictable drift and contamination into surrounding buildings. Defendants could have implemented basic mitigation measures—such as restricting deployments based on wind direction, prohibiting firing toward Gray's Landing, reducing the volume and frequency of deployments, selecting less-dispersive chemical agents, and using

---

[42] *CDC*, *supra* n.31.

available alternatives, including targeted arrests, physical barriers, and de-escalation tactics. But instead they continued repeated, large-scale deployments of gas and smoke that predictably drifted into residents' homes and common areas. "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lewis*, 523 U.S. at 853.

**2.** Even if the Court concludes that Defendants did *not* have time to deliberate, Plaintiffs have demonstrated that Defendants acted with "purpose to harm" protesters and not for any legitimate law enforcement purpose. *Wilkinson*, 610 F.3d at 554. It does not matter whether the Defendants intended to harm protesters rather than Plaintiffs. The Ninth Circuit has squarely held that bystanders may bring substantive due process claims where government officials act with purpose to harm someone else. *See Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 980 (9th Cir. 2025). The court held that there is "no reason to think that conduct is any less shocking when it injures someone other than the intended target, particularly when harm to a third party is a clear, known risk and is entirely foreseeable." *Id.*

Here, Defendants shot tear gas and used other chemical munitions with purpose to harm specific protesters, and the harm to residents living next door was "entirely foreseeable." *Id.* Video footage captures Defendants' use of chemical agents to immobilize, injure, or otherwise intentionally harm protesters, rather than disperse them. King Decl., Exs. 1-2; Roe Decl., Exs. 8-10, 16. Plaintiffs repeatedly observed Defendants deploying chemical munitions when there was no imminent threat to officers, and in ways that predictably inflamed tensions rather than calming them. *See* Doe Decl. ¶¶ 6, 11; Dooley Decl. ¶ 4; King Decl. ¶ 4; Lineberger Decl. ¶ 4; Taylor Decl. ¶ 4; Moreno Decl. ¶ 17.

Video footage likewise captures Defendants using chemical agents against non-violent protesters who presented no danger to officers, sometimes from just a few feet away. *See* Iboshi, *supra* n.6. In another incident previously described, officers shot a peaceful protester in the eye with a tear gas canister. Thompson & McSwane, *supra* n.24.

Although, in limited circumstances, tailored deployment of tear gas and the other munitions at issue might be justified, such as responding to imminent threats to life, that is not how Defendants have used them outside Gray's Landing. "[T]he availability of an otherwise plausible excuse will not shield the officer from liability if the officer acts with an 'ulterior motive[]' to harm that is unrelated to legitimate law enforcement purposes." *Estate of Soakai*, 137 F.4th at 977.

Here, Defendants have used chemical munitions for reasons divorced from legitimate law enforcement purposes, including for political spectacle rather than safety. As described in detail above, Defendants used tear gas to facilitate the creation of propaganda by videographers and social-media influencers.

\*      \*      \*

Defendants' months-long, repeated, unjustified, and disproportionate use of chemical munitions next to Gray's Landing—despite clear notice of the predictable, recurring harms caused by these deployments—is conscience-shocking conduct that deprives Plaintiffs of liberty and property. Plaintiffs are likely to prevail on their substantive due process claim.

## C. Defendants Are Alternatively Violating Plaintiffs' Fourth Amendment Rights

The invasion of Plaintiffs' substantive due process rights to liberty and property is the appropriate constitutional framework for evaluating the facts at hand. However, if Defendants contend, and the court agrees, that Defendants' conduct effectuates a seizure such that the conduct affecting these Plaintiffs should be evaluated under the Fourth Amendment, rather than

substantive due process, the conduct would still be unconstitutional. *See Hess v. Garcia*, 72 F.4th 753, 764 (7th Cir. 2023) (explaining that government conduct may violate the Fourth Amendment or substantive due process, but not both).

As described, Defendants have used force with intent to harm targeted protesters. *LaRocca v. City of Los Angeles*, No. 2:22-CV-06948-SVW-PD, 2024 WL 1635908, at *4 (C.D. Cal. Mar. 14, 2024). That use of force has restrained resident Plaintiffs' "liberty of movement," *Villanueva v. California*, 986 F.3d 1158, 1168-69 (9th Cir. 2021), and Defendants' use of chemical munitions is objectively unreasonable.

