IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

REACH COMMUNITY DEVELOPMENT, et al.,

    *Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

    *Defendants*.

Case No. 3:25-cv-2257

## DECLARATION OF MARGARET SALAZAR

I, Margaret Salazar, declare as follows:

    1.    I make this declaration based on my personal knowledge, information, and belief.

    2.    I am the chief executive officer of REACH Community Development Corporation (REACH) in Portland, Oregon. I have served in this role for over two years. I oversee all of REACH's properties, of which Gray's Landing is the largest. Before working at REACH, I worked for the U.S. Department of Housing and Urban Development (HUD), where I was the Northwest Regional Administrator. In this capacity, I oversaw major program activities of HUD across the states of Oregon, Washington, Alaska and Idaho, and engaged in official visits with communities and grantees across those states to develop and promote solutions to homelessness, housing supply and affordability.

    3.    I am ultimately responsible for all functions of Gray's Landing, including managing finances, building occupancy, compliance, facilities, resident services and lease

enforcement. I supervise REACH staff who direct the day to day functions of Property Management and Resident Services. This includes supervision of six employees who work onsite at Gray's Landing who handle these tasks on a daily basis.

4. I also ensure that REACH's work serves our mission: to create opportunities for *all people* to thrive by developing and promoting access to quality, affordable homes, supportive services, and community. REACH envisions a world where there is a universal right to housing with *all people* living in safe, vibrant, and healthy communities.

5. As Chief Executive Officer, my workplace is in the REACH corporate offices, which are located at 4150 S. Moody Avenue, Portland Oregon, on the ground floor of the Gray's Landing building. I interact regularly with residents, both formally and informally. I regularly interact with two residents of Gray's Landing who serve on the Board of Directors of REACH. I interact directly in informal conversation with residents in and around Gray's Landing. I also receive regular updates from Gray's Landing on-site staff around questions and communications they receive from residents.

6. Gray's Landing is diagonally across Bancroft Street and South Moody Avenue from the Portland ICE facility. Since June, there have been near-daily protests and demonstrations at the ICE facility. Also since June, federal law enforcement officers have responded to the protests by using tear gas and other chemical munitions. Federal law enforcement officers usually fire these munitions from the roof or driveway of the ICE facility in the direction of Gray's Landing.

7. I am typically present at REACH's Gray's Landing offices during standard business hours between 9 a.m. and 5 p.m., Monday through Friday. I have witnessed federal law enforcement officers using bullhorns to yell loudly to peaceful demonstrators, and fully armed

officers standing guard on top of the facility. Upon entering the REACH offices in the morning, I can often smell tear gas residue in our offices. I have seen debris on the streets and sidewalks outside of Gray's Landing from the use of pepper balls. I have seen many REACH staff members relocate their work stations and crowd into areas of the office where the smell of chemical munitions is less severe, work from home or call out sick due to experiencing reactions to residue from chemical munitions the morning after their use by federal officers.

8. I regularly receive verbal reports from staff that work on site about events that happen overnight at Gray's Landing. During the months of September, October and November 2025, I held a daily meeting with on-site staff and managers to discuss the conditions of the building, resident impacts and any known activities after hours at the site. On a daily basis during this time period, and particularly during September and October, staff would report that we had evidence of tear gas, smoke bombs and pepper balls used by federal officers overnight that impacted the building, residents and staff. Staff regularly showed me video evidence taken by residents and others showing the use of these chemical munitions the previous night, and they reported on the cleanup activities of staff each morning walking the perimeter of the building and clearing debris from pepper balls. Staff also shared verbal reports from residents detailing the events of the previous night. Staff shared instances of residents who collected pepper balls on the balconies of their residences, and residents breathing in tear gas overnight.

9. Gas and other chemicals have regularly entered Gray's Landing since June. Starting in late September, we have had daily reports from residents and staff of tear gas entering the building, reports of tear gas entering into residences overnight, video evidence of tear gas and smoke from weapons fired by federal agents inside the Gray's Landing facilities, and staff reporting fumes from gas and smoke entering the REACH offices. After occurring on multiple

dates in June, gas entering the building became a daily experience from late September through late October.

