Darin M. Sands, OSB No. 106624
**Bradley Bernstein Sands LLP**
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480
dsands@bradleybernstein.com

Daniel F. Jacobson (D.C. Bar No. 1016621)+
**Jacobson Lawyers Group PLLC**
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Telephone: +1 301-823-1148
Dan@jacobsonlawyersgroup.com

+ admitted pro hac vice

*Attorneys for Plaintiffs*

(Additional counsel listed on signature page)

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| REACH COMMUNITY DEVELOPMENT, *et al.*, | |
| *Plaintiffs*, | Case No. 3:25-cv-2257 |
| v. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| *Defendants*. | |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 2

    I.     Defendants' Description of the Facts Is Incomplete and Misleading ............................ 3

    II.    Plaintiffs Have Standing to Seek Prospective Relief from Imminent Harm ................. 9

    III.   Plaintiffs Are Likely to Succeed on the Merits ............................................................ 13

        A.   Plaintiffs' Harms Are the Direct Result of Defendants' Conduct ............................ 13

        B.   Plaintiffs Have Demonstrated Harms to Their Liberty and Property Interests ......... 14

        C.   Plaintiffs Have Demonstrated that Defendants' Conduct Shocks the Conscience.... 23

        D.   The Court Need Not Reach Plaintiffs' Fourth Amendment Claim ........................... 29

    IV.   Plaintiffs Have Demonstrated that They Are Suffering Irreparable Harm ................. 29

    V.    The Balance of the Equities and Public Interest Weigh in Favor of an Injunction ...... 31

    VI.   Scope of Relief ................................................................................................................ 32

    VII.  The Court Should Deny Defendants' Request for a Bond and a Stay Pending

        Appeal .............................................................................................................................. 34

CONCLUSION ........................................................................................................... 34

CERTIFICATE OF COMPLIANCE ........................................................................... 36

## TABLE OF AUTHORITIES

**Cases**

*A.D. v. Cal. Highway Patrol,*
  712 F.3d 446 (9th Cir. 2013) ....................................................................... 27-29

*Arc of California v. Douglas,*
  757 F.3d 975 (9th Cir. 2014) ........................................................................ 30

*BAM Hist. Dist. Ass'n v. Koch,*
  723 F.2d 233 (2d Cir. 1983) .......................................................................... 21

*Cameron v. Johnson,*
  390 U.S. 611 (1968) ......................................................................................... 28

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ..................................................................................... 9, 11

*Cnty. of Sacramento v. Lewis,*
  523 U.S. 833 (1998) ............................................................................. 16, 23, 27

*Concerned Citizens of Neb. v. NRC,*
  970 F.2d 421 (8th Cir. 1992) ......................................................................... 19

*Crown Point Development v. City of Sun Valley,*
  506 F.3d 851 (9th Cir. 2007) ................................................................... 20, 21

*Dickinson v. Trump,*
  2026 No. 3:25-cv-2170, Dkt. No. 68 (D. Or. 2026) ..................................... 30

*Ely v. Velde,*
  451 F.2d 1130 (4th Cir. 1971) ........................................................................ 18

*Estate of Soakai v. Abdelaziz,*
  137 F.4th 969 (9th Cir. 2025) ............................................................. 14, 27, 29

*Gonzalez v. City of Anaheim,*
  747 F.3d 789 (9th Cir. 2014) ......................................................................... 27

*Guertin v. Michigan,*
  912 F.3d 907 (6th Cir. 2019) ................................................................... 14-17

*Hampton v. Steen,*
  No. 2:12-cv-00470-AA, 2017 WL 11573592 (D. Or. Nov. 13, 2017) ............ 22

*Hess v. Garcia,*
  72 F.4th 753 (7th Cir. 2023) .......................................................................... 28

*In re Agent Orange Prod. Liab. Litig.,*
  475 F Supp 928 (E.D.N.Y. 1979) ..................................................................... 8

*In re Marriage of Maxwell,*
  876 P.2d 811 (Or. Ct. App. 1994) .................................................................. 20

*Index Newspapers LLC v. U.S. Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ................................................................. 10, 13

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005)..................................................................................... 20

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ..................................................................... 30

*Nicacio v. INS*,
  797 F.2d 700 (9th Cir. 1985) ..................................................................... 10

*Nken v. Holder*,
  556 U.S. 418 (2009)..................................................................................... 34

*Noem v. Vasquez Perdomo*,
  146 S. Ct. 1 (2025).................................................................................11-12

*Nunez ex rel. Nunez v. City of San Diego*,
  114 F.3d 935 (9th Cir. 1997) ..................................................................... 19

*O'Bannon v. Town Court Nursing Center*,
  447 U.S. 773 (1980)..................................................................................... 13

*Pinkney v. Ohio EPA*,
  375 F. Supp. 305 (N.D. Ohio 1974)........................................................... 18

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)..................................................................................... 27

*SF Chapter of A. Philip Randolph Inst. v. EPA*,
  No. C 07-04936 CRB, 2008 WL 859985 (N.D. Cal. Mar. 28, 2008).............. 18

*Shelton v. Tucker*,
  364 U.S. 479 (1960)..................................................................................... 31

*Spain v. Procunier*,
  600 F.2d 189 (9th Cir. 1979) ................................................................. 16, 33

*Sterling v. City of Jackson*,
  159 F.4th 361 (5th Cir. 2025) .................................................................14-17

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)..................................................................................... 10

*Tanner v. Armco Steel Corp.*,
  340 F. Supp. 532 (S.D. Tex. 1972) ............................................................. 18

*Thomas v. Cnty. of Los Angeles*,
  978 F.2d 504 (9th Cir. 1992) ..................................................................... 10

*Tri-Cnty. Concerned Citizens Ass'n v. Carr*,
  No. 98–CV–4184, 2001 WL 1132227 (E.D. Pa. Sep. 18, 2001)................... 21

*United States v. James Daniel Good Real Prop.*,
  510 U.S. 43 (1993)....................................................................................... 20

*Virginia v. Hicks*,
    539 U.S. 113 (2003) .............................................................................................. 28

*Westwood v. City of Hermiston*,
    787 F. Supp. 2d 1174 (D. Or. 2011) .............................................................. 22

*WMX Technologies, Inc. v. Miller*,
    197 F.3d 367 (9th Cir. 1999) ..................................................................... 22-23

**Statutes**

18 U.S.C. § 111 ................................................................................................... 32

18 U.S.C. § 1361 ................................................................................................. 32

**Federal Rules**

Fed. R. Civ. P. 65 .......................................................................................... 30, 34

**Local Rules**

L.R. 7-1(b) ........................................................................................................... 34

**Other Authorities**

Brynelson, Troy, Yemeni mother and daughter shaken after apartment window
    broken by projectile near Portland ICE building, Or. Pub. Broad. (Feb. 5,
    2026),  https://www.opb.org/article/2026/02/05/mother-daughter-shaken-
    after-apartment-window-shaken-near-ice-building/ ..................................... 8, 11

## INTRODUCTION

Defendants ask the Court not to believe its own eyes. Plaintiffs have produced significant video and photographic evidence—and add more with this reply of recent events—showing Defendants regularly and casually deploying tear gas, smoke grenades, and other chemical munitions next to Gray's Landing, with little or no provocation, and in ways that invariably drive toxic chemicals into Plaintiffs' homes. Even after Plaintiffs filed this suit documenting their horrific injuries—and after three senior Department of Homeland Security (DHS) officials filed declarations in this case—Defendants used massive amounts of tear gas, sometimes multiple times per day, on five different days in an eight-day period. Defendants know that their indiscriminate use of chemical munitions is harming Gray's Landing residents—including children, pregnant women, the elderly, and domestic violence victims with PTSD—and they simply don't care.

Indeed, Defendants do not dispute the authenticity of any of Plaintiffs' video and photographic evidence, do not assert that any of Plaintiffs' evidence is missing context, and have not submitted any video or other objective evidence of their own to demonstrate that their conduct has been justified. Defendants rely on two declarations from Customs and Border Protection (CBP) and Federal Protective Service (FPS) officials that lack objective corroborating evidence, and a small number of incident reports from Immigration and Customs Enforcement (ICE) that are not even accompanied by a declaration. ICE submitted a declaration in response to the original motion for a preliminary injunction, but conspicuously did not do so after this Court ruled that declarants would be subject to cross-examination.

