

NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


REACH COMMUNITY DEVELOPMENT, et al.,

       Plaintiffs,

v.                    Case No. 3:25-cv-2257

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

       Defendants.

_____



REMOTE VIDEOTAPED DEPOSITION OF


TIMOTHY SULLIVAN


TAKEN ON

TUESDAY, FEBRUARY 10, 2026

9:08 A.M.



475 K STREET NORTHWEST, UNIT 1118

WASHINGTON, D.C. 20001




NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

TIMOTHY SULLIVAN                February 10, 2026                     2
93884

REMOTE APPEARANCES


Appearing on behalf of all Plaintiffs:

BRIAN C. ROSEN-SHAUD, ESQUIRE

Jacobson Lawyers Group PLLC

5100 Wisconsin Ave. NW, Suite 301

Washington, DC 20016

(301) 823-1148

Brian@jacobsonlawyersgroup.com


Appearing on behalf of all Plaintiffs:

ANNA L. DEFFEBACH, ESQUIRE

Democracy Forward Foundation

600 Pennsylvania Ave SE, Unit 15180

Washington, DC 20003

(202) 448-9090

adeffebach@democracyforward.org

REMOTE APPEARANCES CONTINUED


Appearing on behalf of the Defendant:

SAMUEL HOLT, ESQUIRE

U.S. Department of Justice

475 K Street NW, Unit 1118

Washington, DC 20016

(719) 322-8689

samuel.holt2@us.doj.gov


-and-


KATHLEEN JACOBS, ESQUIRE

U.S. Department of Justice

1100 L Street NW

Washington, DC 20005

(202) 598-7615

Kathleen.c.jacobs@usdoj.gov

TIMOTHY SULLIVAN                February 10, 2026                                4
93884

REMOTE APPEARANCES CONTINUED


Appearing on behalf of the Defendant:

BROOKE D. JENKINS, ESQUIRE

U.S. Department of Homeland Security

2707 Martin Luther King Jr Ave SE

Washington, DC 20032

(771) 210-7535

brooke.jenkins@hq.dhs.gov


Appearing on behalf of the Defendant, U.S. Customs

and Border Protection:

RACHEL MCDONALD, ESQUIRE

Customs and Border Protection

4400 South Expressway 281

Edinburg, Texas 78542

(956) 329-8531

rachel.m.mcdonald@cbp.dhs.gov


Also Present:

Austin Halvorsen, Naegeli Technician

TIMOTHY SULLIVAN                February 10, 2026                         5
93884

EXAMINATION INDEX

PAGE

EXAMINATION BY MR. ROSEN-SHAUD                                    8

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

TIMOTHY SULLIVAN                    February 10, 2026                    6
93884

EXHIBIT INDEX

EXHIBIT                                                      PAGE


ECF 46      SUERSENDING MOTION                               23

     1      VIDEO                                            32

     2      VIDEO                                            38

    46      VIDEO                                            44

    56      VIDEO                                            46

    57      VIDEO                                            47

NAEGELI    (800) 528-3335
DEPOSITION & TRIAL    NAEGELIUSA.COM

REMOTE VIDEOTAPED DEPOSITION OF

TIMOTHY SULLIVAN

TAKEN ON

TUESDAY, FEBRUARY 10, 2026

9:08 A.M.

THE VIDEOGRAPHER:  We are on the record. The time is 9:08 a.m.  The date is February 10th, 2026.  This is the beginning of the deposition of Timothy Sullivan.  The case caption is REACH Community Dev. versus DHS.

Will Counsel introduce yourselves and state whom you represent?

MR. ROSEN-SHAUD:  Good morning.  My name is Brian Rosen-Shaud and I represent all plaintiffs in this case.

MR. HOLT:  Good morning.  This is Samuel Holt and I represent the defendants.

THE REPORTER:  Mr. Sullivan, can you please raise your right hand?  Do you affirm under penalty of perjury that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

MR. SULLIVAN:  I do.

THE REPORTER:  Thank you.  You may

proceed.

TIMOTHY SULLIVAN, having been first duly affirmed to tell the truth, was examined and testified as follows:

EXAMINATION

BY MR. ROSEN-SHAUD:

**Q.   Mr. Sullivan, it's nice to meet you.  My name is Brian Rosen-Shaud.  I appreciate your time today.**

A.   Good morning.

**Q.   Could you please state your name again for the record?**

A.   My name is Timothy Patrick Sullivan.

**Q.   And how old are you?**

A.   I am 50 years old.

**Q.   Where are you currently employed?**

A.   I am employed by the U.S. Border Patrol.

**Q.   And what is your job title?**

A.   Chief Patrol Agent.

**Q.   So can I call you Chief Sullivan?**

A.   Sure.

**Q.   Great.  You're welcome to call me Brian, Counsel, whatever is best.  So in this role do you oversee CBP's response to incidents at the Portland ICE facility?**

TIMOTHY SULLIVAN                February 10, 2026                              9
93884

A.    Yes, currently I do.

Q.    So if there is a significant incident outside of the facility, you would know about it?

A.    Yes.

Q.    And you would know the details of any significant CBP response to an incident outside of the Portland ICE facility, right?

A.    I'm currently monitoring from afar in El Paso, but if there's a significant incident I would be made aware of it.

Q.    And we'll get into this in a few minutes, but you were on the ground in Portland for a little over a month in October; is that right?

A.    That's correct, yeah.

Q.    Have you ever been deposed before?

A.    I have not.

Q.    Have you ever been a party or a witness in another case, any type of litigation?

A.    No.

Q.    Okay.  Well, if you have any questions, we're happy to pause and discuss procedure.  I want to just confirm a few things here at the start.  You understand that you're under oath to tell the truth just like if we were in a courtroom in front of a judge?

A.   Yes, I do.

Q.   And during today's questioning, Counsel for the government, Mr. Holt, could object to one of the questions that I ask you.  Do you understand that you should still answer my question unless Counsel for the government tells you not to?

A.   Sure, yeah.

Q.   Okay.  Great.  Well, please let me know at any point if you need a break, we'll definitely take one.  All that I'll ask is that you finish answering whatever question we're in the middle of before we take that break.

A.   Okay.

Q.   Cool.  So can you tell me what you did to prepare for today's deposition?

A.   My declaration, and then reviewed some of the E-STAR reports.

MR. HOLT:  I'm sorry, Counsel, could I just pause?  I'm sorry.  I think that when -- because I'm using my audio, I think I'm one the showing up.  I don't know if the court reporter is seeing everybody.  I just want to make sure that it's detecting the right person that's coming up on video.  Apologies.  I just want to make sure that you're seeing Chief Sullivan.

THE VIDEOGRAPHER:  I see Chief Sullivan. I have a pin, so I think we're good.

MR. HOLT:  Okay, thank you.  Just wanted to make sure.  I'm sorry, Counsel.

MR. ROSEN-SHAUD:  No, I appreciate you clarifying that, Mr. Holt.

BY MR. ROSEN-SHAUD:

Q.  Okay.  So you mentioned reviewing your declaration.  Did you review all of the approximately 300 pages of E-STAR reports attached to your declaration, or just some of them?

A.  Well, I skimmed over them.  I didn't -- I wasn't able to get through all of them.

Q.  Okay.  So some, but not all.

A.  Yeah.

Q.  Okay.  Did you meet with anyone to prepare for today's deposition?

A.  We met briefly yesterday.

Q.  And who did you meet with?

A.  The attorneys in this room.

Q.  Okay.  Was anyone else present other than the attorneys for that meeting?

A.  No.

Q.  Other than the E-STAR reports, did you review any documents to prepare for today's

deposition?

A.   No.

Q.   So my understanding is that CBP uses a variety of non-lethal munitions; is that right?

A.   That's correct, yes.

Q.   Can you tell me what OC is?

A.   Oleoresin Capsicum, commonly referred to as pepper spray.

Q.   And if I call it pepper spray you'll know what I'm referring to?

A.   Sure.  Sure.

Q.   Okay.  How about CS gas, can you tell me what that is?

A.   Commonly think of it as tear gas.

Q.   Cool.  So if I say tear gas, you'll understand I'm referring to CS gas?

A.   Yeah.

Q.   Okay.  My understanding is that CBP also uses stinger rubber ball grenades and smoke; is that right?

A.   That's correct.

Q.   Are there any other non-lethal munitions that you can think of that CBP uses besides those?

A.   The pepperball launcher system, and those are compressed air launchers, and the FN 303 is the

make and model, but it's another compressed air launcher.

Q.    And those are used to deploy what types of munitions?

A.    It's a powder, like a PAVA powder, but it's -- it's OC, but it's like pepper powder.

Q.    Okay.  So if I use the term chemical agents or chemical munitions to refer to all the types of non-lethal munitions that we just talked about, you'll understand that I'm referring to all of the things that we just discussed?

A.    Sure.  Sure.

Q.    You mentioned compressed air launchers.  I think in your declaration you mentioned munition launchers.  Those are devices that launch a munition far away, further than just dropping it from someone's hand.  Is that fair to say?

A.    That's correct.

Q.    Okay.  And sometimes CBP officers use those launchers to deploy munitions beyond the immediate property of the Portland ICE facility into the street or further, right?

A.    Depending on where the threat is, yes.

Q.    Okay.  So CBP has two law enforcement agencies, I believe, the U.S. Border Patrol and the

TIMOTHY SULLIVAN                February 10, 2026                    14
93884

Office of Field Operations; is that right?

A.    That's correct.

Q.    And in your declaration you wrote that CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.  Does that sound familiar?

A.    That does.

Q.    When CBP agents have been shooting tear gas and other chemical munitions outside of the ICE facility in Portland over the last seven months or so, they have not been securing the border when they do that, right?

A.    Well, we are called to support FPS to defend federal buildings and preserve -- preserve the facility and preservation of life.

Q.    But when the agents, the CBP agents have been deploying the chemical munitions outside of the ICE facility, in that moment they haven't been securing the border, right?

A.    Securing the border is our primary mission, but we're called upon several times to support other law enforcement agencies with their mission.

Q.    So it's a different mission you're acting

to support when the CBP officers do that --

A.    The support --

Q.    -- munitions?

A.    Supporting our law enforcement partners, yes.

THE REPORTER:  Mr. Sullivan, if you can just wait until Mr. Rosen-Shaud is finished with his question so I can get it down, please.  Thank you.

THE DEPONENT:  Yes, ma'am.

BY MR. ROSEN-SHAUD:

Q.    Similar question.  When CBP officers have been deploying tear gas or other chemical munitions outside of the Portland ICE facility, when they've been doing that thing they have not been disrupting human smuggling and traffic networks, right?

A.    Can you repeat the question?

Q.    Sure.  When CBP officers have been deploying chemical munitions, including tear gas, outside of the Portland ICE facility they have not been disrupting human smuggling and trafficking networks, right?

A.    Correct.

Q.    And similarly when CBP officers have been shooting tear gas and other chemical munitions outside of the Portland ICE facility over the last

TIMOTHY SULLIVAN                February 10, 2026                      16
93884

seven months or so, they have not been ensuring consistent enforcement of the immigration laws of the United States in those moments, right?

