UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


REACH COMMUNITY DEVELOPMENT, et al.,

       Plaintiffs,

v.                   Case No. 3:25-cv-2257

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

       Defendants.

_____


REMOTE VIDEOTAPED DEPOSITION OF


ROBERTO CANTU


TAKEN ON

WEDNESDAY, FEBRUARY 11, 2026

9:14 A.M.


1000 SOUTHWEST THIRD AVENUE

PORTLAND, OREGON 97204



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

Nationwide

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

Powerful
LITIGATION SUPPORT



NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

ROBERTO CANTU                     February 11, 2026                          2
93885

REMOTE APPEARANCES


Appearing on behalf of all Plaintiffs:

ANNA L. DEFFEBACH, ESQUIRE

JEFFREY B. DUBNER, ESQUIRE

Democracy Forward Foundation

600 Pennsylvania Ave SE, Unit 15180

Washington, DC 20003

(202) 991-0159

adeffebach@democracyforward.org

j.dubner@democracyforward.org


Appearing on behalf of the Defendant:

KATHLEEN JACOBS, ESQUIRE

U.S. Department of Justice

1100 L Street NW

Washington, DC 20005

(202) 598-7615

kathleen.c.jacobs@usdoj.gov

ROBERTO CANTU                    February 11, 2026                        3
93885

REMOTE APPEARANCES CONTINUED


Appearing on behalf of the Defendant:

SAMUEL HOLT, ESQUIRE

U.S. Department of Justice

475 K Street NW, Unit 1118

Washington, DC 20016

(719) 322-8689

samuel.holt2@us.doj.gov


-and-


BROOKE D. JENKINS, ESQUIRE

U.S. Department of Homeland Security

2707 Martin Luther King Jr Ave SE

Washington, DC 20032

(771) 210-7535

brooke.jenkins@hq.dhs.gov


Also Present:

Austin Halvorsen, Naegeli Technician

ROBERTO CANTU                    February 11, 2026                         4
93885

EXAMINATION INDEX

                                                                    PAGE


EXAMINATION BY MS. DEFFEBACH                                           7

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

ROBERTO CANTU                    February 11, 2026                           5
93885

EXHIBIT INDEX

EXHIBIT                                                      PAGE


1        GOOGLE MAPS                                  58

2        DECLARATION                                  56

3        VIDEO                                        61

4        INSTAGRAM                                    65

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

REMOTE VIDEOTAPED DEPOSITION OF

ROBERTO CANTU

TAKEN ON

WEDNESDAY, FEBRUARY 11, 2026

9:14 A.M.

THE VIDEOGRAPHER:  The time is 9:14 a.m. The date is February 11th, 2026.  This is the beginning of the deposition of Roberto Cantu.  Case caption is REACH Community Development versus DHS.

Will Counsel introduce yourselves and state whom you represent?

MS. DEFFEBACH:  Hello, I'm Anna Deffebach on behalf of the Plaintiffs, and I'm joined by my colleague Jeff Dubner, also on behalf of all Plaintiffs.

MS. JACOBS:  I am Kathleen Jacobs on behalf of Defendants, and I'm joined by my colleague Samuel Holt on behalf of Defendants.

THE VIDEOGRAPHER:  Okay.  If there are no more introductions, the court reporter will now swear in the witness.

THE REPORTER:  Mr. Cantu, please raise your right hand.  Do you affirm under penalty of perjury that the testimony you are about to give

will be the truth, the whole truth, and nothing but the truth?

Mr. Cantu:  Yes, I do.

THE REPORTER:  Thank you.

THE VIDEOGRAPHER:  Counsel may proceed. ROBERTO CANTU, having been first duly affirmed to tell the truth, was examined and testified as follows:

EXAMINATION

BY MS. DEFFEBACH:

Q.    Good morning, Mr. Cantu.  I do want to first make sure I'm pronouncing your name correctly. Is it Cantu, like that?

A.    Yes, ma'am.

Q.    Okay, thank you very much.  As you just heard, my name's Anna Deffebach.  I'm one of the Counsel for the Plaintiffs in this case.  Are you represented by counsel today?

A.    Yes, I am.

Q.    And who is representing you today?

A.    Katie and Sam.

Q.    Is there anyone else in the room with you today?

A.    No.

Q.    Since we're doing this by Zoom, do you

agree to let me know if anyone else enters the room after the deposition begins?

A.    Yes.

Q.    And do you agree not to communicate with anyone in the room while I'm questioning you, by, for example, passing notes?

A.    Yes.

Q.    Is there anything open on your computer or phone screen aside from this video conference?

A.    No.

Q.    Do you have any messaging apps open on the phone that people could use to communicate with you?

A.    No.

Q.    Okay.  And are there any documents in front of you right now?

A.    No.

Q.    Have you ever been deposed before?

A.    Yes, I have.

Q.    How many times?

A.    Once.

Q.    Have you ever testified in court before?

A.    Yes, I have.

Q.    How many times?

A.    Once.

Q.    Since you've been deposed before and

you're probably a little familiar with this, I'll just give some very brief instructions.  Please only give verbal answers.  The court reporter is writing everything down, but she can't capture nonverbal responses.

If you don't understand any of my questions, please let me know and I will try to rephrase, or please feel free to ask me to repeat any of my questions.  If you answer the question, I will assume that you understood the question.  Is that okay?

A.   Yes, ma'am.

Q.   And finally, if at any point you need to take a break, a bathroom break or anything, please let me know.  The only thing I would ask is that if there's a question hanging out there, that you would please first answer the question and then we could take the break.

A.   Understood.

Q.   Do you understand that the oath that you just took is the same oath you would take if you were testifying in court?

A.   Yes.

Q.   Are you on any medications that affect your memory or your ability to testify today?

A.    No.

Q.    Is there any reason why you would be unable to testify truthfully today?

A.    No.

Q.    And Counsel for the government might object to some of my questions.  Do you understand that unless expressly instructed not to answer, you should nevertheless answer the question?

A.    Yes.

Q.    Did you do anything to prepare for this deposition today?

A.    Not today.

Q.    Did you do anything to prepare for today's deposition in the days or weeks leading up to today?

A.    Yeah, I read my deposition, yes.

Q.    You -- did you mean to say you read your declaration?

A.    My declaration, yes, ma'am, sorry.

Q.    Did you meet with anyone in preparation for this deposition?

A.    I have met with my Office of General Counsel and the Counsel that is here currently with me.

Q.    How many times would you say you met?

A.    I have met with my Office of General

Counsel probably about five times.

Q.    And when you met with your Counsel, was there anyone else present?

A.    Yes.  I don't know Michelle's last name, but yes, there was another -- another person from the Office of General Counsel that works with mine.

Q.    Okay.  Did you review -- other than the declaration that you just mentioned, did you review any documents in preparation for this deposition?

A.    Only -- only what's in my declaration.

Q.    And did you bring any documents with you today?

A.    No, ma'am.

Q.    Did you do anything else to prepare for today's deposition?

A.    No, ma'am.

Q.    Can you please state your job title?

A.    I am the Deputy Regional Director for the Federal Protective Service in Region 10.

Q.    And how long have you held that job?

A.    Since 2023.

Q.    Can you please provide an overview of your job duties?

A.    Yeah.  So Region 10 consists of four states, which is Alaska, Washington, Oregon, and

Idaho, and I essentially help run the day-to-day business of all protection for facilities -- excuse me -- all the federal facilities in Region 10 which is -- averages between 5 to 600 facilities.  So that includes the facility security committee meetings, facility security assessments, the protection of property, and the continuity of business for the federal government.

Q.    And you're not based in Portland, correct?

A.    No, ma'am.

Q.    How often do you travel to Portland?

A.    Quite often in the last nine months.

Q.    If I refer to the Southwest Portland ICE facility, do you understand me to be referring to the Lindquist Federal Building at 4310 South Macadam Avenue?

A.    Yes, ma'am.

Q.    So if there's a significant incident at the Southwest Portland ICE facility, you would know about it, right?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  No, not necessarily, because -- because there's -- there's so much consistent activity happening there, I cannot be there dealing with one facility for the entirety of

time.  So what we have is a rotation of incident commanders for the week, and they -- yeah, they -- through their leadership, they're the ones that -- that deal with that facility and the incidences at that facility for that reporting period.

So while I -- I -- if there is a -- an incident like -- like a negligent discharge or, you know, something of catastrophic results, I would be made aware, but for the most part the day-to-day business or activity there, I wouldn't -- if I'm not there in Portland, I would not be made aware of it, no.

BY MS. DEFFEBACH:

Q.    **So you wouldn't necessarily know the details of any response from FPS officers to an incident at the Southwest Portland ICE facility?**

MS. JACOBS:  Objection, speculation. Objection, vague.

THE DEPONENT:  Not always.  We do -- so every incident that does happen to include the use of force, any -- any type of use of force is captured in what's called a Spot Report, which you'll see them in my declaration.

I do get those emails daily, but again I am also dealing with 5 to 600 other federal

facilities and it's not just the Lindquist Building that -- that is seeing civil unrest, so I am managing several buildings and I get several Spot Reports from different areas.

I'm -- I get them.  I don't always have visibility on -- on what's happening there, you know, because they're very -- they're very frequent. The Spot Reports are very frequent.

BY MS. DEFFEBACH:

Q.    **What dates were you at the Southwest Portland ICE facility between June 2025 and now?**

A.    I -- I don't know specifically the dates. Those -- I would have to look at the rosters to see when I was there.  We do keep records of who's there and who the incident commanders are at those times. There are significant events that trigger my memory, you know, but not necessarily dates.

Q.    **Do you recall if you were at the ICE facility -- at the Portland ICE facility on June 12th?**

A.    I don't.

Q.    **What about June 24th?**

A.    I don't.

Q.    **July 4th?**

A.    4th of July... I don't know.  I can't --

ROBERTO CANTU                    February 11, 2026                    15
93885

I'm not certain.

Q.    Okay.    And I -- I did want to just clarify that I'm asking about 2025 in this line.    I think that's probably clear in the context.

A.    Yes.    Yes.

Q.    August -- August 18th, 2025?

A.    I -- I don't know.

Q.    September 1st, 2025?

A.    I don't know.

Q.    October 1st, 2025?

A.    That, I can tell you I was not.

Q.    Why can you tell me that?

A.    Because the significant date that I do recall is -- during my rotation was October 18th, and knowing that I was there for the week leading up to October 18th tells me I wasn't there October 1st because of the rotation of officers that go through. So I'm there every four, five, sometimes every sixth week.

Q.    So were you also not at the Portland ICE facility on October 4th?

A.    No.

Q.    And what about October 11th?

A.    Possibly.    I -- because I believe -- so October 18th happened, I left Portland October 19th

ROBERTO CANTU                    February 11, 2026                    16
93885

back to Auburn.  So I would just have to backtrack a week to see if I arrived that day or it was the day after.

Q.    Okay.  Were you there on October 12th?

A.    Possibly.

Q.    And what about November 23rd?

A.    I don't know.

Q.    November 24th?

A.    I don't know, ma'am.

Q.    November 27th?

A.    I don't know.

Q.    November 30th?

A.    I don't know.

Q.    December 21st?

A.    I was not there because I did spend Christmas with my family.

Q.    Were you there on January 9th, 2026?

A.    I don't know.

Q.    January 10th, 2026?

A.    I don't know.

Q.    January 19th?

A.    I don't know.

Q.    January 24th?

A.    I don't know.  I don't recall.

Q.    January 25th?

A.   No, I don't -- I don't recall.

Q.   January 30th?

A.   No.

Q.   You know you weren't there, or no, you don't recall?

A.   I don't recall.  I don't recall if I was there.  I know -- I know -- actually, I can, because January 30th I was home.  January 31st we did get a call up to go down to Portland, so I was home on the 30th.  The 31st was a significant event that was happening, a lot of people converged on the building, and I ended up being re-called that day on the 31st around 6:00 p.m.  I ended up getting a phone call that things were getting really out of hand down at the Lindquist Building.  We needed to surge more officers, so I did go down the 31st.  So that would tell me that on the 30th I was home.

Q.   Okay.  And so were you also at the Portland ICE building on February 1st?

A.   No, I returned home that night.

Q.   Okay.

A.   Well --

Q.   Is home --

A.   -- February 1st, I would be there, yes, the 1st because it led, you know, past midnight but

ROBERTO CANTU                 February 11, 2026                        18
93885

as soon as we were able to bring things under control on the 1st, I -- I drove home that day.

Q.    Is home base for you Seattle, or the Seattle area?

A.    The Seattle area, yes.

Q.    So we might be using some technical terms during today's deposition.  Can you tell me what your understanding of the term CCA means?

A.    I -- I have -- I'm not familiar with CCA.

Q.    If I referred to a crowd control agent, could that be what CCA might be referring to?

A.    I've never heard that, crowd control agent.  We in the Federal Protective Service use POPs, Public Order Policing.

Q.    Okay.  Can you tell me what CS gas is?

A.    It's a -- it's a form of crowd control gas that's -- that's all I know.

Q.    If I say tear gas, would you understand that I'm referring to CS gas?

A.    Yes.

Q.    CS gas typically affects an entire crowd, not just one person when it's deployed, correct?

MS. JACOBS:  Objection, vague.  Objection, speculation.

THE DEPONENT:  I would assume so.  We at

the Federal Protective Service do not employ tear gas or CS gas.  We don't have it in our inventory. We're not trained to use it.  And so the specifications of it, how it works, what it's made of, all that would be something that you would have to go through our Training and Professional Development or the agency responsible for the deployment of tear gas or CS gas.

BY MS. DEFFEBACH:

**Q.    Other DHS agencies use tear gas or CS gas though, correct?**

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  Yes.

BY MS. DEFFEBACH:

**Q.    And federal law enforcement has used CS gas at the Southwest Portland ICE facility on numerous occasions since June, correct?**

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  Specific federal agencies have.  The Federal Protective Service has not.

BY MS. DEFFEBACH:

**Q.    Has the Federal Protective Service ever used CS gas at the Portland ICE facility?**

A.    No.

ROBERTO CANTU                    February 11, 2026                    20
93885

Q.    Is it possible that people who are not engaged in protests but are just in the vicinity when CS gas is deployed, are they exposed to CS gas?

MS. JACOBS:  Objection, compound. Objection, speculation, and vague.

THE DEPONENT:  I don't know.  I mean, you'd have to ask them.

BY MS. DEFFEBACH:

Q.    In your declaration, you mentioned OC, PLS, CS gas, and FN 303.  Are those all crowd control agents that have been used at the Southwest Portland ICE facility?

A.    Those are considered less-lethal munitions that have been employed at that facility, yes.

Q.    Are there any other chemical munitions or chemical agents besides those I just listed that have been used by any DHS agency at the Southwest Portland ICE facility?

MS. JACOBS:  Objection, speculation, and vague.

THE DEPONENT:  Not to my knowledge.

BY MS. DEFFEBACH:

Q.    Does FPS use rubber bullets?

A.    No.

Q.    Are there official policies that identify

**authorized and unauthorized less-lethal munitions for FPS?**

A.    FPS does have a policy for the use of munitions, yes.

**Q.    Do you know the name of that policy?**

A.    I -- I don't because I am not an instructor or qualified to use the less-lethal, other than OC which is what every officer carries, a little small handheld spray.  That's -- that's for every officer or every duty, it's part of our kind of use of force continuum, so the intermediate use of force.  And every officer goes through annual law enforcement training to certify them with it, and then there's quarterly training that -- that has OC as part of the training, quarterly certification qualification.

**Q.    Are all officers authorized to use PLS?**

A.    No.

**Q.    Can you explain what the process of getting authorized to use PLS entails?**

A.    Yeah, so if someone is going to be a PLS -- and that's pepperball launch system -- user, they would be -- there's a -- there's training that is put on by Training and Professional Development that goes over the policy, the use and employment of the

pepperball system in order to be qualified.  And that is recorded in our Training Management System, and there is recurring training for it in order to stay qualified with it.

Q.   Are there FPS officers at the Southwest Portland ICE facility who are authorized to use PLS?

A.   Yes, ma'am.

Q.   And are all officers authorized to use FN 303?

A.   No.  The FN 303 is -- requires the same qualification based on the similar capability as the pepperball launch system.  So they would have somebody who is an authorized instructor certify, issue the -- the equipment.  And those training records are kept in our -- our Training Management System.

Q.   Are there officers at the Southwest Portland ICE facility who are authorized to use FN 303?

A.   There are, yes.

Q.   Do you know how many officers are authorized to use PLS and FN 303 at the Southwest Portland ICE facility?

A.   No.

Q.   Do you know if it's the majority of

officers who are authorized to use those munitions?

A. No, quite the opposite. We don't have -- for one, we don't have a lot of those capabilities, so we don't have a lot of pepperball launch systems or FN 303s. So even if I wanted to outfit the entire region, we don't -- we don't have enough for everybody. So it's -- it's really a small number of individuals that have that capability.

Q. You are aware of the Gray's Landing apartment building diagonally across the street from the Southwest Portland ICE facility, correct?

A. I am aware of the Gray's Landing apartment complex, yes.

Q. When did you become aware that the building diagonally across the street from the ICE facility was a residential building?

A. Well, I mean, you can -- deductive reasoning. You can -- you can look outside the -- the facility and see that there's an apartment complex across the street.

Q. So it would be obvious to anyone looking out -- out the window.

MS. JACOBS: Objection, speculation. Vague.

THE DEPONENT: Yeah, I can't speak for

ROBERTO CANTU                February 11, 2026                24
93885

everybody, just my personal observation, it appears to be a residential apartment complex.

BY MS. DEFFEBACH:

**Q.    You are aware that children live in that building, correct?**

MS. JACOBS:  Objection, speculation. Assume --

THE DEPONENT:  I am unaware that children --

MS. JACOBS:  Hold on.  Assumes facts not in evidence.  Let's not talk over each other.

THE DEPONENT:  I'm sorry, ma'am.

MS. DEFFEBACH:  Please continue to answer.

MS. JACOBS:  Yeah.

THE DEPONENT:  I am unaware of any children living in that facility.

BY MS. DEFFEBACH:

**Q.    So is today the first time that you've heard that children live in that facility?**

A.    Yes.

**Q.    In that building, I guess.  You are aware that elderly people live in that building, correct?**

MS. JACOBS:  Objection, speculation. Assumes facts not in evidence.

THE DEPONENT:  I am aware that there are

ROBERTO CANTU                    February 11, 2026                    25
93885

elderly people at that facility.

