IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

REACH COMMUNITY DEVELOPMENT;
WHITFIELD TAYLOR, individually and as
Parent and Next Friend of Minor Children A.T.
and B.T.; MINDY KING; SUSAN DOOLEY;
JANICE LINEBERGER; JANE DOE;
REBECCA ROE; REACH B49 PARTNERS LP;
REACH OFFICE LLC; DIANE MORENO;
ERICA DEL NIGRO, individually and as
Parent and Next Friend of Minor Child J.D.; and
ROY BROOKS,

      Plaintiffs,

    v.

U.S. DEPARTMENT OF HOMELAND SECURITY;
KRISTI NOEM, in her official capacity as Secretary of
Homeland Security; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; TODD LYONS,
in his official capacity as Acting Director of ICE;
U.S. CUSTOMS AND BORDER PROTECTION;
RODNEY SCOTT, in his official capacity as the
Commissioner of CBP; FEDERAL PROTECTIVE
SERVICE; FARON PARAMORE, in his official
capacity as the Director of FPS; U.S. SECRET
SERVICE; and SEAN CURRAN, in his official
capacity as Director of the Secret Service,

      Defendants.

Case No. 3:25-cv-2257-AB

OPINION & ORDER

1 – OPINION & ORDER

Darin M. Sands
Taylor Jaszewski
Colin H. Hunter
Bradley Bernstein Sands LLP
1211 NW Glisan St., Suite 204
Portland, OR 97209

Anna Lynn Deffebach
Brian D. Netter
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Daniel F. Jacobson
Brian C. Rosen-Shaud
Stephen K. Wirth
Jacobson Lawyers Group
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016

Jeffrey B. Dubner
Dubner Legal
P.O. Box 34125
Washington, DC 20043

Katharine Schwartzmann
Protect Democracy
3015 Magazine St.
New Orleans, LA 70118

        Attorneys for Plaintiffs

Andrew Warden
Kathleen Jacobs
Michael Benjamin Bruns
Samuel Holt
U.S. Department of Justice
1100 L St., N.W.
Washington, DC 20005

        Attorneys for Defendants

**BAGGIO, District Judge:**

Pending before the Court is Plaintiffs' Superseding Motion for Preliminary Injunction. Pls.' Superseding Mot. Prelim. Inj. ("Pls.' Mot."), ECF No. 46. Defendants oppose Plaintiffs' Motion. Defs.' Opp'n Pls.' Mot. ("Defs.' Opp'n"), ECF No. 57. Plaintiffs filed a Reply to Defendants' Opposition. Pls.' Reply, ECF No. 55. The Court held an evidentiary hearing on Plaintiffs' Motion on February 13, 2026, and oral argument on February 18, 2026. Mins. of Proceedings, ECF Nos. 60, 66. Having considered the full record before the Court, and for the reasons described below, the Court grants Plaintiffs' Motion.

## INTRODUCTION

Since June 2025, federal officers have deployed chemical munitions[1] during protests at the Portland Immigration and Customs Enforcement ("ICE") Facility (the "Portland ICE Facility"). The Portland ICE Facility is located in the City's South Waterfront neighborhood, which is a hub of apartment buildings, restaurants, businesses, and, until recently,[2] an elementary school. Located across the street from the Portland ICE Facility is Gray's Landing, an affordable housing complex that provides residential apartments for a wide variety of qualifying tenants, including young families, retirees, people with disabilities, domestic violence survivors, and military veterans.

---

[1] The term "chemical munitions" is a common umbrella term that refers to many types of chemical agents and manners by which those agents are deployed. *See* Sullivan Dep. 13:7–12, ECF No. 58-1 (discussing the term "chemical munitions" as an umbrella term). Where the parties refer to a more precise type of chemical munition or agent, the Court will use that term. Where a particular deployment of chemical munition has no clear classification, the Court will refer to it as a "chemical munition." Additionally, Plaintiffs use the term "tear gas" as another umbrella term for the chemical munitions deployed near Gray's Landing.

[2] *See* Pls.' Ex. 33, at 1 (explaining the relocation of the Cottonwood School, which was located adjacent to the Portland ICE Facility), ECF No. 46-3.

At the outset, the Court emphasizes three points. First, Defendants unquestionably have the power to enforce federal law and to protect federal employees and property; however, Defendants are required to wield that power responsibly and lawfully. Second, this case is not about the rights of protesters. This case concerns allegations by Plaintiff tenants and businesses at Gray's Landing that Defendants' use of chemical munitions in connection to the protests has been so excessive—so enveloping—that it violates Plaintiffs' rights. Third, the Court emphasizes that this is a decision on a pending motion for preliminary injunction and not a comment on the ultimate decision on the merits of this case.

The Court recognizes a preliminary injunction is an extraordinary remedy, but this is an extraordinary case.

## PARTIES

Plaintiffs are twelve residents of Gray's Landing (the "Resident Plaintiffs")[3] and the business entities that own and operate Gray's Landing (the "REACH Plaintiffs").[4] FAC ¶¶ 10–21, ECF No. 45. Defendants are the U.S. Department of Homeland Security ("DHS"), ICE, U.S. Customs and Border Protection ("CBP"), Federal Protective Service ("FPS"), U.S. Secret Service, and the heads of each department or agency. *Id.* ¶¶ 22–31. An overview of each party is provided below.

///

///

---

[3] For a diagram illustrating the locations of each of the Resident Plaintiffs' apartments in relation to the Portland ICE Facility, *see* Pls.' Ex. 21, ECF No. 46-4.

[4] Because the Court grants relief in connection with the Resident Plaintiffs' bodily integrity substantive due process theory, the Court declines to address the REACH Plaintiffs' asserted property interest theory. *See* Pls.' Mot. 33 ("The REACH Plaintiffs have likewise suffered deprivations of their property interests in the Gray's Landing building, grounds, and offices, and in their reputation, business relationships, and goodwill.").

## I.    The Resident Plaintiffs

### A.    Mindy King

Plaintiff Mindy King has lived at Gray's Landing for ten years and currently lives with her two children, ages nineteen and thirteen. Pls.' Mot. Attach. 1 ("King Decl."), ¶ 2, ECF No. 46-1. She lives on the "south side of Gray's Landing" and "can clearly see the ICE facility, the driveway leading to the facility, and the areas where protesters will often gather." *Id.* ¶¶ 2–3. Plaintiff King has often filmed and livestreamed protests at the Portland ICE Facility from her apartment balcony; some of Plaintiff King's videos are exhibits in evidence.[5] *Id.* ¶ 3.

### B.    Rebecca Roe

Plaintiff Rebecca Roe[6] lives "on the west side of the Gray's Landing complex, facing east over the Gray's Landing courtyard." Pls.' Mot. Attach. 2 ("Roe Decl."), ¶ 3, ECF No. 46-2. She has lived at Gray's Landing for just under two years. Evidentiary Hr'g Tr., February 13, 2026 ("Tr."), 80:12–13, ECF No. 61. Like Plaintiff King, Plaintiff Roe also recorded videos of the protests, some of which have been submitted as exhibits.[7]

### C.    Jane Doe

Plaintiff Jane Doe[8] lives "in the southwest corner of the complex, facing south towards [South] Bancroft Street and close to the [Portland] ICE [F]acility." Pls.' Mot. Attach. 6 ("Doe Decl."), ¶ 5, ECF No. 46-6. She "suffer[s] from post-traumatic stress disorder" because "a former partner shot [her] in the head during a fight." *Id.* ¶ 3. Plaintiff Doe lives at Gray's

---

[5] Plaintiff King's videos are: Plaintiffs' Exhibits 1–6, ECF No. 23; and 56–58, ECF No. 59.

[6] Plaintiff Roe is "a survivor of domestic violence and [has] used a pseudonym in this lawsuit to protect [her] identity from [her] abuser." Roe Decl. ¶ 2.

[7] Plaintiff Roe's videos are: Plaintiffs' Exhibits 7–18; 37–39, ECF No. 49; and 55.

[8] Plaintiff Doe, a survivor of domestic violence, is proceeding under a pseudonym "to protect [herself] from any retaliation." Doe Decl. ¶¶ 3–4.

Landing with her "son and teenage daughter . . . ." *Id.* ¶ 2. Plaintiff Doe has lived at Gray's

Landing "for approximately six years." *Id.*

### D.    Susan Dooley

Plaintiff Susan Dooley is a seventy-two-year-old veteran who lives with several medical

conditions, including fibromyalgia, asthma, and diabetes. Pls.' Mot. Attach. 7 ("Dooley Decl."),

¶ 2, ECF No. 46-7. Her apartment is located on the "west side of the Gray's Landing complex,

facing west towards Moody Avenue." *Id.* ¶ 3. Plaintiff Dooley has lived at Gray's Landing "for

over 10 years." *Id.* ¶ 2.

### E.    Janice Lineberger

Plaintiff Janice Lineberger lives "on the southeast side of the Gray's Landing complex,"

but her apartment "faces west looking onto the Gray's Landing courtyard." Pls.' Mot. Attach. 8

("Lineberger Decl."), ¶ 2, ECF No. 46-8. Plaintiff Lineberger has lived at Gray's Landing "for

approximately three years." *Id.*

### F.    Whitfield Taylor, A.T., and B.T.

Plaintiff Whitfield Taylor lives with his two children, A.T. and B.T.—ages nine and

seven—in an apartment located "on the southwest corner of the Gray's Landing complex, at the

closest point of Gray's Landing to the ICE facility." Pls.' Mot. Attach. 9 ("Taylor Decl."), ¶¶ 2–

3, ECF No. 46-9. The Taylor family has lived at Gray's Landing "for six and a half years." *Id.* ¶

2.

### G.    Diane Moreno

Plaintiff Diane Moreno lives in an apartment "on the fourth floor of Gray's Landing [and

her] windows are on the west side of the courtyard, at the south end of the building." Pls.' Mot.

Attach. 10 ("Moreno Decl."), ¶ 3, ECF No. 46-10. Plaintiff Moreno has "a medical condition

called Cushing's disease[,]" which "causes the body to produce too much cortisol." *Id.* ¶ 4. Because she has Cushing's disease, "high-stress situations, injuries, intense physical activity, or immune reactions . . . put [her] at risk for an adrenal crisis—life-threatening hypotension and hypovolemia." *Id.* ¶ 15. Plaintiff Moreno has lived at Gray's Landing "for almost four years." *Id.* ¶ 2.

### H.     Erica del Nigro and J.D.

Plaintiff Erica del Nigro lives with her twelve-year-old son, J.D. Pls.' Mot. Attach. 11 ("Del Nigro Decl."), ¶ 2, ECF No. 46-11. The two reside in a Gray's Landing apartment "on the east side of the courtyard, facing west [such that she] can see the ICE facility from [her] windows." *Id.* ¶ 3. Plaintiff del Nigro has "an autoimmune syndrome called mast cell activation syndrome ("MCAS")[,]" which "puts [her] at risk of going into life-threatening anaphylaxis . . . ." *Id.* ¶¶ 4–5. Plaintiff del Nigro and J.D. are trying to move out of Gray's Landing but are unable due to financial reasons. *Id.* ¶ 14. Plaintiff del Nigro and her son have lived at Gray's Landing "since February 2025." *Id.* ¶ 2.

### I.     Roy Brooks

Plaintiff Roy Brooks lives in a Gray's Landing apartment with "windows [that] face South Moody Street" and from which he "can see the ICE facility . . . ." Pls.' Mot. Attach. 12 ("Brooks Decl."), ¶ 3, ECF No. 46-12. Plaintiff Brooks has "a condition called limb-girdle muscular dystrophy ("LGMD"), which is a genetic disorder causing muscular atrophy in the proximal muscles around [his] hips and shoulders." *Id.* ¶ 6. He has lived at Gray's Landing "since January 2015." *Id.* ¶ 2.

///

///

## II.    The REACH Plaintiffs

The REACH Plaintiffs include REACH Community Development Corporation ("REACH CDC") and its subsidiaries, REACH B49 Partners LP, and REACH Office LLC. FAC ¶¶ 19–21. The REACH Plaintiffs collectively own and operate Gray's Landing. *Id.* The REACH Plaintiffs' corporate offices are located on the ground floor of Gray's Landing. Pls.' Mot. Attach. 4 ("Salazar Decl."), ¶ 5, ECF No. 46-4. REACH CDC is a nonprofit organization with a mission "to create opportunities for *all people* to thrive by developing and promoting access to quality, affordable homes, supportive services, and community." *Id.* ¶ 4.

