Darin M. Sands, OSB No. 106624
**Bradley Bernstein Sands LLP**
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480
dsands@bradleybernstein.com

Daniel F. Jacobson (D.C. Bar No. 1016621)+
**Jacobson Lawyers Group PLLC**
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Telephone: +1 301-823-1148
Dan@jacobsonlawyersgroup.com

+ admitted pro hac vice

*Attorneys for Plaintiffs*

(Additional counsel listed on signature page)

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| REACH COMMUNITY DEVELOPMENT, *et al.*,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>     *Defendants*. | Case No. 3:25-cv-2257-AB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................3

    A. Gray's Landing Is an Affordable Housing Community Across from the Portland ICE
       Facility .........................................................................................................................3

    B. Defendants Discharge Chemical Munitions Towards Gray's Landing in the Face of
       Generally Non-Violent Protests........................................................................................4

    C. Federal Officers Have Targeted Individuals with Chemical Munitions .............................7

    D. Chemical Munitions Enter Gray's Landing, Injuring Plaintiffs ...........................................9

    E. Procedural Background ....................................................................................................14

LEGAL STANDARD....................................................................................................................14

ARGUMENT ...............................................................................................................................15

    I. Plaintiffs Have Standing.................................................................................................15

    II. The Amended Complaint States a Fifth Amendment Claim................................................18

       A. Plaintiffs Have Pleaded an Infringement of Their Right to Bodily Integrity................19

       B. Plaintiffs Have Pleaded an Infringement of Their Right to Freedom of Movement.....25

       C. The REACH Plaintiffs Have Pleaded an Infringement of their Liberty .......................26

       D. Plaintiffs Have Pleaded an Infringement of Their Property Rights ..............................27

    III. The Amended Complaint States a Fourth Amendment Claim in the Alternative .............32

CONCLUSION.............................................................................................................................33

CERTIFICATE OF COMPLIANCE............................................................................................35

**TABLE OF AUTHORITIES**

**Cases**                                                                      Page(s)

*Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*,
   509 F.3d 1020 (9th Cir. 2007) ................................................................................ 28

*In re Agent Orange Prod. Liab. Litig.*,
   475 F. Supp. 928 (E.D.N.Y. 1979) .......................................................................... 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................. 15

*BAM Hist. Dist. Ass'n v. Koch*,
   723 F.2d 233 (2d Cir. 1983)................................................................................ 29, 30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................. 15

*Burtness v. Legacy Health,*
   No. 3:24-cv-1256-AB, 2024 WL 5168364 (D. Or. Dec. 18, 2024)......................... 15

*City of Chicago v. Morales*,
   527 U.S. 41 (1999)................................................................................................... 26

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983)............................................................................................. 16, 18

*Cnty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998)................................................................................................. 32

*Crown Point Dev. v. City of Sun Valley*,
   506 F.3d 851 (9th Cir. 2007) ....................................................................... 28, 29, 30

*Cullinan v. City of Los Angeles*,
   752 F. Supp. 3d 1180 (C.D. Cal. 2024) ................................................................... 33

*Estate of Soakai v. Abdelaziz*,
   137 F.4th 969 (9th Cir. 2025), cert. denied, 2026 WL 568296 (U.S. Mar. 2, 2025) ........ 23, 25

*Foli v. Metropolitan Water District of Southern California*,
   592 F. App'x 634 (9th Cir. 2015)............................................................................. 23

*Gasper v. Louisiana Stadium & Exposition Dist.*,
   418 F. Supp. 716 (E.D. La. 1976), *aff'd,* 577 F.2d 897 (5th Cir. 1978) ................ 24

*Graves v. Arpaio*,
   623 F.3d 1043 (9th Cir. 2010) ................................................................................. 27

*Guertin v. Michigan,*
   912 F.3d 907 (6th Cir. 2019) ............................................................ 20, 23

*Hampton v. Steen,*
   No. 2:12-cv-470-AA, 2017 WL 11573592 (D. Or. Nov. 13, 2017) ...................................... 31

*Index Newspapers LLC v. U.S. Marshals Serv.,*
   977 F.3d 817 (9th Cir. 2020) ............................................................ 16

*Johnson v. City of Cincinnati,*
   310 F.3d 484 (6th Cir. 2002) ............................................................ 26

*Karnoski v. Trump,*
   No. 17-cv-1297, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ...................................... 20

*King v. New Rochelle Mun. Hous. Auth.,*
   442 F.2d 646 (2d Cir. 1971)............................................................. 27

*LaRocca v. City of Los Angeles,*
   No. 2:22-cv-6948, 2024 WL 1635908 (2024) ............................................. 33

*Lingle v. Chevron U.S.A. Inc.,*
   544 U.S. 528 (2005)................................................................ 28, 29

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)................................................................... 15

*Lund v. Cowan,*
   5 F.4th 964 (9th Cir. 2021) .......................................................... 3, 15

*Lutz v. City of York, Pa.,*
   899 F.2d 255 (3d Cir. 1990)........................................................... 26

*In re Marriage of Maxwell,*
   876 P.2d 811 (Or. Ct. App. 1994)...................................................... 31

*McFalls v. Perdue,*
   No. 3:16-cv-2116-SI, 2018 WL 785866 (D. Or. Feb. 8, 2018) ............................ 27

*NAACP v. Alabama ex rel. Patterson,*
   357 U.S. 449 (1958).................................................................. 27

*Nicacio v. INS,*
   797 F.2d 700 (9th Cir. 1985) ......................................................... 16

*Noem v. Vasquez Perdomo,*
   146 S. Ct. 1 (2025).................................................................. 18

*Nunez ex rel. Nunez v. City of San Diego*,
   114 F.3d 935 (9th Cir. 1997) ........................................................................ 26

*O'Bannon v. Town Court Nursing Center*,
   447 U.S. 773 (1980)......................................................................................... 2

*Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*,
   130 F.3d 432 (9th Cir. 1997) ........................................................................ 23

*Poe ex rel. Poe v. Labrador*,
   709 F. Supp. 3d 1169 (D. Idaho 2023) ........................................................ 20

*RRI Realty Corp. v. Inc. Vill. of Southampton*,
   870 F.2d 911 (2d Cir. 1989)........................................................................... 27

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ................................................................ 15, 16

*Slater and Slater*,
   245 P.3d 676 (Or. Ct. App. 2010)................................................................. 31

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)....................................................................................... 16

*Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*,
   256 F.3d 879 (9th Cir. 2001) ........................................................................ 16

*Tanner v. Armco Steel Corp.*,
   340 F. Supp. 532 (S.D. Tex. 1972).............................................................. 24

*Thomas v. Cnty. of L.A.*,
   978 F.2d 504 (9th Cir. 1992) ........................................................................ 16

*Trifax Corp. v. District of Columbia*,
   No. 98-cv-4184, 2001 WL 1132227 (E.D. Pa. Sep. 18, 2001) ............................ 30

*Tyson v. Sabine*,
   42 F.4th 508 (5th Cir. 2022) ........................................................................ 23

*United States v. James Daniel Good Real Property*,
   510 U.S. 43 (1993)................................................................................... 28, 29

*Villanueva v. California*,
   986 F.3d 1158 (9th Cir. 2021) ...................................................................... 33

*Warth v. Seldin*,
   422 U.S. 490 (1975)....................................................................................... 16

*Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*,
    24 F.3d 56 (9th Cir. 1994) ................................................................................... 31

*Westwood v. City of Hermiston*,
    787 F. Supp. 2d 1174 (D. Or. 2011) .................................................................... 31

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ............................................................................. 15

*Williams v. Fears*,
    179 U.S. 270 (1900) ............................................................................................. 26

*WMX Technologies, Inc. v. Miller*,
    197 F.3d 367 (9th Cir. 1999) ......................................................................... 31, 32

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................................................. 23

**Rules & Regulations**

Federal Rules of Civil Procedure
    Rule 8(d) .............................................................................................................. 32
    Rule 12(b)(6) ........................................................................................... 1, 15, 22, 27
    Rule 12(b)(1) .................................................................................................. 15, 16

Or. Admin. R. 150-307-0020(1) ................................................................................. 31

**INTRODUCTION**

This Court has already held that Defendants' repeated deployment of chemical munitions into Plaintiffs' homes and bodies likely violates the Fifth Amendment. After conducting an evidentiary hearing and reviewing hundreds of pages of DHS incident reports, the Court found that Plaintiffs established standing, that DHS's conduct infringed Plaintiffs' right to bodily integrity, and that Defendants acted with conscience-shocking deliberate indifference to Plaintiffs' injuries. Because the plausibility standard under Rule 12(b)(6) is less demanding than the likelihood-of-success showing required for a preliminary injunction, the Amended Complaint states a claim *a fortiori*.