## II.    Plaintiffs Are Suffering Irreparable Harm

Irreparable injury is that "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "It is well established that" a deprivation of constitutional rights alone "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotations omitted)). And Plaintiffs here have suffered concrete physical and psychological injuries, both acute and potentially long-lasting, that will recur with each instance that Defendants use chemical munitions again.

### A.  Plaintiffs Are Suffering Physical, Psychological, and Constitutional Harms

As described above, Defendants are causing constitutional injuries to Plaintiffs that cannot be repaired after-the-fact. That includes invasion of their bodily integrity with toxic substances, which constitutes a "significant intrusion upon an individual's liberty interests." *Young*, 655 F.3d at 1161. Any additional instances of harmful chemicals invading Plaintiffs' bodies, in the time between now and a final judgment, cannot be unwound. Nor can Plaintiffs ever regain time spent sealed inside their apartments, without liberty of movement, when

Defendants begin releasing massive volumes of gas and smoke. And the deprivation of Plaintiffs' use and enjoyment of their homes is irreparable as well.

The severe physical and psychological injuries that Plaintiffs have suffered and will continue to suffer are also irreparable. Susan Dooley should not suffer through any more gassing incident that cause her to fall to the ground, or that add to the disorientation she continues to feel. Dooley Decl. ¶ 6. Jane Doe should not be made to suffer through one more episode of PTSD when federal agents fire tear gas and flashbangs near her apartment. Doe Decl. ¶ 7. Nor should Whitfield Taylor have to take his young daughters—aged 7 and 9—to urgent care again to treat their respiratory symptoms. Taylor Decl. ¶ 7. And Rebecca Roe should not be made to feel as if her heart is being squeezed during any tear gas incidents that would occur while this case is being fully litigated. Roe Decl. ¶ 10. Roy Brooks will continue to suffer irreversible muscle atrophy—which has already caused him to lose the ability to do some activities of daily living, like transferring from his wheelchair to the toilet—as long as federal agents continue to fire tear gas and flash bangs that interrupt his sleep. Brooks Decl. ¶¶ 8-9. Diane Moreno will soon suffer the irreversible consequence of having one of her adrenal glands removed to control the cortisol spikes caused by the stress and lack of sleep from living with Defendants' tear gas and flashbangs, and will be at risk of a life-threatening adrenal crisis while she recovers from the surgery—and possibly for the rest of her life. Moreno Decl. ¶¶ 12-14. Erica del Nigro and her twelve-year-old son J.D. should not have to suffer serious respiratory issues, anxiety, and severe allergic reactions like migraines and full-body rashes. Del Nigro Decl. ¶¶ 6-7, 10-11.

The REACH Plaintiffs are also suffering multiple forms of irreparable harm. The injuries include substantial harms to the REACH Plaintiffs' missions. REACH Community Development operates Gray's Landing to serve its "mission[] to create opportunities for *all people* to thrive by

developing and promoting access to quality, affordable homes, supportive services, and community." Salazar Decl. ¶ 4. Residents obviously cannot thrive at Gray's Landing when their apartments are invaded with poisonous gases. Nor can REACH build a sense of community where common areas of the complex are filled with gas and smoke, and residents must seal themselves in their units with wet towels under their doors. The harm to the REACH Plaintiffs' missions is evident from the fact that residents are leaving Gray's Landing and REACH is unable to rent out units to new tenants. *Id.* ¶ 20. And REACH employees have had to spend "hours each day working in rapid response to help mitigate the impacts of tear gas and other munitions on the health and safety of residents and staff," while other mission-critical work sits idle. Salazar Decl. ¶¶ 12, 21. These ongoing harms to the REACH Plaintiffs' missions could not be fully remedied upon a final judgment in Plaintiffs' favor. *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020).

Defendants' unconstitutional actions are also causing the REACH Plaintiffs economic harm that would not be reparable through a final judgment on the constitutional claims asserted in this case. The REACH Plaintiffs have already spent more than $100,000 to mitigate the effects of the government's chemical munitions use, and face more expected expenses to fully remediate residue from tear gas and other chemical munitions in the building. Salazar Decl. ¶¶ 17-18. Absent this Court's intervention, REACH may be in a position where it spends that money on remediation only to be put back at square one of its cleanup the next time federal law enforcement deploys chemical munitions. *See id.* ¶ 18. The REACH Plaintiffs could not obtain money damages from the government for the constitutional violations asserted in this case, *see Egbert v. Boule*, 596 U.S. 482, 492 (2022), and thus no final judgment on these claims would

make the REACH Plaintiffs whole for the money they will need to spend absent a preliminary injunction.