10. Residents have complained consistently about tear gas entering the common areas and residential units at Gray's Landing. One resident described having to take a shower in the middle of the night to wash tear gas off of herself because the residue caused itching and burning of her skin and eyes while she tried to sleep in her apartment. Another resident described spending sleepless nights hiding in the bathroom of his unit trying to hide from the fumes. Two residents whose apartments face the ICE facility submitted Reasonable Accommodation requests to move to the other side of the building away from the ICE activity due to ICE munitions triggering their Post Traumatic Stress Disorder diagnosis stemming from their service in the Armed Forces. REACH has approved these transfers. In total, six Gray's Landing households have complained about their inability to function in their apartments and REACH has been working to relocate them to units on the side of the building furthest from the ICE facility in an attempt to address their direct exposure to chemical munitions. REACH does not have sufficient space on the East side of the building to relocate all Gray's Landing residents who are located on the sides of the building closest to the ICE facility.

11. While the reports of tear gas usage were constant during this period, some nights were more extreme. On the night of Saturday, October 4, 2025, REACH internal security cameras documented clouds of tear gas in the interior 4th and 5th floor hallways of the Gray's Landing residence. Video footage shows residents coming in and out of their units into the hallway wiping their eyes and coughing. That night, one resident informed staff that they put towels in the gaps in the door of their unit to block the tear gas from coming into their residence,

and took refuge inside the bedroom of their unit with a personal air purifier. That resident shared that it took 30 minutes of running the air purifier for the purifier to show the air was clear.

12. REACH staff have been directly impacted by the impact of chemical munitions seeping into our office spaces. Approximately 15 staff work in office spaces along Moody Avenue, which is the side of Gray's Landing closest to the ICE building. These staff have regularly reported coming into the office in the morning and smelling strong fumes from chemical munitions. Staff have detailed symptoms such as headaches and eye irritation from this exposure. Staff in other locations of the building have also reported these symptoms. REACH has spent significant time working to address staff concerns including creating makeshift work stations crowded into less impacted parts of the office, and approving paid sick leave for staff experiencing symptoms. REACH staff have spent hours each day working in rapid response to help mitigate the impacts of tear gas and other munitions on the health and safety of residents and staff.

13. The government's use of tear gas has become more intermittent in recent weeks. In November up through December 1, staff noticed fumes in the REACH offices consistent with prior instances of deployment of tear gas.

14. On the morning of January 25, 2026, I read news coverage that indicated federal officers had deployed tear gas around the ICE building overnight. On Monday morning, January 26, 2026, REACH staff found 5 tear gas canisters in front of the Gray's Landing building, on the sidewalk and in the vegetation on the west side of the building closest to the ICE facility. Staff removed the canisters and took photos. Staff also reported finding multiple pepper balls around the exterior of the building with visible residue. Staff documented a burn mark on the exterior west wall of the Gray's Landing building where a tear gas canister was lodged between the

sidewalk and the wall. On January 26 and January 27, 2026, several REACH staff informed me that the air quality at their work stations on the west side of the building was causing irritation, including burning eyes and sore throats. The offices on this side of the building had a strong odor.

15. On the morning of January 29, 2026, REACH staff informed me that ICE agents had deployed pepper balls the prior evening, and our employee found a whole pepper ball outside of the building.

16. REACH has taken various measures to mitigate the impact of the gas and chemicals released by the federal government. This includes: installing industrial air scrubbing machines throughout the commercial and residential spaces, which have been running continuously since June 2025; regularly replacing HVAC charcoal filters to maintain safe air quality and remove chemical residue following munitions activity; patrolling the exterior of the entire building each morning and picking up residue from federal officers outside of the Gray's Landing building, including pepper balls and tear gas canisters; hosing down the sidewalks each morning to clear residue from tear gas, smoke and pepper balls from the entryways to the residence and REACH offices; installing sticky mats at all building entrances to prevent people from bringing in chemical residue on their shoes; purchasing and offering ear plugs to residents seeking noise mitigation; hiring overnight and weekend courtesy patrols seven days a week to seek to ensure resident and staff safety, deter confrontations, and coordinating rapid on-site responses; accommodating resident requests to relocate to units on the north side of the building less impacted by tear gas and noise pollution from flash bang grenades and helicopters; purchasing individual air purifiers for residents throughout the building to mitigate exposure to tear gas in their buildings; and holding a daily crisis meeting using work time of numerous staff

to actively manage these mitigation efforts. On January 27, I authorized staff to order an additional 10 individual air purifiers for residents to address the new impacts from recent tear gas deployment.