Defendants also ignore—and thus do not dispute—key factual allegations (and evidence) about Defendants' conduct and the injuries to Plaintiffs. Defendants do not deny that in October

2025 they invited social media "influencers" to the ICE facility, and that Defendants used tear gas and other chemical munitions in mass volumes to create "content" for the influencers and DHS itself to put in political propaganda videos and social media posts. Defendants do not deny that, on one occasion, they specifically shot a tear gas canister from a long distance at Plaintiff Mindy King who was filming their actions. And most importantly, Defendants do not deny that many Plaintiffs—including medically vulnerable residents and children—have already suffered life-altering injuries and that these harms will only compound each time Defendants again deploy chemical munitions outside Plaintiffs' windows.

On these facts, standing is not a close question. Plaintiffs live 100-120 feet from the ICE facility from which Defendants repeatedly and regularly deploy chemical munitions, including by firing or dropping canisters down Bancroft Street immediately adjacent to Plaintiffs' apartments and the Gray's Landing courtyard. Defendants' standing arguments are largely a relic of their previous filing that predated their recent use of chemical munitions. With Defendants having now again used massive amounts of tear gas and other chemical munitions right outside Gray's Landing—on five different days within an eight-day span—the risk that Defendants will again use these munitions in a manner that affects Plaintiffs in their homes is not remotely speculative. Given Plaintiffs' proximity to the ICE facility and the undisputed pattern of deployment, Plaintiffs' future injury is not merely "possible"; it is the predictable and unavoidable consequence of Defendants' next response to the next protest.

On the merits, Defendants attempt to label Plaintiffs' substantive due process claims "novel" and "unprecedented," but Plaintiffs' legal theory is straightforward: the Fifth Amendment protects the rights to bodily integrity and property, and those rights are violated when the government repeatedly introduces harmful chemicals into people's bodies—eyes,

noses, throats, lungs, skin—through foreseeable chemical intrusions into their homes. The record

now leaves no doubt that Defendants have acted with shocking deliberate indifference to

Plaintiffs' severe injuries. The only thing "unprecedented" here is federal officers' repeated

release of harmful chemical munitions outside a residential apartment building and Defendants'

callous indifference to the suffering their conduct predictably causes.

For these reasons, Plaintiffs seek relief that is tailored to provide them with complete

protection while preserving Defendants' ability to protect life. Plaintiffs ask the Court to enjoin

(1) only the deployment of chemical munitions likely to infiltrate Gray's Landing and its

apartments, and (2) only when the use of such munitions is not necessary to protect against an

imminent and concrete threat to the lives of law enforcement officers and the public. Defendants

would be free to employ chemical munitions when either of those two conditions are not present,

and Defendants would at all times be free to employ other lawful tools to protect property,

maintain order, and enforce the law without poisoning innocent civilians in their homes.

## ARGUMENT

## I.    Defendants' Description of the Facts Is Incomplete and Misleading

Defendants' accounting of their use of chemical munitions outside the Portland ICE

facility is incomplete and highly misleading, as documented in detail below. Perhaps most

jarring, though, is what Defendants do not include with their brief and declarations. Defendants

submit no video footage—from the ICE facility's security cameras or from cameras worn on

officers' uniforms ("body cams")—to substantiate any of their assertions. Defendants describe

the security cameras outside the facility, Opp. 8 (ECF No. 50), and their incident reports note

some officers wore body cams on relevant days (although some of those officers purportedly

failed to activate those body cams), Sullivan Decl. at 31, 146, 288, 301, 343. But Defendants submit not a second of this footage as evidence.

Instead, they rely solely on bald assertions in two declarations from the Federal Protective Service and Customs and Border Protection, and cherry picked incident reports from ICE that are not even accompanied by a declaration. Indeed, an ICE official submitted a declaration in response to Plaintiffs' original preliminary injunction motion, but after the Court ruled that any declarant would be subject to cross-examination, Defendants conspicuously omitted any declaration from ICE. The ICE incident reports that Defendants submit now cover just five days from 2025, and only two of the four recent major uses of chemical munitions. Defendants' omission of an ICE declaration and their submission instead of scattered incident reports is a patent effort to evade this Court's ruling on cross-examination. The reports should be given no weight on this basis.

Moreover, without any ICE attestation or documentation of the actions of ICE officers during certain key incidents—including the afternoon of October 4, and January 24 and 25— Defendants' recitation of those incidents is meaningless. For these and most other days described on pages 6– 10 of Defendants' opposition, they purport to summarize the actions of CBP and FPB officials, but say nothing about what ICE officials did. These partial accounts have no probative value in understanding the full scope of the government's actions on those days.

In any event, for the accounts that Defendants do submit, the video evidence that Plaintiffs submitted with their opening motion, along with the new footage Plaintiffs now add for recent incidents with this reply, debunk or provide context omitted from Defendants' descriptions. For instance:

- **October 4, 2025 (afternoon):** Defendants assert that, prior to using tear gas and other chemical munitions, "approximately 100 individuals trespassed on federal property." Opp. 7. They claim that when "[o]fficers attempted to push the crowd back," some protesters "made threatening gestures toward officers," that one protester struck an officer, and that chemical munitions were used "in response" to these gestures and actions. Opp. 7–8. The tape shows otherwise. There were not 100 people trespassing on federal property prior to the tear gas use; there were a few dozen people milling about on Bancroft Street, not in the ICE driveway, when federal officials rushed out and started using gas. King Decl., Ex. 1 at 0:00– 2:30. An SUV then drove out of the facility a minute later, making clear that the gassing was mainly to clear a path for the car, not to repel any threat. In addition, Defendants fail to mention that a federal officer standing on the street to the west of the ICE facility fired a projectile tear gas canister *several hundred feet* down Bancroft Street to the east, landing directly under Mindy King's apartment. *Id.* (2:35– 3:20).

- **October 4, 2025 (evening):** After purporting to describe the above afternoon incident on October 4, Defendants write "Similar unlawful conduct occurred that night, necessitating the use of CCAs." Opp. 8. Defendants do not explain what "similar unlawful conduct" occurred, and they neglect to mention that officers pushed protesters all the way down Bancroft Street, directly next to Gray's Landing and released tear gas at their feet with no provocation at all. Jacobson Decl., Ex. 19; *see also* King Decl., Ex. 2 at (0:00– 8:00, 14:00– 18:00); ECF No. 46-10 (Moreno Decl.) ¶ 10. The CBP declarant likewise acknowledged that his declaration's description of that night was incomplete. Transcript of the Deposition of Timothy Sullivan at 41:22-42:09; *see* Sullivan Decl. ¶ 23 (ECF No. 50– 2).

- **October 4, 2025 (evening):** Also as to the events on the evening on October 4, neither the brief, the declarations, nor the ICE incident report say a word about the fact that Defendants had videographers on the street and drones overhead taking footage to use for propaganda purposes. Indeed, the video evidence shows a person in a yellow vest and a mask with sophisticated recording equipment taping federal officers pushing protesters down Bancroft Street, gassing the protesters, and then pulling down an anti-ICE sign, after which the person with the recording device retreats into the ICE facility. *See* King Decl., Ex. 2 at 5:25– 6:00, 14:00– 14:30; Jacobson Suppl. Decl., Ex. 61. The CBP declarant identified a drone visible outside of the Portland ICE facility that night as a DHS drone. Transcript of the Deposition of Timothy Sullivan at 42:25-43:14; *see* King Decl., Ex. 2 at 18:35– 18:50 (drone with two lights alternating between green and red on top right side). Two days later, DHS released a slickly produced video on its official Instagram account that appears to use the footage that the person in the yellow vest and the DHS drone captured on the evening of October 4. Deffenbach Decl., Ex. 49. Three days after the incident, October 7, DHS released another video on its official Instagram account that featured drone footage showing gas surrounding Gray's Landing. Deffenbach Decl., Exs. 47 & 49 (DHS videos), 48 & 50 (still images showing Gray's Landing from same videos), 51 (Google Earth image of Gray's Landing, for reference). Defendants and their declarants make no mention of these official DHS productions, nor do they dispute any of Plaintiffs' evidence that their conduct "was patently for show." Pls.' Super. PI Mot. at 15 (ECF No. 46).[1]

---

[1] The CBP declarant acknowledged that he was photographed on the roof of the Portland ICE facility standing next to conservative influencer Nick Sortor during Secretary Noem's visit to the building in October. Transcript of the Deposition of Timothy Sullivan at 20:12–22:02; *see* Superseding PI Mot. at 11. Likewise, the CBP declarant acknowledged that there were several

- **January 24, 2026:** Defendants omit from their account of this recent event that officers deployed tear gas many different times over the span of five hours on this evening. Roe Decl., Exs. 37–39; Jacobson Decl., Exs. 43–44. Their brief describes "200–300 individuals pounding on the ICE facility," Opp. 9, but that crowd was allegedly present at 5:13 p.m., hours before multiple other deployments of chemical munitions, including at 9:48 p.m. when "federal officers saturated the area" with gas, smoke, and flash bangs in response to protesters allegedly "throwing rocks at the [security] camera." Cantu Decl. ¶ 27 (ECF No. 50–1). The video evidence shows no significant instigating incident preceding that saturation of the area, and Defendants offer no explanation for why they released tear gas at that time well-down Bancroft Street in front of Gray's Landing. Jacobson Decl., Ex. 44.