A.    That's correct, but we're supporting our law enforcement partners as requested.

Q.    Are you aware that tear gas is dangerous when you are exposed to it?

A.    I've been exposed to it.

Q.    And what happens to you when you are exposed to it?

A.    It's -- it's uncomfortable.  It's temporary, but it's uncomfortable.

Q.    When you say uncomfortable, what physical effects did you feel?

A.    Watery eyes, snotty nose.

Q.    And what did you do after you were exposed to the -- the chemicals?

A.    Nothing.  Walked away.

Q.    Did you blow your nose?

A.    Sure.

Q.    Did you wash your eyes out?

A.    No.

Q.    Did you do anything else?

A.    No.

Q.    And how long of a period when that

happened were you exposed to the chemicals for?

A.    I've been exposed numerous times.

Q.    When was the most recent time?

A.    I don't recall.  It probably would have been sometime in October.

Q.    Where were you when you were exposed in October?

A.    At the ICE facility.

Q.    And about how long did you feel the physical effects on that occasion of the tear gas or other chemical munition?

A.    A few minutes.

Q.    Were you inside or outside when that happened?

A.    Outside.

Q.    So when you say you felt the effects for a few minutes, what happened between when you were exposed and then when you stopped feeling the effects?

A.    Can you say that again?

Q.    Yeah.  So when you were exposed, you were outside.  A few minutes later you stopped feeling the effects of the tear gas.  What did you do in the interim?  Did you go to a new location?  Did you take clothing off?  What types of things did you do?

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

TIMOTHY SULLIVAN                    February 10, 2026                    18
93884

A.    I went on with my -- the course of my day, the -- my duties as assigned at the ICE building.

Q.    Did you go back into the ICE building?

A.    I did.

Q.    Was there any tear gas inside of the ICE building at that time?

A.    Not that I recall.  No, not that I recall.

Q.    Did you feel relieved to be out of the tear gas?

A.    Did I feel relieved?

Q.    Yes.

A.    I would -- yeah, I guess.

Q.    Would it have been uncomfortable to be exposed to the tear gas for an hour instead of a couple of minutes?

A.    I can't speculate on that.  I haven't been exposed to it an hour, not an hour.

Q.    What's the longest period of time you would say you've been exposed to tear gas?

A.    I don't know.  We're exposed to it a lot through our training, but I've never timed it.

Q.    But it's fair to say it's been minutes and not hours.

A.    That's fair to say.

Q.    Okay.  I'd like to show you a chemical

fact sheet from the CDC, the Center for Disease Control. Do you see that displayed on your screen?

A. I do.

Q. And do you see where I'm highlighting that it says Chemical Fact Sheet?

A. I do.

Q. And the date on this chemical fact sheet is September 6, 2024; is that right?

A. Yes.

Q. Okay. I'm going to scroll down to where it says Signs and Symptoms. First, do you see that the CDC refers to tear gas as poisoning?

A. I see that.

Q. And do you see that long lasting exposure or exposure to a large dose of tear gas may cause severe effects such as blindness?

A. I see that, yes.

Q. It can lead to respiratory failure that could even result in death.

A. Yes, I see that.

Q. So you were on site in Portland from, I think it was the end of September until early November. Are those dates about right?

A. Yes.

Q. Okay. Are you aware that around the time

that you arrived and while you were there, the President of the United States had threatened to send the National Guard to Portland?

A.    I'm aware of that possible deployment.

Q.    Are you also aware that right around when you arrived in early October, there were members of conserve -- conservative media outlets and social media influencers who were hosted at the Portland ICE facility, including on the roof?  Do you remember that?

A.    Can you repeat that?

Q.    Yeah.  Are you aware that in early October members of conservative media outlets and social media influencers were hosted at the Portland ICE facility, including on the roof?

A.    I didn't have any contact with the media.

Q.    But were you aware that there were some of those folks there?

A.    I don't believe I was.

Q.    Okay.  Do you have any basis to deny that those folks were there during that time?

MR. HOLT:  Objection, speculation.  You can answer the question.

THE DEPONENT:  Can you repeat that?  Do I -- I didn't understand that.

TIMOTHY SULLIVAN              February 10, 2026                     21
93884

BY MR. ROSEN-SHAUD:

Q.   Yeah.   Do you have any reason to deny that there were those folks there from conservative media outlets or social media influencers?

A.   No, I didn't have any contact with media.

Q.   Okay.   I am going to show you -- I'm displaying ECF Document 46.   It is Plaintiff's Superseding Motion for Preliminary Injunction.   I am going to page 11 of the document.   Do you recognize either of the two men shown in this picture on page 11?

A.   That's obviously me on the right.

Q.   And who is on the left?

A.   I do not know.

Q.   If I told you that was a man named Nick Sortor, conservative social media influencer, would that sound familiar?

MR. HOLT:   Objection, speculation.   You can answer.

THE DEPONENT:   Are you asking me -- repeat the question?

BY MR. ROSEN-SHAUD:

Q.   Yeah.   If I told you that that man's name was Nick Sortor, a conservative social media influencer, would that sound familiar?

TIMOTHY SULLIVAN                 February 10, 2026                        22
93884

A.    I guess.  I don't know.  I don't know a Nick Sortor.

Q.    Do you remember why you were on the roof of the Portland ICE facility with him?

A.    Secretary Noem was there that day.

Q.    What did you do on that day when Secretary Noem visited?

A.    I gave her an operational overview of -- we had a law enforcement agency head meeting with her, and gave her an overview of the ongoings there at the ICE facility.

Q.    And were members of the media present for part or all of that?

A.    I don't know, to be honest with you.  I don't know who -- who was with her.  I was mainly focused on the secretary.

Q.    Do you remember folks with cameras, either camcorders or just iPhone cameras?

A.    Sure, there was several.

Q.    You remember those several?

A.    Yeah, I -- I don't know who they were though.

Q.    Gotcha.  Do you remember if tear gas was used that day that Secretary Noem was present?

A.    I don't believe so because Portland Police

Bureau had blocked the entire street in front of the ICE building to all vehicle and pedestrian traffic.

Q.  **Gotcha.  So there weren't protestors outside of the driveway of the Portland ICE facility, like there often were, on that day?**

A.  No, but there were on the -- the flanks of the ICE -- where the barricades were, there was protestors.

Q.  **Okay.**

THE REPORTER:  Would you like to mark that as an exhibit?

MR. ROSEN-SHAUD:  Anything else --

THE REPORTER:  I'm sorry, Mr. Rosen-Shaud.

MR. ROSEN-SHAUD:  I'm happy to refer to this as -- because it's already on the court record, I would suggest we could refer to this as ECF 46.

THE REPORTER:  Okay, thank you.

(WHEREUPON, Exhibit ECF 46 was marked for identification.)

BY MR. ROSEN-SHAUD:

Q.  **Anything else out of the ordinary from your normal job duties happen on that day that Secretary Noem visited?**

MR. HOLT:  Objection, vague.

THE DEPONENT:  Not that I recall.

TIMOTHY SULLIVAN                February 10, 2026                    24
93884

BY MR. ROSEN-SHAUD:

Q.    Were there more people than usual in the building when the secretary visited that day?

MR. HOLT:  Objection, vague.  You can answer the question.

THE DEPONENT:  Were there more people in the building was the question?

BY MR. ROSEN-SHAUD:

Q.    Yes.

A.    There was the secretary -- well, yes, because there was the secretary's group that was there.

Q.    Okay.  So that was page 11 of ECF 46.  I want to go down to page 12.  Do you recognize the two people shown in this picture on page 12 of ECF 46?

A.    I believe -- I don't know for certain.  I don't know who they are.  I know -- well, obviously Katie Daviscourt is on the left, based on the post.

Q.    Sure.  Do you recognize ever seeing her before?

A.    I don't.

Q.    Okay.  And how about the person standing to her right, from the way we're looking at the picture?

A.   I don't know who that is.

Q.   Do you recognize the view -- or from the view, do you recognize where they're standing?

A.   That looks like they were -- well, it appears to be the ICE building.

Q.   Okay.  And it's fair to say you've been up there a few times?

A.   I have, yes.

Q.   Okay.  I'm going to go to page 13 of ECF 46.  Do you recognize any of the three people in this picture?

A.   I do not.

Q.   Do you see the figure in the center is wearing what appears to be a vest that says Press on it?

A.   Yes.

Q.   And from -- sorry about that.  From the picture, do you recognize where they're standing?

A.   That may be the second floor of the ICE building, the roof on the second floor.

Q.   Okay.  Now, on the bottom of page 13, do you recognize any of the men in this picture?

A.   In the front?  Is that what you're talking about?

Q.   Yeah, thank you for clarifying, in the

TIMOTHY SULLIVAN               February 10, 2026                    26
93884

front.  I recognize there were some officers in the back whose faces are not shown, but talking about the three men who are standing in the front of the photo.

A.    I don't believe I do.

Q.    Okay.  So thinking about the ICE facility, you're aware that there's a building -- an apartment building that is diagonally across the street from the ICE facility, right?

A.    Yes, I'm aware.

Q.    Okay.  That building is called Gray's Landing.  It's about a hundred feet away from the entrance to the Portland ICE facility.  Does that sound roughly correct to you?

A.    I don't --

MR. HOLT:  Objection, lack of foundation, vague.

You can answer.

THE DEPONENT:  I don't know the distance, but it's adjacent to the northwest of the ICE building.

BY MR. ROSEN-SHAUD:

Q.    If I told you it was a hundred feet, would that sound about right?

A.    I can't say -- I can't say the distance of

it.  I've never measured it.

Q.   Okay.  And you're aware that it's an apartment complex?

MR. HOLT:  Objection, lack of foundation.

THE DEPONENT:  That's what I understand it to be, yes.

BY MR. ROSEN-SHAUD:

Q.   And you understand that when you -- when CBP officers release gas, smoke, other chemicals outside of that building, that they seep into that apartment building?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  I'm not aware of that.  We address the threat that's in front of the ICE building.

BY MR. ROSEN-SHAUD:

Q.   When did any CBP official become aware that residents of the Gray's Landing apartment building were complaining that they were experiencing symptoms of being exposed to tear gas?

A.   Can you repeat that?

Q.   Yeah.  When did any CBP official become aware that residents of the Gray's Landing apartment building were complaining of experiencing symptoms of exposure to tear gas?

MR. HOLT:  Objection, speculation, lack of foundation.

THE DEPONENT:  I -- I don't know when a CBP official became aware of that.

BY MR. ROSEN-SHAUD:

Q.   When did you become aware of that?

A.   When I was advised of this situation here.

Q.   And what situation are you referring to?

A.   The -- what we're discussing right now, the complaint.

Q.   Okay.  So the complaint was filed in December, so you became aware of the complaints about tear gas exposure among the residents in December of 2025?

A.   I can't remember when it was.  I don't recall when.

Q.   So you signed your declaration, your first declaration in this case, on January 22nd of 2026. So on that date you were aware that residents of the Gray's Landing apartment building were complaining of exposure to tear gas, right?

A.   That sounds correct.

Q.   And you reference that you learned about it when the complaint was filed, so that was a couple of weeks before you signed your declaration

in this case; is that right?

MR. HOLT:  Objection, lack -- lack of foundation, and calls for facts not in evidence.

You can answer.

THE DEPONENT:  I don't know when I was initially made aware, but it was up when this was -- when I was made aware of it, I -- I don't know the exact date.