BY MS. DEFFEBACH:

Q.   **When did you become aware that elderly people live in that building?**

A.   I saw a media report from -- from a resident at that facility that was giving an interview sometime in the late summer, early fall, and they were talking about the residents there, older ladies that are afraid to come out.

And so this gentleman that was giving the interview said that he had to consistently escort these -- these ladies out and in because they were afraid of the protestors outside. So that's -- that's my only knowledge of the, you know, the folks there.

Q.   **Are you aware that people with serious pre-existing medical conditions live in that building?**

MS. JACOBS:  Objection, speculation. Assumes facts not in evidence.

THE DEPONENT:  No, I'm not aware.

BY MS. DEFFEBACH:

Q.   **So today is the first time that you've heard that people with serious pre-existing medical conditions live in that apartment building?**

A.    Yes.

Q.    Are you aware that the residents of the Gray's Landing apartment building have been complaining that they are experiencing symptoms of chemical munitions exposure?

A.    Only as of the time of -- of this, you know, the progress of this -- this lawsuit is kind of the first time I've been made aware that they have been effected.

Q.    So just to kind of pinpoint that, were you -- did you become aware of that before you signed your first declaration in this matter around January 16th, 2026?

A.    No, I was not aware of any incident or anyone coming and saying that there was people affected by munitions at their residence, at that Gray's Landing apartment complex prior to this declaration.

Q.    So it was only after you signed your declaration, your first declaration on January 16th, 2026, that you learned that the residents of the Gray's Landing building had been complaining of exposure from chemical munitions?

A.    Correct.

Q.    You didn't undertake any efforts to learn

ROBERTO CANTU                    February 11, 2026                    27
93885

about the Gray's Landing building before DHS first deployed chemical munitions at the Southwest Portland ICE facility, correct?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  Correct.

BY MS. DEFFEBACH:

Q.    To your knowledge, did anyone at DHS undertake efforts to learn about the Gray's Landing building or its residents before deploying chemical munitions across the street?

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  Speaking for the Federal Protective Service, no.

BY MS. DEFFEBACH:

Q.    Before federal law enforcement deployed chemical munitions at the Southwest Portland ICE facility, you didn't try to learn whether any children lived in that building, correct?

MS. JACOBS:  Objection, speculation. Asked and answered.  Vague.

THE DEPONENT:  That is correct.

BY MS. DEFFEBACH:

Q.    And you didn't try to learn whether any medically fragile people lived in that building,

correct?

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  Correct.

BY MS. DEFFEBACH:

Q.   So has -- since this lawsuit was filed, I suppose, has DHS changed its policies or practices on the use of chemical munitions at the Southwest Portland ICE facility?

A.   No.  I mean, the TRO is in place, right. So we are abiding by the temporary restraining order.  That has been the only change.  And what that does is now it forces us to now use -- use more physical force in order to effect the lawful purpose of trespass or vandalism, property damage, impeding, you know, the same things that we were trying to enforce prior to, now just have to be done differently.

Q.   After this lawsuit was filed, DHS hasn't changed its policy on the use of tear gas at the Southwest Portland ICE facility, correct?

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  The Federal Protective Service does not employ tear gas, so we don't --

that doesn't -- that's not on me.

BY MS. DEFFEBACH:

Q.    And you're not aware of any other changes in policy by your partner agencies at that facility.

MS. JACOBS:  Objection, speculation. Assumes facts not in evidence.  Vague.

THE DEPONENT:  Yeah, I have not -- I have not spoken to any of our partner agencies since the temporary retraining order has been in place.

BY MS. DEFFEBACH:

Q.    And since this lawsuit was filed, has FPS changed any of its policy -- policies regarding launched chemical munitions?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  Since the temporary restraining order, we are abiding by the temporary restraining order and the -- the constraints of it. And now we are more selective of how we go out.  And again, now with the -- taking away the capability to use less-than-lethal now forces us to have to resort to physical contact with people that are vandalizing, impeding, or trespassing.

BY MS. DEFFEBACH:

Q.    Prior to the issuance of the TRO, you had not changed your policies, correct?

ROBERTO CANTU                    February 11, 2026                    30
93885

MS. JACOBS:  Objection, vague.

THE DEPONENT:  No.

BY MS. DEFFEBACH:

Q.    **You are aware that protestors have required medical attention for exposure to chemical munitions at the Southwest Portland ICE facility, correct?**

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  I am aware that they have been subject to it, and those that are -- protestors that are in our care have received medical attention for it.

BY MS. DEFFEBACH:

Q.    **So FPS has provided medical assistance to protestors for exposure to chemical munitions?**

A.    Yes.

Q.    **Have any protestors suffered from serious medical events that Federal Protective Service has treated?**

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  Not to my knowledge.

BY MS. DEFFEBACH:

Q.    **Are you aware that residents of Gray's**

Landing have required medical attention for exposure to chemical munitions?

A.    I am unaware.  No.

Q.    You've never been inside the Gray's Landing apartment building, correct?

A.    That is correct.

Q.    To your knowledge, nobody from FPS or DHS has ever requested to go into the Gray's Landing apartment building to see what conditions are like in there, correct?

A.    That is correct.

Q.    So you have no firsthand knowledge of what it's like inside the building, correct?

A.    I do not have firsthand knowledge of what it's like, correct.

Q.    When considering whether the use of chemical crowd control agents is appropriate, is it FPS policy to consider the surroundings?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  I think you have to look at the totality of the circumstance, you know.  So every -- not every incident is the same.  There's no cookie-cutter response for an officer using reasonable discretion for the employment of a pepperball launch system or an FN 303.

BY MS. DEFFEBACH:

**Q.   So as an example, if the Southwest Portland ICE facility was across the street from an elementary school, would that change FPS's position on the appropriate use of chemical crowd control agents?**

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  I'm -- I don't know.  I don't know, because I'm not -- I'm not dealing with that situation, so I mean, it would be all hypothetical.

I would safely assume base -- because children, you know, and the -- the potential of exposure to CS gas or other munitions that have the capability to be persistent and waft, that that's -- that is a strong possibility, but the Federal Protective Service employs pepperball and PAVA because of its small circumference of effectiveness and its ability to quickly dissipate.

So, you know, the -- the area that the Federal Protective Service targets is either on federal property or immediately in front of that -- the federal facility.  It is not directed, you know, towards the -- the Gray's Landing apartments, you know.  We're only trying to affect the -- the area

immediately in front of the federal facility.

BY MS. DEFFEBACH:

Q.    **Why doesn't FPS use CS gas?**

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  That would be a question for Training and Professional Development.

BY MS. DEFFEBACH:

Q.    **What do FPS officers consider when determining what amount of force to use?**

A.    It's -- it's totality of the circumstance, you know.  That -- that officer's reasoning as to -- as to why, I mean, every person has their own level of discretion, you know.  Our standard really is -- is to be reasonable in our use of force.  And so I can't speak for every officer.

Q.    **So the determination of whether to use force and how much force to use, it might vary officer by officer?**

A.    Yes, and their -- and their optics of the threat or, you know, the severity of the crime.

Q.    **Does FPS consider the presence of bystanders in determining the amount of force to use?**

MS. JACOBS:  Objection, vague. Speculation.

ROBERTO CANTU                    February 11, 2026                    34
93885

THE DEPONENT:  We only attempt to target the individuals breaking the law.  So we use the amount of reasonable force to affect that lawful purpose, detention or arrest.  If, you know, we do our best to -- to mitigate and minimize force to anybody else, but given the fact that when you have a thousand people in front of that facility and a lot of them are, you know, conducting what I perceive to be civil disorder, it is -- it's very difficult to differentiate, one, the bystanders or the people that are -- that are there peacefully protesting from those that are not.

More often than not, from my experience and my optics, it's -- a large amount of people are conducting civil disorder, and you can't -- you can't differentiate between the two.

BY MS. DEFFEBACH:

Q.    **Could you explain what you mean when you use the term civil disorder?**

A.    When people are -- so I think we've kind of lowered the bar on what we -- we call peaceful protests.  For the Federal Protective Service, you know, for us, if they're not actively destroying any property, impeding, trespassing, you know, we'll call it peaceful.

But, you know, the First Amendment allows for freedom of speech and the peaceful assembly, but in my observation, my personal observation, you know, it's -- it's consistent hate speech, a lot of racial -- racially charged words towards my officers of -- of ethnic backgrounds.  A lot of death threats.  A lot of "use your service pistol and shoot yourself," so we get that kind of speech predominantly and consistently more often than anything else.

And then the civil disorder, I mean, the right to peacefully assemble to me is more like permissive civil disorder because, you know, we will effect an arrest or a detention on federal property, but on public property, you know, we have everything from guillotines coming out.  We have fights between protestors within the crowd.

We have rocks thrown at us.  We have dumpsters pushed in front of our facilities.  Currently right now the new tactic is they're using slingshots at our facility and targeting our -- our windows, our cameras.  So that's what I mean when I say civil disorder, you know.

They -- they consistently taunt the federal government as a whole at that facility to

elicit a response from the federal government.  Keep in mind that my federal officers do not -- are not outside.  They are not in the line of sight of the participants, so there is no -- no taunting on our end, or perceived taunting on our end.

It's -- people will -- will consistently test the boundaries to elicit a response from the federal government.  And we do our best to -- to show restraint, and -- and respond when feasible and necessary.

**Q.    You were just describing how protestors or people are trying to elicit a response from officers.  Have you ever observed an officer respond to those taunts?**

MS. JACOBS:  Objection, vague.

THE DEPONENT:  Yeah, you'd have to be more specific.  So, you know, if it's -- we're just -- if they're telling us to kill ourselves, I mean, no.  We don't -- we don't do that.

You know, if they're out there with a guillotine, you know, lopping heads off of dolls or whatever in front of the federal facility, no, we don't go out there.  But taunting for a response would be when they -- there is a definitive blue line.  I'm -- I'm safely assuming, ma'am, you're

aware of the facility and the layout and the blue line that differentiates public property from federal property.

And so you will have individuals that typically we classify them as like black bloc. They're all in black, they wear their masks. They could also be associated with Antifa. A lot of these folks will cross that line, run into federal property to throw something, and run back into the crowd.

Those are the kinds of taunts where they're trying to elicit a response from the federal government.

BY MS. DEFFEBACH:

Q.   **Have you ever observed any federal officer use force in response to verbal taunting?**

A.   Yes.

Q.   **When?**

A.   So this individual right now is currently under investigation. I'm under an NDA for this individual, so I don't know -- I don't know the outcome of it.

Q.   **Can you describe what you observed?**

A.   I observed an individual say something to an officer as the officer was walking back to the

facility, and he changed his direction from heading back to the facility straight to this specific individual, and push him.  That's what I observed.

Q.    And who is your NDA with?

MS. JACOBS:  I -- Counsel, we're getting into some law enforcement privileged information at this point, and because it's a pending investigation I'm going to have to direct the witness not to respond to additional questions related to that specific investigation, which I think notably does not involve chemical munitions, so -- but since it is a pending investigation, he'll be instructed not to answer questions regarding that investigation.

BY MS. DEFFEBACH:

Q.    I understand your objection, and can I say based on the substance of that objection, is it fair to say that there is a government agency involved? It's not an NDA with a private party, for example?

A.    That is correct.

Q.    Thank you.  Have you ever been exposed to any chemical munitions?

A.    Yes, I have.

Q.    Can I just go back one second?  The incident you just described where an officer pushed a protestor, is that the only time you've seen an

officer respond with force to verbal taunting?

A.    No.

Q.    Can you describe the other instances?

A.    Again, the other instance is also under investigation.

Q.    Did that also occur at the Southwest Portland ICE facility?

A.    It did.

Q.    Without getting into the details, did it involve a similar -- similar level of force to what you were just describing with the pushing incident?

A.    Yes.

THE REPORTER:  Pardon my interruption. I'm just getting some feedback.  I'm not quite sure where that noise is coming from.

MS. DEFFEBACH:  If you give me one second, I will just ask some people to be a little bit quieter.  Can we go off the record for one second, please?

THE REPORTER:  Yes, ma'am.

THE VIDEOGRAPHER:  Yes, stand by.  Time is 9:58 a.m. and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  Time is 9:58 a.m. and we are back on the record.

ROBERTO CANTU                    February 11, 2026                    40
93885

BY MS. DEFFEBACH:

Q. Have you ever become aware or been made aware of an officer from another partner agency at the Portland -- Southwest Portland ICE facility using chemical munitions in response to verbal taunting?

A. No.

Q. Are there any other instances in which you observed officers using force that you thought was unreasonable?

A. Say that again?

Q. Are there other instances in which you've observed an officer using force that you thought was unreasonable? At the Southwest Portland ICE facility, I should add.

A. Yes, and they are under investigation.

Q. Understood. Okay. Now, switching gears a little bit. Have you ever been exposed to any chemical munitions?

A. Yes, I have.

Q. Which ones have you been exposed to?

A. I have been exposed to CS gas in the military. I have been -- and then during military training. I have been exposed to OC, the regular little spray that we have. We get that in the

academy.  And then of course in my time working at 4310 Southwest Macadam, I have been exposed to the munitions that have been deployed at that facility as well.

Q.   Okay.  Starting with the CS gas, can you describe what exposure to CS gas feels like?

A.   Well, my first time I did it in what's called the gas chamber, boot camp in the Army, you know.  They put you in a room.  They light the CS canister in there.  Everyone wears a mask, and that is to show that the mask works.

And then they tell you to take off the mask, and they'll ask you a series of questions, like your Social Security Number, whatever.  It's just to get you to breathe and talk.  And I found that -- what I learned was, you know, it's not as bad inside the gas chamber.

It's when you walk out and it's in combination with the fresh air that, you know, it's -- it's an irritant to the eyes, to the lungs, your mucus.  You'll -- you'll -- I didn't have the, you know, a bad reaction to it, but I just remember coughing and having a really runny nose and eyes that just would not stop watering, and I felt like I had to rub them quite a bit.  So that's my exposure

with CS.

With OC, again we -- we have that exposure during our training at the law enforcement academy. I can humbly say that I wasn't as effected by it as other people. We did have one -- one officer who had a bit of an adverse reaction to it, but you know, it's just an irritant to the eyes, to the skin, and just gets you to -- really clears out your sinuses. That's the only way I can really describe it.

Q. **Would you describe exposure to tear gas as painful?**

A. No.

Q. **Would you describe exposure to OC spray as painful?**

A. No, not -- my personal experience, no.

Q. **How long did you feel the effects of the exposure to tear gas?**

A. It only affected me when I was in the affected area, so not long.

Q. **So it wasn't until you were able to leave the area that was affected by the tear gas that you -- the effects dissipated.**

MS. JACOBS: Objection, vague, and assumes facts not in evidence.

THE DEPONENT:  My own -- my own personal experience, I did not have lasting effects or any residual effects from the exposure.  That's my own personal experience, no.

BY MS. DEFFEBACH:

Q.    Did you -- or how long did you feel the effects of the OC spray?

A.    I would -- I would say probably 15, 20 minutes.

Q.    Can you describe the effects of these chemical agents on children?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  No.

BY MS. DEFFEBACH:

Q.    So you don't know what effects these chemical agents would have on children, correct?

A.    That's based on my own personal observation, and that is lack of observation of seeing children being effected by munitions.

Q.    And similarly is it fair to say that you also don't know what effect tear gas and OC spray would have on people with pre-existing medical conditions?

A.    That is correct, I don't know.

Q.    What would you do if you knew you were

going to be exposed to chemical munitions?

A.    In terms of what?  As in -- as in, like, being at the Federal Law Enforcement Academy and saying, today we're going to be exposing you to OC?

Q.    Would you don any protective gear?  Would you take any precautions?  Those kinds of things.

A.    At the Federal Law Enforcement Academy you can't.  You're -- you're going to be exposed, so all you can do is endure.

Q.    What if it was part of your daily life?

A.    To be --

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  I -- I -- maybe I'm not understanding the question, because I can't imagine somebody that wants to, in their daily life, be exposed to CS every day.

BY MS. DEFFEBACH:

Q.    What if you lived in an apartment building across the street from an ICE facility, and just living in your apartment you were exposed to chemical munitions on an almost daily basis?  What precautions, if that was your situation, would you personally take?

MS. JACOBS:  Objection, compound. Speculation.  Assumes facts not in evidence, and

vague.

THE DEPONENT:  I would just shut my windows.

BY MS. DEFFEBACH:

**Q.  Can you describe, and I know we've covered a little bit of this, but the methods by which FPS deploys chemical munitions?  And by that I mean, you know, spray canisters, launching systems.  Can you just give me a brief overview of the different methods there?**

A.    Yeah.  So we have the -- the small OC canisters that every officer carries on their belt. That's typically reserved for daily duties when they're in their own regions conducting, you know, their daily operations.

Because again, we -- we don't just deal with the ICE facility at 4310 Southwest Macadam.  We have Social Security offices, IRS offices, courthouses, you know.  We have -- you know, we have crimes being committed across, you know, many federal facilities daily.  So that is the daily carry of every officer, which again they are trained in every year during our annual law enforcement training, to include their quarterly training.

At the 4310 Southwest Macadam, they -- we

have MK9 canisters which are -- it's the same -- the same liquid that's in the small one, it's just in a bigger canister that has the ability to give it a little bit more throw, so more distance, which gives us more stand-off from people.  But also because it's in a bigger canister and because of the consistent civil unrest, it allows us to use it more often versus the small canister which, you know, in two, three sprays it's -- it's done, now you need a new one.

So those -- those are the two OC canisters that we use.  And then we have the FN 303 which is a launch system for marking rounds, basically paintball rounds that do not have munitions on them. It's just -- it's literally a paintball round.  And they also shoot PAVA rounds, which is a chemical munition used for crowd control or area denial.

Then you have the pepperball launch system which only shoots pepperballs, which is a -- the chemical munition predominantly seen in or used in -- at 4310.

Q.    **Sometimes chemical munitions are deployed outside the confines of federal property, correct?**

MS. JACOBS:  Objection, vague.

THE DEPONENT:  Yes.

BY MS. DEFFEBACH:

Q.    DHS officers sometimes leave the property of the Southwest Portland ICE facility and go out into the street when there's a protest happening, correct?

A.    Yes.

Q.    And they deploy chemical munitions out there on the street as well as on federal property, correct?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  Correct.

BY MS. DEFFEBACH:

Q.    What is the maximum range of the pepperball launch system that you were just describing?

A.    I don't know.  I -- you'd have to ask those that are trained on the system.

Q.    And the -- what is the maximum range of the FN 303 system?

A.    Yeah, same answer.  I -- I honestly do not know what the range is.  That is a question for our Training and Professional Development, and our instructors.