## III.    Defendants

Defendants are the government entities DHS, ICE, CBP, FPS, the U.S. Secret Service, and their agency heads. FAC ¶¶ 22–31. ICE operates the Portland ICE Facility at 4310 South Macadam Avenue in Portland, Oregon. Defs.' Mot. Attach. 1 ("Cantu Decl.") ¶ 5, ECF No. 57-1. The Portland ICE Facility is located at the corner of South Macadam Avenue and South Bancroft Street, with a driveway leading out to South Bancroft Street. *See* Pls.' Ex. 21. FPS is responsible for ensuring the protection of federal government facilities, including the Portland ICE Facility. *Id.* ¶¶ 2, 4. CBP and ICE support FPS's mission to protect the Portland ICE Facility and the federal employees working there. *See, e.g.*, Sullivan Decl. ¶¶ 13–15 (describing CPB's coordination with FPS and ICE in responding to civil disturbances at or around the Portland ICE Facility), ECF No. 57-2; ICE Ex. 1, at 1 (reporting "coordinating with [FPS] personnel"), ECF No. 57-3.

///

///

///

## FACTS

Gray's Landing is an affordable housing complex located in the South Waterfront neighborhood of Portland, Oregon. Salazar Decl. ¶ 23. The complex is the only building on its block and is bounded by the following streets: South Lowell Street to the north; South Bond Avenue to the east; South Bancroft Street to the south; and South Moody Avenue to the west.[9] Gray's Landing is "diagonally across Bancroft Street and South Moody Avenue from the Portland ICE facility." *Id.* ¶ 6. The distance between Gray's Landing and the Portland ICE Facility at their closest point is "less than a hundred feet." Tr. 10:18.

From approximately June 11, 2025, to February 1, 2026,[10] federal officers deployed chemical munitions near the Portland ICE Facility in response to demonstrations of varying sizes. *See* Cantu Decl. Exs. 1–23 (FPS incident reports); Sullivan Decl. Exs. A–H (CBP incident reports); ICE Ex. 1 (ICE incident reports). While "FPS is the law enforcement agency within [DHS] that protects the federal government facilities and persons[,]" Cantu Decl. ¶ 2, federal officers from CBP also worked "in coordination with . . . [FPS] and [ICE]" during this period to ensure the "protection of the Portland ICE Facility[,]"[11] Sullivan Decl. ¶¶ 14–15; *see also*

---

[9] Because the location of Gray's Landing is not subject to reasonable dispute, the Court takes judicial notice of the above-mentioned cross streets of Gray's Landing. *See also* Pls.' Ex. 21 (aerial photograph of Gray's Landing with notations of South Bancroft Street and South Moody Avenue as the shared cross streets of Gray's Landing and the Portland ICE Facility).

[10] On February 3, 2026, Judge Simon entered a temporary restraining order (TRO) enjoining officers acting under DHS from using chemical munitions "unless the specific target of such a weapon or device poses an imminent threat of physical harm to a law enforcement officer or other person." *Dickinson v. Trump*, No. 3:25-CV-2170-SI, 2026 WL 279917, at *10 (D. Or. Feb. 3, 2026). The TRO expired on March 3, 2026. *Dickinson*, No. 3:25-CV-2170-SI, Order Extending Temporary Restraining Order, ECF No. 105.

[11] Agencies other than CBP, ICE, and FPS were present at the Portland ICE Facility on certain dates, but these other agencies did not deploy chemical munitions beyond pepper spray. First, from September 29, 2025, to November 22, 2025, "approximately 45 personnel from the Federal Bureau of Prisons [("BOP")] were deployed . . . to assist with perimeter security for the [Portland] ICE Facility." Oral Arg. Tr., February 18, 2026, 50:19–23, ECF No. 69. "[T]he only

Sullivan Dep. 15:23–16:5 (explaining that CBP officers were "supporting our law enforcement partners as requested" at the Portland ICE Facility); ICE Ex. 1, at 1 (reporting "coordinating with [FPS] personnel"). Because of the proximity of the Portland ICE Facility to Gray's Landing, the Resident Plaintiffs have reported that the gas deployed by federal officers entered their homes and bodies, causing injury. *See, e.g.*, Doe Decl. ¶ 8 (Plaintiff Doe reporting a "non-stop scratchy throat, chest pain, coughing, blurry and burning eyes, congested nose and some of the worst headaches [she has] ever experienced"); Dooley Decl. ¶¶ 5–6 (Plaintiff Dooley reporting "[falling] four different times and requir[ing] medical assistance each time" and "very mild heart failure").

Before discussing events of the last eight months, the Court will first explain the types of chemical agents and munitions that Defendants have used near the Portland ICE Facility. The paragraphs below summarize the categories of chemical agents that federal officers used and how they have been deployed.

Oleoresin capsicum ("OC") is "an oil-based irritant derived from chili peppers, commonly known as pepper spray, in aerosol format." Cantu Decl. ¶ 6. Officers can deploy OC gas in the form of a handheld spray, such as by using an MK-9 canister or "fogger." Cantu Dep. 45:25–46:10, ECF No. 58-2; Cantu Decl. ¶ 6. MK-9 canisters can deploy OC up to roughly twelve to twenty feet. Cantu Dep. 76:9–21. OC can also be deployed using a hand-thrown munition, such as a grenade. *See, e.g.*, Sullivan Decl. Ex. D, at 23–24 (CBP incident report, dated January 24, 2026, reporting the use of an "Instant Blast Powder Grenade OC" thrown at an

---

chemical agents utilized by BOP in Portland was [oleoresin capsicum] spray or pepper spray." *Id.* at 50:23–24. Second, U.S. Secret Service agents "had a presence at the [Portland] ICE Facility on October 7th, 2025, in support of a protected visit by the DHS secretary." *Id.* at 51:1–3. "[N]one of [the Secret Service] personnel used any chemical munitions or any less lethal devices while at the Portland ICE Facility." *Id.* at 51:4–6.

estimated distance of fifteen feet). OC can also be deployed in the form of "breakable 'pepper balls' that release OC in a dust format" from a "PepperBall Launching System" ("PLS"). Cantu Decl. ¶ 6. "The immediate impact zone for [a] pepper ball is a 3–6 [foot] radius when deployed at dry hard ground from the PLS." *Id.* ¶ 7.

Pelargonic acid vanillylamide ("PAVA") is "[a] synthetic version of OC." *Id.* ¶ 6 n.1. PAVA rounds can affect a fifteen-foot radius where deployed. Cantu Decl. ¶ 7; Cantu Dep. 77:2–13. PAVA can be deployed through an FN 303 launch system (a compressed air launcher) or a PLS with an area of impact ranging from ten to 300 feet. Cantu Dep. 46:12–21; Sullivan Dep. 12:24–13:6; Sullivan Decl. ¶ 10.

O-chlorobenzylidene malononitrile ("CS") is commonly referred to as "tear gas." Tr. 75:12–13; Cantu Decl. ¶ 6. It is "a class of chemical agent that is a powder at room temperature" that will either "explode" or react with a "pyrotechnic" such that a "gas cloud" forms. Tr. 73:6–10. FPS does not authorize its officers to use munitions containing CS. Cantu Decl. ¶ 6; Cantu Dep. 28:24–25. CBP and ICE officers, however, do use munitions containing CS. *See* Sullivan Decl. ¶ 9 (explaining that CBP's "Use of Force Policy" allows the use of CS gas); ICE Ex. 1, at 4 (reporting ICE officers' use of "[s]everal CS gas canisters"). Federal officers have used CS near the Portland ICE Facility in the form of hand-thrown canisters, Sullivan Decl. Ex. A, at 6, 40MM rounds deployed from launchers, Sullivan Decl. Ex. B, at 4, and grenades, Sullivan Decl. Ex. D, at 28. When deployed with a "40 mm" or "Less Lethal Specialty Impact and Chemical Munitions" ("LLSI-CM") launcher, CS munitions "can impact up to 450 feet." Sullivan Decl. ¶ 9–10.

Finally, federal officers have used "stinger" munitions, which may contain "more than one agent" including OC, PAVA, or CS. Tr. 74:24–75:5; *see, e.g.*, Sullivan Decl. Ex. B, at 5

(reporting on October 4, 2025, a "Stinger grenade" as a "Rubber Ball Grenade CS"); ICE Ex. 1, at 4 (reporting on June 24, 2025, that an ICE Special Response Team ("SRT") agent "used a hand thrown stinger munition to disperse a crowd of agitators that displayed pre-assault indicators").

Having reviewed the types of chemical agents and munitions used in this case, the Court now proceeds to describe how federal officers used them on five dates in particular. While the record reflects the full degree to which Defendants have used chemical munitions near Gray's Landing over the past eight months, the Court highlights Defendants' most recent use of chemical munitions as well as one date from 2025. Those dates are October 4, 2025, January 24, 2026, January 30, 2026, January 31, 2026, and February 1, 2026.[12]

---

[12] For agency reports describing Defendants' responses to protests on other dates, *see* Cantu Decl. Ex. 7, at 1–2 (FPS report on June 11, 2025, reporting the use of FN 303 to push back protesters); Cantu Decl. Ex. 10, at 1–2 (FPS report on June 12, 2025, reporting the use of pepper balls against protesters who were breaking cameras); Sullivan Decl. Ex. A, at 14–18 (CBP report on June 14, 2025, reporting nineteen uses of force, most of them chemical munitions); ICE Ex. 1, at 1 (ICE report on June 14, 2025, reporting the use of chemical munitions in response to trespassing and assaultive protesters); Cantu Decl. Ex. 1, at 3–6 (FPS report on June 24, 2025, reporting five rounds from an FN 303 on woman with a machete); ICE Ex. 1, at 4 (ICE report on June 24, 2025, reporting the use of OC, CS, and PLS to push an "aggressive and advancing crowd"); Cantu Decl. Ex. 2, at 3–4 (FPS report on July 4, 2025, reporting the use of OC spray to aid ICE officers conducting an arrest); ICE Ex. 1, at 6–8 (ICE report on July 15, 2025, reporting the use of CS gas and PLS rounds on a crowd of twenty-five to thirty protesters for failing to keep distance during an arrest); Cantu Decl. Ex. 3, at 7–8 (FPS report on August 18, 2025, in which FPS officers responded to an abandoned car at the Portland ICE Facility driveway); Cantu Decl. Ex. 4, at 8 (FPS report on September 1, 2025, reporting the use of pepper balls to disperse a group blocking the main entrance to the Portland ICE Facility); ICE Ex. 1, at 11 (ICE report on September 1, 2025, reporting the use of various types of chemical munitions to clear individuals from federal property); Cantu Decl. Ex. 5, at 1 (FPS report on October 1, 2025, reporting the use of "Mark 9" to clear the Portland ICE Facility Driveway); Cantu Decl. Ex. 8, at 1–2 (FPS report on October 11, 2025, reporting the use of an FN 303 to clear the Portland ICE Facility driveway and during a targeted arrest); Cantu Decl. Ex. 9, at 4 (FPS report on October 12, 2025, reporting the use of OC spray on individuals interfering with an arrest); Sullivan Decl. Ex. C, at 3–4, 11, 18 (CBP report on October 18, 2025, reporting seven total uses of force, all of which involved CS or PAVA); Cantu Decl. Ex. 11, at 1 (FPS report on November 23, 2025, reporting the use of pepper ball munitions on an individual for refusing to comply with orders to stay off federal

## I.    October 4, 2025

On October 4, 2025, federal officers responded to protests from roughly 11:00 am to 1:00 am the following day. Sullivan Decl. Ex. B, at 1. In total, CBP reported twenty-one uses of force. *Id.* at 13. CBP also reported using twenty-two individual chemical munitions containing CS. *Id.* at 2–10. CBP reported no collateral property or bystander injuries. *Id.* at 16.

Around 1:00 pm, FPS officers observed 100 demonstrators "on Federal Property past the blue line" that establishes the boundary between the public sidewalk and the Portland ICE Facility. Cantu Decl. Ex. 6, at 3. FPS first gave orders—directly by officers and broadcasted over a "Long-Range Acoustic Device" ("LRAD")—to leave federal property. *Id.* Later, an individual "threw a large heavy object" at an officer, and the officer responded by deploying an "MK9 OC spray" at that individual. *Id.* Around 1:30 pm, CBP reported using a "hand-tossed green smoke munition" in response to protesters interfering with an arrest. Sullivan Decl. Ex. B, at 22. CBP officers also deployed a "Spede-Heat" CS canister in response to protesters "kicking and attempting to pick up actively deployed munitions." *Id.* One officer noted in their narrative report that "[d]ue to the large amount of smoke and CS gas in the area, [the officer] was unable to observe the results of his [chemical munition] deployment." *Id.* at 23.

---

property); Cantu Decl. Ex. 12, at 1 (FPS report on November 24, 2025, reporting the use of pepper ball munitions or kinetic impact munitions to prevent protesters from blocking the Portland ICE Facility driveway); Cantu Decl. Ex. 13, at 1 (FPS report on November 27, 2025, reporting the use of pepper ball munitions or kinetic munitions on an individual who refused to leave federal property); Cantu Decl. Ex. 14, at 1 (FPS report on November 30, 2025, reporting the use of three rounds of pepper ball munitions on trespassers); Cantu Decl. Ex. 15, at 1 (FPS report on December 21, 2025, reporting the use of pepper ball or kinetic impact munitions at a protester running toward an ICE vehicle as it was departing); Cantu Decl. Ex. 16, at 1 (FPS report on January 9, 2026, reporting use of pepper ball munitions at protesters throwing rocks); Cantu Decl. Ex. 17, at 1 (FPS report on January 10, 2026, reporting the use of PLS munitions at an individual attempting to block a vehicle from leaving the Portland ICE Facility); Sullivan Decl. Ex. E, at 8–9, 22 (CBP report on January 25, 2026, reporting twelve uses of force, the majority of which were chemical munitions).