Plaintiffs have also more than plausibly stated substantive due process claims on grounds this Court did not address in its preliminary injunction decision, and that are therefore not at issue in the current stay proceedings on appeal. Defendants' flooding the streets outside of Gray's Landing—and the interior of Gray's Landing—with tear gas and other chemical munitions has deprived the Resident Plaintiffs of their liberty of movement and their protected property interests in the use and enjoyment of their apartments and the tangible belongings within them. The allegations in the Amended Complaint also plausibly allege deprivations of the REACH Plaintiffs' tangible and intangible property rights, as well as their liberty interests in pursuing their organizational mission. Defendants do not make any argument for dismissal of the latter claim.

The arguments that Defendants do make largely recycle arguments that the Court already rejected. On standing, Defendants again argue that Plaintiffs' injuries are "speculative," but this Court has already found that Defendants' use of chemical munitions has repeatedly harmed Plaintiffs and is likely to continue. Op. & Order at 26, Dkt. 75 ("PI Op."). On the merits,

Defendants again invoke *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980), to characterize Plaintiffs' injuries as "incidental" effects of action aimed at third parties, and they again attempt to cabin the right to bodily integrity to nonconsensual medical procedures—the same arguments the Court considered and rejected. PI Op. 35–37. Moreover, Defendants fail to address the alternative basis upon which Plaintiffs allege a bodily integrity violation: Defendants acted with purpose to harm the targets of the chemical munitions, intentionally causing tear gas and other chemical munitions to enter those persons' bodies, and under Ninth Circuit precedent, Plaintiffs may raise due process claims for the foreseeable intrusions on their bodily integrity that resulted from Defendants' intentional acts directed toward the targets. As for Plaintiffs' liberty interest in freedom of movement, Defendants continue to try to circumscribe this fundamental right to interstate travel and nighttime curfews, without citing any text, history, or precedent for doing so. Defendants also argue that Plaintiffs' property rights have not been infringed because Plaintiffs have not been entirely deprived of their apartments. But they ignore Supreme Court and Ninth Circuit precedent holding that burdens on property that lack a legitimate government interest can give rise to a substantive due process claim.

What Defendants do *not* contest is perhaps the most telling. Defendants make no argument that their conduct, as alleged, does not shock the conscience. That is a remarkable concession. A substantive due process claim requires both a cognizable life, liberty, or property interest and conscience-shocking government conduct. By declining to contest the second element, Defendants implicitly acknowledge what the record makes plain (and the Court already found): that repeatedly saturating an apartment building with poison gas, in the face of documented injuries to residents and in response to largely peaceful protests, is the kind of conduct that shocks the conscience.

The Court should deny the motion to dismiss in its entirety. The Amended Complaint plausibly alleges that Plaintiffs have standing, that Defendants' conduct infringes Plaintiffs' rights to bodily integrity, liberty of movement, and property, and that Defendants' conduct shocks the conscience. And as for Plaintiffs' Fourth Amendment claim, which is pleaded in the alternative, the Court should permit that claim to proceed as well, so that Plaintiffs may pursue that relief if the record ultimately supports it.

## BACKGROUND

In resolving Defendants' motion to dismiss, the following facts alleged in Plaintiffs' Amended Complaint must be taken as true and construed in the light most favorable to Plaintiffs. *See Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021).

### A.    Gray's Landing Is an Affordable Housing Community Across from the Portland ICE Facility

Gray's Landing is a large affordable housing complex in Portland managed by Plaintiff REACH Community Development. First Am. Compl. for Declaratory and Inj. Relief ¶¶ 1, 19, Dkt. 45 ("Am. Compl.").[1] Of Gray's Landing's 209 affordable apartments, 42 are reserved for low-income veterans. *Id.* ¶¶ 37–38. Gray's Landing is home to people of all ages and backgrounds—16% of the 237 individuals living there identify as disabled; 5% are children under six years old; and 30% are age 63 or older. *Id.* ¶¶ 37, 39. All residents must have an income that is less than 60% of the Area Median Income. *Id.* ¶ 37. Some residents must meet

---

[1] REACH Community Development is the property manager at Gray's Landing, and two wholly owned subsidiaries, REACHB49 Partners LP and REACH Office LLC (collectively with REACH Community Development, the "REACH Plaintiffs"), own the residential and commercial spaces within Gray's Landing respectively. REACH B49 Partners LP also owns the lot upon which Gray's Landing sits. Am. Compl. ¶¶ 19–21.

*Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss*                    3

stricter income criteria because their units receive Section 8 housing assistance. *See id.* Roughly

33% of residents receive some form of rental subsidy to live in the building. *Id.* ¶ 38.

Gray's Landing sits kitty-corner from the Portland ICE facility, at the intersection of S.

Moody Avenue and Bancroft Street. *See id.* ¶ 43 (image). The southwest corner of Gray's

Landing, where Plaintiffs Jane Doe and Whitfield Taylor and his daughters live, is closest to the

ICE facility, less than 100 feet away. *See id.* ¶¶ 10, 12, 43 (image); Gray's Landing has an

outdoor, U-shaped courtyard that many apartments overlook, including those of Plaintiffs Janice

Lineberger, Mindy King, Diane Moreno, Erica del Nigro and her son J.D., and Rebecca Roe. *Id.*

¶¶ 11, 14–15, 17–18, 43 (image), 74, 89.[2]

### B. Defendants Discharge Chemical Munitions Towards Gray's Landing in the Face of Generally Non-Violent Protests

The Portland ICE facility next to Gray's Landing has been the scene of protests since at

least early June 2025. *Id.* ¶ 45. The protests occurred nearly every day at one point during the

summer, and although protest sizes have ebbed and flowed since, significant crowds have

continued to gather in response to political developments or other newsworthy events. *Id.* For

example, protests swelled in the first weeks of October after the President announced he would

be deploying the National Guard to Portland, and during the October 18, 2025 "No Kings"

protests.[3] *Id.* Protests of various sizes continue to this day in response to national events,

including the shooting of Alex Pretti in Minnesota in January 2026. *Id.* Protesters generally

congregate near the north driveway to the ICE facility, on Bancroft Street, and continue down

Bancroft Street running east, directly in front of the south side of Gray's Landing. *Id.* ¶ 46.

---

[2] After Plaintiffs filed their Amended Complaint and the Court entered the preliminary injunction, Plaintiff Roe vacated her apartment in Gray's Landing. Plaintiff King intends to vacate her apartment within the next few weeks.

[3] *See* Findings of Fact and Conclusions of Law at 21–23, *Dickinson v. Trump*, No. 3:25-cv-1756-IM (D. Or. Nov. 7, 2025), Dkt. No. 146 (incorporated in Am. Compl. ¶ 45 n.1).

In the vast majority of instances where Defendants have used tear gas and other chemical munitions, the protesters have been non-violent.[4] *Id.* ¶ 49. Another judge of this Court, in ruling that the deployment of the National Guard to Portland was unlawful, concluded: "the trial record showed that although protests outside the Portland ICE building occurred nightly between June and October 2025, ever since a few particularly disruptive days in mid-June, protests have remained peaceful with only isolated and sporadic instances of violence. The occasional interference to federal officers has been minimal, and there is no evidence that these small-scale protests have significantly impeded the execution of any immigration laws."[5]

Despite the non-violent nature of most of the protests, federal officers (including at various times agents from ICE, FPS, CBP, and Secret Service) have consistently and indiscriminately shot tear gas, smoke grenades, pepper balls, and other projectile chemical munitions from the street and from multiple levels of the ICE building, often shooting directly toward Gray's Landing. *Id.* ¶¶ 50–52. Plaintiffs to this action who are residents of Gray's Landing (the "Resident Plaintiffs") have witnessed—and in some cases videotaped—the moments when federal officers begin using tear gas and other chemical munitions on a given night. *E.g.*, Am. Compl. ¶¶ 11, 53–56. Officers have used chemical munitions on occasions when as few as a dozen protesters were present, Taylor Decl. ¶ 4, Am. Compl. ¶ 56, solely because a protester walked close to, or stuck a toe over, a blue line at the end of the driveway to the ICE facility, Doe Decl. ¶ 6; Am. Compl. ¶ 54, or when protesters were simply chanting loudly or using profanity, Am. Compl. ¶ 54. Defendants continued to use chemical munitions after

---

[4] *See* Findings of Fact and Conclusions of Law at 29, *Dickinson*, No. 3:25-cv-1756-IM.
[5] Findings of Fact and Conclusions of Law at 78, *Dickinson*, No. 3:25-cv-1756-IM.

Plaintiffs filed their initial complaint and moved for preliminary relief, when there could be no question that Defendants were on notice of Plaintiffs' injuries. *Id.* ¶¶ 69–73; *see* PI Op. 51–52.