A preliminary injunction is necessary and warranted to prevent all of the above harms to the Resident Plaintiffs and the REACH Plaintiffs from continuing while this litigation proceeds. Other courts have found injunctions warranted to prevent the harmful effects of tear gas and other chemical crowd control agents. *See, e.g.*, *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1156 (D. Or. 2020); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1082 (N.D. Cal. 2020). And courts more broadly recognize that the government causes irreparable injury when it causes public health risks, such as by exposing citizens to pollutants and chemicals. *Washington v. Dep't of Health & Hum. Servs.,* No. 6:25-cv-0178-AA, 2025 WL 3002366, at *26 (D. Or. Oct. 27, 2025). This Court should hold the same here.

**B. Defendants' Use of Chemical Munitions Is Continuing and Likely to Recur**

Defendants' recurring deployment of chemical munitions, including as recently as January 24 and January 30, 2026 (the day of this filing), demonstrates that a preliminary injunction is critical to ensure that Plaintiffs do not suffer further irreparable harm. Defendants have given no indication that they will refrain from deploying tear gas, smoke grenades, and other chemical agents—in the same extreme amounts that they did on January 24 and January 23 as well as in October and throughout the summer—whenever large protests occur outside the ICE facility. To the contrary, Defendants have provided every reason to believe that they will continue to release mass volumes of gas and smoke in response to future protests next to Gray's Landing. In response to the prospect of the instant lawsuit, DHS's Assistant Secretary of Public Affairs Tricia McLaughlin stated that "DHS is authorized to do what is appropriate and necessary in each situation," that "[t]he fact that this particular location is experiencing this

behavior more frequently than most others, is not remotely ICE's fault," and that DHS "will continue to safeguard the American people, our homeland, with honor, integrity and values in line with the U.S. Constitution and basic common sense.[43] And notwithstanding the pendency of this suit and Plaintiffs' prior motion for a preliminary injunction, Defendants deployed massive amounts of chemical munitions outside of Gray's Landing on January 24 and January 30, 2026, which, again, foreseeably infiltrated the building and harmed Plaintiffs.

DHS thus made clear that its conduct will continue unabated absent an injunction in response to future protests, and such protests may occur at a moment's notice in response to current events.

Indeed, courts in this District have found that when federal officers engage in a pattern of violating constitutional rights through their efforts at crowd control, plaintiffs demonstrate irreparable harm where there is "some cognizable danger of recurrent violation." *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1152 (D. Or. 2020). In considering whether a violation is likely to recur, the Ninth Circuit looks at "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations." *Id*. at 1152-53 (quoting *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989)). Defendants' indifference as articulated in their public statements speak to their scienter, the recurrent nature of the infractions, and the lack of

---

[43] Singh, Jennifer, *Landlord, residents sue federal government over tear gas use near Portland ICE building*, KATU2abc (Dec. 8, 2025), https://katu.com/news/local/grays-landing-sues-federal-government-over-tear-gas-use-near-south-portland-complex-oregon-ice-immigration-customs-enforcement-lawsuit-veterans-low-income-reach-nonprofit-homeland-security-dhs-trump (attached as Jacobson Exhibit 34).

assurances against future violations. Defendants cannot reasonably assert that there is any uncertainty about whether they will continue to engage in their injurious tactics.

### III.    The Public Interest and Balance of the Equities Weigh in Favor of Injunctive Relief

The balance of the equities and the public interest decisively weigh in Plaintiffs' favor. As discussed above, Plaintiffs have demonstrated that the government has violated Plaintiffs' constitutional rights, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotations omitted). Defendants' use of tear gas, smoke grenades, pepper balls, and other chemical munitions has deprived Plaintiffs and countless other Gray's Landing residents of their fundamental Fourth and Fifth Amendment rights. A preliminary injunction serves the public interest because "all citizens have a stake in upholding the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (citation omitted).