17. These mitigation measures have already directly cost REACH in excess of $210,000. REACH has outlayed approximately $150,000 in overnight security to address and deter ICE officers' actions by protecting the Gray's Landing property and attempting to de-escalate conflicts, approximately $17,000 to purchase individual air purifiers for residents, and $14,000 for air mitigation, including rental of air scrubbers for offices and common areas, purchase and installation of charcoal HVAC filters, and sticky mats.

18. REACH also expects to incur significant costs of up to $100,000 for testing and comprehensive cleaning of Gray's Landing to fully remediate residue from tear gas and other chemical munitions in the building common areas, exterior and residential units. The final scope of work for this building-wide remediation is still being developed. REACH is concerned that, even if we complete this work, federal law enforcement will continue using tear gas and other chemical munitions that infiltrate Gray's Landing, which would put our cleanup back at square one.

19. REACH has also incurred indirect costs estimated at $300,000 including extensive staff time of executives, managers, and on site staff across the organization that was budgeted for other mission critical activities. These staff have instead been deployed to support this effort on a daily basis.

20. REACH has also experienced a loss in rental revenue of $121,000, and counting, at Gray's Landing due to residents moving out of the property and the inability to lease up vacant

units because potential tenants have heard about the impacts of ICE activity and have chosen not to move in.

21. The use of tear gas, chemical munitions, flash bang grenades and other violent tactics by ICE officers has created emotional distress, including tension between REACH and residents of Gray's Landing because residents are desperate for a resolution to this harmful situation. REACH has had to re-deploy significant attention, staff time, donations and resources to respond to this situation, which means we have limited capacity to deliver on mission-critical initiatives. Our Asset Management and Property Management teams have had to pull focus away from leasing up vacant apartments and repairing and making units ready in other properties across the Portland Metro Area, which means fewer homes are available to be rented by low income members of our community. These teams have also had less capacity to focus on securing resources to repair and recapitalize other REACH properties, which puts key real estate transactions in jeopardy and delays needed maintenance and improvements for other residents. The financial hit to REACH has drawn resources away from our end-of-year fundraising goals which would have benefitted planned resident services work in 2026; we have had to use donations to purchase air purifiers, for example, instead of expanding our food pantries to serve families in need of healthy food.

22. In addition to chemical munitions including tear gas, REACH and residents of Gray's Landing have also endured extreme noise pollution, including high decibel flash bang grenades and helicopters, and have found pepper balls around the building and in balconies.

23. Gray's Landing has long stood as a shining example as one of our region's most successful affordable housing properties - providing residents with amenities and services, proximity to public transit and the riverfront, and special attention to the needs of veterans. This

property was the first affordable housing residence in Portland's beautiful South Waterfront neighborhood. Ever since Gray's Landing opened its doors, REACH has spent significant resources cultivating valuable business goodwill with Gray's Landing's residents and staff, as well as the Portland community more broadly, related to REACH's provision of safe and affordable housing to everyone. DHS's actions amount to an attack on this publicly supported housing development that was originally created with federal resources. This is particularly harmful to the many veterans who call Gray's Landing Home, many of whom suffer from PTSD. DHS's conduct is also destroying REACH's valuable goodwill, harming our relationships with existing tenants and making it harder to find new tenants.

24. I authenticate that the image submitted as Exhibit 21 of Plaintiffs' motion for a preliminary injunction is a true and correct copy of an image of Gray's Landing when it was under construction, labeled with the general location of the apartments of the Plaintiffs who are residents of Gray's Landing.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on January 29, 2026.

*/s/ Margaret Salazar*

# EXHIBIT 43