- **January 30, 2026:** The CBP declaration states that, at 8:00 p.m, a large crowd was "damaging and trespassing on federal property," and that CBP officials "attempted to push back the crowd" and utilized tear gas to do so. Sullivan Decl. ¶ 27. That is false. Video evidence shows that a relatively small group was standing peacefully on Bancroft Street— with nobody on ICE's property in the driveway—when officers came out and started deploying tear gas and smoke grenades for no discernible reason. Jacobson Decl., Ex. 46.

- **January 31, 2026:** Defendants assert that officers deployed tear gas in response to discrete threats at the gate and guard shack of the facility, and that CBP deployed tear gas to protect the guard shack and disperse the crowd. Opp. 10; Cantu Decl. ¶ 30; Sullivan Decl. ¶ 29. Defendants wholly omit that, amidst their overwhelming use of tear gas on this day, they shot tear gas canisters using long-range weapons far from the guard shack and gate. In fact,

---

people with cameras filming in the Portland ICE facility around when Secretary Noem visited. *See* Transcript of the Deposition of Timothy Sullivan at 22:12–22:22.

Defendants shot a tear gas munition that directly hit and broke the window of a Gray's Landing apartment.[2] Additionally, officers can be seen standing on the roof of Gray's Landing shooting projectile tear gas canisters hundreds of feet away up Moody Avenue. Supp. King Decl., Ex. 58 at 18:45–55.

- **February 1, 2026:** Defendants write that protesters were allegedly "banging on the front door of the building and trying to break the front grate by rocking it." Opp. 10. Defendants have chosen not to substantiate this assertion with security camera footage. Defendants then write that "[o]ne individual threw a smoke canister onto the roof of the ICE facility," and "[t]o get the crowd to move back, CBP deployed CCAs." *Id.* This misrepresents the sequence of events. The video evidence clearly shows that federal officers initiated the use of gas and smoke, and only after they heavily deployed those weapons did a protester throw back a smoke canister toward the ICE facility. Roe Suppl. Decl., Ex. 55 at 0:00–0:30. The video evidence also shows that after protesters had been cleared from the ICE driveway, federal officers began causally lobbing and shooting tear gas canisters far into the street, in a manner not necessary to protect against any imminent threat to officers or the facility. *Id.* at 1:40–2:30. One tear gas canister traveled far down Bancroft Street, stopping right outside the Gray's Landing courtyard, King Suppl. Decl., Ex. 56 at 5:40–5:55, causing gas to fill into the courtyard, *id.* at 6:40–6:50. What's more, at around 11:30 p.m., when there were no protesters outside the ICE facility at all, federal officers shot multiple tear gas canisters toward a make-shifted memorial in the alley to the east of the facility. King Suppl. Decl. Ex.

---

[2] Troy Brynelson, *Yemeni mother and daughter shaken after apartment window broken by projectile near Portland ICE building,* Or. Pub. Broad. (Feb. 5, 2026), https://www.opb.org/article/2026/02/05/mother-daughter-shaken-after-apartment-window-broken-near-ice-building/.

57 at 28:15–28:20. The fact that Defendants' declarations and the ICE incident report are completely silent on this deployment calls into question, at minimum, the completeness of their accounts.

Defendants' factual depictions are inaccurate not only in relation to specific events, but also more broadly with respect to the frequency with which they have used chemical munitions and the likelihood that each use will impact Gray's Landing. Defendants assert that there have only been "isolated, sporadic incidents" of tear gas use. Opp. 1. They later tick through events on 15 specific days, implying that those incidents and some unknown number of "other October incidents" were the only times that they have used chemical munitions outside Gray's Landing since last summer. See Opp. 6–10. But Plaintiffs' sworn declarations make clear that, for multiple months over the summer, Defendants were using tear gas and other chemical munitions *several times per week*, and in October at least weekly. *See* Roe Decl. ¶ 4 (ECF No. 46-2), Doe Decl. ¶ 10 (ECF No. 46-6), Liuneberger Decl. ¶ 4 (ECF No. 46-8), Moreno Decl. ¶ 7 (ECF No. 46-10), Brooks Decl. ¶ 5 (ECF No. 46-12). More recently, when protests resumed in earnest in January following the killing of Alex Pretti, Defendants used tear gas in mass volumes on five different days within an eight-day span (January 24, 25, 30, 31, and February 1), and on at least three of those days they used tear gas and other chemical munitions multiple times.

## II.    Plaintiffs Have Standing to Seek Prospective Relief from Imminent Harm

A plaintiff facing future injury has standing where the harm is "certainly impending, or there is a substantial risk" it will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). While a single, isolated past injury, standing alone, may not always establish a "real and immediate" threat of repetition, *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983), the Ninth Circuit has emphasized that "the possibility of recurring injury ceases to be speculative when actual

repeated incidents are documented." *Thomas v. Cnty. of L.A.*, 978 F.2d 504, 507 (9th Cir. 1992),

as amended (Feb. 12, 1993) (quoting *Nicacio v. INS*, 797 F.2d 700, 702 (9th Cir. 1985)).

Consistent with that principle, the Ninth Circuit has held that an "ongoing, sustained pattern of

conduct" creates a non-speculative risk of future injury. *Index Newspapers LLC v. U.S. Marshals

Serv.*, 977 F.3d 817, 826 (9th Cir. 2020).

That standard is easily met here. Plaintiffs have documented repeated—and recent—

injuries caused by Defendants' "ongoing, sustained pattern" of releasing chemical munitions

immediately adjacent to their homes. *Id.*; *see supra* Section I. That is true both for the Resident

Plaintiffs, who have suffered extreme physical and psychological harms from repeated gassing in

their homes, PI Mot. 40–41, and for the REACH Plaintiffs, whose property has been repeatedly

contaminated, *id.* at 41–43. And the evidence demonstrates that Defendants are likely to continue

that harmful conduct in response to recurring protests outside of the ICE facility. *See id.* at 43–

45; *supra* Section I.

Defendants attempt to minimize the risks to Gray's Landing residents from their conduct.

They claim that, even when they deploy gas and smoke outside the ICE facility, any exposure to

Plaintiffs depends on a "speculative chain of possibilities," Opp. 14, and "a sequence of

contingent events," including that "CCAs are released; the weather conditions—like wind—are

such that the CCAs waft in the direction of Gray's Landing; and the volume released is enough

to reach Resident Plaintiffs' apartments," *id.* at 31. But it is hardly "speculative" that the gas and

smoke Defendants deploy outside the ICE facility will reach Gray's Landing and Resident

Plaintiffs who live right next to the facility. It is inevitable.

Plaintiffs Jane Doe and Whitfield Taylor and his young daughters live less than 100 feet

from the ICE driveway, at the corner of Moody Avenue and Bancroft Street, and are even closer

to where Defendants routinely have deployed chemical munitions in and around the intersection of those streets. Defendants have also repeatedly shot or dropped tear gas canisters down Bancroft Street, immediately outside Mindy King's apartment and next to the Gray's Landing courtyard that the apartments of Rebecca Roe, Janice Lineberger, Diane Moreno, Erica del Nigro and her son J.D. face. *See, e.g.,* King Decl., Ex. 1; Roe Decl., Ex. 16; *see also* Salazar Decl., Ex. 21; Rao Decl. (ECF No. 46-5) ("Gray's Landing's U-shaped building around the courtyard creates conditions that may prevent aerosolized tear gas from readily moving past the building.").[3] And recently, Defendants' munitions directly hit the window of a Gray's Landing apartment. Brynelson, *supra* n.2. Even for residents who live up Moody Avenue, the massive volume of gas that Defendants deploy outside the facility predominantly spreads north and northeast toward the river, and into their units. For example, Exhibit 54 shows tear gas that originates outside the ICE driveway and then within a few minutes envelops Plaintiff Roy Brooks' apartment. Brooks Suppl. Decl., Ex. 54; *see also id.*, Exs. 52–53. And Exhibits 62 through 69 show individuals inside Gray's Landing suffering the effects of tear gas exposure. Suppl. Decl. of Margaret Salazar, Exs. 62–69. Thus, one need not speculate whether the gas and smoke that Defendants release will "waft" toward Gray's Landing, *contra* Opp. 31, and enter the building. The poison gas that Defendants release predictably invades the homes and property of Plaintiffs, causing severe injuries and trauma.