BY MR. ROSEN-SHAUD:

Q.    Was that weeks before you signed your declaration in this case?

A.    I don't recall.

Q.    Was it at least a week?

A.    I don't -- I can't answer that.  I don't remember.

Q.    Okay.  When did you first become aware that there are children who live in the Gray's Landing apartment complex?

MR. HOLT:  Objection, lack of foundation.

THE DEPONENT:  I was not aware there were children in the apartment complex.

BY MR. ROSEN-SHAUD:

Q.    When you signed your declaration in this case, at that time you were not aware that there were children in the Gray's Landing apartment

TIMOTHY SULLIVAN                February 10, 2026                    30
93884

complex?

A.   I don't know who lives in the apartment complex.

Q.   Is today the first time that anyone has told you that children live in the Gray's Landing apartment complex?

A.   I believe so.

Q.   You're not disputing that the residents of Gray's Landing say that they are experiencing symptoms from the tear gas and other chemical munitions that are released outside of their apartment, right?

A.   Can you repeat that?

Q.   You're not disputing that Gray's Landing residents are experiencing injuries related to the tear gas that is released outside of their apartment building, right?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  I'm not disputing that they say what?

BY MR. ROSEN-SHAUD:

Q.   That they are suffering injuries from the tear gas.

A.   I don't know that they are.

Q.   So you're not disputing it, fair to say.

A.    I can't say that.

Q.    **You have no basis to say that -- basis to say that they are making it up, right?**

MR. HOLT:  Objection, speculation.  Lack of personal knowledge.

THE DEPONENT:  I don't know.

BY MR. ROSEN-SHAUD:

Q.    **The residents of Gray's Landing, the apartment complex, when they're in their homes they don't pose a threat to CBP officers, right?**

MR. HOLT:  Objection, speculation.

THE DEPONENT:  It -- define a threat.

BY MR. ROSEN-SHAUD:

Q.    **I'm happy to have you define it as you see fit.**

A.    So we had information that there was drones launched from that building, I don't know whether it was an apartment or a store, whatever, that were flying over the ICE building to surveil law enforcement movements.  I consider that a threat.

Q.    **You're not aware of any dangers that the individual plaintiffs in this case posed to DHS officers, right?**

A.    Say that again?

Q.    You're not aware of any dangers that the individual plaintiffs in this case posed to DHS officers, right?

A.    I don't know who the plaintiffs are.

Q.    So in your declaration you said that CS gas, tear gas, was used on the afternoon of October 4th outside of the Portland ICE facility, right?

A.    I believe so, yes.

Q.    I am going to show you the first three and a half minutes of Plaintiff's Exhibit 1, and then I'm going to ask you some questions about that.

A.    Okay.

Q.    So I'm going to share my screen.  All right, I'm hitting play.

(WHEREUPON, Exhibit 1 was played.)

BY MR. ROSEN-SHAUD:

Q.    So that was the first three and a half minutes of Plaintiff's -- Plaintiff's Exhibit 1. Multiple CS gas canisters were deployed near the driveway of the Portland ICE facility in that video, right?

A.    There was gas or smoke deployed, I could tell that.

Q.    Multiple different deployments of those chemical munitions?

TIMOTHY SULLIVAN                February 10, 2026                    33
93884

A.    It appeared so.

Q.    **There was a gap in time between when the first canisters or deployments of the chemical munitions were made, and then another round of chemical munitions was released a short time later, right?**

A.    It appeared so, yeah.

Q.    **Near the end, did you see the canister that was filed -- sorry.  Near the end, did you see the canister that was fired from a projectile gun near the ICE facility driveway, that traveled a long distance and landed right near the camera and filled the screen with smoke?**

MR. HOLT:  Objection, compound. Objection, vague.

THE DEPONENT:  I didn't see it fired, no.

MR. ROSEN-SHAUD:  I'm going to go back to Exhibit 1 and show you beginning at 2 minutes and 30 seconds until about 3 minutes and 10 seconds of that exhibit.

(WHEREUPON, Exhibit 1 was played.)

BY MR. ROSEN-SHAUD:

Q.    **Right there shortly before 2 minutes and 40 seconds, did you see a canister fired from a projectile gun near the ICE facility driveway?**

A.   I saw it launched, yes.

Q.   Okay.  I'm going to continue playing.
We're at 2 minutes and 41 seconds.

(WHEREUPON, Exhibit 1 was played.)

BY MR. ROSEN-SHAUD:

Q.   And right there at about 3 minutes of the
video, did you see the camera fill with smoke or
gas?

A.   I did.

Q.   That gas canister that was fired, the one
that we just watched again, that was not used to
clear the driveway of the Portland ICE facility of
protestors, right?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  I can't speak to why that
would -- that officer perceived -- what that officer
perceived to force him to launch that.

BY MR. ROSEN-SHAUD:

Q.   But we can eliminate as a possibility that
that specific canister was used to clear a path out
of the ICE facility driveway, right?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  Repeat the question,
please?

BY MR. ROSEN-SHAUD:

Q.    We can eliminate as a possibility for why the officer fired that munition, the reason being that he wanted to clear a path out of the driveway of the ICE facility, right?

A.    Well, I don't know what he perceived down the street.

Q.    So you think there is a chance that he launched that chemical munition for the specific purpose of clearing the driveway of the ICE facility?

A.    No, I didn't say that.  I'm saying I don't know what he perceived that -- where he made the decision to launch it down the street.

Q.    For sure.  I hear you saying that you do not know the reason why he chose to launch it?

A.    Right.

Q.    And so I'm not going to ask you for the specific reason that he launched it.  I want to eliminate one possible reason that he could have launched it, though, as a possibility.  And I'm suggesting to you, and I'm curious if you agree, that he could not have had the intent of clearing the driveway of the ICE facility when he, standing in the driveway of the ICE facility, shot a tear gas canister over a hundred feet down the street.

MR. HOLT:  Objection, speculation.

THE DEPONENT:  Can you repeat that?

BY MR. ROSEN-SHAUD:

Q.    **Is it possible that that officer on the video we just saw, shot a tear gas canister a hundred feet away from the Portland -- from the driveway of the Portland ICE facility for the purpose of clearing the driveway?**

MR. HOLT:  Objection, speculation.

THE DEPONENT:  I don't know.  I'm not sure I understand the question.  Are you saying he was trying to clear the driveway or he was not trying to clear the driveway?

BY MR. ROSEN-SHAUD:

Q.    **I'm asking you if you think it's possible that he was trying to clear the driveway when he fired that specific munition.**

A.    I can't answer that.  I -- I'm not him.

Q.    **Would watching that part of the video again help?**

A.    Sure.

Q.    **Okay.  I'm going to show from 2 minutes and 40 seconds until 3 minutes.  I apologize.  I meant to show from 2 minutes and 30 seconds.**

THE REPORTER:  Mr. Rosen-Shaud, it's not

on the screen.

MR. ROSEN-SHAUD:  Sorry about that.  Thank you.  So I'm going to start the video at 2 minutes and 30 seconds, and I'm going to pause the video when the canister is launched to ask you a question, Chief Sullivan.

THE DEPONENT:  Okay.

(WHEREUPON, Exhibit 1 was played.)

BY MR. ROSEN-SHAUD:

**Q.    Where was that chemical munition fired from?**

MR. HOLT:  Objection, speculation.

THE DEPONENT:  It appears to be somewhere in front of the ICE building on -- I guess that's Bancroft Street.  Bancroft --

(WHEREUPON, Exhibit 1 was played.)

BY MR. ROSEN-SHAUD:

**Q.    And we just saw at about 2 minutes and 41 seconds, the munition lands on the street.  Does it land anywhere near the driveway of the Portland ICE facility?**

A.    It does not appear so, no.

**Q.    Does it land close to the people who, on the camera, are closest to the driveway of the Portland ICE facility?**

TIMOTHY SULLIVAN                February 10, 2026                    38
93884

A.    It's behind them.

Q.    Is there any world in which that officer fired that munition to clear the driveway of the Portland ICE facility?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  Again, I don't know what he's -- sees down the street.  I don't know if there's a vehicle coming up there or what.  I don't know.

BY MR. ROSEN-SHAUD:

Q.    Okay.  In your declaration when you talk about October 4th, you don't mention this specific chemical munition being fired, right?

A.    It's -- no, not a specific munition.

Q.    In your declaration, you also say that CBP deployed tear gas again on the night of October 4th, right?

A.    That sounds correct.

Q.    I'm going to play Plaintiff's Exhibit 2. I'm going to show you between minute 5 and minute 7 of that video, and then I'm going to ask you some questions.

A.    Okay.

(WHEREUPON, Exhibit 2 was played.)

BY MR. ROSEN-SHAUD:

Q.   That -- that video showed DHS officers moving the crowd away from the Portland ICE facility all the way down past -- in front of and ultimately past the Gray's Landing apartment building, right?

A.   Correct.

Q.   That wasn't the usual tactic that CBP or other DHS officers used to clear a path out of the driveway of the ICE facility, was it?

A.   No, but it is a tactic.

Q.   Not the usual?

A.   That was -- the attempt there was to try to push the -- the hostile protestors completely out of the area.

Q.   Did you happen to notice a man in a yellow vest with a camcorder or other video recording device in his hand, in that video?

A.   I did not.

Q.   Okay.  I'm going to show you that video again from minute 6 -- 6 minutes and 20 seconds through 6 minutes and 40 seconds.  I'm going to use the pointer on my mouse to, you know, I guess highlight who I am pointing out to you.

A.   Okay.

(WHEREUPON, Exhibit 2 was played.)

BY MR. ROSEN-SHAUD:

Q.   Do you see who I'm pointing at?

A.   I do, yes.

Q.   Do you see a person in a yellow vest?

A.   I do, yes.

Q.   Do you see him with an object in his hand?

A.   I do.

Q.   It's currently raised above his head?

A.   Yes.

Q.   Pointing down the road at where the protestors are being forced?

A.   Yes.

Q.   If I told you that was a camcorder or other recording -- video recording device, would that seem about right?

A.   Yes.

        MR. HOLT:  Objection, speculation.

        THE DEPONENT:  Yes.

        MR. ROSEN-SHAUD:  I'm going to put the same video back up on the screen, the same exhibit, and this time I'm going to show you from minute 13 to minute 16, and then ask you some questions.

        (WHEREUPON, Exhibit 2 was played.)

BY MR. ROSEN-SHAUD:

Q.   That video showed tear gas in front of the Gray's Landing apartment building, right?

A.    I believe so.

Q.    Releasing tear gas on Bancroft Street all the way down there past the Gray's Landing apartment building, that wasn't used to clear the driveway of the Portland ICE facility, right?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  But there would have been a reason why tear gas was deployed.

BY MR. ROSEN-SHAUD:

Q.    But that reason wasn't clearing the driveway on that occasion.

A.    No, but if there -- obviously they weren't in front of the driveway, but if there was a -- a threat posed to the agents as they were pushing the crowd down the street, that's when there would have been deployment.

Q.    So after we see the gas go in front of the camera, DHS officers and the crowd start walking back down the street toward the Portland ICE facility, right?

A.    Correct, appears so.

Q.    The part of your declaration that talks about the evening of October 4th doesn't mention anything about what we just saw, right?