Q.    You understand them to be fairly long range though, right?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  No, I do not understand them to be long range.

BY MS. DEFFEBACH:

**Q.    Do you think they could reach farther than 30 feet?**

A.    Yes.

**Q.    Farther than 50 feet?**

A.    I don't know, because we -- in my observation, we have not used them for distance.  We use, you know, in the immediate area and in the nexus area of our facility, which is -- if you -- if you know the size of the driveway, right, the width of that drive and you follow that across the street, that's typically the area that we are trying to open up.

And so the munitions that -- that the Federal Protective Service employs would be to open that area up.  Anything, you know, down -- we don't employ anything down on Moody.  We have no -- no business on Moody.  There is no -- unless -- unless, given the circumstance, and in my observation I have not seen it in my purview, but unless there is an immediate threat to a facility or an officer that for whatever reason is over on Moody, you know, that

-- that is a possibility.

But in my experience, we don't -- we don't -- we don't even -- none of my officers go towards Moody. We're not in that area. We're not towards -- and that goes for east and west. So whether up -- I think it's Bancroft, the -- the other north/south road that parallels Moody, we don't -- we don't go up to either intersection.

The Federal Protective Service pushes out and immediately across the street, and typically the width of that drive is what we use our munitions to deny the area to people participating in civil disorder, to allow for the ingress/egress of vehicles and/or to move a crowd back that is causing -- actively causing damage to federal property.

Q. **Have you observed other law enforcement agencies within DHS going those directions that you just described, towards Moody Street, towards Bancroft Street, have you observed that?**

A. I have, yes.

Q. **And have you observed other DHS law enforcement officers using chemical munitions when on the street out towards Moody or towards Bancroft?**

MS. JACOBS: Objection, vague.

THE DEPONENT: Yes. Yes, I have

MS. DEFFEBACH:  I do want to show an exhibit to the Defendant, and I think the best way for me to do this is to just put it into the chat.

MS. JACOBS:  And then we're going to have to -- because we had to modify -- sorry, Counsel, to the phone, we're going to use Mr. Holt's computer so that he can adequately see whatever you're putting up on the screen.

MS. DEFFEBACH:  Of course, yes.  I forgot you were on a phone.

MS. JACOBS:  Yeah, yeah.

THE VIDEOGRAPHER:  Ms. Deffebach, if you need help sharing it on your device, I can show you how to do that.

MS. DEFFEBACH:  I think I can do it.  I just wanted to make sure that I have the correct -- correct file right here.  I have to push "send." Okay.  Now let me see if I can share it.

BY MS. DEFFEBACH:

Q.    Okay.  Can you see what I'm sharing on my screen?

A.    Yes, ma'am.

Q.    And this is a screenshot of a Google Maps image.  And do you recognize the area depicted on this map?

A.    Yeah, it's -- I mean, it's small even though I do have my glasses, I can't see the -- I can't see the names here, but I'm... over here, this is -- this should be -- because this I think is --

Q.    Make sure you're talking loudly.

A.    Oh, yeah, I'm -- I'm just trying to -- it's crazy because despite having your map up, I -- I can't read the -- the signs so I can't tell which is Bancroft, Moody, and Macadam.  I think you have your phone, I just want to --

Q.    Have you had a chance to look at a map?

Mr. Cantu, are you still with us?

THE REPORTER:  Looks like our deponent has frozen.

MS. DEFFEBACH:  Could we go off the record for a moment because of the tech issues?

THE VIDEOGRAPHER:  Yeah, I think we should.  Time is 10:15 a.m. and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  Time is 10:18 a.m. and we are back on the record.

BY MS. DEFFEBACH:

Q.    Okay.  Can you see the map that I'm showing you right now?

A.    Yes, ma'am.

Q.    Okay.  And we were talking a moment ago about federal officers pushing protestors up Moody Avenue.  Can you see Moody Avenue on the map?

A.    Yes, I can.

Q.    And Moody Avenue goes right in front of the Gray's Landing apartment building, correct?

A.    Yes.  That is the north/south road, correct?

Q.    And we were also talking about pushing protestors east down Bancroft Street?  Do you see Bancroft Street on the map?

A.    I do.

Q.    And Bancroft Street goes right in front of the Gray's Landing apartment building, correct?

A.    Correct.

Q.    Okay.  That is all I needed to show with the map, so I will close that out.  Do FPS officers have good aim when shooting projectile crowd control munitions?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  The -- they go through their training.  I'm not -- I'm not familiar with the -- with the syllabus, but that's -- that's each individual officer's, you know, qualification.

ROBERTO CANTU                    February 11, 2026                    53
93885

BY MS. DEFFEBACH:

Q.    How often do they hit bystanders by accident?

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  That, I don't know.

BY MS. DEFFEBACH:

Q.    Do you know if it's common for somebody to be shot several times with chemical munitions or rubber bullets by mistake?

A.    I am unaware of anyone that was hit by mistake, much less not aware that any rubber bullets have been employed at 4310 Southwest Macadam.

Q.    So if people were hit by projectiles, it would have been predominantly the pepperballs or the paintballs, correct?

A.    Correct.

Q.    Is it safe to assume that if somebody gets hit by a projectile several times in a row, the officer was aiming for them?

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  Yeah, I don't -- I don't know the totality of the circumstances.  I can't speak for that individual officer.

BY MS. DEFFEBACH:

Q.    Does FPS have policies or procedures for what officers should do when they are exposed to chemical munitions?

A.    Wait.  Say that again?

Q.    Does FPS -- FPS have policies or procedures for what officers should do when they are exposed to chemical munitions?

A.    Not -- not that I'm aware of.

Q.    Does FPS have policies or procedures for decontaminating areas of federal property where chemical munitions have been used?

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  Not -- not that I'm aware of.

BY MS. DEFFEBACH:

Q.    Does FPS ever use hoses to wash residue from chemical munitions out of the driveway of the Portland ICE facility?

A.    I -- I have not seen that.

Q.    You've never studied chemical munitions, have you?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  No, ma'am.

BY MS. DEFFEBACH:

Q.   You don't have a degree in medicine, correct?

A.   That's correct.

Q.   You don't have a degree in chemistry, correct?

A.   Correct.

Q.   You've never studied the effects of CCA -- or sorry -- on crowd control munitions on the human body, correct?

A.   Correct.

Q.   You've never studied the effects of long term or frequent exposure to crowd control munitions, correct?

A.   Correct.

Q.   Do you understand that crowd control munitions can affect individuals even after they're no longer visible?

MS. JACOBS:  Objection, speculation. Assumes facts not in evidence.  Vague.

THE DEPONENT:  Yeah, I am unaware of that.

BY MS. DEFFEBACH:

Q.   I -- turning to a new topic.  I want to ask you about October 4th, 2025.  You were not in Portland on that date, correct?

A.    I don't believe I was, no.

Q.    **Were chemical munitions deployed on October 4th?**

A.    I -- I don't know.  I'd have to look at the report.

Q.    **Was CS gas deployed on the night of October 4th?**

A.    Same answer.  I'd have to look at the report.

Q.    **Why don't we turn to your declaration which discusses that, and that is the first document that I dropped into the chat at the beginning of this deposition, so everybody should have a copy of it.**

THE REPORTER:  Ms. Deffebach, are we marking this exhibit for the record?

MS. DEFFEBACH:  Yes.  It can be Exhibit 2, I think.

THE REPORTER:  Okay.

(WHEREUPON, Exhibit 2 was marked for identification.)

MS. JACOBS:  And Ms. Deffebach, we've been going over an hour, so if --

MS. DEFFEBACH:  Yeah.

MS. JACOBS:  So if we'd like to take a

break now, or if you want to get through a certain line of questioning, I'm fine either way, whatever works best for you.

MS. DEFFEBACH:  I think now would be a good time for a break, especially whatever our witness prefers.  He's the -- he's in the driver's seat right now.

THE DEPONENT:  Yeah, I guess a bathroom break would be great.

MS. JACOBS:  Ten minutes?

THE DEPONENT:  Easy.

THE VIDEOGRAPHER:  Okay, stand by.  The time is 10:24 and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  Time is 10:35 a.m. and we are back on the record.

BY MS. DEFFEBACH:

Q.   Mr. Cantu, while we were on break just now, did you speak with anyone about this deposition?

A.   No, I did not.

Q.   So before we went on the break, we were about to start talking about your declaration.  Do you have that document in front of you?

A.   I do not.

Q.    I can pull it up and share my screen.

THE REPORTER:  For the record, Ms. Deffebach, I do apologize.  I think I may have missed marking your first exhibit.  Would you like the screenshot 2026 marked as Exhibit 1?

MS. DEFFEBACH:  Yes, please.

THE REPORTER:  My apologies.  Thank you, ma'am.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MS. DEFFEBACH:

Q.    I'll scroll up to the top.  Do you recognize this document?

A.    Yes, I do.

Q.    And is this the declaration that you submitted in this case?

A.    Yes, it is.

Q.    And I'm going to scroll down to paragraph 15, but if you -- if I'm scrolling too fast or anything, just please let me know.

A.    Yep.

Q.    Okay.  Can you see paragraph 15 on your screen?

A.    Yes, I can.

Q.    What is your source of knowledge for the

information in this?

A.    We use Spot Reports and Incident Reports in order to compile this information from the inspector.

Q.    Were there any -- I guess, first of all, can you tell me what paragraph 15 of your declaration says?

A.    Do you want me to read it to you?

Q.    You can just summarize it in a sentence.

A.    Okay.  Let me -- let me -- I need to read it myself to familiarize myself with it.

Okay.

Q.    So this paragraph describes an officer deploying OC -- OC spray with his MK9, correct?

A.    Yes, ma'am.

Q.    Were there any other deployments of chemical munitions on October 4th that are not described in this paragraph?

A.    I can only go by what we have on record, and it is the standing of the Federal Protective Service that any deployment of OC or pepperball is a reportable use of force as it is an intermediate use of force, and it would be documented in the -- in our Spot Reports and Incident Reports, and Use of Force packets.

ROBERTO CANTU                    February 11, 2026                    60
93885

Q.    Are deployments of FN 303 also those intermediate levels that would be documented?

A.    Yes.

Q.    I want to direct your attention to pages 43 through 46 of your declaration, and I will scroll down to show those pages.  Went too far.  Okay.  Do you see this document on page 43?

A.    I do.

Q.    And can you tell me what this is?

A.    That is an Incident Report.  It is our official record of, you know, the events and the actions of an officer.

Q.    Who prepared this document?

MS. JACOBS:  Objection.  As far as individual names and things being included in the record, those would have to be privileged.  So we direct the deponent to refer to the individual by their number.

BY MS. DEFFEBACH:

Q.    You did not prepare this document, correct?

A.    No, I did not.

Q.    Do you believe -- and I can scroll through to show you the rest of it.  Do you believe that this document is a complete accounting of the

protest and law enforcement activity in front of the Southwest Portland ICE building on October 4th?

A.   As it is a document of record, we -- we rely on accuracy and truthfulness from the officer preparing the Incident Report to provide that -- that level of accuracy.  So I can -- I could safely assume yes.

Q.   Okay.  I want to turn to another exhibit. I will stop sharing this, and I will try to upload it for the court reporter's benefit.  It is a video file, so we'll see how that works, but I want to play a -- a video for you, so let me just -- this will be Exhibit 3.

(WHEREUPON, Exhibit 3 was marked for identification.)

BY MS. DEFFEBACH:

Q.   Can you see -- or I haven't -- let me share.  Okay.  Can you see what I'm sharing on the screen now?

A.   Yes.

Q.   Okay.  And I represent that this video will become Plaintiff's Exhibit 47 later tonight with the filing of Plaintiff's Reply Brief.  Have you seen this web page before?

A.   Web page?  I have not seen this specific

web page before, no.

Q.   Can you -- can you describe what this looks like?

A.   It looks like officers at night.  I can't -- I can't tell where they are.

Q.   Does this look like an Instagram video?

A.   Yes, ma'am.  I'm sorry.

Q.   And can you tell what Instagram account posted this video?

A.   I cannot.

Q.   Do you see up here at the top it says DHSgov?

A.   Yes.

Q.   I will represent that this was a video that was posted by DHS's --

A.   Okay.

Q.   -- Instagram.  So I'm going to play this video, and hopefully the volume will work.  Let me know if you can't hear it.

A.   Okay.

(WHEREUPON, Exhibit 3 was played.)

BY MS. DEFFEBACH:

Q.   Did you recognize any scenes from this video?

A.   I can assume.  I mean, I assume that on --

on a couple of those frames it looked like Portland.

Q.    **Do you know how DHS got the footage that it used in this video?**

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  Not a clue.

MS. DEFFEBACH:  I'm going to close out of this and then show you another image that will tonight become Plaintiff's Exhibit 48, and it is a screenshot from this video.  I'm putting it in the chat, and I will also pull it up on my screen.

THE VIDEOGRAPHER:  And Ms. Deffebach, I don't know if you're aware of this, but there is a share sound feature when you're sharing videos.

MS. DEFFEBACH:  The -- I was going to say the audio is not relevant, but I can play it again with the audio, if you'd prefer.

THE VIDEOGRAPHER:  Okay.  I'm just saying if there is like video with audio, there's -- there's a setting you can click that makes it easier to play back, and I can show you that if you need me to.

BY MS. DEFFEBACH:

Q.    **Mr. Cantu, would you like to watch the video again with the music in the background?**

A.    From what I deduced, it was country music.

Not a fan.  I'm good.  Thank you.

Q.    Okay.  I am going to show you, this is a screenshot from minute 0.01, the opening scene of this video.  Do you recognize the location that is in this screenshot?

A.    No.

Q.    Let me see if I can show you.  Does it -- does it look like the -- I can -- I can pull it up, I have it here, but does it look like that Google Maps image that we just saw that showed the -- sorry -- the vertical view of the ICE building and the apartment building?

MS. JACOBS:  Objection, speculation. Asked and answered.

THE DEPONENT:  I cannot -- I can't tell you definitively where that is, no.

BY MS. DEFFEBACH:

Q.    Okay.  We're staring right at the image and I've now found it, and I will pull it up for you.  So -- so this is a screenshot of -- do you recognize this?  This is Moody Street right here, and then that's Bancroft Street right over there.

A.    Okay.  I've never -- I've never had a birds' eye view, but yes, I can -- I can see -- I can identify other landmarks that tell me that that

is in front of -- that east/west road with the Y over closer to the freeway is -- would be in front of the ICE facility, yes.

Q.   And you see this building with the kind of, you know, angular front here?

A.   Yes.

Q.   Let me go back to the image from the video and pull that up again.

(WHEREUPON, Exhibit 4 was marked for identification.)

THE REPORTER:  Exhibit 4 marked for the record.

MS. DEFFEBACH:  Oh, yes, please.  That would have been Exhibit 4.

BY MS. DEFFEBACH:

Q.   Do you see the video that has the screenshot?

A.   I do.

Q.   And do you recognize that the screenshot from the video is that same aerial view of the area around the Portland ICE facility we were just looking at?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  All I see, you know, I see that the -- the long rectangular building which is

indicative of most buildings, and then to the south of it at the very bottom I see a very snippet of the corner of a building.  So I'm not -- I'm not going to definitively say that that is the exact same spot.

BY MS. DEFFEBACH:

Q.    Okay.  I will close out of this and stop sharing.  And Court Reporter, let me know if you need a copy of the other images as well.

Is it FPS policy to coordinate with the press or social media influencers when determining whether to use force?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  To coordinate with social media?

BY MS. DEFFEBACH:

Q.    Yes.

A.    As in my Public -- Public Affairs officers?

Q.    No, like social media influencers, prominent online personalities.

A.    My understanding is we're not direct -- we don't do interviews.  We are directed not to -- to speak with social media in a -- in a manner other than affecting a lawful purpose.  If they want to do

interviews or talk to us, we are instructed to point them to our Public Affairs officer. So I am unaware of any social media influencer coordination.

Q. **Is it FPS policy to consider whether the use of force will look good in social media video?**

MS. JACOBS: Objection, vague.

THE DEPONENT: Okay. Say that again?

BY MS. DEFFEBACH:

Q. **Is it FPS policy to consider whether the use of force will look good in social media video?**

A. No, not to my knowledge, no.

Q. **Who was FPS's tactical commander at the Southwest Portland ICE facility on October 4th?**

MS. JACOBS: Objection as unless we're referring to an individual by their --

THE DEPONENT: Badge number.

MS. JACOBS: -- by their -- by their number, I would instruct the witness not to provide individual identifying information. So you're instructed not to respond unless it's clarified.

BY MS. DEFFEBACH:

Q. **I can rephrase. Do you know who the FPS tactical commander at the Southwest Portland ICE facility was on October 4th? Just yes or no, do you know who it was?**

A.    No.

Q.    Do you know what, if any, communications that -- the tactical commander had with the press in advance of any use of force on October 4th?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  So, repeat that question again?

BY MS. DEFFEBACH:

Q.    Do you know what communications, if any, the tactical commander at the Southwest Portland ICE facility had with the press in advance of any use of force on October 4th?

MS. JACOBS:  Same objection.

THE DEPONENT:  Yeah.  I am unaware of any interaction of a tactical manager speaking with the press over use of force.

BY MS. DEFFEBACH:

Q.    Are you aware of any tactical commander speaking with social media influencers about the use of force on October 4th?

A.    I am unaware of any tactical commander speaking with social media regarding the use of force -- social media influencers.

Q.    I also want to ask about October 18th. You, as you mentioned earlier, you're aware of a

protest that occurred on October 18th, 2025?

A.    I am.

Q.    You don't mention any protest on October 18th in your declaration though, correct?

A.    Correct.

Q.    And you don't include any Spot Reports or Incident Reports for October 18th with your declaration, correct?

A.    Correct.

Q.    You don't mention -- you don't mention October 18th in your declaration at all, so it's fair to say you also don't mention that CS gas was used on October 18th?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  In the declaration? Relative to the declaration?

BY MS. DEFFEBACH:

Q.    Let me rephrase.  Was CS gas used on October 18th?

A.    You would have to refer to the -- the federal agencies with that capability, if they did or did not.

Q.    Are you personally aware of whether any CS gas was used on that day?

MS. JACOBS:  Objection, asked and

answered.

THE DEPONENT:  I am aware that munitions were deployed on October 18th, on that day, yes.

BY MS. DEFFEBACH:

**Q.    What munitions are you aware were deployed on that day?**

A.    I am aware that PAVA and pepperball by the Federal Protective Service was deployed.

**Q.    Are you aware of any munitions that were deployed by other federal agencies that day?**

MS. JACOBS:  Objection, asked and answered.