Around this same time, Plaintiff King was recording the ongoing protest from her balcony at Gray's Landing. King Decl. ¶ 7. While she was recording, a federal officer deployed a chemical munition canister from the driveway of the Portland ICE Facility, which landed under Plaintiff King's balcony located near the intersection of South Bancroft Street and South Bond Avenue—roughly one block away. Pls.' Ex. 1, at 2:35–42; *see also* Tr. 136:7–25 (Plaintiff King testifying as to the trajectory of the gas canister deployed); King Decl. ¶ 7 (Plaintiff King describing the distance between her balcony and the deployment of the canister as "approximately 150 feet"). After this canister hit the street, Plaintiff King's video recording shows gas entering her balcony area and Gray's Landing generally. Pls.' Ex. 1, at 2:55–3:30. Plaintiff King states that "there were not any protesters immediately around [her] apartment." King Decl. ¶ 7. While CBP generally reports how far their chemical munitions travel after deployment, CBP reports from October 4 do not report any chemical munition deployed at a distance such that it could reach Plaintiff King's apartment. *See* Sullivan Decl. Ex. B, at 2–10; *see also id.* at 2–3 (longest reported range of a chemical munition on October 4, 2025, was a CS triple chaser canister that traveled at an estimated distance of sixty feet). ICE similarly does not report any munitions deployed near Plaintiff King's balcony. *See* ICE Ex. 1, at 9–10 (ICE incident report from October 4, 2025).

Later that evening, CBP officers reported using CS gas several times to clear the driveway of the Portland ICE Facility and to respond to "hostile" protesters nearby. Sullivan Decl. Ex. B, at 17–18, 21. Federal officers also deployed more CS gas in response to protesters who were kicking or throwing canisters back at federal officers. *Id.* at 19, 21, 22–23. ICE similarly reported using CS gas grenades to clear protesters who "made threatening gestures toward federal officers, trespassed on Federal property, and blocked access to the ICE facility."

ICE Ex. 1, at 9. By 9:00 pm that evening, CBP officer narratives explain that CS canisters were mainly used to clear the Portland ICE Facility driveway. *See, e.g.*, Sullivan Decl. Ex. B, at 19–20. No agency report mentions specific uses of chemical munitions beyond the intersection of South Bancroft Street and South Moody Avenue. *See id.* at 18–19 (describing "the maximum point of the push" of the protestors as "the stop sign[,]" ostensibly near the Portland ICE Facility); *see also* Cantu Dep. 48:19–21 ("[W]e don't employ anything down on Moody. We have no . . . business on Moody."); *id.* at 49:5–8 (same statement with respect to South Bancroft Street). *But see id.* at 49:16–25 (Director Cantu confirming that he observed "other law enforcement agencies within DHS going . . . towards Moody Street, towards Bancroft Street" and "using chemical munitions when on the street out towards Moody or towards Bancroft"). FPS reports do not provide details about protests on the evening of October 4, 2025. *See generally* Cantu Decl. Ex. 6.

Plaintiffs' video evidence, by contrast, shows the use of chemical munitions beyond the direct vicinity of the Portland ICE Facility. On one occasion, a line of federal officers slowly pushed a group of protesters eastbound down South Bancroft Street for roughly ten minutes. Pls.' Ex. 2, at 1:45–12:16; *see also* Pls.' Ex. 19 (Oregon Public Broadcasting video documenting federal officers pushing protesters slowly down South Bancroft Street and then deploying chemical munitions). Once protesters were pushed near the intersection of South Bancroft Street and South Bond Avenue—a full block away from the Portland ICE Facility—federal officers deployed chemical munitions, resulting in visible plumes of gas quickly reaching Gray's Landing. Pls.' Ex. 2, at 13:48–15:13; *see also* Moreno Decl. ¶ 10 ("While I was on Bancroft Street east of Gray's Landing, far from the ICE facility . . . ICE pushed the crowd past Gray's Landing, tear gassing them . . . ."). FPS maintains, however, that their duty of protecting the

Portland ICE Facility does not require uses of force down South Bancroft Street or South Moody Avenue. Cantu Dep. 48:19–49:8.

Several of the Resident Plaintiffs state that Defendants' use of chemical munitions on October 4, 2025, caused serious adverse effects to their physical and mental health. Plaintiff Moreno testified that the use of chemical munitions that evening "was the worst . . . [she] has dealt with . . . ." Tr. 43:10; *see also* Del Nigro Decl. ¶ 11 (stating that October was "when the tear gas was at its worst"); Dooley Decl. ¶ 5 (same). Specifically, Plaintiff Moreno states that "tear gas was leaking into [her] apartment . . . ." Moreno Decl. ¶ 10. Because of the presence of gas in her apartment, she "called [her] partner to come pick [her] up." Tr. 43:12–13. Plaintiff Moreno then left her apartment and headed eastbound "on Bancroft Street east of Gray's Landing, far from the ICE facility and two blocks from the protests . . . ." Moreno Decl. ¶ 10. While waiting there, "ICE pushed the crowd past Gray's Landing, tear gassing them" and Plaintiff Moreno *Id.* After she was exposed to chemical munitions, Plaintiff Moreno vomited on the side of the road. *Id.* Similarly, Plaintiff King "closed up [her] apartment[,]" but gas was still coming in through her front door because gas had seeped in through the "front door of the Gray's Landing building" and "interior hallways . . . ." Tr. 137:11–138:6. Because of the chemical exposure that night, Plaintiff King experienced coughing and burning in her eyes, throat, and skin that lasted for weeks. Tr. 138:24–139:13.

Plaintiffs' evidence also highlights the presence of social media influencers and/or videographers who were embedded with federal officers on the ground and on the roof of the Portland ICE Facility on October 4, 2025.[13] *See, e.g.*, Pls.' Ex. 22 (post on social media website "X," dated October 4, 2025, showing a known social media figure "on the rooftop of the

---

[13] The relevance of the presence of social media personalities is explained below.

Portland ICE facility"); Pls.' Ex. 24 (post on X, dated October 3, 2025, in which a social media

account shows two social media figures "[o]n top of the roof at [the] Portland ICE [Facility]");

Cantu Decl. Ex. 6, at 3 (reporting that the Portland ICE Facility was "closed to the public"

around 1:00 pm on October 4, 2025).[14] Plaintiffs' video evidence captures an individual standing

*behind* a line of federal officers with camera equipment filming the protest on the evening of

October 4, 2025. Pls.' Ex. 2, at 14:10–14:42; *see also* Tr. 141:22–142:22 (Plaintiff King

describing individual filming the protest). Plaintiffs' evidence also shows the presence of a drone

flying near Gray's Landing that evening. Pls.' Ex. 2, at 18:35–18:42; *see also* Sullivan Dep.

43:1–14 (discussing presence of a DHS-operated drone on October 4, 2025). A few days later, on

October 6 and 7, the official DHS Instagram account posted short videos displaying aerial

footage capturing the use of chemical munitions directly outside Gray's Landing on the corner of

South Moody Avenue and South Lowell Street, roughly one block away from the Portland ICE

Facility.[15] Pls.' Ex. 49, at 0:33 (social media post, dated October 6, 2025, on DHS's Instagram

---

[14] Plaintiffs also present evidence of the presence of social media influencers at the Portland ICE Facility as early as September 11, 2025. *See* Pls.' Ex. 29 (post on X, dated September 11, 2025, showing footage of a protest at the Portland ICE Facility with a caption reading, "I went behind the scenes at the ICE facility in Portland with the Department of Homeland Security's Federal Protective Service . . . . [H]ere's an inside look at the officers who stand as our nation's first line of defense in protecting our federal buildings."); *see also* Doe Decl. ¶ 10 ("In October, the use of tear gas and flashbangs ramped up again to nearly daily after federal DHS officials and influencers visited the ICE facility.").

[15] It is unclear whether the footage used in the cited DHS Instagram videos was taken on October 4, 2025, or on another evening that fall. It is clear, however, that some technology capable of capturing aerial footage—such as a drone—was deployed over Gray's Landing on or before October 6, 2025. Whenever the footage was taken, the cited video shows the deployment of chemical munitions as far as the corner of South Lowell Street and South Moody Avenue, roughly one block away from the Portland ICE Facility. Pls.' Ex. 49, at 0:33; *see also* Sullivan Decl. Ex. B, at 17 (describing "mov[ing] towards the crowd to redirect the crowd north on [South] Moody [Avenue]").

page showing aerial footage of Gray's Landing); Pls.' Ex. 47, at 0:01 (social media post, dated October 7, 2025, on DHS's Instagram page showing aerial footage of Gray's Landing).

## II.    January 24, 2026

On the evening of January 24, 2026, federal officers responded to a few hundred protesters outside the Portland ICE Facility. Cantu Decl. Ex. 19, at 2–3 (reporting 200–400 protesters); *see also* Sullivan Decl. Ex. D, at 39 (reporting 500 protesters). Over the course of the evening, CBP reported eighty-three uses of force, the majority of which involved the deployment of chemical munitions. Sullivan Decl. Ex. D, at 11, 50. Additionally, CBP reported the deployment of roughly eighty-five individual munitions containing CS. *Id.* at 2–5, 21–37. CBP reported no bystander injuries or collateral damage. *Id.* at 13, 60.

CBP mainly reported using CS munitions to disperse crowds from the Portland ICE Facility's gate, *id.* at 66, 69, and to clear the driveway, *id.* at 15–16, 65. Federal officers also used CS gas in response to protesters: (1) throwing objects, such as water bottles, at federal officers, *id.* at 66, 70; (2) attempting to create a barrier outside the Portland ICE Facility, *id.* at 61; (3) attempting to destroy security cameras, *id.* at 61; and (4) dumping or throwing broken glass in the driveway, *id.* at 61, 65, 69. Federal officers also deployed additional CS munitions in response to protesters throwing or kicking back previously-deployed canisters. *Id.* at 64, 72; *see also* Pls.' Ex. 44, at 0:06–2:50 (live canisters thrown back and forth between federal officers and protesters). FPS deployed pepper ball munitions for many of the same reasons as listed above. Cantu Decl. Ex. 19, at 1–3. Defendants did not provide an ICE report for January 24, 2026.

Evidence proffered by Plaintiffs shows large clouds of gas and explosions coming from the Portland ICE Facility. *See generally* Pls.' Exs. 37–39. From the video evidence provided,

protesters appear to be standing around the Portland ICE Facility, Pls.' Ex. 43, at 0:00–17, when officers exited the Portland ICE Facility to disperse the crowd with gas, *id.* at 0:17–2:42.

Plaintiffs Doe and Roe state that federal officers fired chemical munitions at least every hour from roughly 7:00 pm to 11:00 pm. Doe Decl. ¶ 11; Roe Decl. ¶ 8. Plaintiff Roe adds that she "saw that the protests had shrunk" but "the federal officers were still using tear gas and chemical munitions at that point." Roe Decl. ¶ 8. CEO Salazar also states that "[s]taff documented a burn mark on the exterior west wall of the Gray's Landing building where a tear gas canister was lodged between the sidewalk and the wall." Salazar Decl. ¶ 14. Because of how close chemical munitions canisters got to Gray's Landing, Plaintiff Doe states that "the gas took a few minutes from being fired at 7:00 p.m. to get into [her] apartment." Doe Decl. ¶ 12. After the "worst volley came at approximately 10 p.m.," chemicals entered into Plaintiff Doe's living room and kitchen. *Id.* ¶ 11. Defendants' use of chemical munitions on this day caused Plaintiff Doe to "cough severely[,]" and her "throat became itchy and [her] eyes watered." *Id.* ¶12. Plaintiff Doe states that "[her] symptoms have gotten worse after each exposure." *Id.* ¶ 14.

Plaintiff Lineberger similarly states that on January 24, "federal agents again used tear gas in significant quantities in response to protests outside of the ICE facility near to [Plaintiff Lineberger's] home." Lineberger Decl. ¶ 9. She adds that "[t]ear gas was fired at least six times, which created a cloud of gas that reached Gray's Landing and [her] apartment." *Id.* She reports that Defendants' use of chemical munitions caused her to suffer impaired breathing, lost sleep, headaches, and anxiety. *Id.* ¶ 10.

## III.    January 30, 2026

On January 30, 2026, federal officers responded to protests occurring mostly between 8:00 pm and 9:00 pm. *See* Sullivan Decl. Ex. F, at 25–32 (narrative reports of CBP officers).