Defendants have also deployed chemical munitions next to Plaintiffs' homes for propaganda purposes. Am. Compl. ¶¶ 62–68. On September 27, President Trump announced that he was "directing Secretary of War, Pete Hegseth, to deploy all necessary Troops to protect War ravaged Portland." *Id.* ¶ 61. Several days later, the President again described Portland as "war ravaged" and painted it in apocalyptic terms. *Id.* In the weeks that immediately followed, DHS hosted and gave roof-top access to a number of conservative "influencers" to photograph and film the purported chaos outside the ICE facility, in a patent effort to create propaganda to support the President's assertions. *Id.* ¶ 62. Defendants repeatedly used tear gas, smoke grenades, pepper balls, and other chemical agents, while conservative influencers filmed from the ICE facility. *Id.* ¶ 64. The Government used the influencers' footage to produce propaganda. Jacobson Decl., Ex. 28.

During the afternoon of October 4, influencers were watching as a relatively small crowd of protesters assembled outside the ICE facility. King Decl., Ex. 1. Defendants nonetheless flew *Black Hawk helicopters* overhead, and they then suddenly deployed tear gas and smoke grenades at the crowd. King Decl., Ex. 1. Federal officers seemingly targeted Plaintiff Mindy King herself, while she was filming officers' use of tear gas from her apartment in Gray's Landing. Am. Compl. ¶ 57. King frequently videotapes and livestreams events at the ICE facility, and officers had previously shined flashlights at her while she was filming, demonstrating that the officers knew of her filming activities. *Id.* In the afternoon of October 4, moments after officers began shooting tear gas from the ICE facility, an officer standing far away on the street up Bancroft shot a projectile tear gas canister that landed near King's apartment. *Id.* There was little to no

crowd in proximity to King's apartment at the time. *Id.* Officers thus targeted King's unit directly with the long-range tear gas canister they shot. *Id.*

Defendants escalated their use of gas and smoke later that day, in an incident that was patently for show. On the evening of October 4, federal law enforcement slowly pushed protesters east down Bancroft Street, forming a line in front of Gray's Landing. Am. Compl. ¶¶ 58, 66–67. This movement was unprecedented. *Id.* ¶ 66. Onsite Oregon Public Broadcasting reporters likewise described the officers' actions as atypical. *Id.* ¶ 58 n.6. According to their report, the "[f]ederal officers were flanked by videographers, toting professional equipment and wearing high-visibility vests." Troy Brynelson & Alex Zielinski, *Federal tactics on Portland protesters escalate, hours after judge rules against Trump*, Or. Public Broadcasting (Oct. 5, 2025), https://perma.cc/LSR3-3WWB (incorporated by reference in Amended Complaint ¶ 58 n.6). The videographers "filmed from behind the lines of officers, capturing the show of force," while "[a]t least two drones swept over the scenes." *Id.*

Once the officers had pushed the protesters to the corner of Bancroft Street and South Bond Avenue, outside the southeast corner of Gray's Landing, the officers took "a pause," and then "dropped tear gas and other chemical munitions at protesters' feet and legs." *Id.* "Officers then marched back to the ICE building in a similar, stuttered fashion, punctuating each stop with gas and volleys of pepper balls." *Id.* Meanwhile, "[o]fficers similarly pushed a group of protesters and other people northbound through South Moody Avenue." *Id.* The gas released by officers this night flooded Gray's Landing, filling its hallways and common areas, and pouring into apartments, causing residents substantial breathing difficulties. *See* Am. Compl. ¶¶ 66–67, 88. Plaintiff Diane Moreno was trying to flee the tear gas in her apartment when Defendants

chased protesters toward her a block away from the ICE facility, hitting her with rubber bullets and tear gassing her to the point she was left vomiting on the side of the road. Moreno Decl. ¶ 9.

### C.    Federal Officers Have Targeted Individuals with Chemical Munitions

Defendants have also used chemical munitions to disable, disorient, and otherwise harm protesters, rather than to merely disperse them. Am. Compl. ¶ 55. Plaintiffs have personally observed Defendants' officers using chemical munitions against non-violent protesters in ways that go far beyond dispersal. *Id*. Plaintiff Rebecca Roe has taken videos and photos of officers using chemical munitions at close range, for reasons other than to merely disperse the protesters. *See* Roe Decl., Exs. 8, 10, 11, 12, 16, 18.

Several examples of officers specifically targeting individuals with tear gas and other chemical sprays, to harm rather than disperse them, have been widely reported, including:

- In June, officers shot tear gas canisters through the *closed* gate of the ICE Facility and hit a nurse in the face, crushing his eye and concussing him. Am. Compl. ¶ 142.[6]

- On October 2, an officer sprayed a chemical spray in two protesters' faces from less than five feet away, even though the protesters were only yelling at the officers. Am. Compl. ¶ 56.[7]

---

[6] A.C. Thompson & J. David McSwane, *Trump's Immigration Forces Deploy "Less Lethal" Weapons in Dangerous Ways, Skirting Rules and Maiming Protesters*, ProPublica (Nov. 25, 2025), https://perma.cc/4JQ8-L47N (incorporated by reference in Amended Complaint ¶ 142 n.31).

[7] Iboshi, Kyle, *Did federal officers cross the line at Portland's ICE facility?*, KGW (Nov 17, 2025), https://perma.cc/BT6F-NNF2 (incorporated by reference in Amended Complaint ¶ 56 n.5).

*Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss*                                              8

- On October 11, Defendants encountered peaceful protesters and deployed tear gas and pepper balls with the intent to temporarily disable them. Am. Compl. ¶ 59. Before law enforcement exited the Portland ICE building, protesters had been dancing. *Id.*[8]

- Around this time, an officer sprayed the air vent of a protester's inflatable frog suit from just a foot away. *Id.* ¶ 142.[9]

- On October 4, 2025, as described above, federal officers targeted Plaintiff Mindy King herself.

**D.    Chemical Munitions Enter Gray's Landing, Injuring Plaintiffs**

Given Gray's Landing's proximity to the ICE facility, chemical agents have predictably infiltrated Gray's Landing seemingly every day that Defendants have used tear gas or other chemical agents in mass volume. *Id.* ¶ 2. Indeed, Defendants have fired chemical munitions that have directly hit Gray's Landing apartments or the building's central courtyard, and Gray's Landing occupants have found tear gas canisters, pepper balls, and other munitions on the sidewalks next to their building, on their balconies, in the building parking garage, and in the building courtyard. *Id.* ¶ 50.

Gray's Landing residents, including Plaintiffs, have incurred significant physical and psychological injuries from the sustained exposure to tear gas and other chemical munitions. *Id.* ¶ 80. Federal agents' use of flashbangs and tear gas has triggered episodes of PTSD for Jane Doe, a survivor of domestic violence who was once shot in the head by her abuser. *Id.* ¶¶ 12, 86; Doe Decl. ¶¶ 3, 7. On multiple occasions, Doe has fled to her closet in fear and urinated on

---

[8] *Portland Oregon Ice Building Protest Antifa vs Vellyray* (YouTube, Oct. 11, 2025), https://perma.cc/8V8L-XQ3R (video beginning around 1 hour and 26 minute mark) (incorporated by reference in Amended Complaint ¶ 59 n.7).
[9] *ICE agent pepper-sprays frog-suited protester*, YouTube (Oct. 5, 2025), https://perma.cc/4CTR-YRRE (incorporated by reference in Amended Complaint ¶ 142 n.30).

herself as a reaction to the triggering of her PTSD. Am. Compl. ¶ 86. Doe, who lives on the southwest corner of Gray's Landing closest to the ICE facility, has had tear gas fill her apartment on a sustained basis, including several particularly severe episodes. Am. Compl. ¶ 12, 86. Doe lives with her daughter, who lost a pregnancy after Defendants began routinely using tear gas outside their apartment. Doe Decl. ¶ 2. On one occasion in July 2025, when tear gas filled Doe's apartment, the gas masks she had purchased did not protect her or her family and the gas was so invasive that chemicals got into Doe's food and left a green residue on Doe's window screens. Doe Decl. ¶ 8. After this and similar incidents, Doe has been left crying, struggling to breathe, and with her home and belongings full of gas. Am. Compl. ¶ 86; Doe Decl. ¶¶ 8–9.

More recently, tear gas entered Doe's apartment on January 24, 2026. Doe Decl. ¶¶ 11–12. The chemicals were so intense that they forced Doe from her living room and kitchen. *Id.* ¶ 11. Doe slept in her closet that night, and Doe's "daughter slept in [the] bathtub to attempt to avoid the gas." *Id.* ¶¶ 11–12. Just as she had experienced in the summer and fall of 2025, Doe developed an itchy throat, watery eyes, and cough that lasted for days. *Id.* ¶¶ 12, 14. Doe's "symptoms have gotten worse after each exposure." *Id.* ¶ 14. And just as in July 2025, the food and drink that was out in Doe's kitchen was contaminated by the tear gas. *Id.* ¶ 12.