The shocking nature of the constitutional violations here, and the attendant harms they have caused hundreds of Gray's Landing residents and staffers, underscore the overwhelming public interest in enjoining Defendants' conduct. Defendants' sustained use of chemical munitions outside an affordable housing complex has caused Gray's Landing residents and REACH personnel extreme physical and mental anguish, and has interfered with their ability to live peacefully in their own homes. The public has no interest in the government releasing poison gas into the homes of citizens, placing them at risk of serious short- and long-term harm.

On the other side of the ledger, federal agencies "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Any harm claimed by the Government would be especially specious where the evidence shows Defendants have deployed these munitions with purpose to harm targeted individuals, and

have repeatedly used these munitions when faced with no violence or other imminent threats to life. *See* Doe Decl. ¶¶ 6, 11; Dooley Decl. ¶ 4; King Decl. ¶ 4; Lineberger Decl. ¶ 4; Taylor Decl. ¶ 4. And the requested injunction contains an exception for instances when federal officers need to use these munitions to prevent an imminent threat to life, mitigating any legitimate harm that the government could claim. The health and safety of innocent civilians far outweigh any "harm" that Defendants suffer by limiting the use of noxious chemical agents to justified circumstances. *Id*.

## IV.   Scope of Relief

The Court should enter a preliminary injunction that is tailored to protecting Plaintiffs from tear gas and other chemical munitions that harm them, while carving out a narrow exception for when the use of such munitions is actually necessary to protect against an imminent threat to life. Specifically, the Court should preliminarily enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from deploying tear gas, smoke grenades, and other chemical munitions that are likely to infiltrate Gray's Landing and its apartments, unless the use of such munitions is necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons.

Numerous other courts have similarly enjoined the use of chemical munitions against protesters and bystanders with narrow exceptions. *See, e.g.*, *Los Angeles Press Club v. Noem*, No. 2:25-CV-05563-HDV-E, 2025 WL 2658327, at *24-25 (C.D. Cal. Sept. 10, 2025) (preliminarily enjoining DHS from using "chemical irritants" on those "who are not themselves posing a threat of imminent harm to a law enforcement officer or another person," and from "[f]ring tear gas canisters … so as to strike any person … unless that person poses an immediate threat of death or serious bodily injury"); *Don't Shoot Portland*, 465 F. Supp. 3d at 1157

(limiting tear gas use to "situations in which the lives or safety of the public or the police are at risk"); *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't.*, 466 F. Supp. 3d 1206, 1216 (W.D. Wash. 2020) (enjoining use of "chemical irritants or projectiles of any kind" against peaceful protesters, except when "taking necessary, reasonable, proportional, and targeted action to protect against a specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property"); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 275-76 (S.D. Ohio 2021), *as modified*, 2021 WL 3375834 (S.D. Ohio June 25, 2021) (similar); *Berg v. Cnty. of Los Angeles*, No. CV 20-7870 DMG (PDX), 2021 WL 4691154, at *15 (C.D. Cal. May 28, 2021) (similar).

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' motion for a preliminary injunction.

January 30, 2026                                 Respectfully submitted,

/s/Daniel F. Jacobson
Daniel F. Jacobson (D.C. Bar No. 1016621)+
Lynn D. Eisenberg (D.C. Bar No. 1017511)+
Stephen K. Wirth (D.C. Bar No. 1034038)+
Brian C. Rosen-Shaud (D.C. Bar No. 90042065)+
**Jacobson Lawyers Group PLLC**
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Telephone: +1 301-823-1148
Dan@jacobsonlawyersgroup.com

Darin M. Sands, OSB No. 106624
Colin Hunter, OSB No. 131161
**Bradley Bernstein Sands LLP**
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480
dsands@bradleybernstein.com
chunter@bradleybernstein.com

Taylor Jaszewski (CA Bar No. 345094)+
**Bradley Bernstein Sands LLP**
1212 Broadway, Suite 1100
Oakland, CA 94612
Telephone: +1 510-380-5801
tjaszewski@bradleybernstein.com


Brian D. Netter (D.C. Bar No. 979362)+
Jeffrey B. Dubner (D.C. Bar No. 1013399)+
Anna L. Deffebach (D.C. Bar No. 241346)+
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
bnetter@democracyforward.org
adeffebach@democracyforward.org

Katie Schwartzmann (La Bar No. 30295)+
**Protect Democracy**
201 St. Charles Ave., Suite 114
New Orleans, La 70170
(202) 573-4382

+ Admitted pro hac vice

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 12,491 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.