For these reasons, Defendants' reliance on *Lyons*, 461 U.S. at 105–08, and Justice Kavanaugh's solo concurrence in *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025), is misplaced. Opp. 12–14. In *Lyons*, the Supreme Court explained that an individual plaintiff's one-time

---

[3] Dr. Rao is a leading expert in emergency medicine and medical toxicology. She currently serves as the Chief of the Division of Medical Toxicology at Weill Cornell Medical College and has significant practice, research, and teaching experience in the field. *See* Rao Decl. ¶¶ 3–21.

interaction with law enforcement "does nothing to establish a real and immediate threat" that he would "again be stopped for a traffic violation, or for any other offense," and then subjected to another unconstitutional chokehold. *Id.* at 105, 108. Likewise, in *Vasquez Perdomo*, Justice Kavanaugh reasoned that "plaintiffs have no good basis to believe that law enforcement [would] unlawfully stop them in the future," so any future harm was speculative. 146 S. Ct. at 2 (Kavanaugh, J., concurring). Here, by contrast, Plaintiffs are not asking the Court to speculate about whether they will again cross paths with DHS officers at some unknown future time and place. Plaintiffs' apartments and property are located in a fixed location immediately adjacent to a fixed ICE facility, and there is no genuine dispute that protests at that fixed location regularly recur and that Defendants repeatedly respond by deploying chemical munitions in a manner that predictably harms them. *See supra* Section I. Plaintiffs' threatened future injury therefore does not depend on a chain of speculation about the happenstance of a future individualized stop; it flows from an ongoing practice repeatedly deployed at the same place, under recurring conditions, immediately next to Plaintiffs' homes and property.

Defendants' own declarants acknowledge as much. They report that Defendants have repeatedly deployed chemical munitions over many months in response to regular protests outside the ICE facility. Cantu Decl. ¶¶ 10–31; Sullivan Decl. ¶¶ 16–30. DHS officers likewise report that "Portland has a history of rioters that routinely gather outside the building" and that protests have occurred repeatedly "[o]ver the course of the last several months." Sullivan Decl., Ex. D at 139, 149 (ECF No. 50-2). And Defendants' own statements make clear that, when the protests recur, Defendants will continue to use chemical munitions. Defendants defend their deployment of these munitions as "critical" and "important" tools for suppressing protests. Cantu Decl. ¶ 36; Sullivan Decl. ¶ 31. And they acknowledge that they have deployed chemical

munitions whenever protesters engage in common and recurring conduct—like stepping over the blue line painted on the ICE facility driveway, standing in the path where vehicles would enter the facility, or merely "shouting obscenities" and "posturing aggressively." *See, e.g.*, Cantu Decl. ¶¶ 12–14, 17, 20, 28, 31; Sullivan Decl. ¶¶ 22–23, 25–27; Sullivan Decl., Ex. D at 49, 67, 92, 93, 95, 175 (ECF No. 50-2). This is precisely the type of "ongoing, sustained pattern of conduct" that supports prospective relief. *Index Newspapers*, 977 F.3d at 826.

### III.    Plaintiffs Are Likely to Succeed on the Merits

#### A.    Plaintiffs' Harms Are the Direct Result of Defendants' Conduct

Defendants' lead argument on the merits is that Plaintiffs have suffered only "incidental effects from DHS's use of [chemical munitions] against third-party protesters," so their claims are foreclosed by *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980). Opp. 16. But Defendants misread that case and overstate its holding. *O'Bannon* is a procedural due process case about the right to participate in a third party's administrative hearing; it says nothing about government conduct that, as a result of deliberate inference, directly inflicts physical and psychological injuries on Plaintiffs.

In *O'Bannon*, the Supreme Court held that nursing home patients did not have "a constitutional right to a hearing before a state or federal agency [could] revoke the home's authority to provide them with nursing care at government expense." 447 U.S. at 775. The Supreme Court emphasized that decertification did not withdraw the patients' "direct benefits" (their eligibility for Medicaid payments) but instead affected them only insofar as they could no longer use those benefits at an unqualified facility. *Id.* at 786–87. Under those circumstances, the Court concluded that any harm to patients was an "indirect and incidental" consequence of the government "enforcing minimum standards of care" on nursing home facilities, not a direct infringement of their due process rights. *Id.* at 787.

Plaintiffs' substantive due process claims are fundamentally different. Plaintiffs assert that Defendants are violating Plaintiffs' rights to liberty and property by acting with deliberate indifference to *Plaintiffs' injuries*, in a manner that shocks the conscience. PI Mot. 34–38. In other words, Plaintiffs are the object of the government's deliberately indifferent conduct. The deliberate indifference claim does not complain about conduct that "incidentally" affects Plaintiffs (Opp. 15); it challenges Defendants' indifferent conduct toward Plaintiffs' plight. Defendants' position that Plaintiffs cannot assert their own substantive due process rights in these circumstances runs counter to the whole premise of the deliberate indifference doctrine, and cannot be reconciled with precedent. *See Sterling v. City of Jackson*, 159 F.4th 361, 377–84 (5th Cir. 2025); *Guertin v. Michigan*, 912 F.3d 907, 922–28 (6th Cir. 2019); *Nicholson v. City of L.A.*, 935 F. 3d 685, 694–95 (9th Cir. 2019); *Ziglar v. Abbasi*, 582 U.S. 120, 146–47 (2017).

Defendants' argument is also incorrect with respect to Plaintiffs' alternative theory that, if Defendants are found not to have had time to deliberate, their conduct violates substantive due process because they acted with purposes to harm. PI Mot. 38–39. The Ninth Circuit has expressly held that bystanders may bring substantive due process claims based on a purpose to harm others. *Est. of Soakai v. Abdelaziz*, 137 F.4th 969, 977–80 (9th Cir. 2025). In *Abdelaziz*, the Ninth Circuit held that a bystander struck by a police officer's stray bullet could assert a purpose to harm substantive due process claim, even if the officer intended to shoot someone else. *Id.* Under Defendants' reading of *O'Bannon*, bystanders could never bring substantive due process claims, but even Defendants acknowledge that is not the law. *See* Opp. 30 (discussing *Abdelaziz*).

**B.       Plaintiffs Have Demonstrated Harms to Their Liberty and Property Interests**

Plaintiffs have constitutionally protected liberty and property interests in being free from Defendants' repeated invasions of their bodies and homes with tear gas, smoke grenades, pepperballs, and other chemical agents deployed in and around Gray's Landing. This is not a novel concept; it is well supported by a long history of Supreme Court and circuit precedent.

**1.** The Resident Plaintiffs' liberty interest in their bodily integrity is well-established and undeniable, as is the fact that they have suffered serious, life-altering injuries caused by Defendant's repeated invasion of their bodily integrity with harmful chemicals. *See* PI Mot. 27–34. Defendants attempt to recast Plaintiffs' due process claim as asserting a novel, freestanding "fundamental right to be free from incidental exposure to wafting [chemical agents]." Opp. 17. But that misstates Plaintiffs' allegations and the undisputed facts. Plaintiffs assert a right to be free from chemical intrusion into their bodies—their lungs, throat, eyes, noses, and skin—caused by Defendants' repeated deployment of chemical munitions directly adjacent to their residences.

Such claims fall squarely within the right to bodily integrity. As both the Fifth and Sixth Circuits have held, the right to bodily integrity is implicated when the government causes exposure to toxic substances. *See Sterling v. City of Jackson*, 159 F.4th 361, 373–74 (5th Cir. 2025); *Guertin v. Michigan*, 912 F.3d 907, 921 (6th Cir. 2019). These cases make clear that "a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent." *Guertin*, 912 F.3d at 921; *see Sterling*, 159 F.4th at 373–74.

In response, Defendants attack a strawman. They characterize Plaintiffs' position to be "that any nonconsensual 'intrusion' amounts to a deprivation of bodily integrity," and complain that Plaintiffs' use of the word "intrusion" "could easily encompass large swaths of tort and

constitutional law—and beyond." Opp. 17. Not so. Plaintiffs' position is simply that their right to

bodily integrity is infringed when the government directly introduces toxic chemicals into their

bodies and homes, without Plaintiffs' consent, as the Fifth and Sixth Circuits held in *Guertin* and

*Sterling*. Those cases directly contradict Defendants' assertions that this is a "previously

unrecognized right" and that Plaintiffs lack "any historical authority to support their claim." Opp.