A.    I don't believe so.

Q.    It doesn't mention that officers pushed protestors all the way down Bancroft Street.

A.    Not in my declaration, no.

Q.    And it doesn't mention that officers released tear gas all the way down Bancroft Street.

A.    We don't specify where it was released.

Q.    And it didn't mention anything about the man in the yellow vest, the videographer?

A.    Not in my declaration, no.

Q.    Did you notice the man in the yellow vest in that video again there?

A.    I did.

Q.    So I'm going to bring that video back up. Again this is Plaintiff's Exhibit 2, and I'm going to show you from minute 16, which is where we are now, through minute 20.

(WHEREUPON, Exhibit 2 was played.)

BY MR. ROSEN-SHAUD:

Q.    Did you see any cars exit the driveway of the Portland ICE facility in that video?

A.    I could not.

Q.    Do you -- did you happen to notice a drone in that video?

A.    I did not notice a drone, no.

Q.    Okay.  I'm going to share the video again.

This is Plaintiff's Exhibit 2, and I'm going to go to 18 minutes and 35 seconds, at least as close as I can get.  We're starting at 18.

(WHEREUPON, Exhibit 2 was played.)

BY MR. ROSEN-SHAUD:

Q.    Do you see the object I'm circling?

A.    I see it, yeah.

Q.    With red and green blinking lights?

A.    I see it.

Q.    Does that appear to be a drone to you?

A.    It does, yeah.

Q.    Safe to say that was a DHS operated drone?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  I believe so, yes.

MR. ROSEN-SHAUD:  Okay.

THE REPORTER:  I don't see Mr. Sullivan's video.  Mr. Landis, just to confirm, do you see it?

THE VIDEOGRAPHER:  I no longer see video.

MR. HOLT:  Looks like it might have frozen.

MR. ROSEN-SHAUD:  Maybe he disconnected.

MR. HOLT:  Could we go off the record to fix this?

THE VIDEOGRAPHER:  Sure.  Please stand by. The time is 10:06 a.m.  We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record. The time also is 10:06 a.m.

BY MR. ROSEN-SHAUD:

Q.    So Chief Sullivan, you said in your declaration that tear gas was used on the evening of January 30th to remove trespassers from the property of the ICE facility, right?

A.    That sounds correct.

Q.    I'm going to play you the entire video of Plaintiff's Exhibit 46.

(WHEREUPON, Exhibit 46 was played.)

BY MR. ROSEN-SHAUD:

Q.    No -- sorry.  No protestor was standing across the blue line when DHS officers exited the building and began firing tear gas, right?

A.    Repeat that?

Q.    At the time that the officers exited the gate of the ICE facility, no protestor was standing across the blue line at the end of the driveway, right?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  You can't see what happened prior to that video.  I don't even know what date or time that video is from.

TIMOTHY SULLIVAN                February 10, 2026                45
93884

BY MR. ROSEN-SHAUD:

Q.    But in the part of the video we saw, there was no one standing across the blue line in the driveway.

A.    I can't tell that.

Q.    No vehicles exited the driveway of the Portland ICE facility in that video, right?

A.    I did not see a vehicle.

Q.    Turning to the next day, January 31st, are you aware that a munition broke the window at a Gray's Landing apartment on Saturday January 31st?

A.    I am not aware of that.

Q.    Do you have any basis to dispute that that is true?

A.    I don't know that that is true.

Q.    But no reason to say that that is untrue.

A.    A building would not be the aiming point of the munition.

Q.    But you don't have any reason to say that the munition did not end up breaking the window, even if it wasn't the intent.

A.    I have no reason to say a munition would be fired at a building.

Q.    Does CBP have any awareness of a threat posed to federal officers from a person living in

that Gray's Landing apartment building on Saturday January 31st?

A.    I don't know other than the drone, the counter drone that I mentioned earlier.

Q.    In your declaration, you said that on Sunday February 1st, CBP had used chemical munitions to control a crowd outside of the Portland ICE facility, right?

A.    What day?

Q.    Sunday February 1st.

A.    That sounds correct, yes.

Q.    I am going to show you what will be designated as Plaintiff's Exhibit 56, and show minutes 3 to 6 of that video.

(WHEREUPON, Plaintiff's Exhibit 56 was marked for identification.)

(WHEREUPON, Exhibit 56 was played.)

BY MR. ROSEN-SHAUD:

Q.    Was that volume of tear gas necessary to protect the lives of DHS officers?

A.    I don't know what the officers were perceiving as a threat at that time.

Q.    So that video was taken between 6:30 and 7:00 p.m. on Sunday February 1st.  CBP used tear gas again later that night on the 1st, right?

TIMOTHY SULLIVAN                February 10, 2026                    47
93884

MR. HOLT:  Objection, assumes facts not in evidence, and compound.

THE DEPONENT:  I don't know.

MR. ROSEN-SHAUD:  I'm going to play you what will be marked as Plaintiff's Exhibit 57, and I'm showing from 4 minutes and 30 seconds until 7 minutes in this video.

(WHEREUPON, Plaintiff's Exhibit 57 was marked for identification.)

(WHEREUPON, Exhibit 57 was played.)

BY MR. ROSEN-SHAUD:

Q.    **That video showed a crowd of protestors that numbered about a dozen?**

A.    Sorry, we're having trouble hearing.

MR. HOLT:  It might be an issue on our end, for one.

MR. ROSEN-SHAUD:  I'm happy to repeat the question whenever you can hear me.

MR. HOLT:  Sorry.

THE REPORTER:  Shall we go off the record?

MR. ROSEN-SHAUD:  I think that's a good idea.

THE VIDEOGRAPHER:  Yes.  Yes, we can. Please stand by.

MR. ROSEN-SHAUD:  Can you hear me?

TIMOTHY SULLIVAN                February 10, 2026                    48
93884

THE REPORTER:  I can hear you, can you hear me?

MR. ROSEN-SHAUD:  Gotcha.

THE REPORTER:  Oh, okay.

THE DEPONENT:  We switched from his phone to my laptop.

MR. ROSEN-SHAUD:  Okay, great.  I'm happy to repeat the question if everyone is ready.

THE VIDEOGRAPHER:  Okay, so we won't go off the record.  Okay.

BY MR. ROSEN-SHAUD:

Q.    That video showed a group of protestors that numbered about a dozen people?  Was that what you saw?

A.    It appeared so, yes.

Q.    And DHS officers that were standing on the roof of the Portland ICE facility shot chemical munitions at those dozen or so people?

A.    I couldn't tell where the munitions were coming from.

Q.    Did you see the officers on the roof though?

A.    I did not notice that, no.

Q.    Okay.  I'm happy to jump back in the video.  I'm going to start at about 5 minutes and

use my mouse cursor pointer to highlight where folks are moving on the roof.

(WHEREUPON, Exhibit 57 was played.)

BY MR. ROSEN-SHAUD:

Q.    Do you see what appears to be people on the roof of the Portland ICE facility?

A.    It appears so, yes.

Q.    I'm actually going to jump right back into that video.  This is still what we've marked at Plaintiff's Exhibit 57, and I'm jumping to minute 27 and 30 seconds, and I plan to show you from 27:30 until 30 minutes and 30 seconds.  I'm going to go back to start at 27:30.

We're starting at 27:13.

(WHEREUPON, Exhibit 57 was played.)

BY MR. ROSEN-SHAUD:

Q.    In that video the crowd of protestors was again about a dozen people.  Right?

A.    Is that a question?

Q.    Yes.  There were about a dozen people in the crowd, right?

A.    Appeared so, yeah.

Q.    And DHS officers standing on the roof of the Portland ICE facility shot chemical munitions at those protestors?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  Well, I can't see what was in between those two buildings, between the ICE building and that warehouse where the munitions were thrown.

BY MR. ROSEN-SHAUD:

Q.    Did you see officers on the roof of the Portland ICE facility deploy chemical munitions?

A.    I did.

Q.    And they were launched from either a compressed air launcher or a munition launcher?

A.    I can't tell.  Those could have been hand thrown from that distance.

Q.    I'm going to jump back to the video for just a couple seconds, and I'm going to go to 28 minutes and 55 seconds, or as close as I can get. Looks like we're going to have to start at 28:32. I'm going to use my mouse cursor to highlight when munitions -- the part of the munition I want you to -- want to ask you about.

A.    Okay.

(WHEREUPON, Exhibit 57 was played.)

BY MR. ROSEN-SHAUD:

Q.    Right there.  Did you see --

A.    Can you rewind that just a hair?

TIMOTHY SULLIVAN                February 10, 2026                        51
93884

Q.    I will do my best here.  I can go back 10 seconds and then we can watch it.

A.    There you go.

(WHEREUPON, Exhibit 57 was played.)

BY MR. ROSEN-SHAUD:

Q.    We're looking right up here.  Fair to say that was from a munitions launcher or a compressed air launcher?

A.    Yes.

Q.    And later in the video we saw gas clouds travel from near the Portland ICE facility on the left, to the right as the camera is looking; is that right?

A.    It appeared so, yeah.

Q.    Okay.  The last incident report that you --

MR. HOLT:  Counsel?

MR. ROSEN-SHAUD:  Yes.

MR. HOLT:  Can we take a break before you move on to the next --

MR. ROSEN-SHAUD:  I'm happy to.  I think this -- this is my last line of questioning, and I think it will take -- well, I have two more, so we should take a break.

MR. HOLT:  Okay.  I also think we may have

a little bit of a -- our internet might -- we might have to reset our internet here, so I think this is a good time too.  I don't want to lose --

MR. ROSEN-SHAUD:  Great reason.

MR. HOLT:  Yeah.  Okay, thanks.

THE VIDEOGRAPHER:  Please stand by.  The time is 10:29 a.m.  We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record.  The time is 10:41 a.m.

BY MR. ROSEN-SHAUD:

Q.    All right.  Chief Sullivan, the last incident report that you reference in your declaration is dated February 1st, right?

A.    I believe so, yes.

Q.    Have you reviewed any incident reports from the ICE facility since February 1st?

A.    I don't believe I have, no.

Q.    So you have no basis for saying whether protests since February 1st have been more violent, less violent, or about the same than the protests earlier in the year?

A.    So I see situation reports.  I don't see -- but you made reference to incident reports.  So I see the post shift reports.

TIMOTHY SULLIVAN                February 10, 2026                53
93884

Q.    Gotcha.  Okay.  What is the CBP policy on using tear gas and chemical munitions?

A.    So, and there's two different manners in which they can be deployed; area saturation, meaning just that, saturating the area around an active resistance subject, or if it's kinetic impact it's assaultive.  You're responding to an assault.

Q.    And so like in what circumstances are you, you being CBP officers, authorized to use tear gas and other chemical munitions?

A.    Just that, in -- if it's an active resistant subject or in active resistance, agents and officers are authorized to deploy munitions, or any less-lethal device.

Q.    To what extent do you consider the surroundings that officers find themselves in?

A.    Can you say that again?

Q.    Yeah.  To what extent does the policy require officers to consider the surroundings that they're in when deciding to use chemical munitions?

A.    I don't believe surroundings are taken into account, other than you're -- you're dealing with the immediate -- in front of you.

Q.    Does the policy take into account the presence of bystanders?

A.    I'd have to look at the policy.  I don't recall.

Q.    Do you recall if the policy considers the presence of children or elderly folks in the environment?

A.    You should -- it states you should not -- should not deploy when -- against children or elderly.

Q.    Are you aware that there were children and elderly folks in the crowd on Saturday January 31st when tear gas was used at the Portland ICE facility?