THE DEPONENT:  I saw smoke, which is not -- it's not a -- it's not an irritant.  It's meant to obscure, but I did see smoke.

BY MS. DEFFEBACH:

**Q.    You refer to both Spot Reports and Incident Reports in your declaration.  Could you please explain the difference between the two?**

A.    Yeah.  So a Spot Report is for an incident that's happening -- those Spot Reports could be anything from our dispatch asking for a number, an estimate, a number of protestors outside or a disposition of the crowd.  There are triggers that -- that the -- that our dispatch needs in order to

push out a Spot Report.

So if there's media on scene. If there's people -- over a hundred people that are on scene, you know, they will issue out a Spot Report. So, you know, some of the Spot Reports may not necessarily contain any use of force or anything. It's just a quick snapshot in time of what's happening at that -- at the facility.

Of course, then also the dispatches also use kind of like our own stenographer, realtime stenographer, so if an incident does occur where pepperball systems were used or, you know, a specific incident was happening where the crowd was, say, pushing a -- a dumpster in front of our facility and an inspector radios that in to our dispatch, it will trigger a Spot Report.

An Incident Report is a record by the individual officer and their individual actions and observations in effecting an arrest or an investigative detention, and/or even the use of munitions or any level of force.

Q.    **Did you include every Spot Report and Incident Report for the days you discuss in your declaration?**

A.    We put in every -- every Spot Report for

ROBERTO CANTU                    February 11, 2026                      72
93885

the dates that were requested.

Q.   Did you include Spot Reports and Incident Reports for every day that chemical munitions were used at the Southwest Portland ICE facility?

A.   No.

Q.   Why not?

A.   Well, I think for one, you --

MS. JACOBS:  I'm sorry.  We're kind of getting into the area of attorney-client privilege, so I'd instruct you not to answer.

BY MS. DEFFEBACH:

Q.   Did you make an individual judgment call to not include certain Spot Reports or Incident Reports?

A.   No.

Q.   Did you draft your declaration?

MS. JACOBS:  Objection.  This is getting into attorney-client privileged information.  You're instructed not to answer.

BY MS. DEFFEBACH:

Q.   I'm going to ask a few more questions about your declaration.  So I can -- is it easier for you if I put that back up on the screen?

A.   Yes.

Q.   Okay.  Let me screen share.  Okay.  Do you

see your declaration up on the screen?

A.    I do.

Q.    Okay.  And I'm kind of just going to walk through some of the key paragraphs here.  I want to start with paragraph 4, and I'll show it on the screen.  What's your source of knowledge for this paragraph?

A.    So I, as a Deputy Regional Director, I am privy to agency meetings with the actual director of the Federal Protective Service.  So many times my regional director, my boss, you know, he will include me or I will be in his stead on these Teams calls that we have.  I think they're every two weeks with the director, and all of the regional directors from all eleven regions in the United States.

And so each one of those regional directors will brief the director on significant activities or what's happening in their area of operations.

Furthermore, we have a reporting -- excuse me -- we have a reporting where we -- we send up every -- every week, well, actually most recently every day, the -- the areas that are being -- are experiencing civil unrest to include future operations for the potential to ask for support.

So I guess for some context here, you know, if -- we'll say Dallas that's on this declaration, things are winding down. The support for Dallas is -- is dying down. We don't need many officers down there. That gives the director the ability then to shift forces to areas that may need more officers.

So -- so yes, every two weeks and/or as things develop there will be meetings with the director to brief him on our areas of operations and what, you know, what's -- where they're experiencing civil unrest.

Q. **Okay. And the next paragraph, paragraph 5. Do you have personal knowledge of the information in this paragraph?**

A. Let me read it real quick.

So, yes, I do have personal knowledge of that.

Q. **I want to ask one question about something you just said when you were talking about paragraph 4, about redirecting officers. Have you had to request additional support since the TRO was issued on February 2nd in the ACLU case?**

A. It is currently a course of action, so -- so --

MS. JACOBS:  I think to the extent, Counsel, just to the extent we're getting into internal workings and decision making within FPS, that would generally fall under the law enforcement privilege.  So I think if we could narrow the question, that would be helpful for purposes of the deponent answering.

MS. DEFFEBACH:  I'm not sure that that would fall within the scope of law enforcement privilege, but I will rephrase.

BY MS. DEFFEBACH:

Q.   **Since the TRO was issued, have you formed the opinion that you need to request additional officers?**

A.   Yes.

Q.   **Okay, thank you.  So for paragraph 5, I was asking if you have personal knowledge of the information in that paragraph.**

A.   Paragraph 5, yes.

Q.   **Yes, okay.  And in paragraph 6, do you have -- does the information in this paragraph come from your personal knowledge?**

A.    I believe this response came from our -- for the specifications of the -- and the nomenclature came from our Training and Professional

Development for accuracy.

Q.    Okay.    In paragraph 7, I want to ask a few more specific questions about paragraph 7, so why don't you take a moment --

A.    Okay.

Q.    -- to read it, and let me know if you need me to scroll down.

A.    Okay, you can scroll down.  Okay.

Q.    So in this paragraph you provide estimates for ranges of different crowd control munitions. You say that MK9 OC spray canisters can deploy OC up to approximately 20 feet.  What is your basis for that number?

A.    That came from Training and Professional Development.  So up to 20 feet is, you know, the -- the max range that I think that it can deploy.  I will tell you, and that's -- I'm sure the specification is given from our Training and Professional Development.

My own personal experience, I -- I've seen it roughly around 12 feet.  So it also depends on how much that canister is used and how much pressure is still in it.  So the more you use, the less pressure, the less throw it will have.  So potentially a brand-new can could -- could shoot up

ROBERTO CANTU                February 11, 2026                    77
93885

to 20 feet.

Q.    And you say that a PAVA round can affect an approximately 15-foot radius from where it's compromised.  What is your basis for that number?

A.    Again, that comes from TPD, our Training and Professional Development on specifications to those munitions.  I will also tell you just from personal experience and personal observation that that's -- 15 feet is quite a -- quite a big number, I mean, because it -- in my experience and my observation, officers generally need to compromise three or four little balls in order to get some sort of effectiveness with the -- the pepperball system.

Q.    And PAVA balls are a launched munition, correct?

A.    Yes.

Q.    And how far could a PAVA round be launched?  Do you know how far it could travel?

A.    I don't know.

Q.    Okay.  Could it travel up to 50 feet perhaps?

MS. JACOBS:  Objection, asked and answered.

THE DEPONENT:  Yeah.  I -- I don't know. You'd have to speak with the Training and

Professional Development and the instructors of these systems for actual specifications and capabilities.

BY MS. DEFFEBACH:

Q.    **Would it surprise you if officers ever launched chemical munitions that could be felt by individuals a hundred feet away?**

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  So to clarify your question, if I was to shoot a PAVA round at my foot, and would I be surprised that someone would feel it a hundred feet away?  Yes.

BY MS. DEFFEBACH:

Q.    **Yeah, I -- I guess I will -- I will move on to a new -- next question.  You -- you say that the immediate impact then for a pepperball is a 3 to 6 feet radius.  What is the basis for that range?**

A.    Specifications through Training and Professional Development.

Q.    **And you say that their effects can last between 15 to 45 minutes.  Can you explain how you got those numbers?**

A.    That -- that again is from Training and Professional Development from the instructors that know the specifications and capabilities.

Q.    You've never personally yourself studied the ranges for these chemical munitions, correct?

A.    That is correct.

Q.    And what do you mean by -- you used the word "impact" a few times here.  What do you mean for an area of impact or a zone of impact?  Can you just please explain like what -- what that intends to convey?

A.    Well, the zone that's being impacted by the civil unrest or the -- the localized area that we are trying to affect.

Q.    So would it be where --

A.    In conjunction where -- where -- where the rounds are -- are hitting.

Q.    Would it be the area where somebody would feel the effects of that chemical munition?

A.    That is correct.

Q.    And I want to turn next to paragraph 8, and I will scroll down, and I'll give you a chance to read this paragraph.

A.    Okay.

Q.    In this paragraph you say the use of chemical dispersal agents in crowd control situations results in fewer injuries to suspects, violent protestors, and officers.  And I want to

know, fewer as compared to what?

A.    Well, historically in my observations is specifically in the earlier portion of, you know, the civil unrest since June, when vehicles were leaving and coming from the federal facility through the north entrance, we would -- we would push out without using munitions to clear the crowd.  We would physically move them.  And that's where we would find there was more -- more physical confrontations that led to injuries to my officers.

Q.    And I want to ask about paragraph 10 next, and my question is just what is the source of your knowledge for the information in paragraph 10.

A.    Let me read this.

Okay.

Q.    Do you have personal knowledge of the events described in this paragraph?

A.    I was not there for that, but I am aware of that incident.

Q.    So your knowledge of this incident comes from the Incident Report you reference in this paragraph, correct?

A.    That is correct.

Q.    Do you know whether there were any other uses of force by FPS on that day?

A.   I would have to refer to the Spot Reports and any other Incident Reports under that date.

Q.   **So are there Spot Reports for that date that are not appended to your declaration?**

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  I'm unaware.

BY MS. DEFFEBACH:

Q.   **Do you know whether there were other uses of force by other federal law enforcement agencies on that day?**

A.   I'm unaware of that.

Q.   **Do you -- do you know who wrote the Incident Report?**

A.   No, I do not know.  I would have to refer to the report, and it would -- that would tell me who -- who wrote it.

Q.   **What have you done to investigate the veracity of the Incident Report?**

A.   What do you mean?  What have I done to -- rephrase the question for me, please.

Q.   **Have you done anything to confirm the truthfulness or accuracy of that Incident Report?**

A.   No.  I rely on my officers to be as truthful and accurate as possible based on their observation when they write their reports.

Q.    Do you know if the person who wrote this Incident Report has any disciplinary complaints against them?

MS. JACOBS:  Objection, speculation, and exceeds the bounds of the declaration.

MS. DEFFEBACH:  I'm trying to ask about the credibility of the information that's been presented to the court.

BY MS. DEFFEBACH:

Q.    So do you know if the person who wrote this Incident Report has any disciplinary complaints against them?

A.    I don't know who wrote it.

Q.    Would it help if we pulled up the Incident Report?

A.    If it's not redacted, and if I can recognize the badge number, you know, I could possibly identify who that individual was.

Q.    That's -- that's okay.  We'll move on to paragraph 11.  Can you see paragraph 11 here?

A.    Yes.

Q.    And in this one, I will -- I will -- you see that at the end of paragraph 11 you rely on Incident Report F25100147862, correct?

A.    Correct.

Q.    Is that Incident Report the source of your knowledge contained in this paragraph?

A.    Yes.

Q.    I want to scroll down to that Incident Report, which is on page -- let's see.  I'll just pull it up.  It is on page 17.  Okay.  Do you see the Incident Report on your screen?

A.    I do.

Q.    What have you done to investigate the accuracy or truthfulness of this Incident Report?

MS. JACOBS:  Objection, assumes facts not in evidence.  And vague, as well as speculation.

THE DEPONENT:  So I rely on the officer's observations and ability to articulate what he saw and what he did when he writes the report.  That report typically, especially with use of force, when feasible we attach evidence, typically in the form of video evidence, to support the officer's claim.  And then it is reviewed by the next line supervisor.

So at my level, I do not review these.  That is the immediate supervisor, in this case down at the Lindquist Building, you know, the tactical commander or one of the team leaders if they are not involved, or if they are -- if they have -- when

they have time, they go through these reports and they are the ones that approve these reports or send back for corrections, or ensure that if there is evidence that is able to -- to corroborate, that it's attached to it.

BY MS. DEFFEBACH:

Q.   Do you know who wrote this Incident Report?

A.   I do -- I mean, the -- it's redacted, so no.

Q.   Do you know if the person who wrote this Incident Report has ever had any disciplinary complaints against them?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  I don't know the person.  I can't answer that question.

BY MS. DEFFEBACH:

Q.   So I want to scroll down a little bit to the narrative section of this report.  And I don't know if you want to read the whole thing, but some of the questions that I have are not necessarily specific to, you know, they're questions that you could -- you might be able to answer without having it in front of you, but if you want to read through the whole thing I'm happy to take the time and give

you time to read through it.

A.   Okay.  So this is the report that is -- that you are referencing -- that you just recently referenced, right?

Q.   **Yes, about July 4th, 2025.**

A.   Okay.  So I can -- I can definitively tell you just based on the -- right after the redaction and seeing the number, the -- is that an 8?  Is it 77 Paul 1402?

MS. JACOBS:  Just very briefly.

THE DEPONENT:  Yeah, sorry.  Yes.

MS. JACOBS:  Just as a reminder, do not disclose any personal --

THE DEPONENT:  Right.

MS. JACOBS:  -- identifying information.

THE DEPONENT:  Yeah.  I'm -- I'm unaware if that is -- 7 Paul typically means they come from Region 7.  So that means that they are a deployed asset here.  I would not have any knowledge of any disciplinary action for any inspector outside of my region.

By MS. DEFFEBACH:

Q.   **Do you know what an AED, or automated external defibrillator, is?**

A.   I do know, yes.

Q.    And I can scroll down a little bit.  An AED is used when somebody's heart has stopped, right?

MS. JACOBS:  Objection, speculation. Vague.

THE DEPONENT:  Or about to.

BY MS. DEFFEBACH:

Q.    FPS emergency medical personnel are trained to use an AED in medically appropriate situations, correct?

A.    Correct.

Q.    On July 4th, and this is what's described in this paragraph, an FPS officer observed a protestor pick up an, quote, actively dispersing munition canister and throw it towards FPS and ICE personnel at approximately 20:03 hours.  Correct?

A.    Yeah, that's what the report says, yes.

Q.    And FPS arrested this person at approximately 20:04 hours.  Correct?

A.    That's what's documented, yes.

Q.    And it's documented that during the arrest of this person, quote, he went down dead weight while snarling and looking around.  It looked like his eyes were not focusing while his tongue was sticking out of the side of his mouth, quote.

Correct?

A.    That's what it says, yes.

Q.    And by 20:07 hours, he was conscious but unresponsive, correct?

A.    According to the document.

Q.    And EMT had to apply an AED to this person at 20:07 hours, correct?

A.    That's what it says.

Q.    And you omitted this incident in your paragraph in your declaration for this day, correct?

A.    I omitted that -- that medical response? Is that what you're asking?

Q.    Yes, you did not mention this incident.

A.    I did not mention it, no.

Q.    Okay.  I'll scroll back up to the -- back up to the body of your declaration, and we'll just kind of go through a couple more of the paragraphs. That was paragraph 11.

On paragraph 12, is your source for the information contained in this paragraph the Incident Report that you referred to at the bottom of the paragraph?

A.    Yes.  That paragraph would be in conjunction with that report at the bottom, yes.

Q.    And you don't know, or -- and have you

done anything to investigate the truthfulness or accuracy of this Incident Report referenced in paragraph 12?

MS. JACOBS:  Objection, speculation. Misstates prior testimony.  Assumes facts not in evidence, and vague.

THE DEPONENT:  Again, I rely on the -- the officer, his accuracy, truthfulness, his observation to be documented, corroborated by video evidence or any other evidence that could be attached to the report, and reviewed by their first line supervisor.

BY MS. DEFFEBACH:

Q.   Do you know whether the officer that wrote that particular Incident Report has any disciplinary complaints against them?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  I'm unaware.

BY MS. DEFFEBACH:

Q.   And on paragraph 13, I just want to confirm again that your -- the source of your knowledge for the information in this paragraph is the Incident Report that's referenced at the bottom of the paragraph?

A.   That is correct.

Q.   And you have not taken any steps to

ROBERTO CANTU                February 11, 2026                    89
93885

confirm the truthfulness or accuracy of that

Incident Report, correct?

        A.   No.

             MS. JACOBS:  Objection, speculation.

Assumes facts not in evidence.  Misstates prior

testimony, and vague.

             THE DEPONENT:  Same response.

BY MS. DEFFEBACH:

        Q.   And you -- do you know whether the officer

who wrote that Incident Report has been the subject

of any disciplinary complaints?

        A.   I'm unaware.

             MS. JACOBS:  Objection, speculation.

             THE DEPONENT:  Unaware.

BY MS. DEFFEBACH:

        Q.   And paragraph 14, is the source of your

knowledge about the information in this paragraph,

the Spot Report referenced at the end of the

paragraph?

        A.   Yes.

        Q.   And have you taken any steps to confirm

the truthfulness or accuracy of that Spot Report?

             MS. JACOBS:  Objection, speculation.

Assumes fact not in evidence.  Vague.

             THE DEPONENT:  Yeah.  Same response.

ROBERTO CANTU                    February 11, 2026                    90
93885

BY MS. DEFFEBACH:

Q.    And you don't know whether the officer who wrote that Spot Report has been the subject of any disciplinary complaints, correct?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  Correct.

BY MS. DEFFEBACH:

Q.    We've already talked about paragraph 15, so I'm going to skip down to paragraph 16.  And is the source of your knowledge of the facts in this paragraph, the Spot Report referenced at the end of the paragraph?

A.    Correct.

Q.    And have you taken any steps to confirm the accuracy or truthfulness of that Spot Report?

MS. JACOBS:  Objection, speculation. Assumes facts not in evidence.  Vague, and misstates prior testimony.

THE DEPONENT:  Yeah.  Same thing.  I rely on the -- the officer, their -- their truthfulness and accuracy in their observations, and any evidence that could be submitted to corroborate.

BY MS. DEFFEBACH:

Q.    And you don't know whether the officer who wrote that Spot Report has been the subject of any

disciplinary complaints, correct?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  Correct.

BY MS. DEFFEBACH:

Q.    And on paragraph 17, is the source of your knowledge of the facts contained in this paragraph the Spot Report referenced at the end of this paragraph?

A.    Yes.

Q.    And have you taken any steps to verify the accuracy or truthfulness of that Spot Report?

MS. JACOBS:  Objection, speculation. Assumes facts not in evidence.  Vague, and misstates prior testimony.

THE DEPONENT:  Yeah.  I have the same response for all those.

BY MS. DEFFEBACH:

Q.    And you don't know whether the officer who wrote that Spot Report has been the subject of any disciplinary violation or proceedings, correct?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  Correct.

BY MS. DEFFEBACH:

Q.    And paragraph 18, I apologize for being repetitive, I just want to get this on the record

ROBERTO CANTU                February 11, 2026                    92
93885

for all of the information contained here.

Paragraph 18, is the source of your knowledge of the facts in this paragraph the Incident Report cited at the end of the paragraph?