CBP and FPS "exited the facility to effect the targeted arrest of two individuals actively engaged in riotous behavior." *Id.* at 25. Agents then "deployed a green smoke munition for the purpose of assessing wind conditions and to encourage crowd dispersal." *Id.* In response, protesters "immediately retrieved and threw the munition back toward agents . . . ." *Id.* at 25–26. In reply, agents deployed further chemical munitions (including PAVA, CS, and stingers) largely in response to protesters throwing previously-deployed munitions back at federal officers. *Id.* at 26, 28, 30–31 (various narrative reports of PAVA, CS, and stingers deployed at protesters attempting to throw or kick canisters back at officers). CBP also reported deploying chemical munitions at protesters to facilitate arrests, *id.* at 28, as well as at protesters exhibiting "active resistance" and "assaultive behavior[,]" *id.* at 26. In total, CBP reported twenty-two uses of force, and most involved chemical munitions. *Id.* at 23–25. CBP also reported deploying seven chemical munitions containing CS. *Id.* at 2–13. CBP did not report any bystander injuries or collateral damage. *Id.* at 25. FPS did not report any use of chemical munitions. *See* Cantu Decl. ¶ 29 (citing Cantu Decl. Ex. 21, at 1–2). Defendants did not provide an ICE incident report for this date.

Plaintiffs' video evidence, by contrast, shows protesters standing in front of the Portland ICE Facility and across the street on South Bancroft Street. Pls.' Ex. 45, at 0:00–1:20; *see also* Pls.' Ex. 46, at 0:00–09 (same). On at least one occasion, federal officers exited the Portland ICE Facility and deployed chemical munitions in response to protesters standing on the public sidewalk at the end of the Portland ICE Facility driveway and across the street. Pls.' Ex. 45, at 1:20–2:44; *see also* Pls.' Ex. 46, at 0:09–2:13 (same); *id.* at 0:24–29 (canister launched across or into the street).

///

///

IV.     **January 31, 2026**

On January 31, 2026, between 4:00 pm and 5:00 pm, a large crowd of roughly 3,000

people gathered at the Portland ICE Facility. One narrative attached to CBP's incident report

describes this crowd as "violent protesters" who "coordinated an organized attack on the front

gate of the facility." Sullivan Decl. Ex. G, at 73; *see also id.* (reporting that when the crowd's

size shrank to approximately 1,500 individuals, "[t]he remaining crowd continued to exhibit

aggressive behavior . . . ."); *id.* at 75 ("The ICE building had been besieged by upwards of

approximately 3000 protesters."). Around 4:30 pm, CBP officers deployed CS munitions to

disperse the crowd gathering around the Portland ICE Facility, and to respond to reported

incidents of protesters throwing objects, such as "rocks, eggs, bottles and pieces of riot

munitions." *Id.* at 84–85; *see also id.* at 76 ("I was struck in the arm with an object that I later

identified as an egg. I deployed one Triple Chaser CS device to prevent the assault of myself and

fellow federal law enforcement officers."). CBP officers also deployed CS munitions to respond

to some protesters kicking live chemical munitions back at federal officers. *Id.* at 84–85. By 6:00

pm, CBP reported that the crowd shrank to roughly 500 people. *Id.* at 78. CBP continued to use

CS munitions to disperse the "hostile" crowd, *id.* at 81, and in response to more protesters

kicking live munitions back at federal officers, *id.* at 84. In total, CBP reported 126 uses of force.

*Id.* at 59–72. Of those uses of force, CBP reported the use of thirty-three munitions containing

CS and thirteen munitions containing OC. *Id.* at 2–25. CBP reported no bystander injury or

collateral damage. *Id.* at 72. FPS and ICE offered similar reports of using chemical munitions to

disperse crowds around the Portland ICE Facility. Cantu Decl. ¶ 30 (citing Cantu Decl. Ex. 22, at

1–2); ICE Ex. 1, at 13–14.

Plaintiffs' evidence presents another perspective on the group of 3,000 protesters on this day. Video evidence shows that there was a large presence of protesters affiliated with various labor unions. *See* Pls.' Ex. 58, at 2:26–7:39 (protesters carrying long banners or signs with labor union-related language). Many children and elderly people are seen in the crowd. Pls.' Ex. 63, at 3:15–4:00. From the perspective of Plaintiff King's balcony, around 4:14 pm, protesters marched south on South Moody Avenue toward the Portland ICE Facility, turned east on South Bancroft Street, and marched eastward past the Portland ICE Facility before falling out of frame of Plaintiff King's video footage. Pls.' Ex. 58, at 2:26–7:39. Eventually, protesters stopped marching and began to gather around the Portland ICE Facility. *See id.* at 13:32–17:30. Then, at 4:32 pm, federal officers began deploying chemical munitions. *Id.* at 17:50–22:00; *see also* Pls.' Ex. 52, at 0:00–0:25 (same deployment from the perspective of Plaintiff Brooks' apartment located on South Moody Avenue; gas is seen travelling in large plumes northbound up South Moody Avenue). Federal officers deployed chemical munitions not only from the driveway of the Portland ICE Facility, but also from its rooftop. Pls.' Ex. 58, at 18:55–19:05. At 4:34 pm, "a projectile with a corkscrew tail of smoke" broke a window on the third story of Gray's Landing, causing glass to fall on protesters below. Pls.' Ex. 72, at 2; *see also* Pls.' Ex. 58, at 19:30–19:33 (Plaintiff King's footage capturing a munition launched from the Portland ICE Facility driveway and colliding with the façade of Gray's Landing). By 4:36 pm, the amount of chemical munitions deployed by federal officers produced a gas cloud large enough to reach the north side of Gray's Landing, more than one block away from the Portland ICE Facility. Pls.' Ex. 63, at 3:00–4:30. At this point, security camera footage outside the north entrance of Gray's Landing on South Lowell Street captures a large group of protesters (including elderly persons and children) rushing into the main lobby of Gray's Landing. *Id.* In the same timeframe, security camera

footage within Gray's Landing shows many protesters bent over, leaning against walls, and rubbing their eyes. Pls.' Ex. 62, at 1:45–4:00. By 4:38 pm, the air outside the north entrance of Gray's Landing was visibly saturated in a dense fog of gas. Pls.' Ex. 63, at 4:30–9:00. The gas appears to dissipate outside by 4:43 pm, but people are still seen covering their faces after the fog lifts. *Id.* at 9:50–10:30.[16]

Elsewhere within Gray's Landing, security footage of the complex's interior hallways and elevator banks shows individuals covering their faces or rubbing their eyes from roughly 4:49 pm to 5:14 pm—seventeen to forty-two minutes after federal officers began using chemical munitions outside the Portland ICE Facility. Pls.' Exs. 64–69.

At the evidentiary hearing, Plaintiff Roe testified that the federal officers' deployment of chemical munitions on January 31 was "the largest gas event [she's] ever experienced." Tr. 91:16–17. Eventually, Plaintiff Roe returned to her apartment after being outside and "proceeded to vomit." Tr. 92:1. She started "having trouble catching her breath and . . . was experiencing heart palpitations[,]" so she "decided to contact 911." Tr. 92:2–4. Plaintiff Roe added that the responding paramedics told her "that the gas was worse in the building than outside the building and . . . led [her] outside to help [her] breathe outside." Tr. 92:14–16. Plaintiff del Nigro similarly testified that gas entered into her apartment despite her attempt to "turn[] on the air filter on full blast and put towels under doors" and enter a room "that doesn't have a vent in it." Tr. 116:22–117:2.[17] As a result of Defendants' use of chemical munitions, Plaintiff del Nigro

---

[16] At the evidentiary hearing, Dr. Rama Rao testified that when aerosolized chemicals "dissipate[,]" it does not necessarily mean that the chemicals are no longer present. Instead, even when gas is longer visible, chemicals may still be present and chemically active. *See* Tr. 61:3–62:19 (discussion of how gases move through environments).

[17] On cross-examination, Plaintiff del Nigro confirmed that the events she describes in this paragraph happened on January 31, 2026. Tr. 122:2–6.

suffered "really severe migraines for a few weeks after that" as well as "a burning rash on [her] hands and arms, neck, and face[,]" and her son "ended up getting hives on his whole groin, as well as his ankles and his hands." Tr. 117: 7–10.

## V.    February 1, 2026

On February 1, 2026, federal officers reported using multiple rounds of chemical munitions between 4:00 pm and 11:00 pm. Sullivan Decl. Ex. H, at 36, 46. Over the course of the day, CBP reported forty-five uses of force. *Id.* at 24–30. CBP used nineteen munitions containing CS and twenty-one munitions containing OC. *Id.* at 2–22. CBP reported using CS munitions because protesters: (1) threw objects at federal officers such as CS canisters, *id.* at 33– 34; (2) attempted to break the front gate of the Portland ICE Facility, *id.* at 32, 35, 38; and (3) used lights and lasers to disorient or temporarily blind federal officers, *id.* at 45. ICE agents similarly deployed CS gas to respond to protesters throwing objects and attempting to break the front gate of the Portland ICE Facility. ICE Ex. 1, at 15. FPS reported a single use of OC spray "for area disbursal [sic] . . . ." Cantu Decl. Ex. 23, at 2. Federal officers did not report any bystander injuries or collateral damage. Sullivan Decl. Ex. H, at 30.

According to Plaintiffs' evidence, Plaintiff Roe described federal officers "lobbing" chemical munitions "way out into the crowd." Tr. 96:10. Plaintiffs' video evidence also captures gas clouds northbound up South Moody Avenue and eastbound down South Bancroft Street. *See generally* Pls.' Ex. 54 (Plaintiff Brooks recording gas up South Moody Avenue); *see also* Pls.' Ex. 56, at 5:40–8:00 (Plaintiff King's security camera recording gas canisters launched far down South Bancroft Street near the courtyard of Gray's Landing at roughly 6:50 pm). Additionally, Plaintiff King testified that she was not in Portland between January 24 and February 1, 2026, returning shortly before midnight on February 1. Tr. 147:1–2. Upon her return to Gray's

Landing, however, Plaintiff King testified that "[w]ithin an hour or so, [she] started to feel symptoms that [she] felt prior when being exposed to teargas, including the extremely dry throat[,]" which she described as "like [she is] swallowing glass." Tr. 147:11–14. Plaintiff King's symptoms continued to worsen "to the point where [she] had to seek medical attention." Tr. 147:14–15.

## STANDARDS

Federal Rule of Civil Procedure 65 grants federal district courts the authority to issue preliminary injunctions. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20; *see also id.* at 22 (holding that the Ninth Circuit's earlier rule that the mere showing of a "possibility" of irreparable harm, as opposed to its likelihood, was insufficient to justify a preliminary injunction). When the nonmovant is a government entity, the last two *Winter* factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

The Ninth Circuit recognizes an alternative "'serious questions' approach to preliminary injunctions[,]" which "survives *Winter* when applied as part of the four-element *Winter* test." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Under this test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (internal quotation marks omitted). Therefore, a court may grant a

preliminary injunction "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## STANDING

Defendants argue as an initial matter that Plaintiffs lack standing because Plaintiffs fail to show that "each specific plaintiff will 'again be wronged in a similar way.'" Defs.' Opp'n 14 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). The Court finds that Plaintiffs have standing.

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). To establish the first element of Article III standing, "[i]t is insufficient to demonstrate only a past injury." *Mortensen v. Cnty. of Sacramento*, 368 F.3d 1082, 1086 (9th Cir. 2004). Instead, "[t]o have standing to seek an injunction against future unlawful conduct, a plaintiff must show a 'sufficient likelihood' that they will suffer a similar injury in the future." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 673 (9th Cir. 2025) (quoting *Lyons*, 461 U.S. at 111). "[A] plaintiff can show that an injury is likely to recur by 'demonstrat[ing] that the harm is part of a pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights.'" *Id.* at 674 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012)).

Here, Defendants only challenge Plaintiffs' ability to show the first element of Article III standing; that is, Defendants argue that Plaintiffs cannot show a likelihood of future harm caused by chemical munitions because Plaintiffs rely on "a highly 'speculative chain of possibilities'

that 'does not satisfy the requirement that threatened injury must be certainly impending.'"

Defs.' Opp'n 14 (quoting *Clapper*, 568 U.S. at 410). The Court disagrees with Defendants.[18]

First, the challenged action—Defendants' use of chemical munitions—is not only likely to

happen again; it did. Specifically, federal officers deployed tear gas at the Portland ICE Facility

on January 30, 2026, the same day Plaintiffs filed their pending motion. *See* Pls.' Exs. 45–46

(video evidence of tear gas deployed on January 30, 2026); Sullivan Decl. Ex. F, at 23–25

(reporting 22 uses of force, including munitions containing CS gas, on January 30, 2026).

Defendants also deployed chemical munitions on the next two days. *See* Pls.' Exs. 52–58, 62–69

(video evidence of tear gas deployed on January 31, 2026, and February 1, 2026); Sullivan Decl.