Tear gas and other chemical odors have also infiltrated Susan Dooley's apartment on a consistent basis. Am. Compl. ¶ 87. Dooley has suffered from dizziness, shortness of breath, sleep deprivation, and aggravations to her existing asthma due to exposure to the chemicals federal agents have released. *Id.*; Dooley Decl. ¶ 5. When Dooley went to her doctors at the VA in November, the doctor immediately sent her to the emergency room, where doctors found that her blood oxygen saturation was low due to difficulty breathing after gas exposure and diagnosed her with mild heart failure. Am. Compl. ¶ 87; Dooley Decl. ¶ 5. Dooley fell four times in October,

and even today feels disoriented and slurs her words when speaking. Am. Compl. ¶ 87; Dooley Decl. ¶¶ 5, 8. These new symptoms only developed after Defendants began releasing gas and chemicals outside of Dooley's home. *See* Am. Compl. ¶ 87; Dooley Decl. ¶ 8.

Whitfield Taylor and his children, who also live at the southwest corner of the complex closest to the ICE facility, are often unable to sleep due to the chemicals, flashbangs, and bright lights outside of their apartment. Am. Compl. ¶ 85; Taylor Decl. ¶ 6. Despite Whitfield's best efforts to seal his windows and doors, chemicals have frequently entered the apartment and burned his family's eyes and caused severe throat irritation. Am. Compl. ¶ 85; Taylor Decl. ¶ 6. Whitfield has taken his daughters to urgent care given these symptoms, and his daughters began sleeping at times in the closet of his bedroom to feel some sense of safety from federal officers' activities outside their window. Am. Compl. ¶ 85; Taylor Decl. ¶ 7.

Janice Lineberger has had difficulty breathing and had itchiness on her eyes, scalp, and face. Am. Compl. ¶ 89; Lineberger Decl. ¶ 6. Even after showering following an exposure in the Gray's Landing parking garage, Lineberger continued to feel ill. Lineberger Decl. ¶ 6; *see* Am. Compl. ¶ 89. Lineberger's voice has permanently changed since before federal agents began using chemical munitions, Am. Compl. ¶ 89—her "voice is now very gravely, as if [she] was a chain smoker." Lineberger Decl. ¶ 7. Lineberger observed Defendants fire tear gas at least six times on January 24, 2026, and she declares that after the gas entered her home "my voice got worse, my breathing was impaired, and I developed a significant headache." *Id.* ¶ 10. The repeated use of gas and other chemical munitions has caused Lineberger to experience severe anxiety and fear of violence outside of her home. *Id.*; *see* Am. Compl. ¶ 89.

Diane Moreno suffers from Cushing's disease, which causes overproduction of cortisol. Am. Compl. ¶ 92. The frequent exposure to tear gas in her apartment, lack of sleep, and anxiety

have driven her cortisol levels to an unprecedented and dangerous high, leading her to have one of her adrenal glands surgically removed. *Id.*; Moreno Decl. ¶¶ 4, 13, 14 . Even outside of her apartment, she is not safe: Defendants shot her several times with rubber bullets in both October and January, when she was simply walking home to her apartment or trying to leave the area. Am. Compl. ¶ 92; Moreno Decl. ¶¶ 10–11. She also suffers from respiratory problems, tightness in her chest, and serious sinus problems as a result of Defendants' tear gas, which has forced her to visit urgent care multiple times and begin using an inhaler. *Id*. ¶¶ 8–9; *see* Am. Compl. ¶ 92.

Erica del Nigro has an autoimmune syndrome called mast cell activation syndrome, which causes severe allergic reactions and other immune responses. Am. Compl. ¶ 93; Del Nigro Decl. ¶ 4. Tear gas, del Nigro now knows, is a major trigger for her autoimmune condition: she has suffered persistent respiratory issues and severe allergic reactions like a six-week long full-body rash, and developed migraines, hives, and eye inflammation after Defendants began gassing Gray's Landing again in January. Am. Compl. ¶ 93; Del Nigro Decl. ¶¶ 6–7, 10. The chemicals from the pepperballs also set off her allergies. Del Nigro Decl. ¶ 9. Her 12-year-old son J.D. has also developed chronic respiratory issues that have required treatment with multiple medications; both he and del Nigro began using inhalers regularly, even though neither of them needed to before tear gas began infiltrating their apartment. Am. Compl. ¶ 93; Del Nigro Decl. ¶ 10. J.D. has also developed serious anxiety, Am. Compl. ¶ 93, and is "often afraid to leave the apartment, not knowing if he'll be able to get back home safely," leading his doctor to place him on anxiety medication. Del Nigro Decl. ¶ 11.

Roy Brooks, who has muscular dystrophy, has suffered irreversible muscle loss. Am. Compl. ¶ 91; Brooks Decl. ¶ 6. The sleep loss from the frequent and unpredictable explosions of tear gas canisters and flashbangs have led to irreversible muscle atrophy, now leaving him

unable to transfer from his wheelchair to a standard toilet and back. Am. Compl. ¶ 91; Brooks Decl. ¶¶ 6–8. The lack of a steady sleep schedule also puts additional stress on his pulmonary and cardiovascular systems, with a potential risk for permanent and life-threatening damage. Brooks Decl. ¶ 9. Tear gas has entered his apartment repeatedly, causing coughing, a running nose, and watering eyes. Am. Compl. ¶ 91; Brooks Decl. ¶ 11. Because his apartment lacks air conditioning, over the summer he had to choose between a stiflingly hot apartment or having tear gas pour into his apartment. Am. Compl. ¶ 91; Brooks Decl. ¶ 10.

The REACH Plaintiffs have incurred significant financial expenses and harms to their core missions as a result of Defendants' use of chemical munitions. Am. Compl. ¶¶ 94, 128, 130; Salazar Decl. ¶¶ 16–23. To safeguard the health and well-being of residents and staff, the REACH Plaintiffs have, among other things, installed air scrubbing machines throughout the commercial and residential spaces; regularly replaced HVAC charcoal filters to maintain safe air quality and remove chemical residue following munitions activity; provided in-unit air purifiers for residents to improve indoor air quality; installed sticky mats at all building entrances to prevent people from bringing in chemical residue on their shoes; offered ear plugs to residents seeking noise mitigation; and hired daily safety patrols. Am. Compl. ¶¶ 94, 126; Salazar Decl. ¶ 16. The REACH Plaintiffs have spent more than $100,000 on mitigation efforts already, with future cleanup expected. Am. Compl. ¶ 94; Salazar Decl. ¶¶ 17–18. The REACH Plaintiffs face the prospect that any remediation work they undertake will need to be repeated ad infinitum, since federal officers have given no indication that they will stop using tear gas and other chemical agents near Gray's Landing absent court intervention. Salazar Decl. ¶ 18.

Defendants have known full-well that their use of tear gas and other chemical agents has harmed the inhabitants of Gray's Landing, and the officers have continued to use these munitions

anyway. Am. Compl. ¶ 76. The impact on Gray's Landing is obvious given that it is less than 100 feet away from the ICE facility. *Id.* Moreover, REACH employee Christine Piggott approached DHS officers in early July to inform them that the tear gas and chemicals were harming her and others who lived and worked at Gray's Landing. Am. Compl. ¶ 77. And, of course, Defendants knew about the harms to Plaintiffs from this lawsuit when they deployed heavy amounts of tear gas outside Plaintiffs' apartment on January 24, 2026, nearly a month after Plaintiffs had submitted sworn declarations about their injuries. Am. Compl. ¶¶ 7, 78; *see also* Dkt. 20-1 to 20-10.

### E.    Procedural Background

Plaintiffs filed this case on December 5, 2025, following months of consistent and indiscriminate use of tear gas by Defendants. Compl. for Declaratory and Inj. Relief, Dkt. 1. Plaintiffs filed an Amended Complaint on January 30, 2026 following increased use of tear gas and other chemical munitions by Defendants. Plaintiffs brought claims for relief under both the Fifth and Fourth Amendments. Am. Compl. ¶¶ 117–56. In conjunction with their complaint, Plaintiffs sought a preliminary injunction to enjoin Defendants from continuing to release chemical munitions into Gray's Landing during the pendency of this action.

Following an evidentiary hearing and after "review[ing] hundreds of pages of incident reports documenting [DHS's] use of force over the past eight months," the district court found that Plaintiffs are likely to succeed on a Fifth Amendment substantive due process claim. PI Op. 42. Defendants appealed and, on March 25, 2026, the Ninth Circuit administratively stayed the preliminary injunction. *See Reach Cmty. Dev. v. U.S. Dep't Homeland Sec.*, No. 26-1575 (9th Cir. Mar. 25, 2026), Dkt. 9.