17. Both *Guertin* and *Sterling* recount the "long and rich history" of the right to bodily integrity

across "many fact patterns" like this one. *Sterling*, 159 F.4th at 373–74; *see Guertin*, 912 F.3d at

919–21. And with regard to tear gas in particular, the Ninth Circuit has held that "the

unwarranted use of this painful and dangerous substance as a matter of practice" would violate

the (more rigorous) standards of the Eighth Amendment's protection against cruel and unusual

punishment. *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (Kennedy, J.).

Defendants attempt to distinguish *Guertin* and *Sterling* on the basis that the

contamination at issue there (lead in the cities' water supply) "had no legitimate governmental

objective, did not quickly dissipate, and directly infected the entire city's drinking water." Opp.

18. But these supposed distinctions make no difference. Whether the government's objective is

legitimate is relevant only to whether its conduct shocks the conscience for constitutional

purposes, not to whether the conduct implicates bodily integrity as an antecedent matter. *See

Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998). Indeed, in many bodily-integrity

cases, the government asserts facially legitimate objectives (including public safety);

nevertheless, "when a person does not consent to an intrusion, that intrusion is subject to judicial

scrutiny, regardless of if the intrusion is beneficial or even necessary." *Sterling*, 159 F.4th at 374.

As for the government's assertion that the gases here "quickly dissipate" (Opp. 18), that

(factual) issue is contested, as Defendants appear to be referencing outdoor dissipation and not

when these chemicals enter a confined indoor space, but that is beside the point in any event for purposes of Plaintiffs' right to bodily integrity. Defendants have *not* disputed that tear gas routinely enters Plaintiffs' apartment and physically invades Plaintiffs' bodies, causing both acute and long-lasting physical and psychological injuries. *See, e.g.*, Dooley Decl. ¶ 6; Doe Decl. ¶ 7; Taylor Decl. ¶ 7; Roe Decl. ¶ 10; Brooks Decl. ¶¶ 8–9; Moreno Decl. ¶¶ 12–14; Del Nigro Decl. ¶¶ 6–7, 10–11. Nor have they disputed that the chemicals they release stick to surfaces, causing lasting contamination of residences and harm to residents. Rao Decl. ¶¶ 50–53. It also does not matter that *Guertin* and *Sterling* involved "the entire city's drinking water" (Opp. 18), as opposed to the airborne contamination of specific residences. Both forms of contamination "introduc[e] life-threatening substances into individuals." *Guertin*, 912 F.3d at 921.

Defendants also attempt to distinguish *Guertin* and *Sterling* on the ground that (according to them) they did not "know[]" that these munitions "would contaminate the air at Gray's Landing." Opp. 18. Again, this factual assertion is contested. There is overwhelming record evidence that Defendants had actual knowledge (or, at the very least, should have known) about the effects of their conduct on Gray's Landing and its residents. PI Mot. 36-37 (citing evidence). Indeed, Defendants have continued using these munitions in shocking amounts even after Plaintiffs filed this case and the original motion for a preliminary injunction. *See id.*; *supra* Section I. In any event, Defendants' knowledge of the harms goes to whether their conduct is conscience shocking, not to whether Plaintiffs have invoked a cognizable liberty interest that is being burdened. *See, e.g.*, *Sterling*, 159 F.4th at 378 (discussing officials' knowledge and false public statements in assessing whether that conduct was "conscience shocking").

Defendants assert that other courts have "rejected" claims like Plaintiffs', but their lengthy string cite (at Opp. 17–18) provides no support. None of those cases involved the

intentional deployment of harmful chemical munitions by government agents directly adjacent to (or targeting) residences. Rather, in every case, the emissions at issue were made by *private* parties, not government agents; the alleged harms involved generalized exposure risks affecting broad populations over long periods of time; and the claims amounted to generalized complaints about ambient air quality or radiation levels or the environment more broadly. *E.g.*, *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir. 1971); *Pinkney v. Ohio EPA*, 375 F. Supp. 305, 310 (N.D. Ohio 1974); *Tanner v. Armco Steel Corp.*, 340 F. Supp. 532, 537 (S.D. Tex. 1972). Several cases did not involve government defendants at all. *E.g.*, *In re Agent Orange Prod. Liab. Litig.*, 475 F. Supp. 928, 933–34 (E.D.N.Y. 1979); *Tanner*, 340 F. Supp. at 536. And in other cases, the government was sued only in its capacity as regulator. *E.g.*, *Concerned Citizens of Neb. v. NRC*, 970 F.2d 421, 426–27 (8th Cir. 1992); *SF Chapter of A. Philip Randolph Inst. v. EPA*, No. 07-cv-4936, 2008 WL 859985, at *7 (N.D. Cal. Mar. 28, 2008). Simply put, each of those cases involved a different type of exposure, a different type of harm, and a different type of government action (if any) than that at issue here.[4]

**2.** Plaintiffs have also established that Defendants are infringing their right to free movement. By repeatedly deploying chemical munitions in a manner that foreseeably infiltrates Plaintiffs' residences and property, Defendants have made it unsafe for residents to walk around their own homes, sleep in their own beds, and use their own common areas—confining them and stripping them of ordinary, safe freedom of movement in and around their residences. Plaintiffs have submitted substantial and unrebutted evidence that they have had to seal off their

---

[4] Defendants also argue that Plaintiffs cannot rest their due process claim on psychological harms "alone." Opp. 19. But Plaintiffs have not asserted claims based solely on psychological harm. Those harms have been pleaded (and proven) alongside the significant *physical* harms caused by the physical intrusion of their bodies by the chemical munitions deployed by Defendants.

apartments, sleep in bathtubs or closets (or with a gas mask on), and avoid hallways and common areas. *See* PI Mot. 32 (citing evidence).

Defendants attempt to cabin the right to movement to ordinances regulating interstate travel and imposing juvenile curfews. *See* Opp. 21–22. But the right to liberty of movement is not limited to interstate travel or going outside at night. *See, e.g.*, *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002) (holding statute excluding those convicted of drug offenses from specified "drug exclusion zones" because "the right to travel locally through public spaces and roadways enjoys a unique and protected place in our national heritage."); *Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3d Cir. 1990) (holding that "the right to move freely about one's neighborhood or town, even by automobile, is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history.'"); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) ("It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state."). Moreover, Plaintiffs here face far more severe and arbitrary intrusions on their basic liberty than were present in those cases. *See, e.g*, *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 944–46 (9th Cir. 1997) (holding juvenile curfew unconstitutional).

Even if the Court ultimately treats Plaintiffs' constructive confinement as evidence supporting Plaintiffs' bodily-integrity and property theories, rather than as a standalone freedom of movement claim, the confinement Plaintiffs are suffering powerfully corroborates other claims: a government-created chemical hazard that repeatedly makes normal occupancy and internal movement unsafe is not a minor infringement—it is inconsistent with basic due-process protections against arbitrary government action.

**3.** Finally, all Plaintiffs have demonstrated deprivations of their property rights.

The Resident Plaintiffs' property interests are straightforward. The right to possess and safely occupy a home is among the most sacred forms of property protected by due process. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53-54 (1993) (recognizing the weighty private interest in maintaining control over one's home and real property in due process analysis). And Defendants' repeated use of tear gas and other chemical munitions has enormously burdened Resident Plaintiffs' property interests by contaminating their homes and their personal belongings. *See, e.g.*, Doe Decl. ¶¶ 8, 10; Dooley Decl. ¶ 7; Roe Decl. ¶ 10.

Defendants argue that Plaintiffs have not suffered a "constitutional deprivation" of their property rights because they have not been fully "deprived of their apartment[s]" and are "still living at Gray's Landing." Op. 22-23. But no case requires Plaintiffs to have suffered a complete deprivation of their property to state a due process claim. The Supreme Court has recognized that a property "regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005). And the Ninth Circuit has "explicitly" permitted claims "that [a] land use action lacks any substantial relation to the public health, safety, or general welfare." *Crown Point Dev. v. City of Sun Valley*, 506 F.3d 851, 856 (9th Cir. 2007). Indeed, Defendants acknowledge due process claims involving "rent control" or "restricting a land owner's construction of real property." Opp. 23. The stakes here are far higher: Resident Plaintiffs have suffered direct and persistent effects of tear gas and chemical munitions repeatedly infiltrating their homes and contaminating carpets, surfaces, and personal belongings. *See, e.g.*, Doe Decl. ¶¶ 8, 10; Dooley Decl. ¶ 7; Roe Decl. ¶ 10.