A.    I am not.

Q.    To what extent does the policy on using chemical munitions consider people with medical conditions being present at the time?

A.    I don't know if that is covered in the policy.  I'd have to review it.

Q.    Does the policy consider the severity of criminal activity that's happening in determining whether chemical munitions are appropriate to use?

A.    Just active resistance.

Q.    If you knew that you were going to be in a place where you might be exposed to tear gas, what would you do?

A.    Repeat the question?

Q.    If you knew you were going to be in a place where tear gas might be used, what would you do?

A.    Who am I speaking as?

Q.    As yourself.  What would you do to prepare if you knew you were going to be in a place where tear gas might be used?

A.    In my official capacity, or as a member of the public?

Q.    You can answer it both ways.

A.    As a member of the public, I wouldn't go, but as -- as -- in my official capacity, I would have my protection equipment with me.

Q.    What types of protection equipment?

A.    Gas mask.

Q.    The residents of Gray's Landing, the apartment building, don't have the option of not going to the place that the tear gas is used, right, because it's right outside of their apartment?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  Repeat the question, please?

BY MR. ROSEN-SHAUD:

Q.    The residents of the Gray's Landing apartment building don't have the option of not

going to the place where the tear gas is going to be used because it's being released right outside of their apartments, right?

A.   But they have the option of contacting Portland police to respond and prevent a protest from becoming violent.

Q.   What efforts have you undertaken in your role as the official in charge of CBP -- CBP folks to prevent the use of tear gas in that way?

A.   Repeat that, please?

Q.   Have you undertaken any actions like that, like what you just suggested, to prevent the use of tear gas at the Gray's Landing -- or at the Portland ICE facility?

A.   We are reactive to the -- the situation that is presented to us, so if there is a peaceful protest, there is no reason to deploy tear gas.  If it becomes resistant or volatile, the agents and officers respond to what they perceive as a threat, and they respond accordingly.

Q.   I'd like to go back to the question asked a minute ago.  I don't think I got a complete answer to it.  The people who live at the Gray's Landing apartment complex, right across the street from the Portland ICE facility, they don't have the option of

not being in the place that tear gas is used, right, because it's been repeatedly deployed right outside of their homes?  Is that right?

MR. HOLT:  Objection, speculation. Objection, speculation, asked and answered.

You can answer.

THE DEPONENT:  The tear gas has been deployed in response to hostile protests.

BY MR. ROSEN-SHAUD:

Q.  And there's nothing that the Gray's Landing apartment residents can do about being caught in the crossfire, is there?

MR. HOLT:  Objection, speculation.

THE DEPONENT:  They can request Portland PD to respond and -- and quell some of that hostility.

BY MR. ROSEN-SHAUD:

Q.  Do they have the same option that you said you would take a moment ago as a member of the public?  You said you would just not go to the place where tear gas was used, and I'm just trying to say the residents of the Gray's Landing apartment complex don't have that option, do they?

A.  I don't know that.

Q.  Would you send one of your CBP officers

outside of the Portland ICE facility without a gas mask if you knew tear gas might be used?

A.    I myself have gone outside of the Portland ICE facility without a gas mask when tear gas was used.

Q.    Would you send out one of your CBP officers in that situation without a gas mask?

A.    I would not direct them.

Q.    Do you remember that DHS had to call an ambulance after an officer was exposed to chemical munitions at the Portland ICE facility in the fall?

A.    I do not recall.

Q.    Couple last questions.  Do you have a medical degree?

A.    I do not.

Q.    Do you have a science degree or anything related to the environment?

A.    I have a bachelor of science.

Q.    In what?

A.    In criminal justice.

Q.    Those are all the questions that I have for you today, Chief Sullivan.

A.    Okay.  Appreciate you.

Q.    Thank you.

MR. HOLT:  Can we take a 10-minute recess

TIMOTHY SULLIVAN                    February 10, 2026                    59
93884

to determine whether we want to do any redirect?

MR. ROSEN-SHAUD:  Sounds good.

MR. HOLT:  Thank you, Counsel.

THE VIDEOGRAPHER:  Please stand by.  The time is 10:50 a.m.  We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record. The time is 10:59 a.m.

MR. HOLT:  And we have no redirect, no further questions.

MR. ROSEN-SHAUD:  Okay.  Well, I think that's all, Chief Sullivan.  I do appreciate your time today, thank you.

THE DEPONENT:  Appreciate you.

THE VIDEOGRAPHER:  Please stand by.  All right, just a moment.  This is the end of the deposition of Timothy Sullivan.  The court reporter will now take the orders for the transcript.

THE REPORTER:  Mr. Rosen-Shaud, you would like the original?

MR. ROSEN-SHAUD:  Yes, please.

THE REPORTER:  And to confirm, you want it by tomorrow?

MR. ROSEN-SHAUD:  Tomorrow at 10:00 a.m. Pacific time is when we need it.  We would happily

TIMOTHY SULLIVAN                February 10, 2026                    60
93884

take it sooner.

THE REPORTER:  Okay, thank you.

And Mr. Holt, would you like to order a copy?

MR. HOLT:  Yes.

THE REPORTER:  Okay, great.  And Mr. Landis, do you want to take orders for the video?

THE VIDEOGRAPHER:  Yes.  So Mr. Holt, Mr. Rosen-Shaud is getting the video of today's deposition.  Would you like to order a copy of today's video?

MR. HOLT:  Yes.

THE VIDEOGRAPHER:  Okay.  The time is 11:01 a.m. and we are off the record.

THE REPORTER:  Okay.  I also have Ms. Deffebach.  Would you like to order a copy of the transcript?

MS. DEFFEBACH:  I think -- I defer to Brian.  We're all co-counsel, so I don't know that we necessarily need a separate copy, but can I let you know if we later decide that we do need a separate copy?

THE REPORTER:  Absolutely.  So co-counsel is Deffebach of Mr. Holt?  Am I correct on that?

MS. DEFFEBACH:  No, I'm co-counsel of Mr.

TIMOTHY SULLIVAN                February 10, 2026                    61
93884

Rosen-Shaud, I represent the plaintiffs.

THE REPORTER:  Oh, okay.  And what about Ms. Kathleen Jacobs?

MS. JACOBS:  No, thank you.  None for me.

THE REPORTER:  And who do you represent?

MS. JACOBS:  Defendants.

THE REPORTER:  Okay.  And Ms. Brooke Jenkins?

MS. JENKINS:  Not for me, and I represent the defendants.

THE REPORTER:  Thank you.  And Ms. McDonald?

MS. MCDONALD:  No, and I represent defendant Customs and Border Protection.

THE REPORTER:  Okay, great.  Thank you very much.

(WHEREUPON, the remote streaming videotaped deposition of TIMOTHY SULLIVAN was concluded at 11:01 a.m.)

CERTIFICATE

I, the undersigned Jeremy Landes, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Timothy Sullivan, in the above captioned matter on the 10th day of February, 2026 taken at the location of 475 K Street NW, Unit 1118 in Washington, DC.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

Jeremy Landes

TIMOTHY SULLIVAN                    February 10, 2026                    63
93884

CERTIFICATE


I, Jennifer Mariano, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.


I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.


IN WITNESS HEREOF, I have hereunto set my hand this 11th day of February, 2026.


Jennifer Mariano

Certificate No. 602786

TIMOTHY SULLIVAN                    February 10, 2026                    64
93884

Date:         February 10, 2026    Assignment #: 93884

Deponent:  Timothy Sullivan

Case:        REACH Community Development vs. US DHS


ATTORNEY - TRANSCRIPT ENCLOSED:

signature of your client is required.  Please have

your client make any corrections necessary.

Sign the Correction Sheet where indicated.  Forward

a COPY of the executed Correction Sheet directly to

the attorney(s) listed below.  (The Address(es) can

be found on the Appearance page of the deposition.)


Also, send a COPY of the executed Correction Sheet

to our corporation.


CC:  Naegeli Deposition and Trial
     Brian C. Rosen-Shaud, Esquire

TIMOTHY SULLIVAN                February 10, 2026                    65
93884

CORRECTION SHEET

Deposition of: Timothy Sullivan    Date: 02/10/26

Regarding: REACH Community Development vs. US DHS

Reporter: Mariano/Breezee

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet on the line provided.

Page    Line    Reason for Change

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

            Signature: _____

                    Timothy Sullivan

Email to: Production@NaegeliUSA.com

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

DECLARATION

Deposition of: Timothy Sullivan    Date: 02/10/2026

Regarding: REACH COMMUNITY DEVELOPMENT vs U.S. DHS

Reporter:  Jennifer Mariano

_____


I declare under penalty of perjury the following to be

true:


I have read my deposition and the same is true and

accurate save and except for any corrections as made

by me on the Correction Sheet herein.


Signed at _____, _____

on the _____ day of _____, 20____.


                    Signature: _____

                              Timothy Sullivan

Email to: Production@NaegeliUSA.com

**NAEGELI** | **(800) 528-3335**
DEPOSITION & TRIAL | NAEGELIUSA.COM

### Exhibits

**EX001 USB OF VI DEO** 32:10,15,18 33:18,21 34:4 37:8,16

**EX002 USB OF VI DEO** 38:19,24 39:24 40:22 42:14,17 43:1,4

**EX0046 USB OF VIDEO** 44:11,12

**EX0056 USB OF VIDEO** 46:13,15, 17

**EX0057 USB OF VIDEO** 47:5,8,10 49:3,10,15 50:22 51:4

**EX0ECP46 SUPE RSEDING MOTIO N**

### 1

**1** 32:10,15,18 33:18,21 34:4 37:8,16

**10** 33:19 51:1

**10-minute** 58:25

**10:00** 59:24

**10:06** 43:25 44:3

**10:29** 52:7

**10:41** 52:10

**10:50** 59:5

**10:59** 59:8

**10th** 7:8

**11** 21:9,11 24:13

**11:01** 60:14

**12** 24:14,15

**13** 25:9,21 40:20

**16** 40:21 42:15

**18** 43:2,3

**1st** 46:6,10,24,25 52:14,17,20

### 2

**2** 33:18,23 34:3 36:22,24 37:3,18 38:19,24 39:24 40:22 42:14,17 43:1,4

**20** 39:19 42:16

**2024** 19:8

**2025** 28:14

**2026** 7:9 28:18

**22nd** 28:18

**27** 49:10

**27:13** 49:14

**27:30** 49:11,13

**28** 50:15

**28:32** 50:17

### 3

**3** 33:19 34:6 36:23 46:14

**30** 33:18 36:24 37:4 47:6 49:11, 12

**300** 11:10

**303** 12:25

**30th** 44:7

**31st** 45:9,11 46:2 54:10

**35** 43:2

### 4

**4** 47:6

**40** 33:24 36:23 39:20

**41** 34:3 37:18

**46** 21:7 23:16,18 24:13,16 25:10 44:11,12

**4th** 32:7 38:12,16 41:23

### 5

**5** 38:20 48:25

**50** 8:15

**55** 50:16

**56** 46:13,15,17

**57** 47:5,8,10 49:3, 10,15 50:22 51:4

### 6

**6** 19:8 39:19,20 46:14

**6:30** 46:23

### 7

**7** 38:20 47:6

**7:00** 46:24

### 9

**9:08** 7:8

### A

**a.m.** 7:8 43:25 44:3 52:7,10 59:5,8,24 60:14

**Absolutely** 60:23

**account** 53:22,24

**acting** 14:25

**actions** 56:11

**active** 53:5,11,12 54:21

**activity** 54:19

**address** 27:14

**adjacent** 26:20

**advised** 28:7

**afar** 9:8

**affirm** 7:20

**affirmed** 8:2

**afternoon** 32:6

**agencies** 13:25 14:23

**agency** 22:9

**Agent** 8:19

**agents** 13:8 14:9, 17 41:14 53:12 56:18

**agree** 35:21

**aiming** 45:17

**air** 12:25 13:1,13

50:11 51:8

**ambulance** 58:10

**answering** 10:10

**apartment** 26:7 27:3,11,18,23 28:20 29:18,21, 25 30:2,6,12,16 31:9,18 39:4 40:25 41:3 45:11 46:1 55:17,19,25 56:24 57:11,22