A.    That is correct.

Q.    And have you taken any steps to verify the accuracy or truthfulness of this Incident Report?

MS. JACOBS:  Objection, form.

THE DEPONENT:  Yeah.  I have the same response.

BY MS. DEFFEBACH:

Q.    And are you aware if the officer who wrote this Incident Report has been the subject of any disciplinary proceedings?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  I'm unaware.

BY MS. DEFFEBACH:

Q.    Okay.  And now we're on paragraph 19.  And in paragraph 19, I did want to acknowledge that yesterday you filed a Notice of Correction for this paragraph.  The incidents described as happening on October 12th actually happened on June 12th.  Is that correct?

MS. JACOBS:  Objection, misstates -- well, objection, speculation, and assumes facts not in

evidence.

THE DEPONENT:  Correct.

BY MS. DEFFEBACH:

Q.   You filed a correction, a Notice of Errata, of your -- for your declaration yesterday, correct?

A.   Correct.

Q.   And in that correction, you state that paragraph 19 of the declaration inadvertently referred to the wrong date, and the paragraph is referring to the correctly cited report concerning an incident that occurred on June 12th, 2025, correct?

A.   Correct.

Q.   And I did just want to pause here and ask, are there any other paragraphs in your declaration that you now realize require correction?

A.   No, not to my knowledge.

Q.   And I don't -- I know we've been through this a lot, but I guess it's fair to, maybe just to save us some time, for paragraph 19, 20, 21, 22, 23, 24, 25, 26, and 27, and 28, for all of those paragraphs, is the source of your knowledge the Spot Reports or Incident Reports that you cite in your declaration?

A.    That is correct, yes.

Q.    And have you taken any steps to verify the truthfulness or accuracy of any of those Spot Reports or Incident Reports?

MS. JACOBS:  Objection, speculation. Assumes facts not in evidence.  Misstates prior testimony, and vague.

THE DEPONENT:  Same answer as before.

BY MS. DEFFEBACH:

Q.    And you're not aware if the officers who wrote any of those Spot Reports or Incident Reports have been subject to any disciplinary proceedings, correct?

A.    That's correct.

MS. JACOBS:  Objection --

THE DEPONENT:  I'm so sorry.

BY MS. DEFFEBACH:

Q.    Paragraph 29 describes events on Friday January 30th.  Were you in Portland on that date?

A.    No, I was not.

Q.    Okay.  Is the source of your knowledge the Spot Report referenced at the end of that paragraph?

A.    That is correct.

Q.    Okay.  And have you done anything to investigate the truthfulness or accuracy of that

Spot Report?

MS. JACOBS:  Objection, form.

THE DEPONENT:  Yeah.  Same answer as before.  If I may?

BY MS. DEFFEBACH:

Q.    Yes.

A.    If I can take three minutes to go to the bathroom.

MS. JACOBS:  Oh, you want a break?

THE DEPONENT:  Yeah.

MS. DEFFEBACH:  Of course.

THE DEPONENT:  And I apologize, I've been drinking water all morning.

MS. JACOBS:  Do we want to do another just 10 minutes?

MS. DEFFEBACH:  That works.  We are -- we are getting very close to the end, I can tell you, so.

THE DEPONENT:  Yeah, no, thank you.  I apologize.

MS. JACOBS:  Yeah, so we'll do 10 minutes.  Is that okay?  So he can run to the restroom?  So are we going off the record or are you staying on?

MS. DEFFEBACH:  Let's go off the record.

THE VIDEOGRAPHER:  Okay, stand by.  Time

is 11:29 a.m. and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  Time is 11:34 a.m. and we are back on the record.

BY MS. DEFFEBACH:

Q.    Mr. Cantu, the Spot Reports and Incident Reports described in your declaration are only for FPS, correct?

A.    Correct.

Q.    They don't purport to detail all of the chemical munitions that ICE or a CBP may have used, correct?

A.    Yes, they should.  They should report, because any use of force, you know, regarding whether it's physical force or, you know, the deployment of munitions requires a Use of Force packet.  So for all of these deployments, we put together a packet that, you know, contains, you know, the video evidence, the 3155 which is what these are called, these reports, any Spot Reports.

And those get sent to a Use of Force board for not only their recordkeeping, but their -- they -- they're the ones that -- that look at it and say this, you know, this was justified, this was justified, you know, and so forth.

Q.    You don't express a view in your declaration one way or another about whether the uses of force described were reasonable, correct?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  Yeah, it's not up to me. These are the observations of the officers on the ground at that time given the circumstances presented to them, not me.

BY MS. DEFFEBACH:

Q.    So just to clarify, the Spot Reports or Incident Reports should document uses of force by ICE and CBP as well as by FPS?

A.    We -- we take statements from partner agencies that use force when -- when operating in conjunction with the Federal Protective Service.

Q.    Okay.  According to your declaration and the reports attached, CS gas was used on October 11th, which you mention in paragraph 17; January 24th, 2026, which you mention in paragraph 26; January 25th, 2026, which you mention in paragraph 28; and January 31st, 2026, which you mention in paragraph 30.  Is that correct?

A.    That is correct.

Q.    Are there any other dates on which CS gas was used that you did not mention in your

declaration?

A.   Not to my recollection.

Q.   Other -- other dates on which any other chemical munitions were used that you did not mention in your declaration?

A.   They should all be in 3155s and documented.

Q.   Are you aware that on January 31st, 2026, there were children present in the crowd when CS gas was deployed?

MS. JACOBS:  Objection, speculation.

THE DEPONENT:  No, I was unaware.

BY MS. DEFFEBACH:

Q.   Request any FPS employees recorded improper use of force by ICE or CBP at the Southwest Portland ICE facility?

MS. JACOBS:  Objection, vague.

THE DEPONENT:  Not to my knowledge.

By MS. DEFFEBACH:

Q.   The last Incident Report you describe in your declaration was on February 1st, correct?

A.   I'd have to go to the bottom of the screen to verify that, but I'm going to take your word for it, correct.

Q.   Have you reviewed any Incident Reports

from the ICE facility since February 2nd?

A.   Not to my recollection, no.

Q.   So you have -- do you have any basis to say one way or the other whether the protests since February 2nd have been more violent or less violent than previous protests?

MS. JACOBS:  Objection, speculation.

BY MS. DEFFEBACH:

Q.   Has there been -- sorry, answer the -- I apologize.

A.   No.  State your question again?

Q.   Yes.  Do you have any basis to say that the -- to know whether protests since February 2nd have been more violent or less violent than previous protests?

A.   I take the observations of my incident commander on the ground who reports directly to me, you know, for that type of information.

Q.   Has there been a significant uptick in harm to federal property in the last week?

A.   I have received reports that in the last week slingshots have been employed now, and my incident commander on the ground sent me photos of the impact of those rounds on the facility, damaging the facility.

Q.   Do you believe that property is as important as life?

MS. JACOBS:  Objection, speculation and vague.

THE DEPONENT:  I believe that the -- at the end of the day, the facility, that's -- that's my job.  That's what I get paid to do, that's what I took an oath to protect.  For some, like myself, you know, whether it's the Hatfield courthouse, whether it is an IRS office, it is still beyond just brick and mortar.  It's also a symbol of our government, you know.  So I do give it importance.

BY MS. DEFFEBACH:

Q.   Would you place a greater emphasis on protecting federal officers' life or protecting federal property?

A.   The lives of my officers are paramount, which, if you look at how we respond when we respond, it's never the same but it's all taken into consideration under officer safety.

MS. DEFFEBACH:  Can we take a very short break?  I think I'm almost done, but a very quick break, please?

THE DEPONENT:  Sure.

THE VIDEOGRAPHER:  Okay, stand by.  The

time is 11:41 a.m. and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  Time is 11:44 a.m. and we are back on the record.

BY MS. DEFFEBACH:

Q.  I had a clarifying question about something you said a moment ago when you referenced that you could tell that an officer was not from your region because their number began with the number 7P.  Do you remember that?

A.  I do, yes.

Q.  What numbers indicate officers from your region?  Is that number 9 -- or sorry, 10?

A.  Typically yes.

Q.  Okay.  And are you familiar with officers -- let me rephrase that.  You're not familiar with the service records of officers from other regions outside of Region 10, correct?

A.  That is correct.

Q.  Okay.  Is there anything that you want to change or correct in any of the answers you gave today?

A.  No.

MS. DEFFEBACH:  That's it for Plaintiff's questioning.

MS. JACOBS:  No redirect.

THE VIDEOGRAPHER:  Okay.  If there are no further questions, I will take us off the record. This is the end of the deposition of Roberto Cantu. The court reporter will take orders for the transcript, and then I'll take orders for video.

THE REPORTER:  Thank you, Austin.

Ms. Deffebach, would you like to order the original today?

MS. DEFFEBACH:  Yes, and I believe yesterday's deposition we ordered expedited processing for -- for everything.  We do have a deadline for submitting this to the court, so whatever kind of the -- the best expedited method is.  I think, is it -- Jeff, is it 9:30 a.m. tomorrow morning that we have to submit these to the court?

MR. DUBNER:  I would have to look at the exact time, but that sounds right to me, 9:30 Pacific.

THE REPORTER:  I do have that noted.  We do have you all on a same-day turnaround.  All right, so got that noted here, expedited.

Ms. Jacobs, would you like to order a copy?

MS. JACOBS:  Yes.

THE REPORTER:  And are you also ordering expedited?

MS. JACOBS:  Yes, we would like the copy at the same time.

THE REPORTER:  All right, perfect.

MR. DUBNER:  And is it possible to get a rough transcript in the interim?

THE REPORTER:  I believe so.

MR. DUBNER:  Wonderful, thank you.

THE VIDEOGRAPHER:  Okay.  And Ms. Jacobs, Ms. Deffebach will be getting a video with today's deposition.  Would you like a copy?

MS. JACOBS:  Yes.

THE VIDEOGRAPHER:  Would you like that same-day as well?

MS. JACOBS:  Yes.

THE VIDEOGRAPHER:  Okay.  And with that, the time 11:47 a.m. and we are off the record.

(WHEREUPON, the deposition of ROBERTO CANTU was concluded at 11:47 a.m.)

CERTIFICATE

I, the undersigned Austin Halvorsen, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Roberto Cantu, in the above captioned matter on the 11th day of February, 2026 taken at the location of 1000 Southwest Third Avenue in Portland, OR 97204.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.


Austin Halvorsen

ROBERTO CANTU                        February 11, 2026                    105
93885

CERTIFICATE


     I, Danielle Webb, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.


     I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.


     IN WITNESS HEREOF, I have hereunto set my hand this 12th day of February, 2026.


          Danielle Webb

ROBERTO CANTU                February 11, 2026                    106
93885

CORRECTION SHEET

Deposition of: Roberto Cantu        Date: 02/11/26

Regarding: REACH Community Development vs. US DHS

Reporter: Webb/Breeze

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet on the line provided.

Page    Line    Reason for Change

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

            Signature: _____

                    Roberto Cantu

Email to: Production@NaegeliUSA.com

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

DECLARATION

Deposition of: Roberto Cantu    Date: 02/11/2026

Regarding: REACH COMMUNITY DEVELOPMENT vs U.S. DHS

Reporter:  Danielle Webb

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____ on the _____ day of _____, 20____.

                    Signature: _____

                             Roberto Cantu

Email to: Production@NaegeliUSA.com

## Exhibits

**EX001 GOOGLE MAPS** 58:5,9

**EX002 DECLARA TION** 56:17,20

**EX003 COPY OF USB** 61:13,14 62:21

**EX004 INSTAGRA M** 65:9,11,14

---

## 0

**0.01** 64:3

---

## 1

**1** 58:5,9

**10** 11:19,24 12:3 80:11,13 95:15, 21 101:13,18

**10:15** 51:18

**10:18** 51:21

**10:24** 57:13

**10:35** 57:15

**10th** 16:19

**11** 82:20,23 87:18

**11:29** 96:1

**11:34** 96:3

**11:41** 101:1

**11:44** 101:3

**11:47** 103:19

**11th** 6:8 15:23 97:18

**12** 76:21 87:19 88:3

**12th** 14:20 16:4 92:22 93:12

**13** 88:19

**14** 89:16

**1402** 85:9

**15** 43:8 58:19,22 59:6 77:9 78:21 90:8

**15-foot** 77:3

**16** 90:9

**16th** 26:13,20

**17** 83:6 91:5 97:18

**18** 91:24 92:2

**18th** 15:6,14,16, 25 68:24 69:1,4, 7,11,13,19 70:3

**19** 92:18,19 93:9, 21

**19th** 15:25 16:21

**1st** 15:8,10,16 17:19,24,25 18:2 98:21

---

## 2

**2** 56:17,20

**20** 43:8 76:12,15 77:1 93:21

**2023** 11:21

**2025** 14:11 15:3, 6,8,10 55:24 69:1 85:5 93:12

**2026** 6:8 16:17,19

26:13,21 58:5 97:19,20,21 98:8

**20:03** 86:16

**20:04** 86:19

**20:07** 87:3,7

**21** 93:21

**21st** 16:14

**22** 93:21

**23** 93:21

**23rd** 16:6

**24** 93:22

**24th** 14:22 16:8, 23 97:19

**25** 93:22

**25th** 16:25 97:20

**26** 93:22 97:19

**27** 93:22

**27th** 16:10

**28** 93:22 97:21

**29** 94:18

**2nd** 74:23 99:1,5, 13

---

## 3

**3** 61:13,14 62:21 78:16

**30** 48:6 97:22

**303** 20:10 22:9, 10,19,22 31:25 46:12 47:19 60:1

**303s** 23:5

**30th** 16:12 17:2,8, 10,17 94:19

**3155** 96:19

**3155s** 98:6

**31st** 17:8,10,13, 16 97:21 98:8

---

## 4

**4** 65:9,11,14 73:5 74:21

**43** 60:5,7

**4310** 12:15 41:2 45:17,25 46:21 53:13

**45** 78:21

**46** 60:5

**47** 61:22

**48** 63:8

**4th** 14:24,25 15:21 55:24 56:3, 7 59:17 61:2 67:13,24 68:4,12, 20 85:5 86:12

---

## 5

**5** 12:4 13:25 74:14 75:16,19

**50** 48:8 77:20

---

## 6

**6** 75:20 78:17

**600** 12:4 13:25

**6:00** 17:13

---

## 7

**7** 76:2,3 85:17,18

**77** 85:9

**7P** 101:10

**8**

**8** 79:18 85:8

**9**

**9** 101:13

**9:14** 6:7

**9:30** 102:15,19

**9:58** 39:22,24

**9th** 16:17

**A**

**a.m.** 6:7 39:22,24 51:18,21 57:15 96:1,3 101:1,3 102:15 103:19

**abiding** 28:11 29:16

**ability** 9:25 32:19 46:3 74:6 83:14

**academy** 41:1 42:3 44:3,7

**accident** 53:3

**account** 62:8

**accounting** 60:25

**accuracy** 61:4,6 76:1 81:22 83:10 88:2,8 89:1,22 90:15,21 91:11 92:7 94:3,25

**accurate** 81:24

**acknowledge**

92:19

**ACLU** 74:23

**action** 74:24 85:20

**actions** 60:12 71:18

**actively** 34:23 49:15 86:14

**activities** 73:18

**activity** 12:24 13:10 61:1

**actual** 73:9 78:2

**add** 40:15

**additional** 38:9 74:22 75:13

**adequately** 50:7

**advance** 68:4,11

**adverse** 42:6

**AED** 85:23 86:2,9 87:6

**aerial** 65:20

**Affairs** 66:18 67:2

**affect** 9:24 32:25 34:3 55:17 77:2 79:11

**affected** 26:16 42:19,20,22

**affecting** 66:25

**affects** 18:21

**affirm** 6:24

**affirmed** 7:6

**afraid** 25:9,13

**agencies** 19:10, 20 29:4,8 49:17

69:21 70:10 81:9 97:14

**agency** 19:7 20:17 38:17 40:3 73:9

**agent** 18:10,13

**agents** 20:11,16 31:17 32:6 43:11, 16 79:23

**agree** 8:1,4

**aim** 52:19

**aiming** 53:20

**air** 41:19

**Alaska** 11:25

**Amendment** 35:1

**amount** 33:9,22 34:3,14

**and/or** 49:14 71:20 74:8

**angular** 65:5

**Anna** 6:13 7:16

**annual** 21:12 45:23

**answering** 75:7

**answers** 9:3 101:21

**Antifa** 37:7

**apartment** 23:10, 12,19 24:2 25:25 26:3,17 31:5,9 44:18,20 52:7,15 64:12

**apartments** 32:24

**apologies** 58:7

**apologize** 58:3

91:24 95:12,20 99:10

**appears** 24:1

**appended** 81:4

**apply** 87:6

**approve** 84:2

**approximately** 76:12 77:3 86:16, 19

**apps** 8:11

**area** 18:4,5 32:20, 25 42:20,22 46:17 48:11,12, 15,19 49:4,12 50:24 65:20 72:9 73:18 79:6,10,15

**areas** 14:4 54:11 73:23 74:6,10

**Army** 41:8

**arrest** 34:4 35:14 71:19 86:21

**arrested** 86:18

**arrived** 16:2

**articulate** 83:14

**assemble** 35:12

**assembly** 35:2

**assessments** 12:6

**asset** 85:19

**assistance** 30:15

**assume** 9:10 18:25 24:7 32:12 53:18 61:7 62:25

**assumes** 24:10, 24 25:20 29:6 42:24 44:25

55:20 83:11 88:5 89:5,24 90:17 91:13 92:25 94:6

assuming 36:25

attach 83:17

attached 84:5 88:10 97:17

attempt 34:1

attention 30:5,12 31:1 60:4

attorney-client 72:9,18

Auburn 16:1

audio 63:15,16,18

August 15:6

Austin 102:7

authorized 21:1, 17,20 22:6,8,13, 18,22 23:1

automated 85:23

Avenue 12:16 52:4,6

averages 12:4

aware 13:9,11 23:9,12,14 24:4, 21,25 25:3,16,21 26:2,8,11,14 29:3 30:4,10,25 37:1 40:2,3 53:12 54:9,15 63:12 68:18,25 69:23 70:2,5,7,9 80:18 92:12 94:10 98:8