Ex. G, at 2–5, 21–37, 59–72 (reporting 126 uses of force, including eighty-five munitions

containing CS gas, on January 31, 2026); Sullivan Decl. Ex. H, at 24–30 (reporting 45 uses of

force, including munitions containing CS gas, on February 1, 2026). Second, the record

"demonstrat[es] that the harm is part of a pattern of officially sanctioned behavior, violative of

the plaintiffs' federal rights." *Vasquez Perdomo*, 148 F.4th at 674 (quoting *Lyons*, 461 U.S. at

111). The record contains hundreds of pages of incident reports showing a pattern of federal

officers using chemical munitions outside the Portland ICE Facility for over half a year. *See*

*generally* Cantu Decl. Exs. 1–23; Sullivan Decl. Exs. A–H; ICE Ex. 1. And Defendants' own

briefing takes the position that the deployment of chemical munitions at the Portland ICE

Facility is officially sanctioned behavior. *See, e.g.*, Defs.' Opp'n 37 ("[L]aw enforcement can

---

[18] The Court also finds that Plaintiffs show that their alleged harms are fairly traceable to Defendants' use of chemical munitions, and that their injury is redressable by a favorable ruling. *See, e.g.*, Del Nigro Decl. ¶ 6 ("Since tear gas began to get into my apartment over the summer, I have had severe and long-lasting allergic reactions[,] . . . repeated bouts of dizziness, nausea, and vomiting[,] . . . inflamed eyelids that caused painful styes[, and] . . . a full-body rash [sic] for about six weeks . . . ."); *id.* ¶ 9 (explaining that "symptoms were less severe in December [2025] when ICE was mainly using pepperballs rather than tear gas").

lawfully use [chemical munitions] to protect federal property, disperse crowds obstructing traffic into federal buildings, and stop civil disturbances."); *id.* at 34 ("[T]he record shows that federal law enforcement . . . acted lawfully to disperse such demonstrations."). But as held below, the Court finds this conduct violates Plaintiffs' constitutional rights. On these grounds, the Court finds that Plaintiffs have standing.

## DISCUSSION

Plaintiffs assert claims under the Fifth and Fourth Amendments for which they seek declaratory and injunctive relief with the goal of enjoining Defendants "from acting unlawfully." FAC ¶¶ 33, 117–56. Plaintiffs seek an order declaring that "Defendants' use of tear gas, smoke grenades, and other chemical munitions violates Plaintiffs' substantive due process rights under the Fifth Amendment, or right to be free from unreasonable seizures under the Fourth Amendment[,]" as well as enjoining Defendants "from deploying [chemical munitions] that are likely to infiltrate Gray's Landing and its apartments, unless the use of such munitions is necessary to protect against an imminent and concrete threat to the lives of federal officers or other persons . . . ." *Id.* ¶¶ A–B (Request for Relief). Because the Court considers these claims in the context of a motion for preliminary injunction, *Winter* provides for the applicable legal framework.

## I. *Winter* Factor One: Likelihood of Success on the Merits

The Court first considers the likelihood of success on the merits of both of Plaintiffs' claims: the deprivation of their right to liberty of movement under the Fourth Amendment and the deprivation of substantive due process rights under the Fifth Amendment. FAC ¶¶ 117–56. Although Plaintiffs have articulated their Fourth Amendment claim as an alternative to their Fifth Amendment substantive due process claims, *id.* ¶ 148, the Supreme Court has held that "if

a constitutional claim is covered by a specific constitutional provision, such as the Fourth or

Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific

provision, not under the rubric of substantive due process[,]" *United States v. Lanier*, 520 U.S.

259, 272 n.7 (1997); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998); *Puente v.*

*City of Phoenix*, 123 F.4th 1035, 1050 (9th Cir. 2024). Therefore, Plaintiffs' Fourth Amendment

claim must be analyzed before Plaintiffs' Fifth Amendment substantive due process claim, and

the Court may reach the merits of Plaintiffs' Fifth Amendment claim only if the Court finds on

the current record that no Fourth Amendment right exists as asserted by Plaintiffs.

      A.     Fourth Amendment Claim

      Plaintiffs argue that Defendants have violated the Fourth Amendment because

"Defendants have used force with intent to harm targeted protesters" such that Defendants' use

of chemical munitions unreasonably restrained the Resident Plaintiffs' "liberty of

movement . . . ." Pls.' Mot. 40 (quoting *Villanueva v. California*, 986 F.3d 1158, 1168–69 (9th

Cir. 2021)). To prevail on a Fourth Amendment claim of unlawful seizure, there must be

evidence of an objective intent to restrain or detain. *Puente*, 123 F.4th at 1050–54. Here, as in

*Puente*, the evidence currently before the Court establishes that federal officers use chemical

munitions and crowd control devices to disperse protesters at the Portland ICE Facility, not to

detain them. To whatever extent Defendants impacted the Resident Plaintiffs' freedom of

movement within or outside of their homes by using chemical munitions to disperse protesters,

there is insufficient evidence of an objective intent by Defendants to detain Plaintiffs. Therefore,

Plaintiffs have failed to establish they are likely to succeed on the merits with respect to their

Fourth Amendment claim. The Court therefore proceeds to consider Plaintiffs' Fifth Amendment

claim. *See Lanier*, 520 U.S. at 272 n.7.

B.    Fifth Amendment Claim[19]

The Resident Plaintiffs claim that Defendants' use of chemical munitions violates their substantive due process rights under the Fifth Amendment to the Constitution. FAC ¶¶ 117–46. More specifically, Plaintiffs claim that Defendants are violating the Resident Plaintiffs' rights to bodily integrity when Defendants, through deliberate indifference or intent to harm, excessively deploy chemical munitions that enter Plaintiffs' homes and bodies, causing them irreparable injury. *Id.* ¶¶ 5, 8–9.

The Due Process Clause of the Fifth Amendment of the Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. Substantive due process "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal quotation marks and citations omitted). To establish a substantive due process violation, a plaintiff must show "both a deprivation of [their] liberty and conscience shocking behavior by the government." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006).

As explained below, on the record before the Court at this preliminary stage in the proceedings, the Court finds that Plaintiffs have shown a deprivation of their constitutional liberty interest in bodily integrity, and that Defendants' conduct over the course of the last eight months shocks the conscience such that Plaintiffs have shown a likelihood of success on the

---

[19] The Resident Plaintiffs raise additional substantive due process violation theories involving various asserted rights to liberty and property. *See* Pls.' Mot. 32–33 (asserting a "liberty of movement" interest and property interests). In light of the Court's decision on the Resident Plaintiffs' bodily integrity theory, the Court declines to reach these additional theories in resolving Plaintiffs' pending motion.

merits. Alternatively, Plaintiffs have raised serious questions going to the merits of their

substantive due process claim.

> i.      Have Plaintiffs Established a Cognizable Deprivation of Liberty?

>> a.      Legal Standard

In *Washington v. Glucksberg*, the Supreme Court explained the legal framework for a

substantive due process claim:

> Our established method of substantive-due-process analysis has two primary
> features: First, we have regularly observed that the Due Process Clause specially
> protects those fundamental rights and liberties which are, objectively, "deeply
> rooted in this Nation's history and tradition," [*Moore v. Cleveland*, 431 U.S. 494,
> 503 (1977)] (plurality opinion); *Snyder v. Massachusetts*, 291 U.S. 97,
> 105 . . . (1934) ("so rooted in the traditions and conscience of our people as to be
> ranked as fundamental"), and "implicit in the concept of ordered liberty," such that
> "neither liberty nor justice would exist if they were sacrificed," *Palko v.
> Connecticut*, 302 U.S. 319, 325, 326 . . . (1937). Second, we have required in
> substantive-due-process cases a "careful description" of the asserted fundamental
> liberty interest. [*Reno v. Flores*, 507 U.S. 292, 302 (1993)]; [*Collins v. City of
> Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)]; [*Cruzan v. Dir., Mo. Dep't. of
> Health*, 497 U.S. 261, 277–78 (1990)]. Our Nation's history, legal traditions, and
> practices thus provide the crucial "guideposts for responsible decisionmaking,"
> *Collins, supra*, at 125, . . . that direct and restrain our exposition of the Due Process
> Clause. As we stated recently in *Flores*, the Fourteenth Amendment "forbids the
> government to infringe . . . 'fundamental' liberty interests *at all*, no matter what
> process is provided, unless the infringement is narrowly tailored to serve a
> compelling state interest." 507 U.S., at 302 . . . .

*Glucksberg*, 521 U.S. at 720–21.

"No right is held more sacred, or is more carefully guarded by the common law, than the

right of every individual to the possession and control of his own person, free from all restraint

or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry.

Co. v. Botsford*, 141 U.S. 250, 251 (1891). Subsequent to the Supreme Court's decision in *Union

Pacific Railway*, courts have discussed this right to liberty and bodily integrity in a variety of

contexts, often citing the right's roots in *Union Pacific Railway*. *See Glucksberg*, 521 U.S. at

719–20 (holding that the right to liberty involves "more than the absence of physical restraint," including bodily integrity (citing *Rochin v. California*, 342 U.S. 165 (1952))); *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (holding that the right to bodily integrity includes a detainee's right to be free from forced antipsychotic drugs "absent a finding of overriding justification and a determination of medical appropriateness"); *Cruzan*, 497 U.S. at 269, 278 (holding that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment" and referencing *Union Pacific Railway*); *Rochin*, 342 U.S. at 172 (finding due process right of arrestee to be free from forced stomach pumping); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (finding a right to bodily security includes the right to be free from being affirmatively placed at risk of danger or injury); *Hess v. Garcia*, 72 F.4th 753, 765, 765 n.8 (7th Cir. 2023) (finding the Magna Carta and *Union Pacific Railway* as long recognizing "the right to bodily integrity as an essential component of our liberty protected by the Fourteenth Amendment's due process clause" and finding that such right encompasses the right to be free from sexual abuse); *Guertin v. Michigan*, 912 F.3d 907, 919–21 (6th Cir. 2019) (citing *Union Pacific Railway* to find right to bodily integrity includes right to be free from knowing exposure to poisoned water); *In re Cincinnati Litig.*, 874 F. Supp. 796, 817–19 (S.D. Ohio 1995) (citing *Union Pacific Railway* to find that plaintiffs stated a claim for violation of bodily integrity stemming from government radiation experiments on cancer patients absent informed consent).

This line of cases establishes the history and legal tradition of courts recognizing the right to bodily integrity as fundamental and implicit in the concept of liberty *and* exemplifies the wide variety of factual scenarios in which courts have found the right to be cognizable under the Due Process Clause. And while the right to bodily integrity has not been found in the exact factual scenario presented by this case, that is not the question. Rather, abiding by the crucial guideposts

for responsible decisionmaking, *Collins*, 503 U.S. at 125, and considering the framework of our

Nation's history, legal traditions, and practices, *Glucksberg*, 521 U.S. at 721, the Court must

decide whether the asserted fundamental liberty interest based on the facts of this case fit within

the bodily integrity framework so as to justify finding a cognizable constitutional claim. *See,*

*e.g.*, *Guertin*, 912 F.3d at 921 (holding that "a government actor violates individuals' right to

bodily integrity by knowingly and intentionally introducing life-threatening substances into

individuals without their consent, especially when such substances have zero therapeutic benefit"

(internal quotation marks omitted)).

b.    Application

The Court proceeds with a "careful description" of the right asserted by the Resident

Plaintiffs. *Glucksberg*, 521 U.S. at 721. The Resident Plaintiffs argue they have a right to bodily

integrity free from the nonconsensual exposure and ingestion of toxic airborne substances in the

form of chemical munitions that have been intentionally, repeatedly, and excessively deployed

by Defendants over the past several months and that enter Plaintiffs' homes so as to harm their

health. *See* Pls.' Mot. 28–32.