**LEGAL STANDARD**

Where Defendants raise a facial attack under Rule 12(b)(1), the Court assumes the allegations in the complaint to be true and determines whether those allegations suffice on their face to invoke federal jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Where Defendants dispute Plaintiffs' alleged facts, the Court may look beyond the allegations in the complaint to resolve a Rule 12(b)(1) motion. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

Under Rule 12(b)(6), Plaintiffs must allege sufficient facts that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible on its face when the factual allegations allow the Court to infer the defendant's liability based on the alleged conduct." *Burtness v. Legacy Health*, No. 3:24-cv-1256-AB, 2024 WL 5168364, at *1 (D. Or. Dec. 18, 2024) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept all factual allegations as true and construe them in the light most favorable to" Plaintiffs. *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021). "[O]n a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (cleaned up).

**ARGUMENT**

**I.    Plaintiffs Have Standing**

This Court has already determined that Defendants' use of chemical munitions harmed Plaintiffs and that Plaintiffs' injuries were likely to recur. PI Op. 26–28. The factual allegations

in the Amended Complaint track the evidentiary record Plaintiffs developed during preliminary

proceedings, so Defendants' motion to dismiss for lack of standing fails for the same reasons.[10]

A plaintiff facing future injury has standing where the harm is "certainly impending, or

there is a substantial risk" it will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

(2014) (cleaned up). While a single, isolated past injury, standing alone, may not always

establish a "real and immediate" threat of repetition, *City of L.A. v. Lyons*, 461 U.S. 95, 110

(1983), the Ninth Circuit has emphasized that "the possibility of recurring injury ceases to be

speculative when actual repeated incidents are documented." *Thomas v. Cnty. of L.A.*, 978 F.2d

504, 507 (9th Cir. 1992), *as amended* (Feb. 12, 1993) (quoting *Nicacio v. INS*, 797 F.2d 700, 702

(9th Cir. 1985)). Consistent with that principle, the Ninth Circuit has held that an "ongoing,

sustained pattern of conduct" creates a non-speculative risk of future injury. *Index Newspapers

LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020).

That standard is easily met here. Plaintiffs allege (and have proven) repeated injuries

caused by Defendants' "ongoing, sustained pattern" of releasing chemical munitions

immediately adjacent to their homes. *Id.*; *see* Am. Compl. ¶¶ 84–95; *supra* Background. That is

---

[10] Defendants describe their motion to dismiss for lack of standing as a "facial" challenge but proceed to discuss Plaintiffs' evidentiary "show[ing]." Defs.' Mem. of Law in Supp. of Mot. to Dismiss 8, Dkt. 83 ("MTD"). Plaintiffs provide citations to the allegations in the Amended Complaint, as well as evidence submitted during preliminary proceedings in this case as relevant to Defendants' arguments that Plaintiffs lack standing. Though the Court can deny Defendants' motion entirely based on the pleadings without resolving any disputed facts, *see Safe Air for Everyone*, 373 F.3d at 1039, the Court may also rely on evidence that Plaintiffs have submitted in resolving a Rule 12(b)(1) motion. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."); *Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 882 (9th Cir. 2001) (to determine standing, the court may consider "all material allegations of the complaint and any other particularized allegations of fact, in affidavits or in amendments to the complaint" (citing *Warth*, 422 U.S. at 501)).

true both for the Resident Plaintiffs, who have suffered extreme physical and psychological harms from repeated gassing in their homes, Am. Compl. ¶¶ 84–93, 95, and for the REACH Plaintiffs, whose property has been repeatedly contaminated, *id.* ¶¶ 94–95. And Plaintiffs more than plausibly allege (and indeed, the evidence demonstrates) that Defendants are likely to continue that harmful conduct in response to recurring protests outside of the ICE facility. *Id.* ¶ 146; *see id.* ¶¶ 133–42; *see also* PI Op. 27 ("Defendants' use of chemical munitions [] is not only likely to happen again; it did.").

Defendants attempt to minimize the risks to Gray's Landing residents from their conduct. They claim that, even when they deploy gas outside the ICE facility, any exposure to Plaintiffs depends on a "speculative chain of possibilities." MTD 9. But it is hardly "speculative" that the gas Defendants deploy outside the ICE facility will reach Gray's Landing and Resident Plaintiffs who live right next to the facility. It is inevitable.

That is because Plaintiffs' apartments and property are located in a fixed location immediately adjacent to a fixed ICE facility, and there is no genuine dispute that protests at that fixed location regularly recur and that Defendants repeatedly respond by deploying chemical munitions in a manner that predictably harms them. *See supra* Background. For instance, Plaintiffs Whitfield Taylor and his young daughters live less than 100 feet from the ICE driveway, at the corner of Moody Avenue and Bancroft Street, and are even closer to where Defendants routinely have deployed chemical munitions in and around the intersection of those streets. Am. Compl. ¶ 10; *see also id.* ¶ 12 (Jane Doe's unit also faces Bancroft Street). Defendants have also repeatedly shot, thrown, or dropped tear gas canisters down Bancroft Street, *id.* ¶¶ 50, 74, 89, and next to the Gray's Landing courtyard, which the apartments of

Janice Lineberger, Diane Moreno, Erica del Nigro and her son J.D. face, *id.* ¶¶ 14–15, 17–18.[11]

*See, e.g.,* King Decl., Ex. 1; Roe Decl., Ex. 16; *see also* Salazar Decl., Ex. 21. Even for residents who live up Moody Avenue, the massive volume of gas that Defendants deploy outside the facility regularly infiltrates their units, because the wind in the area predominantly blows north. *See* Am. Compl. ¶¶ 16, 91; Brooks Decl. ¶ 4; Supp. Brooks Decl. ¶ 6.[12] Thus, one need not speculate whether the gas and smoke that Defendants release will enter Gray's Landing and harm Plaintiffs. The poison gas that Defendants release predictably invades Plaintiffs' homes and property, causing severe injuries and trauma. That is more than enough to establish standing at the pleadings stage.

For these reasons, Defendants' reliance on *Lyons*, 461 U.S. at 105–08, and Justice Kavanaugh's solo concurrence in *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025), is misplaced. MTD 7–9. In *Lyons*, the Supreme Court explained that an individual plaintiff's one-time interaction with law enforcement "does nothing to establish a real and immediate threat" that he would "again be stopped for a traffic violation, or for any other offense," and then subjected to another unconstitutional chokehold. 461 U.S. at 105, 108. Likewise, in *Vasquez Perdomo*, Justice Kavanaugh reasoned that "plaintiffs have no good basis to believe that law enforcement [would] unlawfully stop *them* in the future," so any future harm was speculative. 146 S. Ct. at 2 (Kavanaugh, J., concurring).

---

[11] After Plaintiffs filed their Amended Complaint, Defendants shot a tear gas munition that directly hit and broke the window of a Gray's Landing apartment. Troy Brynelson, *Yemeni mother and daughter shaken after apartment window broken by projectile near Portland ICE building,* Or. Pub. Broad. (Feb. 5, 2026), https://perma.cc/K7XB-2UN9, admitted as Exhibit 72.

[12] For example, Exhibit 54 shows tear gas that originates outside the ICE driveway and then within a few minutes envelops Plaintiff Roy Brooks' apartment. Brooks Suppl. Decl., Ex. 54; *see also id.*, Exs. 52–53. And Exhibits 62 through 69 show individuals inside Gray's Landing suffering the effects of tear gas exposure. Suppl. Decl. of Margaret Salazar, Exs. 62–69.

*Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss*

Here, by contrast, Plaintiffs are not asking the Court to speculate about whether they will again cross paths with DHS officers at some unknown future time and place. For as long as the ICE facility remains located next to Gray's Landing, Defendants' use of chemical munitions outside the ICE facility will continue to invade Plaintiffs' homes and bodies, causing serious harm. Plaintiffs' threatened future injury therefore does not depend on a chain of speculation about the happenstance of a future individualized stop; it flows from an ongoing practice repeatedly deployed at the same place, under recurring conditions, immediately next to Plaintiffs' homes and property. *See* PI Op. 27–28.

## II.     The Amended Complaint States a Fifth Amendment Claim

Plaintiffs have pleaded constitutionally protected liberty and property interests in being free from Defendants' repeated invasions of their bodies and property with tear gas, smoke grenades, pepperballs, and other chemical agents deployed in and around Gray's Landing. And Defendants remarkably do not contest that the facts alleged in the Amended Complaint, if proven, would demonstrate that Defendants' conduct shocks the conscience. Plaintiffs therefore have stated a substantive due process claim under the Fifth Amendment.