Defendants are likewise wrong to rely on out-of-circuit NIMBY lawsuits, where courts rejected due process claims involving "common nuisances" caused by private industry and efforts to block construction of a homeless shelter to maintain "the quality of neighborhood life." Opp. 22-23 (quoting *Tri-Cnty. Concerned Citizens Ass'n v. Carr*, No. 98-cv-4184, 2001 WL 1132227, at *4 (E.D. Pa. Sep. 18, 2001), and *BAM Hist. Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983)). Again, this case involves far more grievous harms than mere "common nuisances." *Id.* For similar reasons, Defendants are wrong to fault Plaintiffs for not identifying a case that is "similar to the situation at issue here." Opp. 23. To Plaintiffs' knowledge, the United States government has never before repeatedly released poison gas through entire, densely populated city blocks. The egregiousness of Defendants' conduct makes the application of well-established due process principles to these novel facts more appropriate, not less.

As for the REACH Plaintiffs, Defendants ignore entirely the physical harms and contamination to their property caused by Defendants' conduct and the expensive mitigation and cleanup measures they have been forced to undertake. PI Mot. 33-34; Salazar Decl. ¶¶ 9-23. The REACH Plaintiffs have already spent hundreds of thousands of dollars on mitigation and expect to incur hundreds of thousands more. Salazar Decl. ¶¶ 17-20. They have lost over $120,000 in rental value (and counting). *Id.* ¶ 20. And they have been forced to divert remaining scarce resources away from "mission-critical initiatives," including "needed maintenance and improvements" and "resident services." *Id.* ¶ 21. Again, these property harms (which Defendants ignore) are far more severe than an arbitrary denial of a land-use permit. *See Crown Point*, 506 F.3d at 856. They are cognizable for the same reasons that the Resident Plaintiffs' property harms are cognizable.

Instead, Defendants focus entirely on the REACH Plaintiffs' intangible harms (Opp. 24-26), but these harms are real and cognizable too. To begin, Defendants do not dispute that the REACH Plaintiffs have a constitutionally protected property interest in their goodwill because Oregon characterizes goodwill as a property interest under state law. *See* PI Mot. 33 n.40 (citing authority). Defendants assert that "reputation" and "business relationships" are not protected property rights (*see* Opp. 24-25), but the cases Defendants cite say the opposite. "Under Oregon state law, 'goodwill' generally refers to those intangible assets of a business, such as its *relationships with suppliers, customers, and employees*, as well as its location, name recognition, and *reputation*, that engender customer loyalty regardless of who works there." *Hampton v. Steen*, No. 2:12-cv-470, 2017 WL 11573592, at *9 (D. Or. Nov. 13, 2017) (emphasis added) (quoting *Slater and Slater*, 245 P.3d 676, 681 (Or. Ct. App. 2010)). Defendants fault Plaintiffs for "clumping these alleged interests together." Opp. 24. But that is how Oregon law treats them.

Defendants assert that "Plaintiffs must establish through specific evidence that [their business goodwill] has a monetary 'goodwill value.'" Opp. 24 (quoting *Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174, 1197 (D. Or. 2011)). Plaintiffs have submitted such evidence, including that the harms to their goodwill have made it harder for them to find new tenants, which will lower rental revenue going forward. Salazar Decl. ¶¶ 20, 23. To be sure, the harm to the REACH Plaintiffs' goodwill extends far beyond future lost revenue and lost tenants, including to its reputation in the community at large. *See id.* ¶ 23. But no case suggests that Plaintiffs must quantify every dollar of goodwill harm to bring a constitutional claim seeking only nonmonetary relief.[5]

---

[5] Defendants' additionally assert that "Plaintiffs must also show a loss that is 'above and beyond their personal services and ability to generate new work.'" Opp. 24 (cleaned up) (quoting *Hampton*, 2017 WL 11573592, at *9). But that is true only for "sole proprietors" offering

Defendants invoke *WMX Technologies, Inc. v. Miller*, 197 F.3d 367 (9th Cir. 1999), for the proposition that "damage to the reputation of a business, without more, does not rise to the level of a constitutionally protected property interest." Opp. 25-26 (quoting *WMX Techs.*, 197 F.3d at 376). But *WMX Technologies* involved only "allegedly defamatory remarks" made in an investigative report prepared by the district attorney. 197 F.3d at 370, 376. And the court's analysis was limited to the defamation context: the court was clear that its holding was based on the fact that the plaintiffs had not alleged any harm *beyond* reputational damage and that allowing the case to proceed "would constitutionalize the state tort of defamation." *Id.* at 376. Here, by contrast, the REACH Plaintiffs allege that their business has been directly harmed by Defendants' repeated use of chemical munitions immediately adjacent to their property, which has not only physically contaminated the property but also harmed their business relationships with their tenants and others. Salazar Decl. ¶¶ 9-23. Such property harms extend far beyond the purely reputational injury alleged in *WMX Technologies*.

### C.    Plaintiffs Have Demonstrated that Defendants' Conduct Shocks the Conscience

Plaintiffs have demonstrated that Defendants' decisions to repeatedly deploy massive quantities of chemical agents directly outside Plaintiffs' homes shocks the conscience. The evidence shows—and Defendants do not dispute—that Defendants have engaged in this conduct even against totally peaceful protesters, that they have done so at various times to put on a show for social media influencers, and that they have (on at least one occasion) directly targeted Gray's Landing. None of Defendants' counterarguments withstand scrutiny.

---

"personal services," not large enterprises like the REACH Plaintiffs. *Hampton*, 2017 WL 11573592, at *9; *see In re Marriage of Maxwell*, 876 P.2d 811, 813 (Or. Ct. App. 1994).

**1.** The deliberate-indifference standard applies because Defendants had ample time to deliberate before deploying chemical munitions outside Gray's Landing. *See Lewis*, 523 U.S. at 851-53. And Defendants demonstrated deliberate indifference when they continued to deploy massive quantities of chemical munitions outside Gray's Landing without regard for the known and entirely foreseeable harms suffered by Plaintiffs. *See* PI Mot. 34-38.

Defendants argue that they had no time to deliberate and that "in each separate instance, officers responded to unique circumstances and were required to make snap judgments." Opp. 26. The evidence shows otherwise. Even viewing individual incidents in isolation, there is irrefutable evidence that Defendants had time to deliberate and then made conscious, unhurried choices to deploy gas and smoke next to Gray's Landing. On the evening of October 4, 2025, Defendants pushed protests back down Bancroft Street slowly, about ten feet at a time, Jacobson Decl., Ex. 19 at 0:45–1:01, and then released tear gas at protesters simply standing on the street. At one point, officers are standing still and then one casually throws a canister into the crowd a few dozen feet away, immediately next to Gray's Landing, *id.* at 1:05–1:20, causing severe injuries to Mindy King, King Decl. ¶ 6. And Defendants do not deny that they did this with videographers trailing behind them, and a drone taking footage overhead, as part of a premeditated plan for producing a propaganda video. *Supra* Section I. More examples abound. On January 30, 2026, a relatively small group of protesters was standing calmly on the street when officers opened the gate to the ICE facility, walked out, and started firing tear gas in a manner that was obviously planned. On February 1, officers had cleared the driveway and were standing around facing no imminent threat, when they casually started lobbing gas and smoke munitions in all directions. Roe Suppl. Decl., Ex. 55 at 0:50–2:30. And then there are all the instances where officers deployed gas and smoke because they knew a car was about to leave

from, or arrive at, the ICE facility, making clear that the use of the munitions was part of the planned egress or ingress.

More fundamentally, though, Defendants' conduct cannot be viewed in isolation of each incident: they have deployed massive quantities of tear gas and other chemical munitions dozens upon dozens of times over a 7-month period, in response to routine and predictable conduct by protesters. For example, the evidence (including videographic evidence) shows that Defendants use chemical munitions in response to recurring fact patterns such as when a protester steps a foot or toe over the blue line that ICE has drawn at the end of its driveway, Doe Decl. ¶ 6, or, as mentioned before, when individuals drive in or out of the ICE parking lot, King Decl., Ex. 1 at 2:20; Roe Decl., Ex. 18 at 3:55; *see* Jacobson Decl. Ex. 19. Indeed, CBP agents themselves report that "Portland has a history of rioters that routinely gather outside the building [and] have developed an effective way to guarantee physical confrontation with the police and to occupy the front driveway area, which is Federal property, and refuse to move for vehicles arriving at and leaving the facility." Sullivan Decl., Ex. D at 139 (ECF 50-2); *see id.* 143, 149, 162, 165 (similar). They report that protesters have been engaging in this tactic for at least "the last several months." *Id.* at 149, 165. So, Defendants admit that they have had several months to plan how to respond to these recurring incidents yet continue to deploy massive quantities of chemical munitions every time. This case is therefore not like *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024), which was a one-time response to a one-time protest at a one-time event. *Contra* Opp. 26-27.