**apartments** 56:3

**Apologies** 10:24

**apologize** 36:23

**appeared** 33:1,7 48:15 49:22 51:14

**appears** 25:5,14 37:13 41:21 49:5, 7

**approximately** 11:10

**area** 39:13 53:4,5

**arrived** 20:1,6

**assault** 53:7

**assaultive** 53:7

**assigned** 18:2

**assumes** 47:1

**attached** 11:10

**attempt** 39:11

**attorneys** 11:20, 22

**audio** 10:20

**authorized** 53:9, 13

**aware** 9:10 16:6 19:25 20:4,5,12, 17 26:7,10 27:2, 13,17,23 28:4,6, 12,19 29:6,7,16, 20,24 31:22 32:1 45:10,12 54:9

**awareness** 45:24

---

**B**

**bachelor** 58:18

**back** 18:3 26:2 33:17 40:19 41:19 42:13 48:24 49:8,13 50:14 51:1 56:21

**ball** 12:19

**Bancroft** 37:15 41:2 42:2,5

**barricades** 23:7

**based** 24:19

**basis** 20:20 31:2 45:13 52:19

**began** 44:16

**beginning** 7:9 33:18

**bit** 52:1

**blindness** 19:16

**blinking** 43:8

**blocked** 23:1

**blow** 16:19

**blue** 44:15,20 45:3

**border** 8:17 13:25 14:4,12,20,21 61:14

**bottom** 25:21

**break** 10:9,12 51:19,24

**breaking** 45:20

**Brian** 7:15 8:8,22 60:19

**briefly** 11:18

**bring** 42:13

**broke** 45:10

**Brooke** 61:7

**building** 18:2,3,6 23:2 24:3,7 25:5, 20 26:7,8,11,21 27:10,11,15,19, 24 28:20 30:17 31:17,19 37:14 39:4 40:25 41:4 44:16 45:17,23 46:1 50:4 55:17, 25

**buildings** 14:15 50:3

**Bureau** 23:1

**bystanders** 53:25

---

**C**

**call** 8:20,22 12:9 58:9

**called** 14:14,22 26:11

**calls** 29:3

**camcorder** 39:15 40:12

**camcorders** 22:18

**camera** 33:12 34:7 37:24 41:18 51:12

**cameras** 22:17,18

**canister** 33:8,10, 24 34:10,20 35:25 36:5 37:5

**canisters** 32:19 33:3

**capacity** 55:8,12

**Capsicum** 12:7

**caption** 7:10

**cars** 42:19

**case** 7:10,16 9:18 28:18 29:1,11,24 31:23 32:2

**caught** 57:12

**CBP** 9:6 12:3,18, 23 13:19,24 14:3, 9,17 15:1,11,17, 23 27:9,17,22 28:4 31:10 38:15 39:6 45:24 46:6, 24 53:1,9 56:8 57:25 58:6

**CBP's** 8:24

**CDC** 19:1,12

**center** 19:1 25:13

**chance** 35:7

**charge** 56:8

**chemical** 13:7,8 14:10,18 15:12, 18,24 17:11 18:25 19:5,7 30:10 32:25 33:3, 5 35:8 37:10 38:13 46:6 48:17

49:24 50:8 53:2,
10,20 54:14,20
58:10

**chemicals** 16:17
17:1 27:9

**Chief** 8:19,20
10:25 11:1 37:6
44:5 52:12 58:22
59:12

**children** 29:17,
21,25 30:5 54:4,
7,9

**chose** 35:15

**circling** 43:6

**circumstances**
53:8

**clarifying** 11:6
25:25

**clear** 34:12,20
35:3 36:12,13,16
38:3 39:7 41:4

**clearing** 35:9,22
36:8 41:10

**close** 37:23 43:2
50:16

**closest** 37:24

**clothing** 17:25

**clouds** 51:10

**co-counsel**
60:19,23,25

**commonly** 12:7,
14

**Community** 7:11

**complaining**
27:19,24 28:20

**complaint** 28:10,

11,24

**complaints** 28:12

**complete** 56:22

**completely** 39:12

**complex** 27:3
29:18,21 30:1,3,6
31:9 56:24 57:23

**compound** 33:14
47:2

**compressed**
12:25 13:1,13
50:11 51:7

**conditions** 54:15

**confirm** 9:22
43:17 59:22

**conservative**
20:7,13 21:3,16,
24

**conserve** 20:7

**considers** 54:3

**consistent** 14:5
16:2

**contact** 20:16
21:5

**contacting** 56:4

**continue** 34:2

**control** 19:2 46:7

**Cool** 10:14 12:15

**copy** 60:4,10,16,
20,22

**correct** 9:14 12:5,
21 13:18 14:2
15:22 16:4 26:14
28:22 38:18 39:5
41:21 44:9 46:11
60:24

**Counsel** 7:12
8:23 10:2,6,18
11:4 51:17 59:3

**counter** 46:4

**couple** 18:15
28:25 50:15
58:13

**court** 10:21 23:15
59:17

**courtroom** 9:24

**covered** 54:16

**criminal** 54:19
58:20

**crossfire** 57:12

**crowd** 39:2 41:15,
18 46:7 47:12
49:17,21 54:10

**CS** 12:12,16 32:5,
19

**curious** 35:21

**cursor** 49:1 50:18

**Customs** 61:14

---

**D**

**dangerous** 16:6

**dangers** 31:22
32:1

**date** 7:8 19:7
28:19 29:8 44:24

**dated** 52:14

**dates** 19:23

**Daviscourt** 24:19

**day** 18:1 22:5,6,
24 23:5,22 24:3
45:9 46:9

**dealing** 53:22

**death** 19:19

**December** 28:12,
14

**decide** 60:21

**deciding** 53:20

**decision** 35:13

**declaration** 10:16
11:9,11 13:14
14:3 28:17,18,25
29:11,23 32:5
38:11,15 41:22
42:3,9 44:6 46:5
52:14

**defend** 14:15

**defendant** 61:14

**defendants** 7:18
61:6,10

**defer** 60:18

**Deffebach** 60:16,
18,24,25

**define** 31:12,14

**degree** 58:14,16

**deny** 20:20 21:2

**Depending** 13:23

**deploy** 13:3,20
50:8 53:13 54:7
56:17

**deployed** 32:19,
22 38:16 41:8
53:4 57:2,8

**deploying** 14:18
15:12,18

**deployment** 20:4
41:16

**deployments** 32:24 33:3

**DEPONENT** 15:9 20:24 21:20 23:25 24:6 26:19 27:5,13 28:3 29:5,20 30:19 31:6,12 33:16 34:15,23 36:2,10 37:7,13 38:6 40:17 41:7 43:14 44:23 47:3 48:5 50:2 55:21 57:7, 14 59:14

**deposed** 9:15

**deposition** 7:9 10:15 11:17 12:1 59:17 60:10

**designated** 46:13

**details** 9:5

**detecting** 10:23

**determine** 59:1

**determining** 54:19

**Dev** 7:11

**device** 39:16 40:13 53:14

**devices** 13:15

**DHS** 7:11 31:23 32:2 39:1,7 41:18 43:12 44:15 46:20 48:16 49:23 58:9

**diagonally** 26:8

**direct** 58:8

**disconnected** 43:21

**discuss** 9:21

**discussed** 13:11

**discussing** 28:9

**Disease** 19:1

**displayed** 19:2

**displaying** 21:7

**dispute** 45:13

**disputing** 30:8, 14,19,25

**disrupt** 14:4

**disrupting** 15:14, 20

**distance** 26:19,25 33:12 50:13

**document** 21:7,9

**documents** 11:25

**dose** 19:15

**dozen** 47:13 48:13,18 49:18, 20

**driveway** 23:4 32:20 33:11,25 34:12,21 35:3,9, 23,24 36:7,8,12, 13,16 37:20,24 38:3 39:8 41:4, 11,13 42:19 44:20 45:4,6

**drone** 42:22,24 43:10,12 46:3,4

**drones** 31:17

**dropping** 13:16

**duly** 8:2

**duties** 18:2 23:22

**E**

**E-STAR** 10:17 11:10,24

**earlier** 46:4 52:22

**early** 19:22 20:6, 12

**ECF** 21:7 23:16, 18 24:13,15 25:9

**effects** 16:14 17:10,16,19,23 19:16

**efforts** 56:7

**EI** 9:8

**elderly** 54:4,8,10

**eliminate** 34:19 35:1,19

**employed** 8:16, 17

**end** 19:22 33:8,9 44:20 45:20 47:16 59:16

**enforcement** 13:24 14:6,23 15:4 16:2,5 22:9 31:20

**ensure** 14:5

**ensuring** 16:1

**entire** 23:1 44:10

**entrance** 26:13

**environment** 54:5 58:17

**equipment** 55:13, 14

**evening** 41:23 44:6

**evidence** 29:3 47:2

**exact** 29:8

**EXAMINATION** 8:5

**examined** 8:3

**exhibit** 23:11,18 32:10,15,18 33:18,20,21 34:4 37:8,16 38:19,24 39:24 40:19,22 42:14,17 43:1,4 44:11,12 46:13, 15,17 47:5,8,10 49:3,10,15 50:22 51:4

**exit** 42:19

**exited** 44:15,18 45:6

**experiencing** 27:20,24 30:9,15

**exposed** 16:7,8, 10,16 17:1,2,6, 18,21 18:14,17, 19,20 27:20 54:23 58:10

**exposure** 19:14, 15 27:25 28:13, 21

**extent** 53:15,18 54:13

**eyes** 16:15,21

**F**

**faces** 26:2

**facility** 8:25 9:3,7 13:21 14:11,16, 19 15:13,19,25

17:8 20:9,15 22:4,11 23:5 26:6,9,13 32:7,20 33:11,25 34:12, 21 35:4,10,23,24 36:7 37:21,25 38:4 39:2,8 41:5, 20 42:20 44:8,19 45:7 46:8 48:17 49:6,24 50:8 51:11 52:17 54:11 56:14,25 58:1,4,11