**B**

back 16:1 37:9,25

38:2,23 39:25 49:14 51:22 57:16 63:20 65:7 72:23 84:3 87:15 96:4 101:4

background 63:24

backgrounds 35:6

backtrack 16:1

bad 41:17,22

badge 67:16 82:17

balls 77:12,14

Bancroft 49:6,19, 23 51:9 52:11,12, 14 64:22

bar 34:21

base 18:3 32:12

based 12:9 22:11 38:16 43:17 81:24 85:7

basically 46:13

basis 44:21 76:12 77:4 78:17 99:3, 12

bathroom 9:14 57:8 95:8

began 101:9

beginning 6:9 56:12

begins 8:2

behalf 6:14,15,18, 19

belt 45:12

benefit 61:10

big 77:9

bigger 46:3,6

birds' 64:24

bit 39:17 40:18 41:25 42:6 45:6 46:4 84:18 86:1

black 37:5,6

bloc 37:5

blue 36:24 37:1

board 96:21

body 55:10 87:16

boot 41:8

boss 73:11

bottom 66:2 87:21,24 88:22 98:22

boundaries 36:7

bounds 82:5

brand-new 76:25

break 9:14,18 57:1,5,9,18,22 95:9 100:22,23

breaking 34:2

breathe 41:15

brick 100:10

briefly 85:10

bring 11:11 18:1

building 12:15 14:1 17:12,15,19 23:10,15,16 24:5, 21,22 25:4,18,25 26:3,22 27:1,9, 19,25 31:5,9,13 44:18 52:7,15 61:2 64:11,12

65:4,25 66:3 83:23

buildings 14:3 66:1

bullets 20:23 53:10,12

business 12:2,7 13:10 48:21

bystanders 33:22 34:10 53:2

**C**

call 17:9,14 34:21,25 72:12

called 13:22 41:8 96:20

calls 73:13

cameras 35:22

camp 41:8

canister 41:10 46:3,6,8 76:22 86:15

canisters 45:8,12 46:1,11 76:11

Cantu 6:9,23 7:3, 6,11,13 51:12 57:18 63:23 96:6 102:4

capabilities 23:3 78:3,25

capability 22:11 23:8 29:19 32:15 69:21

caption 6:10

capture 9:4

captured 13:22

care 30:12

carries 21:8 45:12

carry 45:22

case 6:9 7:17 58:16 74:23 83:22

catastrophic 13:8

causing 49:14,15

CBP 96:11 97:12 98:15

CCA 18:8,9,11 55:8

certification 21:15

certify 21:13 22:13

chamber 41:8,17

chance 51:11 79:19

change 28:12 32:4 101:21

changed 28:7,20 29:12,25 38:1

charged 35:5

chat 50:3 56:12 63:10

chemical 20:15, 16 26:5,23 27:2, 9,17 28:8 29:13 30:5,16 31:2,17 32:5 38:11,21 40:5,19 43:11,16 44:1,21 45:7 46:16,20,22 47:7 49:22 53:9 54:4,

8,12,19,22 56:2 59:17 72:3 78:6 79:2,16,23 96:11 98:4

chemistry 55:5

children 24:4,8, 16,19 27:19 32:13 43:11,16, 19 98:9

Christmas 16:16

circumference 32:18

circumstance 31:21 33:10 48:22

circumstances 53:24 97:7

cite 93:24

cited 92:4 93:11

civil 14:2 34:9,15, 19 35:11,13,23 46:7 49:12 73:24 74:12 79:10 80:4

claim 83:18

clarified 67:20

clarify 15:2 78:9 97:10

clarifying 101:6

classify 37:5

clear 15:4 80:7

clears 42:8

click 63:19

close 52:18 63:6 66:7 95:17

closer 65:2

clue 63:5

colleague 6:15,18

combination 41:19

commander 67:12,23 68:3,10, 18,21 83:24 99:17,23

commanders 13:2 14:15

committed 45:20

committee 12:5

common 53:8

communicate 8:4,12

communications 68:2,9

Community 6:10

compared 80:1

compile 59:3

complaining 26:4,22

complaints 82:2, 11 84:13 88:15 89:11 90:4 91:1

complete 60:25

complex 23:13,20 24:2 26:17

compound 20:4 44:24

compromise 77:11

compromised 77:4

computer 8:8 50:6

conditions 25:17, 25 31:9 43:23

conducting 34:8, 15 45:14

conference 8:9

confines 46:23

confirm 81:21 88:20 89:1,21 90:14

confrontations 80:10

conjunction 79:13 87:24 97:15

conscious 87:3

consideration 100:20

considered 20:13

consistent 12:24 35:4 46:7

consistently 25:11 35:9,24 36:6

consists 11:24

constraints 29:17

contact 29:21

contained 83:2 87:20 91:6 92:1

context 15:4 74:1

continue 24:13

continuity 12:7

continuum 21:11

control 18:2,10, 12,16 20:11 31:17 32:5 46:17 52:19 55:9,13,16

76:10 79:23

**converged** 17:11

**convey** 79:8

**cookie-cutter** 31:23

**coordinate** 66:10, 14

**coordination** 67:3

**copy** 56:13 66:9 102:25 103:4,13

**corner** 66:3

**correct** 12:9 18:22 19:11,17 23:11 24:5,22 26:24 27:3,5,19, 22 28:1,4,21 29:25 30:7 31:5, 6,10,11,13,15 38:19 43:16,24 46:23 47:5,9,11 50:16,17 52:7,9, 15,16 53:16,17 55:3,4,6,7,10,11, 14,15,25 59:14 60:21 69:4,5,8,9 77:15 79:2,3,17 80:22,23 82:24, 25 86:10,11,16, 19 87:1,4,7,10 88:24 89:2 90:4, 6,13 91:1,3,20,22 92:5,23 93:2,6,7, 13,14 94:1,13,14, 23 96:8,9,12 97:3,22,23 98:21, 24 101:18,19,21

**correction** 92:20 93:4,8,17

**corrections** 84:3

**correctly** 7:12 93:11

**corroborate** 84:4 90:22

**corroborated** 88:9

**coughing** 41:23

**counsel** 6:11 7:5, 17,18 10:5,22 11:1,2,6 38:5 50:5 75:2

**country** 63:25

**couple** 63:1 87:17

**court** 6:21 8:21 9:3,22 61:10 66:8 82:8 102:5,13,17

**courthouse** 100:9

**courthouses** 45:19

**covered** 45:5

**crazy** 51:7

**credibility** 82:7

**crime** 33:20

**crimes** 45:20

**cross** 37:8

**crowd** 18:10,12, 16,21 20:10 31:17 32:5 35:17 37:10 46:17 49:14 52:19 55:9, 13,16 70:24 71:13 76:10 79:23 80:7 98:9

**CS** 18:15,19,21 19:2,8,10,15,24

20:3,10 32:14 33:3 40:22 41:5, 6,9 42:1 44:16 56:6 69:12,18,23 97:17,24 98:9

---

**D**

---

**daily** 13:24 44:10, 15,21 45:13,15, 21

**Dallas** 74:2,4

**damage** 28:15 49:15

**damaging** 99:24

**date** 6:8 15:13 55:25 81:2,3 93:10 94:19

**dates** 14:10,12,17 72:1 97:24 98:3

**day** 16:2 17:12 18:2 44:16 69:24 70:3,6,10 72:3 73:23 80:25 81:10 87:10 100:6

**day-to-day** 12:1 13:9

**days** 10:14 71:23

**dead** 86:22

**deadline** 102:13

**deal** 13:4 45:16

**dealing** 12:25 13:25 32:9

**death** 35:6

**December** 16:14

**decision** 75:3

**declaration** 10:17,18 11:8,10 13:23 20:9 26:12, 18,20 56:10 57:23 58:15 59:7 60:5 69:4,8,11, 15,16 70:18 71:24 72:16,22 73:1 74:3 81:4 82:5 87:10,16 93:5,9,16,25 96:7 97:2,16 98:1,5,21

**decontaminating** 54:11

**deduced** 63:25

**deductive** 23:17

**Defendant** 50:2

**Defendants** 6:18, 19

**Deffebach** 6:13 7:10,16 13:13 14:9 19:9,14,22 20:8,22 24:3,13, 17 25:2,22 27:6, 15,23 28:5 29:2, 10,23 30:3,14,24 32:1 33:2,7 34:17 37:14 38:14 39:16 40:1 43:5, 14 44:17 45:4 47:1,12 48:4 50:1,9,12,15,19 51:15,23 53:1,7 54:1,17 55:1,22 56:15,17,22,24 57:4,17 58:3,6,11 60:19 61:16 62:22 63:6,11,14, 22 64:17 65:13, 15 66:6,16 67:8, 21 68:8,17 69:17

70:4,16 72:11,20 75:8,11 78:4,13 81:7 82:6,9 84:6, 17 85:22 86:7 88:12,18 89:8,15 90:1,7,23 91:4, 17,23 92:11,17 93:3 94:9,17 95:5,11,16,24 96:5 97:9 98:13, 19 99:8 100:13, 21 101:5,24 102:8,10 103:12

**defibrillator** 85:24

**definitive** 36:24

**definitively** 64:16 66:4 85:6

**degree** 55:2,5

**denial** 46:17

**deny** 49:12

**depends** 76:21

**depicted** 50:24

**deploy** 47:7 76:11,16

**deployed** 18:22 20:3 27:2,16 41:3 46:22 56:2,6 70:3,5,8,10 85:18 98:10

**deploying** 27:9 59:14

**deployment** 19:8 59:21 96:16

**deployments** 59:16 60:1 96:17

**deploys** 45:7

**deponent** 12:22 13:19 18:25 19:13,20 20:6,21 23:25 24:8,12,15, 25 25:21 27:5,13, 22 28:4,24 29:7, 15 30:2,10,23 31:20 32:8 33:5 34:1 36:16 43:1, 13 44:13 45:2 46:25 47:11 48:2 49:25 51:13 52:22 53:6,23 54:15,25 55:21 57:8,11 60:17 63:5 64:15 65:24 66:14 67:7,16 68:6,14 69:15 70:2,13 75:7 77:24 78:9 81:6 83:13 84:15 85:11,14,16 86:6 88:7,17 89:7,14, 25 90:6,19 91:3, 15,22 92:9,16 93:2 94:8,16 95:3,10,12,19 97:5 98:12,18 100:5,24

**deposed** 8:17,25

**deposition** 6:9 8:2 10:11,14,15, 20 11:9,15 18:7 56:13 57:20 102:4,11 103:13

**Deputy** 11:18 73:8

**describe** 37:23 39:3 41:6 42:9, 11,14 43:10 45:5 62:2 98:20

**describes** 59:13 94:18

**describing** 36:11 39:11 47:15

**destroying** 34:23

**detail** 96:10

**details** 13:15 39:9

**detention** 34:4 35:14 71:20

**determination** 33:16

**determining** 33:9, 22 66:11

**develop** 74:9

**Development** 6:10 19:7 21:24 33:6 47:22 76:1, 15,19 77:6 78:1, 19,24

**device** 50:13

**DHS** 6:10 19:10 20:17 27:1,7 28:7,19 31:7 47:2 49:17,21 63:2

**DHS's** 62:15

**DHSGOV** 62:12

**diagonally** 23:10, 15

**difference** 70:19

**differentiate** 34:10,16

**differentiates** 37:2

**differently** 28:18

**difficult** 34:10

**direct** 38:8 60:4, 17 66:22

**directed** 32:23 66:23

**direction** 38:1

**directions** 49:17

**directly** 99:17

**director** 11:18 73:8,9,11,14,17 74:5,10

**directors** 73:14, 17

**discharge** 13:7

**disciplinary** 82:2, 11 84:12 85:20 88:14 89:11 90:4 91:1,20 92:14 94:12

**disclose** 85:13

**discretion** 31:24 33:13

**discuss** 71:23

**discusses** 56:11

**disorder** 34:9,15, 19 35:11,13,23 49:13

**dispatch** 70:22, 25 71:16

**dispatches** 71:9

**dispersal** 79:23

**dispersing** 86:14

**disposition** 70:24

**dissipate** 32:19

**dissipated** 42:23

**distance** 46:4

48:10

**document** 56:11 57:24 58:13 60:7, 13,20,25 61:3 87:5 97:11

**documented** 59:23 60:2 86:20, 21 88:9 98:7

**documents** 8:14 11:9,11

**dolls** 36:21

**don** 44:5

**draft** 72:16

**drinking** 95:13

**drive** 48:14 49:11

**driver's** 57:6

**driveway** 48:13 54:19

**dropped** 56:12

**drove** 18:2

**Dubner** 6:15 102:18 103:7,10

**duly** 7:6

**dumpster** 71:14

**dumpsters** 35:19

**duties** 11:23 45:13

**duty** 21:10

**dying** 74:4

--- **E** ---

**earlier** 68:25 80:3

**early** 25:7

**easier** 63:19 72:22

**east** 49:5 52:11

**east/west** 65:1

**Easy** 57:11

**effect** 28:14 35:14 43:21

**effected** 26:9 42:4 43:19

**effecting** 71:19

**effectiveness** 32:18 77:13

**effects** 42:17,23 43:2,3,7,10,15 55:8,12 78:20 79:16

**efforts** 26:25 27:8

**elderly** 24:22 25:1,3

**elementary** 32:4

**eleven** 73:15

**elicit** 36:1,7,12 37:12

**emails** 13:24

**emergency** 86:8

**emphasis** 100:14

**employ** 19:1 28:25 48:20

**employed** 20:14 53:13 99:22

**employees** 98:14

**employment** 21:25 31:24

**employs** 32:17 48:18

**EMT** 87:6

**end** 36:5 82:23 89:18 90:11 91:7 92:4 94:22 95:17 100:6 102:4

**ended** 17:12,13

**endure** 44:9

**enforce** 28:17

**enforcement** 19:15 21:13 27:16 38:6 42:3 44:3,7 45:23 49:16,22 61:1 75:4,9 81:9

**engaged** 20:2

**ensure** 84:3

**entails** 21:20

**enters** 8:1

**entire** 18:21 23:6

**entirety** 12:25

**entrance** 80:6

**equipment** 22:14

**Errata** 93:5

**escort** 25:11

**essentially** 12:1

**estimate** 70:23

**estimates** 76:9

**ethnic** 35:6

**event** 17:10

**events** 14:16 30:19 60:11 80:17 94:18

**evidence** 24:11, 24 25:20 29:6 42:25 44:25

55:20 83:12,17, 18 84:4 88:6,9,10 89:5,24 90:17,21 91:13 93:1 94:6 96:19

**exact** 66:4 102:19

**EXAMINATION** 7:9

**examined** 7:7

**exceeds** 82:5

**excuse** 12:2 73:20

**exhibit** 50:2 56:16,17,20 58:4, 5,9 61:8,13,14,22 62:21 63:8 65:9, 11,14

**expedited** 102:11,14,23 103:3

**experience** 34:13 42:16 43:2,4 49:2 76:20 77:8,10

**experiencing** 26:4 73:24 74:11

**explain** 21:19 34:18 70:19 78:21 79:7

**exposed** 20:3 38:20 40:18,21, 22,24 41:2 44:1, 8,16,20 54:3,8

**exposing** 44:4

**exposure** 26:5,23 30:5,16 31:1 32:14 41:6,25 42:2,11,14,18 43:3 55:13

**express** 97:1

**expressly** 10:7

**extent** 75:1,2

**external** 85:24

**eye** 64:24

**eyes** 41:20,23 42:7 86:24

---

**F**

**F25100147862** 82:24

**facilities** 12:2,3,4 14:1 35:19 45:21

**facility** 12:5,6,14, 19,25 13:4,5,16 14:11,19 15:21 19:16,24 20:12, 14,18 22:6,18,23 23:11,16,19 24:16,19 25:1,6 27:3,18 28:9,21 29:4 30:6 32:3,23 33:1 34:7 35:21, 25 36:22 37:1 38:1,2 39:7 40:4, 15 41:3 44:19 45:17 47:3 48:12, 24 54:20 65:3,21 67:13,24 68:11 71:8,15 72:4 80:5 98:16 99:1,24,25 100:6

**fact** 34:6 89:24

**facts** 24:10,24 25:20 29:6 42:25 44:25 55:20 83:11 88:5 89:5 90:10,17 91:6,13 92:3,25 94:6

**fair** 38:16 43:20 69:12 93:20

**fairly** 47:24

**fall** 25:7 75:4,9

**familiar** 9:1 18:9 52:23 101:15,16

**familiarize** 59:11

**family** 16:16

**fan** 64:1

**farther** 48:5,8

**fast** 58:19

**feasible** 36:9 83:17

**feature** 63:13

**February** 6:8 17:19,24 74:23 98:21 99:1,5,13

**federal** 11:19 12:3,8,15 13:25 18:13 19:1,15,20, 21,23 27:13,16 28:24 30:19 32:16,21,22,23 33:1 34:22 35:14, 25 36:1,2,8,22 37:3,8,12,15 44:3,7 45:21 46:23 47:8 48:18 49:9,15 52:3 54:11 59:20 69:21 70:8,10 73:10 80:5 81:9 97:15 99:20 100:15,16

**feedback** 39:14

**feel** 9:8 42:17 43:6 78:11 79:16

**feels** 41:6

**feet** 48:6,8 76:12, 15,21 77:1,9,20 78:7,12,17

**felt** 41:24 78:6

**fewer** 79:24 80:1

**fights** 35:16

**file** 50:17 61:11

**filed** 28:6,19 29:11 92:20 93:4

**filing** 61:23

**finally** 9:13

**find** 80:9

**fine** 57:2

**firsthand** 31:12, 14

**FN** 20:10 22:8,10, 18,22 23:5 31:25 46:12 47:19 60:1

**focusing** 86:24

**folks** 25:14 37:8

**follow** 48:14

**foot** 78:10

**footage** 63:2

**force** 13:21 21:11,12 28:14 33:9,14,17,22 34:3,5 37:16 39:1,10 40:9,13 59:22,23,25 66:12 67:5,10 68:4,12,16,20,23 71:6,21 80:25 81:9 83:16 96:14, 15,16,21 97:3,11, 14 98:15

**forces** 28:13 29:20 74:6

**forgot** 50:9

**form** 18:16 83:17 92:8 95:2

**formed** 75:12

**found** 41:15 64:19

**FPS** 13:15 20:23 21:2,3 22:5 29:11 30:15 31:7,18 33:3,8,21 45:6 52:18 54:2,6,10, 18 66:10 67:4,9, 22 75:3 80:25 86:8,13,15,18 96:8 97:12 98:14