Based on credible evidence offered by Plaintiffs, and accounting for Defendants' need to

use force to address unlawfulness and threats to the Portland ICE Facility, the Court begins by

articulating a careful six-part description of the liberty interest and right to bodily integrity in this

case:

> ➢ First, on multiple occasions over the past eight months, Defendants have deployed
>
> chemical munitions that entered the Resident Plaintiffs' homes and their bodies, causing
>
> harm, *see, e.g.*, Dooley Decl. ¶¶ 4–6 (chemicals entering Plaintiff Dooley's apartment,
>
> causing a variety of health complications including falling "four different times" and

"mild heart failure"); Doe Decl. ¶ 9 (explaining that Plaintiff Doe's "apartment became completely filled with smoke[,]" causing "difficulty breathing," "chest pain," and "coughing non-stop");

➤ Second, the Resident Plaintiffs have suffered harm from the chemical munitions despite their efforts to mitigate the damage, *see* Lineberger Decl. ¶ 8 (buying an air purifier, cleaning her carpets, and taking frequent showers); Doe Decl. ¶ 8 (purchasing gas masks); Taylor Decl. ¶ 5 (placing towels under doors and sealing windows); Roe Decl. ¶ 12 (wearing a gas mask to bed); Salazar Decl. ¶ 16 (placing air scrubbing machines throughout Gray's Landing, regularly replacing HVAC filters, and installing sticky mats to capture residue from shoes, among other measures);

➤ Third, Defendants have used chemical munitions in such quantities so as to create clouds of chemical gas that envelope Gray's Landing and enter the Resident Plaintiffs' homes, *see, e.g.*, Pls.' Ex. 58, at 17:50–22:00 (use of chemical munitions on January 31, 2026); Pls.' Exs. 64–69 (Gray's Landing hallway footage showing residents reacting to chemicals present inside the apartment complex); Tr. 92:7–16 (Plaintiff Roe relaying paramedic observations "that the gas was worse in the building than outside the building");

➤ Fourth, Defendants were specifically notified of the harm that their widescale deployments of chemical munitions were having on the Resident Plaintiffs, but Defendants chose to use chemical munitions anyway, often in large quantities, *see* Pls.' Mot. Attach. Ex. 13 ("Piggott Decl.") ¶ 5 (REACH staff addressing harm directly with federal officers outside the Portland ICE Facility on July 7, 2025), ECF No. 46-13; Pls.' Ex. 33 (letter from members of Oregon's congressional delegation advising DHS of the

harm to residents of Gray's Landing on October 16, 2025); Compl., ECF No. 1 (filed

December 5, 2025);

➤ Fifth, Defendants were further advised based on the content of the various agencies' Use

of Force Manuals as to the health impacts of widescale chemical munitions on people

such as the Resident Plaintiffs, *see, e.g.*, Sullivan Decl. ¶ 8 (citing CBP's Use of Force

Policy, which provides that officers "may utilize chemical area saturation" when

"[r]easonable consideration has been given to any factors which may counsel against the

use of such force, such as the presence of . . . small children, the elderly, . . . or

individuals who lack the ability to quickly disperse from the area.");

➤ Finally, while the Court does not reach the Resident Plaintiffs' theory that Defendants

deprived them of their "liberty of movement[,]"[20] chemical munitions inside and outside

of Gray's Landing limit the Resident Plaintiffs' ability to move about, making it difficult

or impossible for them to eat, sleep, or simply breathe normally while in their own

homes.[21]

It is this carefully described right that the Court finds exists in the present case.

Defendants disagree and make multiple arguments against the Court finding a

constitutional right to bodily integrity. First, Defendants argue that the instant claims allege only

"incidental" adverse effects of government action and are thus foreclosed by *O'Bannon v. Town

Court Nursing Center*, 447 U.S. 773 (1980). Defs.' Opp'n 16. However, *O'Bannon* is a

---

[20] *See supra* note 19; Pls.' Mot. 32.

[21] When Defendants deploy large quantities of chemical munitions, the Resident
Plaintiffs race to close their windows, Brooks Decl. ¶ 10, and place wet towels under their doors,
King Decl. ¶ 6. The Resident Plaintiffs also sleep with gas masks on, Roe Decl. ¶ 12, or in
bathtubs to lessen the exposure, Moreno Decl. ¶ 9. Despite the remedial measures to keep their
homes clean, chemical particulates settle into their home spaces, such as in their carpets, Dooley
Decl. ¶ 7, and onto food left uncovered, Doe Decl. ¶¶ 8, 12.

procedural due process case addressing whether Medicare recipient residents of a nursing home have a constitutional right to a hearing before the government revokes the home's authority to provide residential facilities and thereby forces the residents to move. *O'Bannon*, 447 U.S. at 775. This holding has little bearing on Plaintiffs' substantive due process claim.

Second, Defendants argue that Plaintiffs have no constitutionally guaranteed interest in bodily integrity as asserted in this case. Defs.' Opp'n 16–21. Defendants cite a series of environmental and climate change lawsuits for variations on the theme that there is no "right to a healthful environment." *Id.* at 17–19. But none of these cases concern a record in which the government intentionally and repeatedly deploys chemical toxins in the way documented in this record.

Some of the cases cited by Defendants do not even deal with state action. *See In re Agent Orange Prod. Liab. Litig.*, 475 F. Supp. 928, 934 (E.D.N.Y. 1979) ("[T]here are no allegations to suggest that there has been [state] action . . . ."); *Tanner v. Armco Steel Corp.*, 340 F. Supp. 532, 536 (S.D. Tex. 1972) ("[P]laintiffs have not alleged the quantum of state . . . involvement necessary to clothe defendants with the mantle of the State . . . ."). In others, the state-action hook is the government's regulatory capacity with respect to private emitters, not affirmative government 'polluting.' *See Concerned Citizens of Neb. v. NRC*, 970 F.2d 421, 423 (8th Cir. 1992) (challenge of Nuclear Regulatory Commission and state agency regulations); *SF Chapter of A. Philip Randolph Inst. v. EPA*, No. 07-cv-4936, 2008 WL 859985, at *2 (N.D. Cal. Mar. 28, 2008) (challenge of EPA and regional permitting of two power plants); *Hagedorn v. Union Carbide Corp.*, 363 F. Supp. 1061, 1063 (N.D. W. Va. 1973) (in addition to claims against private corporation, challenge to state's pollution abatement program); *Pinkney v. Ohio EPA*, 375 F. Supp. 305, 307 (N.D. Ohio 1974) (challenge under Clean Air Act to shopping mall

development). Another case that Defendants cite is not a challenge to the government's

regulation of private conduct but rather a National Environmental Policy Act (NEPA) challenge

to the government's siting of a penal facility. *See Ely v. Velde*, 451 F.2d 1130, 1133–34 (4th Cir.

1971). Such cases are too different to provide useful guideposts in the present case.

Arguably the most analogous of Defendants' citations—or at least the case in which there

is both state action and government-effected 'pollution'—is a state appellate opinion on a

challenge to fluoridation of water. *See Coshow v. City of Escondido*, 132 Cal. App. 4th 687

(2005). The *Coshow* court declined to find the plaintiff stated a fundamental right when "courts

throughout the United States have uniformly upheld the constitutionality of adding fluoride to

the public water supply as a reasonable and proper exercise of the police power in the interest of

public health." *Id.* at 709. The Court is aware of no such consensus as to the beneficial effects of

exposure to chemical munitions.[22]

Upon consideration of the totality of the facts in the record, and in further consideration

of the case law describing the right to bodily integrity, the Court finds that the Resident Plaintiffs

have established a cognizable deprivation of the constitutional right to bodily integrity.

///

///

///

///

---

[22] Indeed, the Centers for Disease Control and Prevention (CDC) fact sheet on riot control agents such as tear gas warns as follows: "Long-lasting exposure or exposure to a large amount of riot control agent may cause severe effects such as the following: Glaucoma (a serious eye condition that can lead to blindness); Eye scarring; Cataracts; Breathing problems, such as asthma. These effects are more likely if someone was exposed in a closed setting, such as indoors." *Riot Control Agents Chemical Fact Sheet, CDC Chemical Emergencies*, (Sept. 4, 2024), https://perma.cc/F3TW-AJQB; *see also* Pls.' Mot. 25 n.31 (citing CDC Fact Sheet).

   ii.  Does Defendants' Conduct Shock the Contemporary Conscience?

    a.  Legal Standard

After identifying a cognizable right, the second step in the substantive due process analysis is to consider whether the government's conduct shocks the conscience. *Lewis*, 523 U.S. at 846–47. For the reasons below, the Court finds that it does.

The Supreme Court in *Lewis* held that when a claim involves alleged "abusive executive action[,]" "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense' . . . ." *Id*. at 846 (quoting *Collins*, 503 U.S. at 129). The "Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *Id*. (citation modified). A "cognizable level of executive abuse of power" is "that which shocks the conscience." *Id*.

In applying the "shocks the conscience" test as part of a substantive due process analysis, the Supreme Court has stated:

> [A] case challenging executive action on substantive due process grounds . . . presents an issue antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed. For executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law. Thus, in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them. Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways.

*Id.* at 847 n.8. In other words, the government's conduct falls on a spectrum of harm, with one end representing mere negligence, the other representing intent to injure, and the middle range representing deliberate indifference or gross negligence. *Id.* at 849.

"Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Collins*, 503 U.S. at 127 n.10 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (collecting cases)). Mere negligent conduct by a government official, even if the conduct causes injury, is not cognizable under the Due Process Clause. *Id*. Conduct shocks the conscience if it is "so 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957). Conduct may also shock the conscience when it "interferes with rights 'implicit in the concept of ordered liberty' . . . ." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Palko*, 302 U.S. at 325–26). When conduct falls "within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Lewis*, 523 U.S. at 849 (citation modified). Consideration of the record in each case "demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850. Assuming there is conduct more egregious than mere negligence, courts analyze the facts of a case against the spectrum of harm to determine whether the conduct is subject to the (1) "intended to injure" (also known as "purpose-to-harm") standard or (2) "deliberate indifference" standard. *Rosales-Mireles v. United States*, 585 U.S. 129, 138 (2018) (quoting *Lewis*, 523 U.S. at 849–50).

The first standard, called the "purpose to harm" standard, requires a showing that an official acted "maliciously and sadistically for the very purpose of causing harm." *Lewis*, 523 U.S. at 853 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). This standard applies

when officials must "act decisively" and make decisions "in haste, under pressure, and frequently without the luxury of a second chance." *Id.* (quoting *Whitley*, 475 U.S. at 320).

The second standard is deliberate indifference. "An officer acts with deliberate indifference by disregarding a known or obvious consequence of their actions." *Scott v. Smith*, 109 F.4th 1215, 1228 (9th Cir. 2024) (citing *Nicholson v. City of Los Angeles*, 935 F.3d 685, 693 (9th Cir. 2019)). This standard applies "only when actual deliberation is practical . . . ." *Lewis*, 523 U.S. at 851. Under the deliberate indifference standard, "[w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Id.* at 853. "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850. Courts evaluating government conduct are to consider "the totality of facts in a given case." *Id.* (quoting *Betts v. Brady*, 316 U.S. 455, 462 (1942)).

        b.      Application

Without prejudice to any future development of the facts in this case, the Court finds that the record before it supports a finding that Defendants have acted with deliberate indifference to the Resident Plaintiffs. Evidence of Defendants' disregard of known or obvious consequences of their actions is apparent considering both the general nature of Defendants' conduct over the past eight months as well as certain specific incidents in the record.

        1.      Overall Evidence of Deliberate Indifference

Defendants' use of chemical munitions in response to protests at the Portland ICE Facility over the past eight months shows a pattern of deliberate indifference. To be sure, federal officers at the Portland ICE Facility have faced a number of threats to federal officers and federal

property, as well as conduct designed to interfere with officers doing their jobs. Protesters have trespassed on federal property, ICE Ex. 1, at 1, threatened officers, Sullivan Decl. Ex. A, at 20, impeded ingress and egress into the ICE Facility, Cantu Decl. Ex. 4, at 8, brandished weapons, Cantu Decl. Ex. 1, at 3–6, and assaulted officers, Cantu Decl. Ex. 6, at 3, among other unlawful behaviors. Defendants have arrested protesters, and those protesters have faced state or federal charges. *See, e.g.*, Sullivan Decl. Ex. B, at 18 (reporting that a subject "is currently in FPS custody pending felony assault charges"). Certainly, many incidents that officers faced required them to "act decisively" and make decisions "in haste, under pressure, and frequently without the luxury of a second chance." *Lewis*, 523 U.S. at 853 (quoting *Whitley*, 475 U.S. at 320). But this case does not challenge the appropriate use of force in the immediate vicinity of the Portland ICE Facility when officers faced such threats to themselves, their building, or their mission. This case challenges the large-scale, repeated deployment of chemical munitions that infiltrate the Gray's Landing apartments and affect the Resident Plaintiffs who live there, particularly in moments where there was ample time to deliberate before deploying chemical munitions.

Here, unlike cases in which officers had to make split-second decisions, *see Est. of Soakai v. Abdelaziz*, 137 F.4th 969 (9th Cir. 2025), the record reflects eight months of planning, patterned operations, and inter-agency coordination. *See* Sullivan Decl. ¶¶ 14–15 (explaining that CBP worked "in coordination with" FPS and ICE during this period to ensure the "protection of the Portland ICE Facility"); *see also* Sullivan Dep. 15:23–16:5 (explaining that CBP officers were "supporting [their] law enforcement partners as requested" at the Portland ICE Facility); ICE Ex. 1, at 1 (reporting "coordinating with [FPS] personnel"). The use of force reports are filled with descriptions of ongoing and coordinated efforts to respond to civil disturbances at or near the ICE Facility. *See, e.g.*, Sullivan Decl. Ex. B, at 17 (CBP supporting FPS on October 4,

2025); Sullivan Decl. Ex. C, at 11 (same on October 18, 2025); Sullivan Decl. Ex. D at 14 (same on January 24, 2026). And what is notably absent is adequate justification for well-documented incidents of large-scale deployments of chemical munitions down the street from the Portland ICE Facility, immediately outside Gray's Landing on South Moody Avenue and South Bancroft Street, and even on the north side of the Gray's Landing building on South Lowell Avenue.