### A.     Plaintiffs Have Pleaded an Infringement of Their Right to Bodily Integrity

**1.** This Court has already held that Plaintiffs have stated a cognizable infringement of their right to bodily integrity resulting from Defendants' repeated use of chemical munitions with deliberate indifference to the harms they cause Plaintiffs. In granting Plaintiffs' preliminary injunction motion, the Court recounted the long "line of cases [that] establishes the history and legal tradition of courts recognizing the right to bodily integrity as fundamental and implicit in the concept of liberty *and* exemplifies the wide variety of factual scenarios in which courts have found the right to be cognizable under the Due Process Clause." PI Op. 32 (citing cases). Of particular relevance here, the Court cited the Flint water-contamination litigation, in which the

Sixth Circuit held that "a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent." *Guertin v. Michigan*, 912 F.3d 907, 921 (6th Cir. 2019).

The Court then made a series of specific factual findings to conclude that DHS's knowing release of toxic chemicals into Plaintiffs' homes and bodies represented "a cognizable deprivation of the constitutional right to bodily integrity." PI Op. 37; *see id.* at 33–35. "Inherent in that ruling is a finding that plaintiffs have pleaded plausible claims." *Poe ex rel. Poe v. Labrador*, 709 F. Supp. 3d 1169, 1189 (D. Idaho 2023); *see Karnoski v. Trump*, No. 17-cv-1297, 2017 WL 6311305, at *7 (W.D. Wash. Dec. 11, 2017) ("Plaintiffs have established a likelihood of success on the merits with regard to each of these claims, and for the same reasons, these claims survive under Rule 12(b)(6)." (citation omitted)). Simply put, the Amended Complaint *alleges* the same facts that the Court *found* in granting the preliminary injunction.

*First*, the Court found that, "on multiple occasions over the past eight months, Defendants have deployed chemical munitions that entered the Resident Plaintiffs' homes and their bodies, causing harm." PI Op. 33. Plaintiffs allege these episodes in detail through January 30, 2026 (the date of the filing of the Amended Complaint). *See* Am. Compl. ¶¶ 50–97. The Court made further findings based on Defendants' conduct on January 31 and February 1, which postdate the Amended Complaint. *See, e.g.*, PI Op. 21–25.

*Second*, the Court found that "Resident Plaintiffs have suffered harm from the chemical munitions despite their efforts to mitigate the damage." PI Op. 34. Plaintiffs allege those harms in detail, and they supported their allegations with unrebutted evidence in their preliminary injunction motion. *See* Am. Compl. ¶¶ 74–97; Pls.' Superseding Mot. for Prelim. Inj. 40–43, Dkt. 46 (citing evidence); *see also supra* Section I.

*Third*, the Court found that "Defendants have used chemical munitions in such quantities so as to create clouds of chemical gas that envelope Gray's Landing and enter the Resident Plaintiffs' homes." PI Op. 34. Plaintiffs allege these facts in detail, including pictures of several gas clouds that enveloped the building and entered their homes. *See, e.g.*, Am. Compl. ¶¶ 66–67, 69–70, 72. The Court also reviewed extensive video evidence in entering the preliminary injunction. *See* PI Op. 9–25.

*Fourth*, the Court found that "Defendants were specifically notified of the harm that their widescale deployments of chemical munitions were having on the Resident Plaintiffs, but Defendants chose to use chemical munitions anyway, often in large quantities." PI Op. 34. Plaintiffs allege that Defendants were on notice of the harms they were causing Plaintiffs. *See* Am. Compl. ¶¶ 76–78.

*Fifth*, the Court found—based on evidence submitted by Defendants—that "Defendants were further advised based on the content of the various agencies' Use of Force Manuals as to the health impacts of widescale chemical munitions on people such as the Resident Plaintiffs." PI Op. 35. Plaintiffs did not have access to that evidence when they filed their Amended Complaint, but they did identify similar guidance issued by the Centers for Disease Control. *See* Am. Compl. ¶¶ 106–16.

*Sixth*, the Court found that "chemical munitions inside and outside of Gray's Landing limit the Resident Plaintiffs' ability to move about, making it difficult or impossible for them to eat, sleep, or simply breathe normally while in their own homes." PI Op. 35. Again, Plaintiffs allege these facts in detail. *See, e.g.*, Am. Compl. ¶¶ 75, 83, 85–93, 122.

Just as the Court's factual findings supported the more demanding preliminary-injunction standard, the Amended Complaint's factual allegations satisfy Rule 12(b)(6)'s lower plausibility threshold.

**2.** Defendants' arguments for dismissal largely rehash arguments that the Court already rejected in entering the preliminary injunction. *See* PI Op. 35–37.

As before, Defendants' lead argument on the merits is that Plaintiffs have suffered only "incidental effects" from DHS's use of chemical munitions "against third-party protesters," so their claims are foreclosed by *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980). MTD 12–13. The Court already rejected that argument. PI Op. 36. *O'Bannon* held only that nursing home patients had no procedural due process right to participate in an administrative hearing regarding whether to decertify the business that ran the facility. *See id.* The Court's "indirect effects" language addressed only whether patients had a procedural right to intervene in a regulatory proceeding—nothing more.

This case is categorically different. Plaintiffs do not challenge a regulatory decision aimed at someone else that has downstream consequences for them. They challenge DHS's deliberate indifference in firing chemical munitions in volumes that directly harm them, by predictably saturating their apartments, invading their bodies, and causing documented, serious physical injuries. *See id.* at 40. Plaintiffs, in other words, challenge DHS's deliberate indifference *toward Plaintiffs' own injuries*. Plaintiffs, unlike the *O'Bannon* plaintiffs, are the object of Defendants' deliberately indifferent conduct.

Defendants' position that Plaintiffs cannot assert their own substantive due process rights in these circumstances runs counter to the premise of the deliberate indifference doctrine, which is that an official's conduct need not intentionally target or harm the plaintiff to violate

substantive due process. *See Guertin*, 912 F.3d at 922–28; *Ziglar v. Abbasi*, 582 U.S. 120, 146–47 (2017). But even if Plaintiffs were considered "bystanders" incidentally impacted by weapons deployed against others, binding precedent would still foreclose Defendants' argument. In *Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 977–80 (9th Cir. 2025), *cert. denied*, 2026 WL 568296 (U.S. Mar. 2, 2025), the Ninth Circuit held that a bystander may assert a substantive due process claim where conduct targeted at another person injures the bystander. The court of appeals found "no reason to think that conduct is any less shocking when it injures someone other than the intended target, particularly when harm to a third party is a clear, known risk and is entirely foreseeable." *Id.* at 980.

Defendants' other arguments fare no better. They attempt to cabin the right to bodily integrity to "nonconsensual medical procedures and treatment." MTD 15. But the Ninth Circuit has squarely held that a person's right to bodily integrity may be violated outside of medical contexts. *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). And other courts of appeals have likewise held that "[p]hysical force is not a requirement of a violation of the right to bodily integrity." *Tyson v. Sabine*, 42 F.4th 508, 518 (5th Cir. 2022); *see, e.g.*, *Guertin*, 912 F.3d 907.

Defendants cite *Foli v. Metropolitan Water District of Southern California*, 592 F. App'x 634 (9th Cir. 2015) (unpublished), as a binding "holding" of the Ninth Circuit without disclosing that it is an unpublished, non-precedential memorandum disposition. MTD 16. Regardless, *Foli* supports Plaintiffs. The court of appeals distinguished fluoridated municipal water, which residents can decline to drink, from forced bodily intrusion that triggers constitutional protection. 592 F. App'x at 635. Here, Plaintiffs cannot avoid breathing toxic gases forcibly released into their own homes. That makes this case more like *Guertin*, where the plaintiffs could not easily

avoid being poisoned because they were unaware of the lead in the water supply. Defendants assert that "*Guertin* does not apply here" because the Sixth Circuit considered the challenged government conduct—knowingly permitting lead to contaminate the city's water supply—to be "analogous to nonconsensual medical treatment." MTD 16. But the same analogy can be drawn here. Defendants offer no meaningful distinction between the City of Flint releasing poisonous water knowing it would enter its residents' stomachs and DHS releasing poisonous gas knowing it will enter Plaintiffs' lungs.

Defendants assert that other courts have "rejected" claims like Plaintiffs', but their out-of-circuit cases (at MTD 16) provide no support. None of those cases involved the intentional and repeated deployment of harmful chemical munitions by government agents directly adjacent to (or targeting) residences. Rather, in every case, the emissions at issue were made by *private* parties, not government agents; the alleged harms involved generalized exposure risks affecting broad populations over long periods of time; and the claims amounted to generalized complaints about pollution, secondhand smoke, or the environment more broadly. *See Tanner v. Armco Steel Corp.*, 340 F. Supp. 532, 534, 536–37 (S.D. Tex. 1972) ("air pollutants emitted by defendants' petroleum refineries"); *Gasper v. Louisiana Stadium & Exposition Dist.*, 418 F. Supp. 716, 721–22 (E.D. La. 1976), *aff'd,* 577 F.2d 897 (5th Cir. 1978) (secondhand smoke); *In re Agent Orange Prod. Liab. Litig.*, 475 F. Supp. 928, 933–34 (E.D.N.Y. 1979) ("constitutional right to a healthful environment"). Simply put, each of those cases involved a different type of exposure, a different type of harm, and a different type of government action (if any) than that at issue here.