Defendants also argue, without elaboration or explanation, that "[e]ven if the deliberate indifference test applied, law enforcement's conduct in dispersing violent, dangerous, or obstructive demonstrations show[s] no deliberate indifference." Opp. 30. But again, the claim is

that Defendants have shown deliberate indifference toward Plaintiffs living at Gray's Landing, not toward protesters. Moreover, even focusing on protester conduct, Defendants have no response to the fact that, on many occasions, Defendants deployed chemical munitions against peaceful protests who presented no risk of harm to law enforcement officers or others. *See supra* Section I (citing videographic evidence). Indeed, Defendants admit that they regularly deploy chemical munitions in response to protesters who are merely using obscenities and "posturing aggressively." Sullivan Decl. ¶¶ 26-27; Sullivan Decl., Ex. D at 49, 67, 92, 93, 95, 175 (ECF No. 50-2). Nor do Defendants have any response to the unrebutted evidence that they used tear gas during the month of October 2025 to facilitate political propaganda that influencers they invited to the facility, and Defendants themselves, released. *See supra* Section I; PI Mot. 10–17, 35–36.

Defendants also have no response to fact that they have done nothing to mitigate the harms caused by their use of chemical munitions, such as reducing the volume and frequency of deployments, selecting less-dispersive chemical agents, or using available alternatives, including targeted arrests, physical barriers, and de-escalation tactics. Defendants do not dispute that such mitigation efforts would be feasible and could ameliorate some of Plaintiffs' harms, yet Defendants have done nothing to tailor the quantity, type, timing, or direction of their chemical-munition deployments to mitigate predictable drift and contamination into surrounding buildings.

Defendants' argument that "Plaintiffs are not foreseeable bystanders" (Opp. 30) is contradicted by the record. Overwhelming, unrebutted evidence demonstrates that Defendants actually knew—or at the very least should have known—of the effects that their use of chemical munitions is having on Gray's Landing and its residents. PI Mot. 36-37. That evidence includes direct outreach to officers by a REACH employee, a prior state court lawsuit, numerous stories in the press, direct outreach by the press through formal channels, and direct outreach by

Members of Congress to Secretary Noem. *See id.* Defendants ignore all of this evidence, with the sole exception that they acknowledge the statement by a REACH employee that, when she complained directly to DHS officers standing outside the ICE facility, the officers openly mocked her. *See* Piggott Decl. ¶ 5. Defendants attempt to recharacterize the DHS officers' reaction as disbelief rather than mockery. *See* Opp. 31. But the officers certainly do not actually believe that the munitions they release are "environmentally friendly," Piggott Decl. ¶ 5. Even before Plaintiffs filed this suit, it is simply implausible that Defendants did not know that their regular use of tear gas, smoke grenades, and other munitions in the blocks around the ICE facility was affecting the massive apartment complex next door. *See, e.g.*, Opp. 25-27.

And if there were any doubt about Defendants' knowledge in prior months, that doubt can be no more. Just days *after* three DHS officials submitted declarations in this lawsuit, Defendants again deployed massive amounts of tear gas and chemical agents immediately adjacent to Gray's Landing—five times in the span of eight days. *See* Suppl. Roe Decl. ¶¶ 5-8. Defendants cannot plausibly claim they were unaware that their conduct would harm Plaintiffs.

**2.** Even if the "purpose to harm" standard applies rather than deliberative indifference, Opp. 29–30, Plaintiffs have established that Defendants have acted with purpose to harm in a manner that shocks the conscience.

The "purpose to harm" inquiry is subjective: it asks whether officers acted with an illegitimate, harmful purpose "unrelated to legitimate law enforcement objectives," not whether the government can articulate a *post hoc* legitimate objective in the abstract. *Lewis*, 523 U.S. at 854; *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) ("The purpose to harm standard is a subjective standard of culpability."). Accordingly, the existence of an "otherwise plausible excuse" does not end the inquiry, or "shield the officer from liability," if the officer

acts with an ulterior motive to harm unrelated to legitimate law enforcement purposes. *Abdelaziz*, 137 F.4th at 977 (citing *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014) (en banc)); *see also A.D.*, 712 F.3d at 453 (even if an officer ultimately effectuates an arrest, he violates due process if he used force with an illegitimate purpose in mind).

Defendants respond that they lacked a purpose to harm because law enforcement may, generally, use tear gas to disperse "assaultive," "obstructive," "trespassing," or traffic-blocking crowds. Opp. 29-30. But it is not enough for Defendants to describe, at a high level of generality, some legitimate crowd control objectives. Instead, Defendants must grapple with evidence of subjective intent. *See A.D.*, 712 F.3d at 453. The cases Defendants cite do not say otherwise. At most, they reflect the uncontroversial propositions that violence is not constitutionally protected speech and that trespass or obstruction can be regulated and punished. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984); *Virginia v. Hicks*, 539 U.S. 113, 123 (2003); *Cameron v. Johnson*, 390 U.S. 611, 617 (1968). None suggests that officers may use chemical agents for purposes other than a legitimate need for dispersal. And none addresses the core question here: whether Defendants in fact deployed chemical munitions with an illegitimate, harmful purpose— such as to "bully" protesters, "get even," inflict pain, or produce political propaganda—rather than to achieve a legitimate dispersal objective. *A.D.*, 712 F.3d at 453.

On that question, the record supports Plaintiffs: Plaintiffs submitted unrebutted testimonial and videographic evidence that federal officers used chemical agents to immobilize, injure, or otherwise intentionally harm specific protesters—including non-violent protesters, sometimes from only a few feet away. Defendants have not denied that, on several occasions, they deployed the munitions to put on a show for social media influencers and others videotaping for propaganda purposes. *See supra* Section I; PI Mot. 10–17. And Plaintiffs submitted

unrebutted evidence that, on at least one occasion, Defendants targeted a Gray's Landing resident for videographing Defendants' conduct. PI Mot. 19. That is exactly the type of evidence from which a court may infer unconstitutional intent under the purpose-to-harm test. *See A.D.*, 712 F.3d at 453; *Soakai*, 137 F.4th at 978. Defendants cannot make this evidence disappear by ignoring it.

### D. The Court Need Not Reach Plaintiffs' Fourth Amendment Claim

Plaintiffs have alleged Fourth Amendment violations solely in the alternative, in the event Defendants argued (and the Court agreed) that their conduct should be evaluated as a seizure under the Fourth Amendment. *See* PI Mot. 39-40. Defendants argue that "there is no seizure" here (Opp. 32), and thus the parties agree that Plaintiffs' claims should be analyzed under the Fifth Amendment substantive due process framework set forth above. *See Hess v. Garcia*, 72 F.4th 753, 764 (7th Cir. 2023) (explaining that government conduct may violate the Fourth Amendment or substantive due process, but not both). The Court therefore need not reach Plaintiffs' Fourth Amendment claim.

### IV. Plaintiffs Have Demonstrated that They Are Suffering Irreparable Harm

Plaintiffs continue to suffer irreparable harms from Defendants' recurring use of tear gas, smoke grenades, and other chemical munitions immediately adjacent to Gray's Landing. As set forth in Plaintiffs' opening brief and attached declarations, the poison gases Defendants have deployed next to Gray's Landing are causing acute and long-lasting injuries. Diane Moreno, who suffers from Cushing's Disease, now needs to have an adrenal gland removed because of Defendants' use of chemical munitions. Moreno Decl. ¶¶ 4, 13, 14. Roy Brooks, who has muscular dystrophy, has suffered permanent muscle loss. Brooks Decl. ¶ 6. Erica del Nigro, who suffers from mast cell activation syndrome, has suffered persistent respiratory issues and severe allergic reactions. Del Nigro Decl. ¶¶ 6-7, 10. Other Plaintiffs are domestic violence survivors

with severe PTSD. *E.g.*, Roe Decl. ¶ 9; Doe Decl. ¶ 3. Yet others live with their children who are being traumatized by the gas and smoke entering their homes. Taylor Decl. ¶¶ 6-7; Del Nigro Decl. ¶¶ 10-11. And all of the Plaintiffs attest to serious physical injuries from the exposures to these chemicals, including difficulty breathing, heart palpitations, dizziness and fainting, and horrible burning sensations in their eyes, nose, throat, and skin. PI Mot. 20-23.

Defendants do not dispute that any of these harms are occurring and irreparable. Indeed, Defendants have essentially nothing to say about Plaintiffs' grave injuries and ongoing suffering. Instead, Defendants press three technical arguments, none of which holds water.