**fact** 19:1,5,7

**facts** 29:3 47:1

**failure** 19:18

**fair** 13:17 18:22, 24 25:6 30:25 51:6

**fall** 58:11

**familiar** 14:7 21:17,25

**February** 7:8 46:6,10,24 52:14, 17,20

**federal** 14:15 45:25

**feel** 16:14 17:9 18:8,10

**feeling** 17:18,22

**feet** 26:12,23 35:25 36:6

**felt** 17:16

**Field** 14:1

**figure** 25:13

**filed** 28:11,24 33:9

**fill** 34:7

**filled** 33:12

**find** 53:16

**finish** 10:10

**finished** 15:7

**fired** 33:10,16,24 34:10 35:2 36:17 37:10 38:3,13 45:23

**firing** 44:16

**fit** 31:15

**fix** 43:23

**flanks** 23:6

**floor** 25:19,20

**flying** 31:19

**FN** 12:25

**focused** 22:16

**folks** 20:18,21 21:3 22:17 49:1 54:4,10 56:8

**force** 34:17

**forced** 40:10

**foundation** 26:16 27:4 28:2 29:3,19

**FPS** 14:14

**front** 9:24 23:1 25:23 26:1,3 27:14 37:14 39:3 40:24 41:13,17 53:23

**frozen** 43:20

**G**

**gap** 33:2

**gas** 12:12,14,15, 16 14:10 15:12, 18,24 16:6 17:10, 23 18:5,9,14,19 19:12,15 22:23 27:9,20,25 28:13, 21 30:10,16,23 32:6,19,22 34:8, 10 35:24 36:5 38:16 40:24 41:2, 8,17 42:5 44:6,16 46:19,24 51:10 53:2,9 54:11,23 55:2,7,15,18 56:1,9,13,17 57:1,7,21 58:1,2, 4,7

**gate** 44:19

**gave** 22:8,10

**give** 7:22

**good** 7:14,17 8:10 11:2 47:21 52:3 59:2

**Gotcha** 22:23 23:3 48:3 53:1

**government** 10:3, 6

**Gray's** 26:11 27:18,23 28:20 29:17,25 30:5,9, 14 31:8 39:4 40:25 41:3 45:11 46:1 55:16,24 56:13,23 57:10, 22

**great** 8:22 10:8 48:7 52:4 60:6 61:15

**green** 43:8

**grenades** 12:19

**ground** 9:12

**group** 24:11 48:12

**Guard** 20:3

**guess** 18:12 22:1 37:14 39:21

**gun** 33:10,25

**H**

**hair** 50:25

**half** 32:10,17

**hand** 7:20 13:17 39:16 40:5 50:12

**happen** 23:22 39:14 42:22

**happened** 17:1, 14,17 44:23

**happening** 54:19

**happily** 59:25

**happy** 9:21 23:14 31:14 47:17 48:7, 24 51:21

**head** 22:9 40:7

**hear** 35:14 47:18, 25 48:1,2

**hearing** 47:14

**highlight** 39:22 49:1 50:18

**highlighting** 19:4

**hitting** 32:14

**Holt** 7:17,18 10:3, 18 11:3,6 20:22 21:18 23:24 24:4 26:16 27:4,12

28:1 29:2,19 30:18 31:4,11 33:14 34:14,22 36:1,9 37:12 38:5 40:16 41:6 43:13, 19,22 44:22 47:1, 15,19 50:1 51:17, 19,25 52:5 55:20 57:4,13 58:25 59:3,9 60:3,5,8, 12,24

**homes** 31:9 57:3

**honest** 22:14

**hosted** 20:8,14

**hostile** 39:12 57:8

**hostility** 57:16

**hour** 18:14,17

**hours** 18:23

**human** 14:4 15:15,20

**hundred** 26:12,23 35:25 36:6

## I

**ICE** 8:25 9:7 13:21 14:10,19 15:13,19,25 17:8 18:2,3,5 20:9,14 22:4,11 23:2,4,7 25:5,19 26:6,9, 13,20 27:14 31:19 32:7,20 33:11,25 34:12, 21 35:4,9,23,24 36:7 37:14,20,25 38:4 39:2,8 41:5, 19 42:20 44:8,19 45:7 46:7 48:17 49:6,24 50:3,8

51:11 52:17 54:11 56:14,25 58:1,4,11

**idea** 47:22

**identification** 23:19 46:16 47:9

**immigration** 14:6 16:2

**impact** 53:6

**incident** 9:2,6,9 51:15 52:13,16, 24

**incidents** 8:24

**including** 15:18 20:9,15

**individual** 31:23 32:2

**influencer** 21:16, 25

**influencers** 20:8, 14 21:4

**information** 31:16

**initially** 29:6

**Injunction** 21:8

**injuries** 30:15,22

**inside** 17:13 18:5

**intent** 35:22 45:21

**interim** 17:24

**internet** 52:1,2

**introduce** 7:12

**iphone** 22:18

**issue** 47:15

## J

**Jacobs** 61:3,4,6

**January** 28:18 44:7 45:9,11 46:2 54:10

**Jenkins** 61:8,9

**job** 8:18 23:22

**judge** 9:25

**jump** 48:24 49:8 50:14

**jumping** 49:10

**justice** 58:20

## K

**Kathleen** 61:3

**Katie** 24:19

**kinetic** 53:6

**knew** 54:22 55:1, 6 58:2

**knowledge** 31:5

## L

**lack** 26:16 27:4 28:1 29:2,19 31:4

**land** 37:20,23

**landed** 33:12

**Landing** 26:12 27:18,23 28:20 29:18,25 30:5,9, 14 31:8 39:4 40:25 41:3 45:11 46:1 55:16,24 56:13,23 57:11, 22

**Landis** 43:17 60:7

**lands** 37:19

**laptop** 48:6

**large** 19:15

**lasting** 19:14

**launch** 13:15 34:17 35:13,15

**launched** 31:17 34:1 35:8,18,20 37:5 50:10

**launcher** 12:24 13:2 50:11 51:7,8

**launchers** 12:25 13:13,15,20

**law** 13:24 14:23 15:4 16:5 22:9 31:20

**laws** 14:6 16:2

**lead** 19:18

**learned** 28:23

**left** 21:13 24:19 51:12

**less-lethal** 53:14

**life** 14:16

**lights** 43:8

**litigation** 9:18

**live** 29:17 30:5 56:23

**lives** 30:2 46:20

**living** 45:25

**location** 17:24

**long** 16:25 17:9 19:14 33:11

**longer** 43:18

**longest** 18:18

**lose** 52:3

**lot** 18:20

---

**M**

**made** 9:10 29:6,7 33:4 35:12 52:24

**make** 10:22,24 11:4 13:1

**making** 31:3

**man** 21:15 39:14 42:8,10

**man's** 21:23

**manners** 53:3

**mark** 23:10

**marked** 23:18 46:16 47:5,9 49:9

**mask** 55:15 58:2, 4,7

**Mcdonald** 61:12, 13

**meaning** 53:4

**meant** 36:24

**measured** 27:1

**media** 20:7,8,13, 14,16 21:3,4,5, 16,24 22:12

**medical** 54:14 58:14

**meet** 8:7 11:16,19

**meeting** 11:22 22:9

**member** 55:8,11 57:19

**members** 20:6,13 22:12

**men** 21:10 25:22 26:3

**mention** 38:12 41:23 42:1,4,7

**mentioned** 11:8 13:13,14 46:4

**met** 11:18

**middle** 10:11

**minute** 38:20 39:19 40:20,21 42:15,16 49:10 56:22

**minutes** 9:11 17:12,17,22 18:15,22 32:10, 18 33:18,19,23 34:3,6 36:22,23, 24 37:3,18 39:19, 20 43:2 46:14 47:6,7 48:25 49:12 50:16

**mission** 14:22,24, 25

**model** 13:1

**moment** 14:19 57:19 59:16

**moments** 16:3

**monitoring** 9:8

**month** 9:13

**months** 14:11 16:1

**morning** 7:14,17 8:10

**Motion** 21:8

**mouse** 39:21 49:1 50:18

**move** 51:20

**movements** 31:20

**moving** 39:2 49:2

**Multiple** 32:19,24

**munition** 13:14, 15 17:11 35:2,8 36:17 37:10,19 38:3,13,14 45:10, 18,20,22 50:11, 19

**munitions** 12:4, 22 13:4,8,9,20 14:10,18 15:3,12, 18,24 30:11 32:25 33:4,5 46:6 48:18,19 49:24 50:4,8,19 51:7 53:2,10,13,20 54:14,20 58:11

---

**N**

**named** 21:15

**National** 20:3

**necessarily** 60:20

**networks** 14:5 15:15,21

**nice** 8:7

**Nick** 21:15,24 22:2

**night** 38:16 46:25

**Noem** 22:5,7,24 23:23

**non-lethal** 12:4, 22 13:9

**normal** 23:22

**northwest** 26:20

**nose** 16:15,19

**notice** 39:14 42:10,22,24 48:23

**November** 19:23

**numbered** 47:13 48:13

**numerous** 17:2

---

**O**

**oath** 9:23

**object** 10:3 40:5 43:6

**Objection** 20:22 21:18 23:24 24:4 26:16 27:4,12 28:1 29:2,19 30:18 31:4,11 33:14,15 34:14, 22 36:1,9 37:12 38:5 40:16 41:6 43:13 44:22 47:1 50:1 55:20 57:4, 5,13

**OC** 12:6 13:6

**occasion** 17:10 41:11

**October** 9:13 17:5,7 20:6,12 32:6 38:12,16 41:23

**Office** 14:1

**officer** 34:16 35:2 36:4 38:2 58:10

officers 13:19 15:1,11,17,23 26:1 27:9 31:10, 24 32:3 39:1,7 41:18 42:1,4 44:15,18 45:25 46:20,21 48:16, 21 49:23 50:7 53:9,13,16,19 56:19 57:25 58:7

official 27:17,22 28:4 55:8,12 56:8

Oleoresin 12:7

ongoings 22:10

operated 43:12

operational 22:8

Operations 14:1

option 55:17,25 56:4,25 57:18,23

order 60:3,10,16

orders 59:18 60:7

ordinary 23:21

original 59:20

outlets 20:7,13 21:4

oversee 8:24

overview 22:8,10

P

p.m. 46:24

Pacific 59:25

pages 11:10

part 22:13 36:19 41:22 45:2 50:19

partners 15:4

16:5

party 9:17

Paso 9:9

past 39:3,4 41:3

path 34:20 35:3 39:7

Patrick 8:13

Patrol 8:17,19 13:25

pause 9:21 10:19 37:4

PAVA 13:5

PD 57:15

peaceful 56:16

pedestrian 23:2

penalty 7:21

people 24:2,6,15 25:10 37:23 48:13,18 49:5,18, 20 54:14 56:23

pepper 12:8,9 13:6

pepperball 12:24

perceive 56:19

perceived 34:16, 17 35:5,12

perceiving 46:22

period 16:25 18:18

perjury 7:21

person 10:23 24:23 40:3 45:25

personal 31:5

phone 48:5

photo 26:4

physical 16:13 17:10

picture 21:10 24:15,25 25:11, 18,22

pin 11:2

place 54:23 55:2, 6,18 56:1 57:1,20

Plaintiff's 21:7 32:10,18 38:19 42:14 43:1 44:11 46:13,15 47:5,8 49:10

plaintiffs 7:15 31:23 32:2,4 61:1

plan 49:11

play 32:14 38:19 44:10 47:4

played 32:15 33:21 34:4 37:8, 16 38:24 39:24 40:22 42:17 43:4 44:12 46:17 47:10 49:3,15 50:22 51:4

playing 34:2

point 10:9 45:17

pointer 39:21 49:1

pointing 39:22 40:1,9

poisoning 19:12

police 22:25 56:5

policy 53:1,18,24 54:1,3,13,17,18

Portland 8:24 9:7, 12 13:21 14:11 15:13,19,25 19:21 20:3,8,14 22:4,25 23:4 26:13 32:7,20 34:12 36:6,7 37:20,25 38:4 39:2 41:5,19 42:20 45:7 46:7 48:17 49:6,24 50:8 51:11 54:11 56:5,13,25 57:14 58:1,3,11

pose 31:10

posed 31:23 32:2 41:14 45:25

possibility 34:19 35:1,20

post 24:19 52:25

powder 13:5,6

Preliminary 21:8

prepare 10:15 11:16,25 55:5

presence 53:25 54:4

present 11:21 22:12,24 54:15

presented 56:16

preservation 14:16

preserve 14:15

President 20:2

Press 25:14

prevent 56:5,9,12

primary 14:21

prior 44:24

procedure 9:21

proceed 8:1

projectile 33:10, 25

property 13:21 44:7

protect 46:20

protection 55:13, 14 61:14

protest 56:5,17

protestor 44:14, 19

protestors 23:3,8 34:13 39:12 40:10 42:2 47:12 48:12 49:17,25

protests 52:20,21 57:8

public 55:9,11 57:20

purpose 35:9 36:8

push 39:12

pushed 42:1

pushing 41:14

put 40:18

## Q

quell 57:15

question 10:5,11 15:8,11,16 20:23 21:21 24:5,7 34:23 36:11 37:5 47:18 48:8 49:19 54:25 55:21