**FPS's** 32:4 67:12

**fragile** 27:25

**frames** 63:1

**free** 9:8

**freedom** 35:2

**freeway** 65:2

**frequent** 14:7,8 55:13

**fresh** 41:19

**Friday** 94:18

**front** 8:15 32:22 33:1 34:7 35:19 36:22 52:6,14 57:24 61:1 65:1, 2,5 71:14 84:24

**frozen** 51:14

**future** 73:24

**G**

gas 18:15,16,18, 19,21 19:2,8,10, 16,24 20:3,10 28:20,25 32:14 33:3 40:22 41:5, 6,8,17 42:11,18, 22 43:21 56:6 69:12,18,24 97:17,24 98:9

gave 101:21

gear 44:5

gears 40:17

General 10:21,25 11:6

generally 75:4 77:11

gentleman 25:10

give 6:25 9:2,3 39:16 45:9 46:3 79:19 84:25 100:12

giving 25:6,10

glasses 51:2

good 7:11 52:19 57:5 64:1 67:5,10

Google 50:23 64:9

government 10:5 12:8 35:25 36:1,8 37:13 38:17 100:11

Gray's 23:9,12 26:3,17,22 27:1,8 30:25 31:4,8 32:24 52:7,15

great 57:9

greater 100:14

ground 97:7 99:17,23

guess 24:21 57:8 59:5 74:1 78:14 93:20

guillotine 36:21

guillotines 35:16

**H**

hand 6:24 17:15

handheld 21:9

hanging 9:16

happen 13:20

happened 15:25 92:22

happening 12:24 14:6 17:11 47:4 70:21 71:8,13 73:18 92:21

happy 84:25

harm 99:20

hate 35:4

Hatfield 100:9

he'll 38:12

heading 38:1

heads 36:21

hear 62:19

heard 7:16 18:12 24:19 25:24

heart 86:2

held 11:20

helpful 75:6

historically 80:2

hit 53:2,11,14,19

hitting 79:14

Hold 24:10

Holt 6:19

Holt's 50:6

home 17:8,9,17, 20,23 18:2,3

honestly 47:20

hoses 54:18

hour 56:23

hours 86:16,19 87:3,7

human 55:9

humbly 42:4

hundred 71:3 78:7,12

hypothetical 32:11

**I**

ICE 12:13,19 13:16 14:11,18, 19 15:20 17:19 19:16,24 20:12, 18 22:6,18,23 23:11,15 27:3,17 28:9,21 30:6 32:3 39:7 40:4,14 44:19 45:17 47:3 54:20 61:2 64:11 65:3,21 67:13,23 68:10 72:4 86:15 96:11 97:12 98:15,16 99:1

Idaho 12:1

identification 56:21 58:10 61:15 65:10

identify 20:25 64:25 82:18

identifying 67:19 85:15

image 50:24 63:7 64:10,18 65:7

images 66:9

imagine 44:14

immediately 32:22 33:1 49:10

impact 78:16 79:5,6 99:24

impacted 79:9

impeding 28:15 29:22 34:24

importance 100:12

important 100:2

improper 98:15

inadvertently 93:9

incidences 13:4

incident 12:18 13:1,7,16,20 14:15 26:14 31:22 38:24 39:11 59:2,24 60:10 61:5 69:7 70:18,20 71:11, 13,17,23 72:2,13 80:19,20,21 81:2, 13,18,22 82:2,11, 14,24 83:1,4,7,10

84:7,12 87:9,13, 20 88:2,14,22 89:2,10 92:4,7,13 93:12,24 94:4,11 96:6 97:11 98:20, 25 99:16,23

**incidents** 92:21

**include** 13:20 45:24 69:6 71:22 72:2,13 73:12,24

**included** 60:15

**includes** 12:5

**indicative** 66:1

**individual** 37:19, 21,24 38:3 52:25 53:25 60:15,17 67:15,19 71:18 72:12 82:18

**individuals** 23:8 34:2 37:4 55:17 78:7

**influencer** 67:3

**influencers** 66:11,20 68:19, 23

**information** 38:6 59:1,3 67:19 72:18 74:15 75:18,21 80:13 82:7 85:15 87:20 88:21 89:17 92:1 99:18

**ingress/egress** 49:13

**injuries** 79:24 80:10

**inside** 31:4,13 41:17

**inspector** 59:4 71:15 85:20

**Instagram** 62:6,8, 17

**instance** 39:4

**instances** 39:3 40:8,12

**instruct** 67:18 72:10

**instructed** 10:7 38:12 67:1,20 72:19

**instructions** 9:2

**instructor** 21:7 22:13

**instructors** 47:23 78:1,24

**intends** 79:7

**interaction** 68:15

**interim** 103:8

**intermediate** 21:11 59:22 60:2

**internal** 75:3

**interruption** 39:13

**intersection** 49:8

**interview** 25:7,11

**interviews** 66:23 67:1

**introduce** 6:11

**introductions** 6:21

**inventory** 19:2

**investigate** 81:17 83:9 88:1 94:25

**investigation** 37:20 38:7,10,12, 13 39:5 40:16

**investigative** 71:20

**involve** 38:11 39:10

**involved** 38:17 83:25

**irritant** 41:20 42:7 70:14

**IRS** 45:18 100:10

**issuance** 29:24

**issue** 22:14 71:4

**issued** 74:22 75:12

**issues** 51:16

---

**J**

**Jacobs** 6:17 12:21 13:17 18:23 19:12,18 20:4,19 23:23 24:6,10,14,23 25:19 27:4,11,20 28:2,22 29:5,14 30:1,8,21 31:19 32:7 33:4,24 36:15 38:5 42:24 43:12 44:12,24 46:24 47:10 48:1 49:24 50:4,11 52:21 53:4,21 54:13,24 55:19 56:22,25 57:10 60:14 63:4 64:13 65:23 66:13 67:6, 14,17 68:5,13 69:14,25 70:11

72:8,17 75:1 77:22 78:8 81:5 82:4 83:11 84:14 85:10,12,15 86:4 88:4,16 89:4,13, 23 90:5,16 91:2, 12,21 92:8,15,24 94:5,15 95:2,9, 14,21 97:4 98:11, 17 99:7 100:3 102:1,24 103:1,4, 11,14,17

**January** 16:17, 19,21,23,25 17:2, 8 26:12,20 94:19 97:18,20,21 98:8

**Jeff** 6:15 102:15

**job** 11:17,20,23 100:7

**joined** 6:14,18

**judgment** 72:12

**July** 14:24,25 85:5 86:12

**June** 14:11,19,22 19:17 80:4 92:22 93:12

**justified** 96:24,25

---

**K**

**Kathleen** 6:17

**Katie** 7:21

**key** 73:4

**kill** 36:18

**kind** 21:10 26:7, 10 34:20 35:8 65:4 71:10 72:8 73:3 87:17 102:14

February 11, 2026

kinds 37:11 44:6

knew 43:25

knowing 15:15

knowledge 20:21 25:14 27:7 30:23 31:7,12,14 58:25 67:11 73:6 74:14, 17 75:17,22 80:13,16,20 83:2 85:19 88:21 89:17 90:10 91:6 92:3 93:18,23 94:21 98:18

**L**

lack 43:18

ladies 25:9,12

Landing 23:9,12 26:3,17,22 27:1,8 31:1,5,8 32:24 52:7,15

landmarks 64:25

large 34:14

lasting 43:2

late 25:7

launch 21:22 22:12 23:4 31:25 46:13,18 47:14

launched 29:13 77:14,18 78:6

launching 45:8

law 19:15 21:12 27:16 34:2 38:6 42:3 44:3,7 45:23 49:16,21 61:1 75:4,9 81:9

lawful 28:14 34:3 66:25

lawsuit 26:7 28:6, 19 29:11

layout 37:1

leaders 83:24

leadership 13:3

leading 10:14 15:15

learn 26:25 27:8, 18,24

learned 26:21 41:16

leave 42:21 47:2

leaving 80:5

led 17:25 80:10

left 15:25

less-lethal 20:13 21:1,7

less-than-lethal 29:20

level 33:12 39:10 61:6 71:21 83:21

levels 60:2

life 44:10,15 100:2,15

light 41:9

Lindquist 12:15 14:1 17:15 83:23

liquid 46:2

listed 20:16

literally 46:15

live 24:4,19,22 25:4,17,25

lived 27:19,25 44:18

lives 100:17

living 24:16 44:20

localized 79:10

location 64:4

long 11:20 42:17, 20 43:6 47:24 48:3 55:12 65:25

longer 55:18

looked 63:1 86:23

lopping 36:21

lot 17:11 23:3,4 34:8 35:4,6,7 37:7 93:20

loudly 51:5

lowered 34:21

lungs 41:20

**M**

Macadam 12:15 41:2 45:17,25 51:9 53:13

made 13:9,11 19:4 26:8 40:2

majority 22:25

make 7:12 50:16 51:5 72:12

makes 63:19

making 75:3

Management 22:2,15

manager 68:15

managing 14:3

manner 66:24

map 50:25 51:7, 11,24 52:4,12,18

Maps 50:23 64:10

marked 56:20 58:5,9 61:14 65:9,11

marking 46:13 56:16 58:4

mask 41:10,11,13

masks 37:6

matter 26:12

max 76:16

maximum 47:13, 18

means 18:8 85:17,18

meant 70:14

media 25:5 66:11, 15,20,24 67:3,5, 10 68:19,22,23 71:2

medical 25:17,24 30:5,12,15,19 31:1 43:22 86:8 87:11

medically 27:25 86:9

medications 9:24

medicine 55:2

meet 10:19

meetings 12:5 73:9 74:9

memory 9:25 14:16

**mention** 69:3,10, 12 87:13,14 97:18,19,20,21, 25 98:5

**mentioned** 11:8 20:9 68:25

**messaging** 8:11

**met** 10:21,24,25 11:2

**method** 102:14

**methods** 45:6,10

**Michelle's** 11:4

**midnight** 17:25

**military** 40:23

**mind** 36:2

**mine** 11:6

**minimize** 34:5

**minute** 64:3

**minutes** 43:9 57:10 78:21 95:7, 15,21

**missed** 58:4

**misstates** 88:5 89:5 90:17 91:13 92:24 94:6

**mistake** 53:10,12

**mitigate** 34:5

**MK9** 46:1 59:14 76:11

**modify** 50:5

**moment** 51:16 52:2 76:4 101:7

**months** 12:12

**Moody** 48:20,21, 25 49:4,7,18,23

51:9 52:3,4,6 64:21

**morning** 7:11 95:13 102:16

**mortar** 100:11

**mouth** 86:25

**move** 49:14 78:14 80:8 82:19

**mucus** 41:21

**munition** 46:17, 20 77:14 79:16 86:15

**munitions** 20:13, 15 21:1,4 23:1 26:5,16,23 27:2, 10,17 28:8 29:13 30:6,16 31:2 32:14 38:11,21 40:5,19 41:3 43:19 44:1,21 45:7 46:14,22 47:7 48:17 49:11, 22 52:20 53:9 54:4,8,12,19,22 55:9,14,17 56:2 59:17 70:2,5,9 71:21 72:3 76:10 77:7 78:6 79:2 80:7 96:11,16 98:4

**music** 63:24,25

---

## N

**name's** 7:16

**names** 51:3 60:15

**narrative** 84:19

**narrow** 75:5

**NDA** 37:20 38:4, 18

**necessarily** 12:22 13:14 14:17 71:6 84:21

**needed** 17:15 52:17

**negligent** 13:7

**nexus** 48:12

**night** 17:20 56:6 62:4

**noise** 39:15

**nomenclature** 75:25

**nonverbal** 9:4

**north** 80:6

**north/south** 49:7 52:8

**nose** 41:23

**notably** 38:10

**noted** 102:21,23

**notes** 8:6

**Notice** 92:20 93:4

**November** 16:6,8, 10,12

**number** 23:7 41:14 60:18 67:16,18 70:22, 23 76:13 77:4,9 82:17 85:8 101:9, 10,13

**numbers** 78:22 101:12

**numerous** 19:17

---

## O

**oath** 9:20,21 100:8

**object** 10:6

**objection** 12:21 13:17,18 18:23 19:12,18 20:4,5, 19 23:23 24:6,23 25:19 27:4,11,20 28:2,22 29:5,14 30:1,8,21 31:19 32:7 33:4,24 36:15 38:15,16 42:24 43:12 44:12,24 46:24 47:10 48:1 49:24 52:21 53:4,21 54:13,24 55:19 60:14 63:4 64:13 65:23 66:13 67:6, 14 68:5,13 69:14, 25 70:11 72:17 77:22 78:8 81:5 82:4 83:11 84:14 86:4 88:4,16 89:4,13,23 90:5, 16 91:2,12,21 92:8,15,24,25 94:5,15 95:2 97:4 98:11,17 99:7 100:3

**obscure** 70:15

**observation** 24:1 35:3 43:18 48:10, 22 77:8,11 81:25 88:8

**observations** 71:19 80:2 83:14 90:21 97:6 99:16

**observed** 36:13 37:15,23,24 38:3 40:9,13 49:16,19, 21 86:13

**obvious** 23:21

**OC** 20:9 21:8,14 40:24 42:2,14 43:7,21 44:4 45:11 46:11 59:14,21 76:11

**occasions** 19:17

**occur** 39:6 71:11

**occurred** 69:1 93:12

**October** 15:10, 14,16,21,23,25 16:4 55:24 56:3,7 59:17 61:2 67:13, 24 68:4,12,20,24 69:1,3,7,11,13,19 70:3 92:22 97:17

**office** 10:21,25 11:6 100:10

**officer** 21:8,10,12 31:23 33:15,18 36:13 37:15,25 38:24 39:1 40:3, 13 42:5 45:12,22 48:24 53:20,25 59:13 60:12 61:4 67:2 71:18 86:13 88:8,13 89:9 90:2,20,24 91:18 92:12 100:20 101:8

**officer's** 33:11 52:25 83:13,18

**officers** 13:15 15:17 17:16 21:17 22:5,8,17,

21 23:1 33:8 35:5 36:2,13 40:9 47:2 49:3,22 52:3,18 54:3,7 62:4 66:19 74:5,7,21 75:14 77:11 78:5 79:25 80:10 81:23 94:10 97:6 100:17 101:12, 15,17

**officers'** 100:15

**offices** 45:18

**official** 20:25 60:11

**older** 25:9

**omitted** 87:9,11

**online** 66:21

**open** 8:8,11 48:15,18

**opening** 64:3

**operating** 97:14

**operations** 45:15 73:19,25 74:10

**opinion** 75:13

**opposite** 23:2

**optics** 33:19 34:14

**order** 18:14 22:1, 3 28:12,14 29:9, 16,17 59:3 70:25 77:12 102:8,24

**ordered** 102:11

**ordering** 103:2

**orders** 102:5,6

**Oregon** 11:25

**original** 102:9

**outcome** 37:22

**outfit** 23:5

**overview** 11:22 45:9

---

**P**

**p.m.** 17:13

**Pacific** 102:20

**packet** 96:17,18

**packets** 59:25

**pages** 60:4,6

**paid** 100:7

**painful** 42:12,15

**paintball** 46:14, 15

**paintballs** 53:16

**paragraph** 58:18, 22 59:6,13,18 73:5,7 74:13,15, 20 75:16,18,19, 20,21 76:2,3,9 79:18,20,22 80:11,13,17,22 82:20,23 83:2 86:13 87:10,18, 19,20,22,23 88:3, 19,21,23 89:16, 17,19 90:8,9,11, 12 91:5,6,8,24 92:2,3,4,18,19,21 93:9,10,21 94:18, 22 97:18,19,20, 22

**paragraphs** 73:4 87:17 93:16,23

**parallels** 49:7

**paramount** 100:17

**Pardon** 39:13

**part** 13:9 21:10, 15 44:10

**participants** 36:4

**participating** 49:12

**partner** 29:4,8 40:3 97:13

**party** 38:18

**passing** 8:6

**past** 17:25

**Paul** 85:9,17

**pause** 93:15

**PAVA** 32:17 46:16 70:7 77:2, 14,17 78:10

**peaceful** 34:21,25 35:2

**peacefully** 34:11 35:12

**penalty** 6:24

**pending** 38:7,12

**people** 8:12 17:11 20:1 24:22 25:1, 4,16,24 26:15 27:25 29:21 34:7, 11,14,20 36:6,12 39:17 42:5 43:22 46:5 49:12 53:14 71:3

**pepperball** 21:22 22:1,12 23:4 31:25 32:17 46:18 47:14 59:21 70:7 71:12

77:13 78:16

**pepperballs**
46:19 53:15

**perceive** 34:9

**perceived** 36:5

**perfect** 103:6

**period** 13:5

**perjury** 6:25

**permissive** 35:13

**persistent** 32:15

**person** 11:5
18:22 33:12 82:1,
10 84:11,15
86:18,22 87:6

**personal** 24:1
35:3 42:16 43:1,
4,17 74:14,17
75:17,22 76:20
77:8 80:16 85:13

**personalities**
66:21

**personally** 44:23
69:23 79:1

**personnel** 86:8,
16

**phone** 8:9,12
17:14 50:6,10
51:10

**photos** 99:23

**physical** 28:14
29:21 80:9 96:15

**physically** 80:8

**pick** 86:14

**pinpoint** 26:10

**pistol** 35:7

**place** 28:10 29:9
100:14

**Plaintiff's** 61:22,
23 63:8 101:24

**Plaintiffs** 6:14,16
7:17

**play** 61:12 62:17
63:15,20

**played** 62:21

**PLS** 20:10 21:17,
20,21 22:6,22

**point** 9:13 38:7
67:1

**policies** 20:25
28:7 29:12,25
54:2,6,10

**Policing** 18:14

**policy** 21:3,5,25
28:20 29:4,12
31:18 66:10 67:4,
9

**POPS** 18:14

**portion** 80:3

**Portland** 12:9,11,
13,19 13:11,16
14:11,19 15:20,
25 17:9,19 19:16,
24 20:12,18 22:6,
18,23 23:11 27:3,
17 28:9,21 30:6
32:3 39:7 40:4,14
47:3 54:20 55:25
61:2 63:1 65:21
67:13,23 68:10
72:4 94:19 98:16

**position** 32:4

**possibility** 32:16
49:1

**possibly** 15:24
16:5 82:18

**posted** 62:9,15

**potential** 32:13
73:25

**potentially** 76:25

**practices** 28:7

**pre-existing**
25:17,24 43:22

**precautions** 44:6,
22

**predominantly**
35:9 46:20 53:15

**prefer** 63:16

**prefers** 57:6

**preparation**
10:19 11:9

**prepare** 10:10,13
11:14 60:20

**prepared** 60:13

**preparing** 61:5

**presence** 33:21

**present** 11:3 98:9

**presented** 82:8
97:8

**press** 66:11 68:3,
11,16

**pressure** 76:22,
24

**previous** 99:6,14

**prior** 26:17 28:17
29:24 88:5 89:5
90:18 91:14 94:6

**private** 38:18

**privilege** 72:9
75:5,10

**privileged** 38:6
60:16 72:18

**privy** 73:9

**procedures** 54:2,
7,10

**proceed** 7:5

**proceedings**
91:20 92:14
94:12

**process** 21:19

**processing**
102:12

**Professional** 19:6
21:24 33:6 47:22
75:25 76:14,19
77:6 78:1,19,24

**progress** 26:7

**projectile** 52:19
53:19

**projectiles** 53:14

**prominent** 66:21

**pronouncing**
7:12

**property** 12:7
28:15 32:22
34:24 35:14,15
37:2,3,9 46:23
47:2,8 49:15
54:11 99:20
100:1,16

**protect** 100:8

**protecting** 100:15

**protection** 12:2,6

**protective** 11:19

18:13 19:1,21,23 27:14 28:24 30:19 32:17,21 34:22 44:5 48:18 49:9 59:20 70:8 73:10 97:15

**protest** 47:4 61:1 69:1,3

**protesting** 34:12

**protestor** 38:25 86:14

**protestors** 25:13 30:4,11,16,18 35:17 36:11 52:3, 11 70:23 79:25

**protests** 20:2 34:22 99:4,6,13, 15

**provide** 11:22 61:5 67:18 76:9

**provided** 30:15

**public** 18:14 35:15 37:2 66:18 67:2

**pull** 58:1 63:10 64:8,19 65:8 83:6

**pulled** 82:14

**purport** 96:10

**purpose** 28:14 34:4 66:25

**purposes** 75:6

**purview** 48:23

**push** 38:3 50:17 71:1 80:6

**pushed** 35:19 38:24

**pushes** 49:9

**pushing** 39:11 52:3,10 71:14

**put** 21:24 41:9 50:3 71:25 72:23 96:17

**putting** 50:7 63:9

---

**Q**

**qualification** 21:16 22:11 52:25

**qualified** 21:7 22:1,4

**quarterly** 21:14, 15 45:24

**question** 9:9,10, 16,17 10:8 33:5 44:14 47:21 68:6 74:19 75:6 78:10, 15 80:12 81:20 84:16 99:11 101:6

**questioning** 8:5 57:2 101:25

**questions** 9:7,9 10:6 38:9,13 41:13 72:21 76:3 84:21,22 102:3

**quick** 71:7 74:16 100:22

**quickly** 32:19

**quieter** 39:18

**quote** 86:14,22, 25

---

**R**

**racial** 35:5

**racially** 35:5

**radios** 71:15

**radius** 77:3 78:17

**raise** 6:23

**range** 47:13,18, 21,25 48:3 76:16 78:17

**ranges** 76:10 79:2

**re-called** 17:12

**reach** 6:10 48:5

**reaction** 41:22 42:6

**read** 10:15,16 51:8 59:8,10 74:16 76:6 79:20 80:14 84:20,24 85:1

**real** 74:16

**realize** 93:17

**realtime** 71:10

**reason** 10:2 48:25

**reasonable** 31:24 33:14 34:3 97:3

**reasoning** 23:18 33:11

**recall** 14:18 15:14 16:24 17:1,5,6

**received** 30:12 99:21

**recently** 73:22

85:3

**recess** 39:23 51:20 57:14 96:2 101:2

**recognize** 50:24 58:13 62:23 64:4, 21 65:19 82:17

**recollection** 98:2 99:2

**record** 39:18,22, 25 51:15,19,22 56:16 57:13,16 58:2 59:19 60:11, 16 61:3 65:12 71:17 91:25 95:23,24 96:1,4 101:1,4 102:3 103:19

**recorded** 22:2 98:14

**recordkeeping** 96:22

**records** 14:14 22:15 101:17

**rectangular** 65:25

**recurring** 22:3

**redacted** 82:16 84:9

**redaction** 85:7

**redirect** 102:1

**redirecting** 74:21

**refer** 12:13 60:17 69:20 70:17 81:1, 14

**reference** 80:21

**referenced** 85:4 88:2,22 89:18

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM

90:11 91:7 94:22 101:7

**referencing** 85:3

**referred** 18:10 87:21 93:10

**referring** 12:14 18:11,19 67:15 93:11

**region** 11:19,24 12:3 23:6 85:18, 21 101:9,13,18

**regional** 11:18 73:8,11,14,16

**regions** 45:14 73:15 101:17

**regular** 40:24

**related** 38:9

**Relative** 69:16

**relevant** 63:15

**rely** 61:4 81:23 82:23 83:13 88:7 90:19

**remember** 41:22 101:10

**reminder** 85:12

**repeat** 9:8 68:6

**repetitive** 91:25

**rephrase** 9:8 67:22 69:18 75:10 81:20 101:16

**Reply** 61:23

**report** 13:22 25:5 56:5,9 60:10 61:5 70:20 71:1,4,16, 17,22,23,25

80:21 81:13,15, 18,22 82:2,11,15, 24 83:1,5,7,10, 15,16 84:8,12,19 85:2 86:17 87:21, 24 88:2,11,14,22 89:2,10,18,22 90:3,11,15,25 91:7,11,19 92:4, 7,13 93:11 94:22 95:1 96:13 98:20

**reportable** 59:22

**reporter** 6:21,23 7:4 9:3 39:13,20 51:13 56:15,19 58:2,7 65:11 66:8 102:5,7,21 103:2, 6,9

**reporter's** 61:10

**reporting** 13:5 73:20,21

**reports** 14:4,8 59:2,24 69:6,7 70:17,18,21 71:5 72:2,3,13,14 81:1,2,3,25 84:1, 2 93:24 94:4,11 96:6,7,20 97:10, 11,17 98:25 99:17,21

**represent** 6:12 61:21 62:14

**represented** 7:18

**representing** 7:20

**request** 74:22 75:13 98:14

**requested** 31:8 72:1

**require** 93:17

**required** 30:5 31:1

**requires** 22:10 96:16

**reserved** 45:13

**residence** 26:16

**resident** 25:6

**residential** 23:16 24:2

**residents** 25:8 26:2,21 27:9 30:25

**residual** 43:3

**residue** 54:18

**resort** 29:20

**respond** 36:9,13 38:9 39:1 67:20 100:18,19

**response** 13:15 31:23 36:1,7,12, 23 37:12,16 40:5 75:23 87:11 89:7, 25 91:16 92:10

**responses** 9:5

**responsible** 19:7

**rest** 60:24

**restraining** 28:11 29:16,17

**restraint** 36:9

**restroom** 95:22

**results** 13:8 79:24

**retraining** 29:9

**returned** 17:20

**review** 11:7,8 83:21

**reviewed** 83:19 88:11 98:25

**road** 49:7 52:8 65:1

**Roberto** 6:9 7:6 102:4

**rocks** 35:18

**room** 7:22 8:1,5 41:9

**rosters** 14:13

**rotation** 13:1 15:14,17

**rough** 103:8

**roughly** 76:21

**round** 46:15 77:2, 17 78:10

**rounds** 46:13,14, 16 79:14 99:24

**row** 53:19

**rub** 41:25

**rubber** 20:23 53:10,12

**run** 12:1 37:8,9 95:22

**runny** 41:23

## S

**safe** 53:18

**safely** 32:12 36:25 61:6

**safety** 100:20

**Sam** 7:21

**NAEGELI**
DEPOSITION & TRIAL
**(800) 528-3335**
NAEGELIUSA.COM

**same-day** 102:22 103:16

**Samuel** 6:19

**save** 93:21

**scene** 64:3 71:2,3

**scenes** 62:23

**school** 32:4

**scope** 75:9

**screen** 8:9 50:8, 21 58:1,23 61:19 63:10 72:23,25 73:1,6 83:7 98:22

**screenshot** 50:23 58:5 63:9 64:3,5, 20 65:17,19

**scroll** 58:12,18 60:5,23 76:7,8 79:19 83:4 84:18 86:1 87:15

**scrolling** 58:19

**seat** 57:7

**Seattle** 18:3,4,5

**section** 84:19

**security** 12:5,6 41:14 45:18

**selective** 29:18

**send** 50:17 73:21 84:2

**sentence** 59:9

**September** 15:8

**series** 41:13

**service** 11:19 18:13 19:1,21,23 27:14 28:25 30:19 32:17,21 34:22 35:7 48:18

49:9 59:21 70:8 73:10 97:15 101:17

**setting** 63:19

**severity** 33:20

**share** 50:18 58:1 61:18 63:13 72:25

**sharing** 50:13,20 61:9,18 63:13 66:8

**shift** 74:6

**shoot** 35:8 46:16 76:25 78:10

**shooting** 52:19

**shoots** 46:19

**short** 100:21

**shot** 53:9

**show** 36:9 41:11 50:1,13 52:17 60:6,24 63:7,20 64:2,7 73:5

**showed** 64:10

**showing** 51:25

**shut** 45:2

**side** 86:25

**sight** 36:3

**signed** 26:11,19

**significant** 12:18 14:16 15:13 17:10 73:17 99:19

**signs** 51:8

**similar** 22:11 39:10

**similarly** 43:20

**sinuses** 42:9

**situation** 32:10 44:22

**situations** 79:24 86:10

**sixth** 15:18

**size** 48:13

**skin** 42:8

**skip** 90:9

**slingshots** 35:21 99:22

**small** 21:9 23:7 32:18 45:11 46:2, 8 51:1

**smoke** 70:13,15

**snapshot** 71:7

**snarling** 86:23

**snippet** 66:2

**social** 41:14 45:18 66:11,14, 20,24 67:3,5,10 68:19,22,23

**somebody's** 86:2

**sort** 77:12

**sound** 63:13

**sounds** 102:19

**source** 58:25 73:6 80:12 83:1 87:19 88:20 89:16 90:10 91:5 92:2 93:23 94:21

**south** 12:15 66:1

**Southwest** 12:13, 19 13:16 14:10

19:16 20:11,17 22:5,17,22 23:11 27:2,17 28:8,21 30:6 32:2 39:6 40:4,14 41:2 45:17,25 47:3 53:13 61:2 67:13, 23 68:10 72:4 98:15

**speak** 23:25 33:15 53:25 57:19 66:24 77:25

**speaking** 27:13 68:15,19,22

**specific** 19:20 36:17 38:2,10 61:25 71:13 76:3 84:22

**specifically** 14:12 80:3

**specification** 76:18

**specifications** 19:4 75:24 77:6 78:2,18,25

**speculation** 13:17 18:24 19:12,18 20:5,19 23:23 24:6,23 25:19 27:11,20 28:2,22 29:5 30:8,21 32:7 33:4,25 43:12 44:12,25 53:4,21 54:13 55:19 63:4 64:13 65:23 68:5 69:14 78:8 81:5 82:4 83:12 84:14 86:4 88:4,16 89:4,13,23 90:5,

16 91:2,12,21 92:15,25 94:5 98:11 99:7 100:3

**speech** 35:2,4,8

**spend** 16:15

**spoken** 29:8

**spot** 13:22 14:3,8 59:2,24 66:5 69:6 70:17,20,21 71:1, 4,5,16,22,25 72:2,13 81:1,3 89:18,22 90:3,11, 15,25 91:7,11,19 93:23 94:3,11,22 95:1 96:6,20 97:10

**spray** 21:9 40:25 42:14 43:7,21 45:8 59:14 76:11

**sprays** 46:9

**stand** 39:21 57:12 95:25 100:25

**stand-off** 46:5

**standard** 33:13

**standing** 59:20

**staring** 64:18

**start** 57:23 73:5

**Starting** 41:5

**state** 6:12 11:17 93:8 99:11

**statements** 97:13

**states** 11:25 73:15

**stay** 22:4

**staying** 95:23

**stead** 73:12

**stenographer** 71:10,11

**steps** 88:25 89:21 90:14 91:10 92:6 94:2

**sticking** 86:25

**stop** 41:24 61:9 66:7

**stopped** 86:2

**straight** 38:2

**street** 23:10,15, 20 27:10 32:3 44:19 47:4,8 48:14 49:10,18, 19,23 52:11,12, 14 64:21,22

**strong** 32:16

**studied** 54:22 55:8,12 79:1

**subject** 30:11 89:10 90:3,25 91:19 92:13 94:12

**submit** 102:16

**submitted** 58:16 90:22

**submitting** 102:13

**substance** 38:16

**suffered** 30:18

**summarize** 59:9

**summer** 25:7

**supervisor** 83:19, 22 88:11

**support** 73:25 74:3,22 83:18

**suppose** 28:7

**surge** 17:16

**surprise** 78:5

**surprised** 78:11

**surroundings** 31:18

**suspects** 79:24

**swear** 6:22

**switching** 40:17

**syllabus** 52:24

**symbol** 100:11

**symptoms** 26:4

**system** 21:22 22:1,2,12,16 31:25 46:13,18 47:14,17,19 77:13

**systems** 23:4 45:8 71:12 78:2

---

**T**

**tactic** 35:20

**tactical** 67:12,23 68:3,10,15,18,21 83:23

**taking** 29:19

**talk** 24:11 41:15 67:1

**talked** 90:8

**talking** 25:8 51:5 52:2,10 57:23 74:20

**target** 34:1

**targeting** 35:21

**targets** 32:21

**taunt** 35:24

**taunting** 36:4,5, 23 37:16 39:1 40:6

**taunts** 36:14 37:11

**team** 83:24

**Teams** 73:12

**tear** 18:18 19:1,8, 10 28:20,25 42:11,18,22 43:21

**tech** 51:16

**technical** 18:6

**telling** 36:18

**tells** 15:16

**temporary** 28:11 29:9,15,16

**Ten** 57:10

**term** 18:8 34:19 55:13

**terms** 18:6 44:2

**test** 36:7

**testified** 7:7 8:21

**testify** 9:25 10:3

**testifying** 9:22

**testimony** 6:25 88:5 89:6 90:18 91:14 94:7

**thing** 9:15 84:20, 25 90:19

**things** 17:14 18:1 28:16 44:6 60:15 74:3,9

**thought** 40:9,13

**thousand** 34:7

**threat** 33:20 48:24

**threats** 35:7

**throw** 37:9 46:4 76:24 86:15

**thrown** 35:18

**time** 6:7 13:1 24:18 25:23 26:6, 8 38:25 39:21,24 41:1,7 51:18,21 57:5,13,15 71:7 84:1,25 85:1 93:21 95:25 96:3 97:7 101:1,3 102:19 103:5,19

**times** 8:19,23 10:24 11:1 14:15 53:9,19 73:10 79:5

**title** 11:17

**today** 7:18,20,23 9:25 10:3,11,12, 14 11:12 24:18 25:23 44:4 101:22 102:9

**today's** 10:13 11:15 18:7 103:12

**tomorrow** 102:16

**tongue** 86:24

**tonight** 61:22 63:8

**top** 58:12 62:11

**topic** 55:23

**totality** 31:21

33:10 53:24

**TPD** 77:5

**trained** 19:3 45:22 47:17 86:9

**training** 19:6 21:13,14,15,23, 24 22:2,3,14,15 33:6 40:24 42:3 45:24 47:22 52:23 75:25 76:14,18 77:5,25 78:18,23

**transcript** 102:6 103:8

**travel** 12:11 77:18,20

**treated** 30:20

**trespass** 28:15

**trespassing** 29:22 34:24

**trigger** 14:16 71:16

**triggers** 70:24

**TRO** 28:10 29:24 74:22 75:12

**truth** 7:1,2,7

**truthful** 81:24

**truthfully** 10:3

**truthfulness** 61:4 81:22 83:10 88:1, 8 89:1,22 90:15, 20 91:11 92:7 94:3,25

**turn** 56:10 61:8 79:18

**turnaround** 102:22

**turning** 55:23

**type** 13:21 99:18

**typically** 18:21 37:5 45:13 48:15 49:10 83:16,17 85:17 101:14

**U**

**unable** 10:3

**unauthorized** 21:1

**unaware** 24:8,15 31:3 53:11 55:21 67:2 68:14,21 81:6,11 85:16 88:17 89:12,14 92:16 98:12

**understand** 9:6, 20 10:6 12:14 18:18 38:15 47:24 48:2 55:16

**understanding** 18:8 44:14 66:22

**understood** 9:10, 19 40:17

**undertake** 26:25 27:8

**United** 73:15

**unreasonable** 40:10,14

**unresponsive** 87:4

**unrest** 14:2 46:7 73:24 74:12 79:10 80:4

**upload** 61:9

**uptick** 99:19

**user** 21:22

**V**

**vague** 12:21 13:18 18:23 19:19 20:5,20 23:24 27:4,12,21 28:3,23 29:6,14 30:1,9,22 31:19 33:24 36:15 42:24 45:1 46:24 47:10 48:1 49:24 52:21 53:5,22 54:14,24 55:20 66:13 67:6 83:12 86:5 88:6 89:6,24 90:17 91:13 94:7 97:4 98:17 100:4

**vandalism** 28:15

**vandalizing** 29:22

**vary** 33:17

**vehicles** 49:14 80:4

**veracity** 81:18

**verbal** 9:3 37:16 39:1 40:5

**verify** 91:10 92:6 94:2 98:23

**versus** 6:10 46:8

**vertical** 64:11

**vicinity** 20:2

**video** 8:9 61:10, 12,21 62:6,9,14, 18,24 63:3,9,18, 24 64:4 65:7,16, 20 67:5,10 83:18 88:9 96:19 102:6

103:12

videos  63:13

view  64:11,24 65:20 97:1

violation  91:20

violent  79:25 99:5,14

visibility  14:6

visible  55:18

volume  62:18

## W

waft  32:15

Wait  54:5

walk  41:18 73:3

walking  37:25

wanted  23:5 50:16

wash  54:18

Washington  11:25

watch  63:23

water  95:13

watering  41:24

wear  37:6

wears  41:10

web  61:24,25 62:1

week  13:2 15:15, 19 16:2 73:22 99:20,22

weeks  10:14 73:13 74:8

weight  86:22

west  49:5

width  48:13 49:11

winding  74:3

window  23:22

windows  35:22 45:3

Wonderful  103:10

word  79:5 98:23

words  35:5

work  62:18

working  41:1

workings  75:3

works  11:6 19:4 41:11 57:3 61:11 95:16

write  81:25

writes  83:15

writing  9:3

wrong  93:10

wrote  81:12,16 82:1,10,13 84:7, 11 88:13 89:10 90:3,25 91:19 92:12 94:11

## Y

year  45:23

yesterday  92:20 93:5

yesterday's  102:11

## Z

zone  79:6,9

Zoom  7:25