The Court has reviewed hundreds of pages of incident reports documenting Defendants' use of force over the past eight months, and the Court finds deliberate indifference based on the *quantity* of chemical munitions used, the *distance* from the Portland ICE Facility to the impact areas, the fact that chemical munitions are being used *contrary to the advice in agency use of force manuals*, and particularly in light of Defendants' specific *notice of harm* to Resident Plaintiffs.

First, regarding the *quantity* of chemical munitions and their *distance* of impact away from the Portland ICE Facility, FPS Deputy Director Cantu testified at his deposition that FPS, which is the primary agency charged with protecting the ICE Facility, uses munitions "in the immediate area and in the nexus area of our facility, which is . . . if you know the size of the driveway, . . . the width of that drive and you follow that across the street, that's typically the area that we are trying to open up." Cantu Dep. 48:11–16. Deputy Director Cantu continued:

> [W]e don't employ anything down on Moody. We have no – no business on Moody. There is no – unless – unless, given the circumstance, and in my observation I have not seen it in my purview, but unless there is an immediate threat to a facility or an officer that for whatever reason is over on Moody, you know, that – that is a possibility. But in my experience, we don't – we don't – we don't even – none of my officers go towards Moody. We're not in that area. We're not towards – and that goes for east and west. So whether up – I think it's Bancroft, the – the other north/south road that parallels Moody, we don't – we don't go up to either intersection.

Cantu Dep. 48:19–49:8. Before the Court are videos and photographs not only documenting widespread deployment of chemical munitions, but also of spent munitions located in the Gray's

Landing courtyard, which offers an outdoor recreation area and children's play area, Tr. 114:20–24, and of the chemical munition deployment reaching the *north side* of Gray's Landing—one block from the Portland ICE Facility, *see* Pls.' Ex. 63, at 3:00–9:00 (protesters—including elderly persons and children—seeking shelter inside the lobby of Gray's Landing away from gas present on South Lowell Street; a dense haze is seen permeating the air all along the north side of the building); Pls.' Ex. 62, at 2:50–4:00 (interior security camera footage of protesters in the lobby of Gray's Landing bent over, leaning against walls, and rubbing their eyes).

Next, Defendants' deliberate indifference is further highlighted by the fact that Defendants' deployment of large-scale chemical munitions runs *contrary to the advice in the agency manuals* to avoid use in certain circumstances. *See, e.g.*, Sullivan Decl. ¶ 8 (CBP's Use of Force Policy providing that officers "may utilize chemical area saturation" when "[r]easonable consideration has been given to any factors which may counsel against the use of such force, such as the presence of . . . small children, the elderly . . . or individuals who lack the ability to quickly disperse from the area"); *see also* ICE Use of Force Policy, Chapter 1, § (B)(2), ECF No. 63-1; FPS Use of Force Policy, Chapter 11, § (B)(10), ECF No. 63-2; FPS Public Order Policing Policy, § II(B) ECF No. 63-3.

Lastly, and vitally important to the Court's finding of deliberate indifference, is the evidence of Defendants' *notice of the physical harm* to the Resident Plaintiffs. As described above, evidence in the record shows that Defendants were notified of the harm as early as July 7, 2025. Piggott Decl. ¶ 5. Defendants were again advised in the form of a letter from members of Oregon's congressional delegation on October 16, 2025. Pls.' Ex. 33. Defendants were again put on notice on December 5, 2025, when Plaintiffs filed this lawsuit. Despite these various forms of notice, the chemical munition deployments have continued, sometimes in shocking quantities.

*See, e.g.*, Sullivan Decl. Ex. D, at 2–5, 21–37 (reporting the use of eighty-five CS munitions on January 24 and 25, 2026); Sullivan Decl. Ex. G, at 2–25 (reporting the use of thirty-three CS munitions and thirteen OC munitions January 31, 2026); Sullivan Decl. Ex. H, at 24–30 (reporting the use of nineteen CS munitions and twenty-one OC munitions on February 1, 2026).

In sum, these eight months of conduct, involving repeated, large-scale deployments of chemical munitions, impacting sizable areas away from the Portland ICE Facility, coordinated with large numbers of officers, seemingly contrary to warnings contained in the Use of Force manuals, and in the face of repeated notice of physical harm to the Portland ICE Facility neighbors, combine to form a robust record for this Court's conclusion that Defendants had "extended opportunities to do better" but instead displayed a "protracted failure even to care," thereby constituting deliberate indifference. *Lewis*, 523 U.S. at 853.

2.    Specific Events Establishing Deliberate Indifference

In addition to the general findings in support of deliberate indifference over the past eight months, certain specific incidents are worth discussing. First, both afternoon and evening events on October 4, 2025, establish evidence of deliberate indifference. As examined above, the Resident Plaintiffs offered evidence that during the afternoon of October 4, 2025, a group of approximately 100 protesters gathered at the Portland ICE Facility. Cantu Decl. Ex. 6, at 3. Defendants discharged chemical munitions to clear the Portland ICE Facility driveway and allow a vehicle to depart. ICE Ex. 1, at 9; *see also* Pls.' Ex. 1, at 2:19–2:30 (vehicle departing the Portland ICE Facility as chemical munitions are deployed). The protesters cleared the driveway but remained near the Portland ICE Facility. Pls.' Ex. 1, at 2:30–2:38. Plaintiff King stood on her balcony to record the protest and federal officers' deployment of chemical munitions. *See generally id.* As the chemical munitions spread from the Portland ICE Facility driveway to the

intersection of South Moody Avenue and South Bancroft Street, the protesters backed away from the driveway but remained close to the Portland ICE Facility, west of the easterly crosswalk at South Bancroft Street's intersection with South Moody Avenue. Plaintiff King's video then captures the launch of a long-range chemical munition from somewhere within the chemical munition cloud at the Portland ICE Facility, traveling east approximately 150 feet away toward Plaintiff King and Gray's Landing. *Id.* at 2:38–2:41. The video does not reflect the presence of any protesters this far from the Portland ICE Facility, and Defendants offer no evidence to otherwise justify this deployment. *See* King Decl. ¶ 7 ("There were not any protesters immediately around my apartment."). Indeed, it is hard to imagine that whoever launched this long-range munition could have even seen where it was going considering the thickness of the cloud of chemical gas around the Portland ICE Facility itself. *See, e.g.*, Sullivan Decl. Ex. B, at 23 (one CBP officer remarking on October 4, 2025, that they were "unable to observe the results of [their] deployment" because of "the large amount of smoke and CS gas in the area"). The munition landed to the east of Plaintiff King's balcony and, a few seconds later, the gas streamed across her balcony. Pls.' Ex. 1, at 2:55–3:30. Without any information to justify this long-distance deployment of chemical munitions toward a residential apartment—and in the direction of a resident standing on her balcony and recording the protests—the Court is left with an inference from the record that Defendants launched the long-distance chemical munition in the face of a known or obvious consequence, thereby constituting deliberate indifference.

Events of the evening of October 4, 2025, provide further evidence of deliberate indifference. Video evidence documents a large group of federal officers methodically moving protesters eastward on South Bancroft Street away from the Portland ICE Facility in roughly ten-meter increments. The officers then moved the protesters another ten meters. And another. *See*

*generally* Pls.' Ex. 19. Federal officers continued to move the protesters further and further east just past the Gray's Landing courtyard mid-way on the block and stretching to the intersection of South Bancroft Street and South Bond Avenue. Pls.' Ex. 2, at 1:45–12:16. Now a full one-and-a-half to two blocks away from the Portland ICE Facility, Defendants deployed large amounts of chemical munitions. Pls.' Ex. 2, at 13:48–15:13; *see also* Moreno Decl. ¶ 10 ("While I was on Bancroft Street east of Gray's Landing, far from the ICE facility . . . ICE pushed the crowd past Gray's Landing, tear gassing them . . . ."). This conduct of a coordinated, organized, operation in which Defendants deployed significant quantities of chemical munitions on a group of people over a block from the Portland ICE Facility and in front of a large residential apartment building is in and of itself troubling, but there is more.

Defendant DHS subsequently posted short videos to its Instagram account on October 6 and 7, 2025. Pls.' Ex. 49; Pls.' Ex. 47. These videos contain footage documenting a large gas cloud north of the Portland ICE Facility near the intersection of South Moody Avenue and South Lowell Street, Pls.' Ex. 49, at 0:33, and another gas cloud east of the Portland ICE Facility on South Bancroft Street, Pls.' Ex. 47, at 0:18. Plaintiffs argue that on the night of October 4, 2025, Defendants deployed those large quantities of chemical munitions not to further legitimate law enforcement objectives, but to create pro-Defendant "propaganda" social media content, which is a "reason[] divorced from legitimate law enforcement purposes . . . ." Pls.' Mot. 39. Defendants have not denied that the chemical cloud footage in these social media posts was from October 4, 2025. Nor have Defendants offered a justification for why so many chemical munitions were deployed so far from the Portland ICE Facility that night. The Court concludes provisionally and based on the record at this stage of the proceedings that Plaintiffs have offered sufficient evidence to find deliberate indifference with regard to the evening incident on October 4, 2025.

Second, the Court finds that more recent incidents in January and February 2026 also justify a finding of deliberate indifference, particularly in light of Defendants' previous notice of the harm to the Resident Plaintiffs and the absent record to justify the *quantity* of chemical munitions and their deployment so as to impact *such a great distance* from the Portland ICE Facility. Sullivan Decl. Ex. G, at 2–5, 21–37, 59–72 (CBP reporting 126 uses of force, including eighty-five CS munitions on January 31, 2026); Pls.' Ex. 63, at 3:00–4:30 (chemicals visibly reaching the north side of Gray's Landing, roughly one block away from the Portland ICE Facility on January 31, 2026); Pls.' Ex. 64–69 (footage of Gray's Landing hallways in which residents are seen rubbing their eyes and covering their faces seventeen to forty-two minutes after federal officers began deploying chemical munitions on January 31, 2026); Sullivan Decl. Ex. H, at 2–22 (CBP reporting using nineteen CS munitions and twenty-one OC munitions on February 1, 2026); Pls.' Ex. 56, at 5:40–8:00 (Plaintiff King's security camera capturing gas canisters launched far down South Bancroft Street near the courtyard of Gray's Landing on February 1, 2026). The record does not establish at what federal officers were firing chemical munitions nor why. *See, e.g.*, Pls.' Ex. 58, at 19:30–33 (munition launched at a third-floor Gray's Landing apartment window on January 31, 2026); Tr. 96:10 (Plaintiff Roe observing "lobbing" chemical munitions "way out into the crowd" on February 1, 2026). The evidence from these dates shows wide-scale deployment of chemical munitions infiltrating private homes and impacting the health of the Resident Plaintiffs. On one hand, Defendants' use of force reports indeed document unlawful behavior of certain protesters immediately present at the Portland ICE Facility. *See, e.g.*, Sullivan Decl. Ex. G, at 77 (protesters throwing objects); Sullivan Decl. Ex. H, at 32, 35, 38 (trespassing and tampering with the Portland ICE Facility main gate). But the deployment of such copious amounts of chemical munitions is unjustified on the present record.

Do Defendants have the power to do their jobs and protect themselves and their property in the process? Undoubtedly yes. Is there some limit to Defendants' use of force when it involves deployment after deployment of large clouds of chemical munitions that enter and saturate the homes of the Resident Plaintiffs, irreparably harming their health in the process? The Court finds the Constitution answers this question in the affirmative as well.

* * *

For the reasons set forth above, the Court finds that the Resident Plaintiffs have established a likelihood of success on the merits of their Fifth Amendment substantive due process claim so as to tip the first *Winter* factor in the Resident Plaintiffs' favor. In the alternative, and at an absolute minimum, the Court finds that the Resident Plaintiffs have raised "serious questions going to the merits" of this claim. *All. for the Wild Rockies*, 632 F.3d at 1132. While the term "serious questions going to the merits" represents a lesser showing than the traditional likelihood of success on the merits in *Winter*, upon that "serious questions going to the merits" showing, a preliminary injunction is still appropriate "if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025) (citation modified). The remaining *Winter* factors are analyzed below.

## II.    *Winter* Factor Two: Likelihood of Irreparable Harm

Plaintiffs argue that they will suffer irreparable harm in the absence of preliminary relief because of the "concrete physical and psychological injuries, both acute and potentially long-lasting, that will recur with each instance that Defendants use chemical munitions again." Pls.' Mot. 40. The Court agrees.

To show that preliminary injunctive relief is justified, Plaintiffs must show that they are "likely to suffer irreparable harm in the absence of preliminary relief . . . ." *Winter*, 555 U.S. at 20. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres*, 695 F.3d at 1002 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (holding that a finding of irreparable harm "follows inexorably" from a "conclusion that the government's current policies are likely unconstitutional"). "Accordingly, [w]hen an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." *Baird*, 81 F.4th at 1042 (citation modified).

Here, Plaintiffs have shown a likelihood that Defendants violated their constitutional rights to bodily integrity. Alternatively, Plaintiffs have raised serious questions going to the merits of their substantive due process claim. Because the deprivation of constitutional rights "unquestionably constitutes irreparable injury[,]" the Court finds that Plaintiffs show that they are likely to suffer irreparable harm absent preliminary relief. *Melendres*, 695 F.3d at 1002.

In addition to the constitutional violation, Plaintiffs have established additional evidence of irreparable physical injury. "From July to December 2025, [Plaintiff Roe] felt permanently sick" and is currently "suffering from the same symptoms again due to inhaling the gas on January 24[, 2026]." Roe Decl. ¶ 11; *see also* Tr. 92:1–16 (Plaintiff Roe calling 911 because she experienced heart palpitations from the gas build up in Gray's Landing). Because of Plaintiff Dooley's physical reactions to Defendants' use of tear gas, she "fell four different times and required medical assistance each time" and has been diagnosed with "very mild heart failure." Dooley Decl. ¶¶ 5–6. Plaintiff Lineberger reported "difficulty breathing" and "respiratory problems" that continue to get worse "[e]ach time the tear gas gets into [her] apartment . . . ."

Lineberger Decl. ¶¶ 6–7. Plaintiffs del Nigro and J.D. now suffer from chronic respiratory issues, and both need inhalers despite never needing to use one before Defendants began using chemical munitions near Gray's Landing. Del Nigro Decl. ¶¶ 7, 11. As a result of Defendants' conduct, Plaintiff Moreno states that these "enormously stressful" experiences have "increased [her] cortisol levels and exacerbated [her] Cushing's disease[,]" which has led to her doctors recommending that she have one of her adrenal glands removed. Moreno Decl. ¶¶ 13–14.

The symptoms that Plaintiffs report are consistent with those commonly experienced by individuals exposed to chemical munitions. *See* Pls.' Mot. Attach 5 ("Rao Decl.") ¶ 44 (discussing common symptoms of high chemical munition exposure as "vomiting, wheezing, shortness of breath, chest pain, rapid heart rate, coughing, fluid in the lungs, the development of inflammatory membranes over the upper airways that affects speech and breathing, low oxygen levels, loss of consciousness, or death"), ECF No. 46-5; *id.* ¶ 136 ("The ongoing use of deleterious chemical agents . . . in proximity to Gray's Landing, is a health hazard . . . . The staff and residents, including children at Gray's Landing have suffered poisoning often with prolonged health effects severe enough to require medical evaluation, intervention, or even hospitalization."). While scientific studies about the impacts of repeated exposures to chemical munitions are limited due to ethical limitations, Tr. 57:1–8, expert testimony suggests that "patients experience more severe or prolonged effects" if they are subjected to repeated exposures, *id.* ¶ 48. Plaintiffs' symptoms are also consistent with the CDC's guidance that exposure to chemical munitions may cause "chest tightness, coughing, choking sensation, . . . [and] shortness of breath[,]" and create a risk of "[r]espiratory failure[,] and "death due to severe chemical burns in the throat and lungs" caused by "[l]ong lasting exposure or

exposure to a large dose . . . ." *See* Pls.' Mot. 25 n.31 (citing *Riot Control Agents Chemical Fact Sheet*, *CDC Chemical Emergencies*, *supra*).

Moreover, these injuries have continued despite Plaintiffs' mitigation efforts. Plaintiffs have tried to prevent tear gas from entering their homes and bodies, but have been unable to do so. *See* Lineberger Decl. ¶ 8 (buying an air purifier, cleaning her carpets, and taking frequent showers); Doe Decl. ¶ 8 (purchasing gas masks); Taylor Decl. ¶ 5 (placing towels under doors and sealing windows); Del Nigro Decl. ¶ 14 (attempting to move); Roe Decl. ¶ 12 (wearing a gas mask to bed); Salazar Decl. ¶ 16 (placing air scrubbing machines throughout Gray's Landing, regularly replacing HVAC filters, installing sticky mats to capture residue from shoes, among other measures).

Lastly, Defendants have not conveyed any intent to change their practices regarding the use of chemical munitions at the Portland ICE Facility absent court intervention. Defendants have asserted in this proceeding that their use of chemical munitions was appropriate. Defs.' Opp'n 34. And federal officers continued to use chemical munitions on several days after Plaintiffs filed this action on December 5, 2025. Specifically, federal officers used chemical munitions on December 21, 2025, seven dates in January 2026, and February 1, 2026. *See* Cantu Decl. Exs. 15–23; Sullivan Decl. Exs. D–H; ICE Ex. 1, at 13–14.

Defendants argue in response that Plaintiffs' delay in filing this action and their pending motion for preliminary injunction is evidence that "Plaintiffs themselves did not think that their alleged injuries from months ago merited immediate relief." Defs.' Opp'n 35. The Court disagrees. "[A]lthough a failure to seek speedy relief can imply the lack of a need for such relief, 'such tardiness is not particularly probative in the context of ongoing, worsening injuries.'" *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (quoting *Arc of Cal. v. Douglas*,

757 F.3d 975, 990 (9th Cir. 2014). Here, federal officers used chemical munitions as recently as February 1, 2026, two days after Plaintiffs filed their pending motion. *See, e.g.*, Pls.' Ex. 54, at 1:22 (tear gas spreading up South Moody Avenue, directly west of Gray's Landing); Pls.' Ex. 56, at 5:40–8:00 (gas canisters thrown down South Bancroft Street, directly South of Gray's Landing). Considering Defendants' recent use of chemical munitions and Plaintiffs' ongoing injuries, the timing of Plaintiffs' filings does not show a lack of need for injunctive relief.

Defendants also argue that "Plaintiffs' claim of irreparable harm is now even weaker since . . . a court in this District entered a temporary restraining order that enjoins the same conduct Plaintiffs seek to enjoin here." Defs.' Opp'n 35 (citing *Dickinson v. Trump*, No. 3:25-CV-2170-SI, 2026 WL 279917 (D. Or. Feb. 3, 2026)). The Court rejects this argument because the temporary restraining in *Dickinson* expired on March 3, 2026, and there is no injunctive relief in place at the time of filing this Opinion & Order. Moreover, Defendants—here and in *Dickinson*—have suggested that they would file an appeal if the court grants injunctive relief. Defs.' Mem. Opp'n Pls.' Mot. Prelim. Inj. 38, *Dickinson v. Trump*, No. 3:25-cv-2170-SI (D. Or. Feb. 19, 2026), ECF No. 116.

In sum, the Court finds that Plaintiffs have shown a likelihood of irreparable harm absent injunctive relief.

## III.    *Winter* Factors Three & Four: Balance of the Equities and the Public Interest

Plaintiffs argue that "[t]he balance of the equities and the public interest decisively weigh in Plaintiffs' favor" because "Defendants' use of tear gas, smoke grenades, pepper balls, and other chemical munitions has deprived Plaintiffs and countless other Gray's Landing residents of their fundamental . . . Fifth Amendment rights." Pls.' Mot. 45. Defendants argue that "the federal government and the public have a compelling interest in protecting federal property and

personnel." Defs.' Opp'n 37. The Court finds that the balance of the equities and the public interest fall in Plaintiffs' favor.

Assessing the harm to the opposing party and weighing the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Meinecke*, 99 F.4th at 526 (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023)); *see also Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) (same). On the other hand, "[t]he government doubtlessly has an interest in maintaining public order." *Meinecke*, 99 F.4th at 526. This includes "the government's interests in 'ensuring public safety . . . .'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).

As Defendants argue, federal courts have long recognized the importance of protecting federal property. Defs.' Opp'n 36; *see United States v. Griefen*, 200 F.3d 1256, 1261 (9th Cir. 2000) (holding protection of property as a compelling reason related to needs arising from proper forest management practices); *McCullen*, 573 U.S. at 486 (holding "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks" as legitimate government interests); *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679–80 (1992) ("[T]he government . . . 'has power to preserve the property under its control for the use to which it is lawfully dedicated . . . .'" (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976))). The Court acknowledges the importance of Defendants' asserted interests. "But even 'undeniably admirable goals' 'must yield' when they 'collide with the . . . Constitution.'" *Meinecke*, 99 F.4th at 526 (quoting *Fellowship of Christian Athletes*, 82 F.4th at 695); *see also Baird*, 81 F.4th at 1041 ("[A] court 'must not shrink from [its] obligation to enforce . . . constitutional rights,' regardless of the constitutional right at issue." (quoting *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir.

2021)). But none of the cases which Defendants cite support the conclusion that a government defendant may still prevail on the final two *Winter* factors when a plaintiff has shown a likelihood of a deprivation of a constitutional right.[23] Additionally, as noted above, significant questions exist over the amount and location of chemical munition deployments by Defendants thereby undermining the argument of a compelling interest in such uses. This is relevant to the Court's balancing of Plaintiffs' interests in their substantive due process rights and Defendants' interest in protecting federal property and personnel.

The Court finds that the balance of the equities and the public interest weigh in Plaintiffs' favor.

\* \* \*

Having found that each *Winter* factor falls in Plaintiffs' favor, the Court accordingly finds that preliminary injunctive relief is warranted.

### REQUEST FOR STAY AND BOND

Defendants argue that "if the Court grants an injunction, it should require a bond pursuant to [Federal Rule of Civil Procedure ("Rule")] 65(c)." Defs.' Opp'n 38. Defendants also "request that such relief be stayed pending the disposition of any appeal, or at a minimum, administratively stayed for seven days." *Id.* The Court denies both requests.

---

[23] For example, Defendants cite *McCullen* for its proposition that courts have "recognized the legitimacy of the government's interests in 'ensuring public safety and order . . . .'" *McCullen*, 573 U.S. at 486 (quoting *Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 376 (1997)). But the Supreme Court ultimately found that "[t]he Court of Appeals and respondents [were] wrong to downplay . . . burdens on petitioners' speech." *Id.* at 488. Defendants' other cited cases are factually inapposite. *See Int'l Soc. for Krishna Consciousness, Inc.*, 505 U.S. at 679 (holding that airport terminals are nonpublic fora); *Griefen*, 200 F.3d at 1261 (holding that "an area temporarily subject to construction and repair" is not a public forum or a limited public forum).

Defendants first ask that the Court require a bond under Rule 65(c). *Id.* Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation modified) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). "[T]he party affected by the injunction" has the "obligation [to] present[] evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003). Without such evidence, it is not an abuse of discretion to deny a request for bond. *Id.* Here, because Defendants provide no evidence in support of their argument that bond of any amount is needed, the Court denies Defendants' request.

Defendants next ask that any injunctive relief "be stayed pending the disposition of any appeal, or at a minimum, administratively stayed for seven days." Defs.' Opp'n 38. "A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)). "It is instead 'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" *Id.* (quoting *Virginian R. Co.*, 272 U.S., at 672–73). In determining the propriety of a stay, the Supreme Court has instructed courts to consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the

public interest lies." *Id.* at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The standard of whether to apply a stay is similar to the *Winter* factors discussed earlier in this Opinion. *See id.* at 434 ("There is substantial overlap between these and the factors governing preliminary injunctions . . . ."). Here, Defendants ask that the Court issue a stay, but they do not explain why. Defendants do not explain how they will suffer irreparable injury absent a stay. Additionally, to the extent the Court finds for Plaintiffs as to the likelihood of success on the merits, the balance of the equities, and the public interest, the Court similarly denies Defendants' request for stay pending appeal on the same grounds. Lastly, because no court order is in place to prohibit Defendants' use of chemical munitions, the Court finds a stay particularly inappropriate.

## CONCLUSION

In 1952 the Supreme Court held: "The vague contours of the Due Process Clause do not leave judges at large. We may not draw on our merely personal and private notions and disregard the limits that bind judges in their judicial function." *Rochin v. California*, 342 U.S. 165, 170 (1952). Mindful of that guidance from seven decades ago, the Court has considered the full record underlying this Motion for Preliminary Injunction and issued this decision carefully, narrowly, and with due regard to the competing interests between Defendants' need to do their jobs safely and the Resident Plaintiffs' rights to the most fundamental aspects of liberty known since the early days of our democracy.

The Court GRANTS Plaintiffs' Superseding Motion for Preliminary Injunction [46]. The Court enters the following Order:

///

///

///

## PRELIMINARY INJUNCTION ORDER

Defendants are hereby enjoined as follows pending the final resolution of this case:

Defendants, their agents, and all persons acting in concert or participation with Defendants are

enjoined from using chemical munitions in quantities such that the aerosolized chemicals

discharged from said munitions are likely to reach Gray's Landing—including the Resident

Plaintiffs' individual apartments. Such use is prohibited unless it is determined to be necessary to

address an imminent threat to life.

IT IS SO ORDERED.

DATED this ___6th___ day of March, 2026.


_____
AMY M. BAGGIO
United States District Judge

57 – OPINION & ORDER