**3.** The Court should also deny the motion to dismiss Plaintiffs' bodily integrity claim on an independent basis that the Court did not reach in granting the preliminary injunction and that the pending appeal therefore does not implicate. As an alternative ground that Defendants'

actions violate substantive due process, Plaintiffs allege—and Defendants do not dispute in their motion—that Defendants have acted with purpose to harm protesters, by intentionally deploying chemical munitions into the bodies of *protesters*, with the goal of immobilizing, injuring, or otherwise harming them, rather than for a legitimate law enforcement interest. Am. Compl. ¶¶ 50–73, 140–44. For instance, Plaintiffs allege—again without dispute at the pleading stage—that Defendants intentionally released chemical munitions at protesters who posed no threat, as retaliation against protesters and journalists, or to create political propaganda for social media. *Id.* ¶¶ 56, 59, 62–68, 142, 145, 153. Defendants do not argue in their motion that the Amended Complaint fails to allege facts demonstrating that Defendants acted without a legitimate law enforcement purpose.

Defendants do not deny that their intentional use of chemical munitions in this manner implicates the right to bodily integrity of the *targets* of the chemical munitions. Nor could Defendants reasonably dispute this proposition—if the government locked a person in a sealed room and intentionally pumped tear gas into it, that would obviously be an invasion of the person's right to bodily integrity. Under *Abdelaziz*, Plaintiffs may assert violations of their own right to bodily integrity in these circumstances. Where, as Plaintiffs plausibly allege, Defendants intentionally released tear gas and other chemical munitions into protesters' bodies with purpose to harm them, the prospect that the gas and chemicals would invade Plaintiffs' bodies and harm Plaintiffs was "a clear, known risk" that was "entirely foreseeable." 137 F.4th at 980. These factual allegations thus independently support Plaintiffs' bodily integrity claim regardless of how the Court (or the Ninth Circuit) resolves Plaintiffs' bodily integrity based on deliberate indifference.

**B.    Plaintiffs Have Pleaded an Infringement of Their Right to Freedom of Movement**

Independent of their right to bodily integrity, Plaintiffs have also sufficiently pleaded that Defendants are infringing their right to free movement. *See Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 944–45 (9th Cir. 1997) (describing "fundamental right of free movement"); *Williams v. Fears*, 179 U.S. 270, 274 (1900) (recognizing "right to remove from one place to another according to inclination" as "an attribute of personal liberty"); *City of Chicago v. Morales*, 527 U.S. 41, 53–55 (1999) (plurality op.) (similar). By repeatedly deploying chemical munitions in a manner that foreseeably infiltrates Plaintiffs' residences and property, Defendants have made it unsafe for residents to walk around their own homes, sleep in their own beds, and use their own common areas—confining them and stripping them of ordinary, safe freedom of movement in and around their residences. Defendants' actions have forced Resident Plaintiffs to confine themselves in enclosed spaces—placing towels under doors, sealing windows and keeping them closed even in hot weather, sleeping in bathtubs, wearing gas masks inside and to sleep, abandoning ordinary use of patios and common areas, and avoiding going outside at night altogether. *See* Am. Compl. ¶¶ 5, 75, 85, 91, 122, 152. Plaintiffs A.T. and B.T. have been forced to hide, and even sleep, in their father's closet. *See id.* ¶¶ 5, 85.

Defendants attempt to cabin the right to movement to ordinances regulating interstate travel and imposing juvenile curfews. *See* MTD 17. But the right to liberty of movement is not limited to interstate travel or going outside at night. *See, e.g.*, *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002) (holding statute excluding those convicted of drug offenses from specified "drug exclusion zones" because "the right to travel locally through public spaces and roadways enjoys a unique and protected place in our national heritage"); *Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3d Cir. 1990) (holding that "the right to move freely about one's

neighborhood or town, even by automobile, is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history'"); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) ("It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state.").

### C.    The REACH Plaintiffs Have Pleaded an Infringement of their Liberty

Defendants do not contend in their motion that the REACH Plaintiffs fail to state a claim for violations of their substantive due process liberty interests. Plaintiffs specifically pleaded that Defendants' conduct has violated the REACH Plaintiffs' liberty rights, Am. Compl. ¶ 128, and Defendants have waived any argument for dismissing this claim under Rule 12(b)(6). *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (noting that "arguments raised for the first time in a reply brief are waived"); Op. & Order at 3 n.1, *McFalls v. Perdue*, No. 3:16-cv-2116-SI (D. Or. Feb. 8, 2018) (declining to consider arguments presented in reply on motion to dismiss because "[t]he Court … only considers arguments that Defendants present in their opening motion").

In any event, the REACH Plaintiffs have plausibly stated this claim. The REACH Plaintiffs possess a protected liberty interest in being free from government conduct that impairs their ability to conduct business, advance their mission, and maintain their relationships with the people and community they serve. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–63 (1958); *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003); *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 917–18 & n.4 (2d Cir. 1989).

The Amended Complaint alleges facts demonstrating that these interests are being infringed here. REACH CDC is a nonprofit community development organization whose mission is to create equitable access to quality, affordable housing and supportive services for

vulnerable populations. Am. Compl. ¶ 128. To carry out that mission, REACH located its corporate headquarters within Gray's Landing's commercial space, including on-site property management and resident services offices, so that staff could be physically present with and accessible to the residents they serve. *Id.* Defendants' repeated deployment of chemical munitions in and around Gray's Landing has contaminated those offices, forced evacuations, and substantially impaired REACH's ability to operate as an affordable housing provider. *Id.* ¶¶ 128–29. Defendants do not dispute any of this in their motion.

### D.    Plaintiffs Have Pleaded an Infringement of Their Property Rights

Finally, the Due Process Clause also protects against arbitrary government action that deprives people of "property," including the right to possess, use, and safely enjoy one's home and personal effects. *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) (describing due process as "protect[ing] [property owner's] use and possession of property from arbitrary encroachment—to minimize substantively unfair … deprivations of property" (quotations omitted)); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005) ("[A property] regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause."); *Crown Point Dev. v. City of Sun Valley*, 506 F.3d 851, 856 (9th Cir. 2007) ("explicitly" permitting a substantive due process claim "that [a] land use action lacks any substantial relation to the public health, safety, or general welfare"); *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1026 (9th Cir. 2007) (similar).

All Plaintiffs have demonstrated deprivations of their property rights.

**1.** The Resident Plaintiffs' property interests are straightforward. The right to possess and safely occupy a home is among the most sacred forms of property protected by due process. *See*

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53–54 (1993) (recognizing the weighty private interest in maintaining control over one's home and real property in due process analysis). And Defendants' repeated use of tear gas and other chemical munitions has enormously burdened Resident Plaintiffs' property interests by contaminating their homes and their personal belongings. *See, e.g.*, Am. Compl. ¶¶ 3, 95, 123.

Defendants argue that Plaintiffs have not suffered a "constitutional deprivation" of their property rights because the harms caused by Defendants' conduct are only "temporary." MTD 17–18. But no case requires Plaintiffs to have suffered a permanent deprivation of their property to state a due process claim. The Supreme Court has recognized that a property "regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle*, 544 U.S. at 542. And the Ninth Circuit has "explicitly" permitted claims "that [a] land use action lacks any substantial relation to the public health, safety, or general welfare." *Crown Point*, 506 F.3d at 856. Indeed, Defendants previously acknowledged due process claims involving "rent control" or "restricting a land owner's construction of real property." Defs.' Am. Opp'n to Pls.' Superseding Mot. for Prelim. Inj. 24, Dkt. 57. The stakes here are far higher: Resident Plaintiffs have suffered direct and persistent effects of tear gas and chemical munitions repeatedly infiltrating their homes and contaminating carpets, surfaces, and personal belongings. *See, e.g.*, Am. Compl. ¶¶ 3, 95, 123. Notably, Defendants do not contend that this alleged conduct served a legitimate government interest. Indeed, they do not dispute that their alleged conduct shocks the conscience.

Defendants are likewise wrong to rely on out-of-circuit NIMBY lawsuits, where courts rejected due process claims involving "common nuisances" caused by private industry and efforts to block construction of a homeless shelter to maintain "the quality of neighborhood life."

MTD 18 (quoting *Tri-Cnty. Concerned Citizens Ass'n v. Carr*, No. 98-cv-4184, 2001 WL 1132227, at *4 (E.D. Pa. Sep. 18, 2001), and *BAM Hist. Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983)). Again, this case involves far more grievous harms than mere "common nuisances." *Id.* To Plaintiffs' knowledge, the United States government has never before repeatedly released poison gas across an entire, densely populated city block. The egregiousness of Defendants' conduct makes the application of well-established due process principles to these novel facts more appropriate, not less.

**2.** The REACH Plaintiffs have likewise suffered deprivations of their property interests in the Gray's Landing building, grounds, and offices, and in their reputation, business relationships, and goodwill.

Defendants ignore entirely the physical harms and contamination to REACH Plaintiffs' property caused by Defendants' conduct and the expensive mitigation and cleanup measures they have been forced to undertake. Am. Compl. ¶¶ 94–95. The REACH Plaintiffs have already spent hundreds of thousands of dollars on mitigation and expect to incur more. *Id.* ¶ 94; Salazar Decl. ¶¶ 17–20. And they have been forced to "divert significant time and resources away from its mission to crisis response and remediation." Am. Compl. ¶ 130. Again, these property harms (which Defendants ignore) are far more severe than an arbitrary denial of a land-use permit. *See Crown Point*, 506 F.3d at 856. They are cognizable for the same reasons that the Resident Plaintiffs' property harms are cognizable.

Instead, Defendants focus entirely on the REACH Plaintiffs' intangible property harms (MTD 18–20), but these harms are real and cognizable too. To begin, Defendants do not dispute that the REACH Plaintiffs have a constitutionally protected property interest in their goodwill because Oregon characterizes goodwill as a property interest under state law. *See Wedges/Ledges*

*of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 61–62, 65 (9th Cir. 1994); *Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174, 1197 (D. Or. 2011) (citing cases); Or. Admin. R. 150-307-0020(1) (defining "Goodwill" as "Personal Property"). Defendants assert that "reputation" and "business relationships" are not protected property rights (*see* MTD 18–19), but the cases Defendants cite say the opposite. "Under Oregon state law, 'goodwill' generally refers to those intangible assets of a business, such as its *relationships with suppliers, customers, and employees*, as well as its location, name recognition, and *reputation*, that engender customer loyalty regardless of who works there." *Hampton v. Steen*, No. 2:12-cv-470-AA, 2017 WL 11573592, at *9 (D. Or. Nov. 13, 2017) (emphasis added) (quoting *Slater and Slater*, 245 P.3d 676, 681 (Or. Ct. App. 2010)).

Defendants assert that "Plaintiffs must establish through *specific evidence* that [their business goodwill] has a monetary 'goodwill value.'" MTD 18 (emphasis added) (quoting *Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174, 1197 (D. Or. 2011)). But in *Westwood*, the plaintiffs sought monetary damages, and the case was decided on summary judgment after the plaintiffs failed to produce any evidence of damages to support their claim. *See* 787 F. Supp. 2d at 1197. No case suggests that Plaintiffs must quantify every dollar of goodwill harm in their complaint to *plead* a constitutional claim, especially where they seek only *nonmonetary* relief.[13]

Defendants invoke *WMX Technologies, Inc. v. Miller*, 197 F.3d 367 (9th Cir. 1999), for the proposition that "damage to the reputation of a business, without more, does not rise to the level of a constitutionally protected property interest." MTD 20 (quoting *WMX Techs.*, 197 F.3d

---

[13] Defendants additionally assert that "Plaintiffs must also show a loss that is 'above and beyond their personal services and ability to generate new work.'" MTD 19 (cleaned up) (quoting *Hampton*, 2017 WL 11573592, at *9). But that is true only for "sole proprietors" offering "personal services," not large enterprises like the REACH Plaintiffs. *Hampton*, 2017 WL 11573592, at *9; *see In re Marriage of Maxwell*, 876 P.2d 811, 813 (Or. Ct. App. 1994).

at 376). But *WMX Technologies* involved only "allegedly defamatory remarks" made in an investigative report prepared by the district attorney. 197 F.3d at 370, 376. And the court's analysis was limited to the defamation context: the court was clear that its holding was based on the fact that the plaintiffs had not alleged any harm *beyond* reputational damage and that allowing the case to proceed "would constitutionalize the state law tort of defamation." *Id.* at 376. Here, by contrast, the REACH Plaintiffs allege that their business has been directly harmed by Defendants' repeated use of chemical munitions immediately adjacent to their property, which has not only physically contaminated the property but also harmed their business relationships with their tenants and others. Am. Compl. ¶¶ 94–95, 125–30. Such property harms extend far beyond the purely reputational injury alleged in *WMX Technologies*.

*        *        *

Defendants remarkably do not contest that the factual allegations in the Amended Complaint, if proven, would demonstrate that Defendants' conduct shocks the conscience. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Defendants do not dispute that they acted with deliberate indifference to the harms that their conduct is causing Plaintiffs; nor do they dispute that they acted with a purpose to harm the protesters. Accordingly, if the Court determines that Plaintiffs have stated a cognizable liberty or property interest under the Fifth Amendment, the Court should deny Defendants' motion to dismiss.

## III.    The Amended Complaint States a Fourth Amendment Claim in the Alternative

Finally, Plaintiffs have pleaded a Fourth Amendment claim solely in the alternative to their substantive due process claim. *See* Fed. R. Civ. P. 8(d)(2)–(3). The Court should permit both claims to proceed at this stage so that Plaintiffs may pursue relief under the Fourth Amendment if the record ultimately supports it.

Defendants argue that "Plaintiffs have not alleged facts showing Defendants acted with an objective *intent to restrain Plaintiffs*." MTD 10 (emphasis added). But that is not the law. "[A] seizure does not require intent to restrain a specific person"; rather, "there is a seizure as long as the officer (a) uses force, (b) with intent to restrain a person's body (even if that person is not the plaintiff)." *LaRocca v. City of Los Angeles*, No. 2:22-cv-6948, 2024 WL 1635908, at *4 (C.D. Cal. Mar. 14, 2024); *accord Cullinan v. City of Los Angeles*, 752 F. Supp. 3d 1180, 1183–84 (C.D. Cal. 2024); *Villanueva v. California*, 986 F.3d 1158, 1168–69 (9th Cir. 2021). That standard is easily met here: Plaintiffs allege facts—including specific deployments of chemical munitions against specific protesters—demonstrating that "Defendants have deployed chemical munitions not merely to disperse crowds for legitimate law enforcement purposes, but to intentionally restrain protesters, journalists, and others at or around the scene of the protests." Am. Compl. ¶ 153; *see, e.g.*, *id.* ¶¶ 55–68, 142 (documenting specific instances).

Defendants also suggest in passing that Plaintiffs have not been restrained because "crowd control devices cannot lock someone in an apartment." MTD 11. But that assertion amounts to a factual dispute, which is inappropriate at the pleadings stage. Plaintiffs allege facts demonstrating that, due to Defendants' conduct, "Plaintiffs have been unable to leave their apartments, and in some instances have had to seal themselves in their closets, bathrooms, or bedrooms." Am. Compl. ¶ 152. Specifically, "by causing gas, smoke, and other chemical munitions to fill up Plaintiffs' apartments, the common areas of Gray's Landing in hallways, stairwells, and community spaces, and the areas immediately outside the building," Defendants have "render[ed] it unsafe for Plaintiffs to leave their units or the building." *Id.* ¶ 122. Those facts plainly allege a restraint of Plaintiffs' freedom of movement in and out of their homes.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

April 24, 2026

Respectfully submitted,

*/s/Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar No. 1016621)+
Lynn D. Eisenberg (D.C. Bar No. 1017511)+
Stephen K. Wirth (D.C. Bar 1034038)+
Brian C. Rosen-Shaud (D.C. Bar No. 90042065)+
**Jacobson Lawyers Group PLLC**
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Telephone: +1 301-823-1148
Dan@jacobsonlawyersgroup.com

Darin M. Sands, OSB No. 106624
Colin Hunter, OSB No. 131161
**Bradley Bernstein Sands LLP**
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480
dsands@bradleybernstein.com
chunter@bradleybernstein.com

Taylor Jaszewski (CA Bar No. 345094)+
**Bradley Bernstein Sands LLP**
1212 Broadway, Suite 1100
Oakland, CA 94612
Telephone: +1 510-380-5801
tjaszewski@bradleybernstein.com

Brian D. Netter (D.C. Bar No. 979362)+
Jeffrey B. Dubner (D.C. Bar No. 1013399)+
Anna L. Deffebach (D.C. Bar No. 241346)+
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
bnetter@democracyforward.org
jdubner@c.democracyforward.org
adeffebach@democracyforward.org

*Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss*          34

Katie Schwartzmann (La Bar No. 30295)+
**Protect Democracy**
201 St. Charles Ave., Suite 114
New Orleans, La 70170
(202) 573-4382

+ Admitted pro hac vice

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,569 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/Daniel F. Jacobson
Daniel F. Jacobson