First, Defendants' "delay" argument (Opp. 34) is unfounded and, given the undisputed record of Plaintiffs' injuries, remarkably tone-deaf. This case is not about a single months-old exposure; it is about a recurring pattern of mass chemical deployments—most recently on January 24, 25, 30, and 31 and February 1. Plaintiffs have diligently pursued relief from those ongoing injuries, including by very recently filing an amended complaint and superseding preliminary injunction motion on an expedited basis. In any event, the Ninth Circuit has made clear that any delay in seeking preliminary relief is "not particularly probative in the context of ongoing, worsening injuries," like those Plaintiffs are suffering here. *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014).

Second, Defendants argue that a preliminary injunction is unnecessary because Judge Simon recently entered a temporary restraining order in a different case, *Dickinson v. Trump*, No. 3:25-cv-2170 (D. Or. Feb. 3, 2026), ECF No. 68. *See* Opp. 34. But that order, on its face, expires on February 17 and can only be extended 14 days. *See* Fed. R. Civ. P. 65(b)(2). It cannot provide Plaintiffs with durable protection while this case is litigated to final judgment. Moreover, that

injunction is tailored to protesters and their conduct. Opinion and Order, *Dickinson*, ECF No. 68 at 20-22. It does not seek to protect Plaintiffs here.

And third, Defendants argue that the REACH Plaintiffs have failed to show "how a prospective injunction would redress retrospective financial costs." Opp. 34-35. But Plaintiffs are not seeking an injunction to redress past injuries; they seek to prevent *future* harms to their property, which will incur *future* remediation costs. These costs are irreparable because Plaintiffs cannot obtain money damages from the government for the constitutional violations asserted, so waiting for final judgment cannot make them whole. PI Mot. 42-43. In any event, the Resident Plaintiffs' physical and psychological injuries more than suffice to justify the injunction requested.

## V.    The Balance of the Equities and Public Interest Weigh in Favor of an Injunction

The public has a paramount interest in preventing constitutional violations and protecting the health and safety of residents in their homes. Indeed, Defendants do not dispute that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotations omitted). And because Plaintiffs seek only a narrow, administrable limit on a single tactic—chemical munitions likely to infiltrate Gray's Landing—the public interest strongly favors injunctive relief.

Plaintiffs agree that Defendants and the public also have a significant interest in protecting against actual or imminent attacks that threaten the lives of federal law enforcement officers and members of the public. *See* Opp. 35. That is why Plaintiffs' requested relief expressly provides that Defendants may use chemical munitions "if necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons." PI Mot. 46. But Plaintiffs strongly disagree that the public's general "interest in quelling disorderly crowds" and securing "the integrity of public property," Opp. 35, outweighs Plaintiffs' fundamental right to

be free from extreme physical and mental anguish caused by toxic chemicals. Even if the government may sometimes be authorized to use chemical munitions to protect property or deter trespassing, "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties." *See Shelton v. Tucker*, 364 U.S. 479, 488 (1960). That is especially the case when Defendants have numerous other means to secure federal property, including, as Defendants acknowledge, arresting those who violate federal law. *See* Opp. 35 (citing 18 U.S.C. §§ 111, 1361).

Defendants' claim that a preliminary injunction would "interfere[] with lawful enforcement of the Nation's immigration laws" is unsupported by any evidence or explanation. Defendants are not using chemical munitions to enforce immigration laws; they are using them to suppress protests, injure protesters, and create political propaganda for their social media accounts. *See supra* Section I. And if there are actual instances where protesters act in a manner that would justify law enforcement dispersing them (incidents that Defendants have not corroborated with evidence), the requested injunction would permit Defendants to use less-lethal chemical munitions in certain circumstances. Defendants could use such munitions if they are not likely to infiltrate Gray's Landing. And even if infiltration of Gray's Landing were likely, Defendants could still use chemical munitions if necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons.

Finally, Plaintiffs' proposed preliminary injunction would not require this Court to "micromanag[e]" law enforcement, Opp. 35: it provides a clear and workable rule that balances the government's interest in protecting law enforcement officers and the public against Plaintiffs' interest in being free from toxic chemicals in their own homes.

VI.    **Scope of Relief**

Plaintiffs request that the Court enter a preliminary injunction that "enjoin[s] Defendants, their agents, and all persons acting in concert or participation with Defendants from deploying tear gas, smoke grenades, and other chemical munitions that are likely to infiltrate Gray's Landing and its apartments, unless the use of such munitions is necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons." PI Mot. 46.

Defendants' proposal, Opp. 37, to limit relief to a prohibition on the use of CS gas (*i.e.*, tear gas) would fail to provide Plaintiffs with complete relief. The record confirms the harm is not limited to CS gas alone, but also PAVA, smoke grenades and pepperballs that have predictably infiltrated Gray's Landing, injuring Plaintiffs. Moreover, Defendants could deploy other chemical agents if the injunction were limited to CS gas. Plaintiffs' requested preliminary injunction is therefore appropriately tailored: it reaches "tear gas, smoke grenades, and other chemical munitions" only to the extent they are "likely to infiltrate Gray's Landing and its apartments," and includes an exception to protect against threats to the lives of law enforcement officers and others. PI Mot. 47. If Defendants use pepper spray in the ICE driveway, it would not be covered by this injunction. An order confined to one chemical compound invites evasion (by substituting functionally similar chemical munitions), leaving the same constitutional injury likely to recur: harmful chemical intrusion into Plaintiffs' bodies and property.

Defendants also argue that "any injunction should not override what law enforcement are lawfully permitted to do," including deploying chemical munitions "to protect federal property and to disperse crowds blocking the entrance into federal facilities." Opp. 37. But that tautological argument proves too much. The government's general enforcement authority does not license tactics that unconstitutionally inflict severe harms on innocent bystanders in their homes. The Constitution, and not just Defendants' own use of force policies, constrains what

Defendants are "lawfully permitted to do." *Id.* Plaintiffs' proposed exception—permitting the use of chemical munitions to the extent "necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons"—is reasonably tailored to the unique circumstances here and supported by the practice of other courts in similar cases. *See* PI Mot. 47 (citing cases); *cf. Spain*, 600 F.2d at 195 ("If then the tear gas is used in dangerous quantities, we agree with the district court that its use is justified only in those grave circumstances which would justify the use of severe and potentially lethal force."). And it leaves Defendants free to employ other lawful tools to protect property, maintain order, and enforce the law without poisoning innocent bystanders in their homes.

## VII.    The Court Should Deny Defendants' Request for a Bond and a Stay Pending Appeal

Defendants' perfunctory request for a bond and a stay pending appeal is improper. *See* L.R. 7-1(b) ("Motions may not be combined with any response, reply, or other pleading."). In any event, the Court should not require a bond in the interest of justice and because Defendants have not identified any costs or damages they will likely suffer in the event the Court grants Plaintiffs' motion. *See* Fed. R. Civ. P. 65(c). And the Court should deny Defendants' request for a stay pending appeal because Defendants have not met their burden to show entitlement to a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion for a preliminary injunction.

February 11, 2026                                  Respectfully submitted,

                                                   */s/Daniel F. Jacobson*
                                                   Daniel F. Jacobson (D.C. Bar No. 1016621)+
                                                   Lynn D. Eisenberg (D.C. Bar No. 1017511)+
                                                   Stephen K. Wirth (D.C. Bar No. 1034038)+
                                                   Brian C. Rosen-Shaud (D.C. Bar No. 90042065)+

**Jacobson Lawyers Group PLLC**
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Telephone: +1 301-823-1148
Dan@jacobsonlawyersgroup.com

Darin M. Sands, OSB No. 106624
Colin Hunter, OSB No. 131161
**Bradley Bernstein Sands LLP**
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480
dsands@bradleybernstein.com
chunter@bradleybernstein.com

Taylor Jaszewski (CA Bar No. 345094)+
**Bradley Bernstein Sands LLP**
1212 Broadway, Suite 1100
Oakland, CA 94612
Telephone: +1 510-380-5801
tjaszewski@bradleybernstein.com

Brian D. Netter (D.C. Bar No. 979362)+
Jeffrey B. Dubner (D.C. Bar No. 1013399)+
Anna L. Deffebach (D.C. Bar No. 241346)+
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
bnetter@democracyforward.org
adeffebach@democracyforward.org

Katie Schwartzmann (La Bar No. 30295)+
**Protect Democracy**
201 St. Charles Ave., Suite 114
New Orleans, La 70170
(202) 573-4382

+ Admitted pro hac vice

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,764 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.