56:21

questioning 10:2 51:22

questions 9:20 10:4 32:11 38:22 40:21 58:13,21 59:10

## R

raise 7:20

raised 40:7

REACH 7:10

reactive 56:15

ready 48:8

reason 21:2 35:2, 15,18,19 41:8,10 45:16,19,22 52:4 56:17

recall 17:4 18:7 23:25 28:16 29:12 54:2,3 58:12

recent 17:3

recess 44:1 52:8 58:25 59:6

recognize 21:9 24:14,20 25:2,3, 10,18,22 26:1

record 7:7 8:12 23:15 43:22,25 44:2 47:20 48:10 52:7,9 59:5,7 60:14

recording 39:15 40:13

red 43:8

redirect 59:1,9

refer 13:8 23:14, 16

reference 28:23 52:13,24

referred 12:7

referring 12:10, 16 13:10 28:8

refers 19:12

related 30:15 58:17

release 27:9

released 30:11,16 33:5 42:5,6 56:2

Releasing 41:2

relieved 18:8,10

remember 20:10 22:3,17,20,23 28:15 29:15 58:9

remove 44:7

repeat 15:16 20:11,24 21:20 27:21 30:13 34:23 36:2 44:17 47:17 48:8 54:25 55:21 56:10

repeatedly 57:2

report 51:15 52:13

reporter 7:19,25 10:21 15:6 23:10, 13,17 36:25 43:16 47:20 48:1, 4 59:17,19,22 60:2,6,15,23 61:2,5,7,11,15

reports 10:17 11:10,24 52:16, 23,24,25

represent 7:13, 15,18 61:1,5,9,13

request 57:14

requested 16:5

require 53:19

reset 52:2

residents 27:18, 23 28:13,19 30:8, 15 31:8 55:16,24 57:11,22

resistance 53:6, 12 54:21

resistant 53:12 56:18

respiratory 19:18

respond 56:5,19, 20 57:15

responding 53:7

response 8:24 9:6 57:8

result 19:19

review 11:9,25 54:17

reviewed 10:16 52:16

reviewing 11:8

rewind 50:25

road 40:9

role 8:23 56:8

roof 20:9,15 22:3 25:20 48:17,21 49:2,6,23 50:7

**room** 11:20

**Rosen-shaud**
7:14,15 8:6,8
11:5,7 15:7,10
21:1,22 23:12,13,
14,20 24:1,8
26:22 27:7,16
28:5 29:9,22
30:21 31:7,13
32:16 33:17,22
34:5,18,25 36:3,
14,25 37:2,9,17
38:10,25 39:25
40:18,23 41:9
42:18 43:5,15,21
44:4,13 45:1
46:18 47:4,11,17,
21,25 48:3,7,11
49:4,16 50:6,23
51:5,18,21 52:4,
11 55:23 57:9,17
59:2,11,19,21,24
60:9 61:1

**roughly** 26:14

**round** 33:4

**rubber** 12:19

### S

**Safe** 43:12

**Samuel** 7:17

**saturating** 53:5

**saturation** 53:4

**Saturday** 45:11
46:1 54:10

**science** 58:16,18

**screen** 19:2 32:13
33:13 37:1 40:19

**scroll** 19:10

**seconds** 33:19,24
34:3 36:23,24
37:4,19 39:19,20
43:2 47:6 49:11,
12 50:15,16 51:2

**secretary** 22:5,6,
16,24 23:23 24:3,
10

**secretary's** 24:11

**secure** 14:4

**securing** 14:12,
20,21

**seeks** 14:4

**seep** 27:10

**sees** 38:7

**send** 20:3 57:25
58:6

**separate** 60:20,
22

**September** 19:8,
22

**severe** 19:16

**severity** 54:18

**share** 32:13 42:25

**sheet** 19:1,5,7

**shift** 52:25

**shooting** 14:9
15:24

**short** 33:5

**shortly** 33:23

**shot** 35:24 36:5
48:17 49:24

**show** 18:25 21:6
32:9 33:18 36:22,
24 38:20 39:18
40:20 42:15

46:12,13 49:11

**showed** 39:1
40:24 47:12
48:12

**showing** 10:21
47:6

**shown** 21:10
24:15 26:2

**signed** 28:17,25
29:10,23

**significant** 9:2,6,
9

**Signs** 19:11

**Similar** 15:11

**similarly** 15:23

**site** 19:21

**situation** 28:7,8
52:23 56:15 58:7

**skimmed** 11:12

**smoke** 12:19 27:9
32:22 33:13 34:7

**smuggling** 14:4
15:15,20

**snotty** 16:15

**social** 20:7,13
21:4,16,24

**someone's** 13:17

**sooner** 60:1

**Sortor** 21:16,24
22:2

**sound** 14:7
21:17,25 26:14,
24

**sounds** 28:22
38:18 44:9 46:11
59:2

**speak** 34:15

**speaking** 55:4

**specific** 34:20
35:8,18 36:17
38:12,14

**speculate** 18:16

**speculation**
20:22 21:18
27:12 28:1 30:18
31:4,11 34:14,22
36:1,9 37:12 38:5
40:16 41:6 43:13
44:22 50:1 55:20
57:4,5,13

**spray** 12:8,9

**stand** 43:24 47:24
52:6 59:4,15

**standing** 24:23
25:3,18 26:3
35:23 44:14,19
45:3 48:16 49:23

**start** 9:22 37:3
41:18 48:25
49:13 50:17

**starting** 43:3
49:14

**state** 7:13 8:11

**states** 14:7 16:3
20:2 54:6

**stinger** 12:19

**stopped** 17:18,22

**store** 31:18

**street** 13:22 23:1
26:8 35:6,13,25
37:15,19 38:7
41:15,19 42:2,5
56:24

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**Street all**  41:2

**subject**  53:6,12

**suffering**  30:22

**suggest**  23:16

**suggested**  56:12

**suggesting**  35:21

**Sullivan**  7:10,19, 24 8:2,7,13,20 10:25 11:1 15:6 37:6 44:5 52:12 58:22 59:12,17

**Sullivan's**  43:16

**Sunday**  46:6,10, 24

**Superseding**  21:8

**support**  14:14,23 15:1,2

**supporting**  15:4 16:4

**surroundings**  53:16,19,21

**surveil**  31:19

**switched**  48:5

**symptoms**  19:11 27:20,24 30:10

**system**  12:24

**T**

**tactic**  39:6,9

**talk**  38:11

**talked**  13:9

**talking**  25:23 26:2

**talks**  41:22

**tear**  12:14,15 14:9 15:12,18,24 16:6 17:10,23 18:5,9, 14,19 19:12,15 22:23 27:20,25 28:13,21 30:10, 16,23 32:6 35:24 36:5 38:16 40:24 41:2,8 42:5 44:6, 16 46:19,24 53:2, 9 54:11,23 55:2, 7,18 56:1,9,13,17 57:1,7,21 58:2,4

**tells**  10:6

**temporary**  16:12

**term**  13:7

**testified**  8:3

**testimony**  7:21

**thing**  15:14

**things**  9:22 13:11 17:25

**thinking**  26:6

**threat**  13:23 27:14 31:10,12, 21 41:14 45:24 46:22 56:19

**threatened**  20:2

**thrown**  50:5,13

**time**  7:8 8:8 17:3 18:6,18 19:25 20:21 29:24 30:4 33:2,5 40:20 43:25 44:3,18,25 46:22 52:3,7,10 54:15 59:5,8,13, 25 60:13

**timed**  18:21

**times**  14:22 17:2

25:7

**Timothy**  7:10 8:2, 13 59:17

**title**  8:18

**today**  8:9 30:4 58:22 59:13

**today's**  10:2,15 11:17,25 60:9,11

**told**  21:15,23 26:23 30:5 40:12

**tomorrow**  59:23, 24

**traffic**  15:15 23:2

**trafficking**  14:5 15:20

**training**  18:21

**transcript**  59:18 60:17

**travel**  51:11

**traveled**  33:11

**trespassers**  44:7

**trouble**  47:14

**true**  45:14,15

**truth**  7:22,23 8:3 9:23

**Turning**  45:9

**type**  9:18

**types**  13:3,9 17:25 55:14

**U**

**U.S.**  8:17 13:25

**ultimately**  39:3

**uncomfortable**  16:11,12,13 18:13

**understand**  9:23 10:4 12:16 13:10 20:25 27:5,8 36:11

**understanding**  12:3,18

**undertaken**  56:7, 11

**United**  14:6 16:3 20:2

**untrue**  45:16

**usual**  24:2 39:6, 10

**V**

**vague**  23:24 24:4 26:17 33:15

**variety**  12:4

**vehicle**  23:2 38:8 45:8

**vehicles**  45:6

**versus**  7:11

**vest**  25:14 39:15 40:3 42:8,10

**video**  10:24 32:20 34:7 36:5,19 37:3,4 38:21 39:1,15,16,18 40:13,19,24 42:11,13,20,23, 25 43:17,18 44:10,24,25 45:2, 7 46:14,23 47:7, 12 48:12,25 49:9, 17 50:14 51:10

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

60:7,9,11

**view** 25:2,3

**violent** 52:20,21 56:6

**visited** 22:7 23:23 24:3

**volatile** 56:18

**volume** 46:19

---

**W**

---

**wait** 15:7

**Walked** 16:18

**walking** 41:18

**wanted** 11:3 35:3

**warehouse** 50:4

**wash** 16:21

**watch** 51:2

**watched** 34:11

**watching** 36:19

**Watery** 16:15

**ways** 55:10

**wearing** 25:14

**week** 29:13

**weeks** 28:25 29:10

**window** 45:10,20

**world** 38:2

**wrote** 14:3

---

**Y**

---

**year** 52:22

**years** 8:15

**yellow** 39:14 40:3 42:8,10

**yesterday** 11:18

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM